FILED
US DISTRICT COURT
DISTRICT OF ALASKA

2005 DEC 19  AM 10: 25

David Boies
Robert Silver
John F. Cove, Jr.
Kenneth F. Rossman IV
**BOIES, SCHILLER & FLEXNER LLP**
333 Main Street, Armonk, NY 10504
(914) 749-8200; (914) 749-8300 (fax)
dboies@bsfllp.com; rsilver@bsfllp.com
jcove@bsfllp.com; krossman@bsfllp.com

William M. Walker (SBN 8310155)
**WALKER & LEVESQUE, LLC**
731 N Street, Anchorage, AK 99501
(907) 278-7000; (907) 278-7001 (fax)
bill-wwa@ak.net

Charles E. Cole (SBN 5503004)
**LAW OFFICES OF CHARLES E. COLE**
406 Cushman Street, Fairbanks, AK 99701
(907) 452-1124; (907) 456-2523 (fax)
colelaw@att.net

*Attorneys for Plaintiff*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE ALASKA GASLINE PORT AUTHORITY, <br><br> Plaintiff, <br><br> v. <br><br> EXXONMOBIL CORPORATION, a New Jersey corporation; EXXONMOBIL ALASKA PRODUCTION, INC., a Delaware corporation; BP P.L.C., a United Kingdom corporation; and BP EXPLORATION (ALASKA) INC., a Delaware corporation, <br><br> Defendants. | **F 05 - 0026  CIV** <br> CASE NO.: <br><br><br> **COMPLAINT** <br><br> (Seeking Relief under 15 U.S.C. §§ 1, 2, 15, 18, and 26; AS 45.50.471 *et. seq.*; Common Law; Breach of Contract) <br><br> <u>DEMAND FOR JURY TRIAL</u> |

ORIGINAL

## TABLE OF CONTENTS

I.    SUMMARY OF THE ACTION ........................................................................... 1

II.   JURISDICTION, VENUE, AND COMMERCE .............................................. 8

III.  THE PARTIES.................................................................................................. 9

IV.   DEFENDANTS' ANTI-COMPETITIVE CONDUCT ...................................... 11

    A.  THE DEFENDANTS ILLEGALLY AGREED AMONG THEMSELVES NOT TO DO BUSINESS WITH THE AUTHORITY AND TO DELAY THE DEVELOPMENT AND MARKETING OF THEIR ALASKA GAS...................... 13

        1.  No Pipeline Can Be Built Without A Commitment To Supply Gas. ............ 13

        2.  Defendants Recognized That Neither Could Economically Refuse To Develop And Market Alaska Gas Unless It Knew That The Other Would Also Refuse. ....................................................................................... 13

        3.  The Defendants Have Entered Into A Series Of Express Agreements To Prevent Competition In Marketing North Slope Natural Gas And To Enforce, Support, And Facilitate Their Overall Agreement To Prevent The Development And Marketing Of Alaska Gas. ............................................... 15

    B.  IN ACCORDANCE WITH THEIR AGREEMENTS, THE DEFENDANTS HAVE STIFLED ALL POTENTIALLY COMPETITIVE PIPELINE PROPOSALS. ....... 18

        1.  Alcan/Foothills.. ................................................................................ 18

        2.  Yukon Pacific Corporation............................................................... 19

        3.  MidAmerican Energy Holdings Company..................................... 20

        4.  TransCanada. ..................................................................................... 21

    C.  THE AUTHORITY HAS PUT TOGETHER AN ALASKA NATURAL GAS PIPELINE PROJECT THAT REQUIRES ONLY A GUARANTEED SUPPLY OF GAS TO BEGIN CONSTRUCTION...................................................................... 22

    D.  AS THEY HAVE DONE WITH OTHER COMPETITORS, DEFENDANTS HAVE JOINTLY REFUSED TO NEGOTIATE WITH THE AUTHORITY ON THE SALE OF NORTH SLOPE GAS. ......................................................................... 25

E.   THE DEFENDANTS' JOINT REFUSAL TO MARKET THE VAST GAS
     RESOURCES UNDER THEIR CONTROL VIOLATES THEIR DUTY TO
     DEVELOP NORTH SLOPE GAS RESOURCES AND BRING THEM TO
     MARKET AND IS CONTRARY TO THEIR INDIVIDUAL SELF INTERESTS. 26

     1.   Duties To Develop And Market. .................................................. 26

     2.   BP's Obligation To Negotiate In Good Faith With Independent Pipeline
          Providers................................................................................. 27

     3.   The Defendants' Refusal To Deal Is Contrary To Their Self Interest In The
          Absence Of An Agreement. ....................................................... 28

     4.   The Defendants Have Failed To Develop And Market Known Natural Gas
          Resources In The Prudhoe Bay Unit. .......................................... 28

     5.   The Defendants Have Failed to Develop and Market Known Natural Gas
          Resources in the Point Thomson Unit. ......................................... 29

F.   DEFENDANTS ENTERED INTO A SERIES OF MERGERS THAT
     CONSOLIDATED THEIR CONTROL OF THE NORTH SLOPE AND
     FACILITATED THEIR ANTI-COMPETITIVE GOALS. ...................... 31

     1.   Exxon And Mobil. ..................................................................... 31

     2.   BP And Amoco. ......................................................................... 32

     3.   BP And Atlantic Richfield Co. ..................................................... 32

     4.   Other Mergers And Acquisitions. ................................................ 34

V.   RELEVANT MARKETS ......................................................................... 35

A.   MARKET FOR THE TRANSPORT OF NATURAL GAS FROM THE NORTH
     SLOPE. ...................................................................................... 36

B.   MARKET FOR THE PURCHASE OF NATURAL GAS FROM THE NORTH
     SLOPE. ...................................................................................... 37

C.   MARKET FOR THE SALE OF NATURAL GAS IN NORTH AMERICA. .......... 38

D.   MARKET FOR THE SALE OF NATURAL GAS TO SOUTHCENTRAL AND
     INTERIOR ALASKA. ................................................................... 39

VI.    ANTICOMPETITIVE EFFECTS.................................................................. 40

    A.    REDUCED COMPETITION FOR THE TRANSPORT/PURCHASE OF NATURAL GAS. ................................................................................ 41

    B.    REDUCED INCENTIVES FOR THE DEVELOPMENT OF ALASKA'S GAS RESOURCES. ................................................................................. 41

    C.    REDUCED OUTPUT AND HIGHER PRICES FOR GAS IN ALASKA AND THE REST OF THE UNITED STATES. ......................................................... 42

    D.    ALASKA GAS COULD BE LOCKED OUT OF THE MARKET EVEN AFTER A PIPELINE IS BUILT DUE TO THE DEFENDANTS' EFFORTS TO DELAY. ... 43

VII.    CLAIMS FOR RELIEF ...................................................................... 43

FIRST CLAIM FOR RELIEF  Concerted Refusal to Deal and Group Boycott in Violation of Section One of the Sherman Act....................................... 43

SECOND CLAIM FOR RELIEF  Agreements Not To Compete in Violation of Section One of the Sherman Act...................................... 44

THIRD CLAIM FOR RELIEF  Conspiracy to Monopolize Markets for the Transportation and Purchase of Natural Gas from the North Slope in Violation of Section 2 of the Sherman Act................................................................. 46

FOURTH CLAIM FOR RELIEF  Attempted Monopolization of Markets for the Transportation and Purchase of Natural Gas from the North Slope in Violation of Section 2 of the Sherman Act................................................................. 46

FIFTH CLAIM FOR RELIEF  Unlawful Purchase, Holding and Use of Stock or Assets in Violation of Section 7 of the Clayton Act........................................... 48

SIXTH CLAIM FOR RELIEF  Violation of Alaska Unfair Trade Practice and Consumer Protection Act, AS 45.50.471 *et. seq.* ...................................... 48

SEVENTH CLAIM FOR RELIEF  Tortious Interference with Prospective Business Opportunity. .......................................................................... 49

EIGHTH CLAIM FOR RELIEF Against BP – Breach of Contract............................... 52

VIII.    PRAYER FOR RELIEF ................................................................... 53

DEMAND FOR JURY TRIAL ........................................................................ 54

Plaintiff Alaska Gasline Port Authority ("AGPA" or "Authority"), through its undersigned attorneys, by and for its Complaint, upon personal knowledge as to its own acts, and on information and belief as to all others, based upon its own and its attorneys' investigation, alleges as follows:

## I.    SUMMARY OF THE ACTION

1.      This action arises from illegal contracts, combinations, and conspiracies by and between Defendants ExxonMobil Corporation and BP p.l.c. to artificially maintain and increase natural gas prices in Alaska and the continental United States, to boycott competitive pipeline proposals that would increase competition, and to secure and maintain control over Alaska's vast natural gas resources.  Defendants have acted with the purpose and effect of artificially constricting supply as a means of inflating prices and of maintaining and extending their control over natural gas distribution.

2.      As a result of a series of mergers and acquisitions, Defendants, the world's two largest energy companies, directly own over two-thirds of the proved natural gas resources on Alaska's North Slope and control the development of almost all of the known North Slope gas resources they do not own.

3.      Over the past several years, the price of natural gas has been rising sharply and steadily. This trend has already imposed severe costs on the U.S. economy as a whole, including harm to the economy's least powerful and most vulnerable participants.  If not checked, those costs and harm will continue and increase.

4.      The U.S. Department of Energy projects that in 2005, average residential natural gas prices will increase more than 43% over last year, to an average cost of $1,096 for each

American household.  Prices for natural gas for commercial and industrial use have also increased sharply.

5.    This year was not an anomaly.  Natural gas prices in the United States have been rising steadily for several years.  In 2004, natural gas prices increased 14.2% over the previous year.  The winter of 2003-2004 saw natural gas prices rise 15.1%.  And during the winter of 2002-2003, natural gas prices increased by 21.5%.  In fact, the consumer price of natural gas in the United States has risen more than 150% over the last six years.

6.    Last winter was a mild winter, but it was far from easy on the pocketbooks of millions of Americans.  People who struggle with their winter heating bills go without food, without medical or dental care, take less medicine, or miss mortgage payments.  Low-income Americans are hit hardest of all by rising natural gas costs.  Last year four million households received financial assistance with their energy bills.  This year, an estimated six million of the 30 million eligible households are expected to apply for assistance.  Low-income Americans are not alone in bearing the costs of record high natural gas prices; the price of natural gas is a burden to all but the most wealthy and increasingly threatens the economy.

7.    In the face of these increasingly acute problems, the Defendants have concertedly undertaken a series of acts and agreements to prevent the free market from responding to the demand for natural gas.  Defendants have acted with the purpose and effect of eliminating competition that could threaten their control over the development, marketing, and pricing of natural gas, including by blocking the development and marketing of Alaska's North Slope gas.

8.    Although vast resources of natural gas exist beneath Alaska's North Slope, and although Defendants cannot avoid extracting gas as they extract oil, Defendants have jointly acted and agreed not to market this gas.  Defendants' conduct not only aggravates the problem of

2

rising gas prices but also – and with the same goal – jointly excludes all actual and potential competitors from building a pipeline system.

9.    The Plaintiff, which was created in 1999 to build a gas pipeline system to transport natural gas from Alaska's North Slope to Valdez for liquefaction and shipping to market, is one of those injured by the Defendants' illegal conduct.

10.    Defendant BP is the Unit Operator for the largest and most productive oil and gas unit on the North Slope, and indeed in the United States, the Prudhoe Bay Unit ("PBU"). The PBU contains a proved 25 to 30 trillion cubic feet ("TCF") of natural gas, as well as hundreds of millions of barrels of oil. Although small quantities of this gas are used to fuel operations on the North Slope, none of this gas is transported off the North Slope. Natural gas amounting to approximately eight billion cubic feet per day ("BCFD") is extracted in connection with oil production. Instead of permitting this gas to be marketed, Defendants require the gas to be re-injected back into the ground.

11.    Defendants' conduct with respect to Alaska North Slope natural gas is part of a pattern of manipulating and constricting supply in order to raise prices and increase their control of relevant markets. For example, in the mid-90s, BP sold Alaska oil in Asia at prices lower than it could have gotten in the U.S. in order to tighten U.S. oil supplies and raise the price of crude shipped to refineries in California and Washington State. As reported in the press, this scheme was set out in a June 2, 1995 email exchange between BP managers Robert Aicher and Linda Adamany, in which they discussed "shorting the West Coast market" to achieve "West Coast price uplift scenarios" and "leverage up" prices. In the email, one of the managers stated: "Even if [Far East] netback is slightly below [West Coast] netback, we may choose to export some to [the Far East] in order to 'leverage up' our [West Coast Alaska North Slope crude] prices."

3

Adamany called the plan a "no-brainer." Indeed, BP went so far as to use a computer program called "the optimizer" to determine the optimum market "trigger points" for its manipulations. BP's conduct resulted in high prices at the pump for gasoline across the West Coast.

12.    Defendant ExxonMobil is the Unit Operator for the second largest gas unit on the North Slope, the Point Thomson Unit ("PTU"), which contains an estimated eight TCF of natural gas. Although ExxonMobil has been the designated unit operator of the PTU for almost 30 years, no commercial sale of either the gas or oil in the PTU has ever taken place. In an effort to maintain its leases and the leases of its co-conspirators in spite of the failure to market the resources, ExxonMobil has repeatedly claimed that development of the proved resources at Point Thomson would be uneconomic due to the absence of a gas pipeline system.

13.    Defendants also control a number of other smaller units and leases on the North Slope that contain gas resources. None of this gas has been brought to market.

14.    Despite the critical importance of developing a means to transport to market the proved gas resources in the PBU and PTU, as well as elsewhere on the North Slope, the Defendants have engaged in a systematic, joint campaign to derail any competitive gas pipeline. This campaign has had and will continue to have the effect of withholding sorely needed Alaska natural gas from domestic markets in the United States and elsewhere and sustaining higher prices for consumers and higher profits for Defendants – each of which reported record profits last quarter.

15.    Natural gas from Alaska's North Slope could moderate the steady climb in natural gas prices by supplying at least four to six BCFD (equivalent to approximately seven to ten percent of current natural gas consumption in the United States) for at least the next 35 years if there were a pipeline system to transport this gas to market. The only obstacle blocking this

4

pipeline system is Defendants' concerted conduct to prevent the commitment of North Slope gas

to such a pipeline.

16.    Over the last 20 years, several well-qualified firms have made a number of efforts to

develop a pipeline to free the gas on the North Slope and bring it to market. In order to construct

a pipeline, however, commercial realities dictate that the pipeline sponsor have in hand

commitments to supply the pipeline with gas. As ExxonMobil's CEO Lee Raymond bluntly

stated when discussing an Alaska natural gas pipeline project:

> Then you have these competing pipeline proposals, which is fine if
> that's what you want to do. But the reality is, nobody is going to
> build a pipeline without the producers. You and I know how
> pipelines get built. The pipeline goes to the bank. The guy at the
> bank says, what are you going to put in your pipeline? Gas. Do
> you own the gas. No, I don't own the gas. Well, who does own
> the gas, and do you have a commitment from them that they are
> going to put it through the pipeline? Well, no, we don't have that.
> Then I don't think I'm going to give you much money to build a
> pipeline.

17.    In order to prevent competing pipeline sponsors from obtaining financing and

building a pipeline, the Defendants have entered into a series of agreements to block the sale of

Alaska natural gas, the purpose and effect of which has been to eliminate competition in the

exploration, development, and marketing of natural gas resources on the North Slope and to

prevent the competitive transport of natural gas from the North Slope to markets in lower Alaska

and the continental United States. These agreements and related conduct have been undertaken

with the purpose and effect of preventing the tremendous resources of Alaska natural gas from

reaching the lower Alaska and continental U.S. markets, and thereby maintaining artificially high

prices in those markets.

18.    The Authority has developed or acquired significant senior permits, engineering

studies, cost estimates, and plans necessary to build a natural gas pipeline. In addition, it has

available to it approximately $18 billion in federal loan guarantees for the project. At this point, it requires only one significant element to commence the pipeline project: a commitment by at least one of the Defendants to sell the North Slope gas that they are already obligated to develop under their leases.

19.    Earlier this year, the Authority made a detailed offer to the Defendants and others to purchase Alaska North Slope gas and transport it to market. Despite repeated efforts by the Authority, the Defendants refused to discuss prices or terms regarding the sale of gas. The Authority's offer still remains open, but the Defendants have refused to engage in serious negotiations in an effort to kill the Authority's proposal.

20.    Defendants' concerted effort not to deal with the Authority violates their duty to develop and market the resources arising from their agreements with the State, as well as the antitrust laws. Because this conduct involves: (1) the loss of profits on sales of the gas; (2) the risk that the State will default their leases; and (3) the risk that either Defendant will be shut out of market opportunities by the other producer if such other Defendant deals with a competitive pipeline, this conduct would be contrary to each Defendant's self interest in the absence of an agreement not to compete.

21.    In addition to their direct efforts and agreements to restrict the marketing of gas from the North Slope, Defendants in further violation of the antitrust laws have exchanged their plans for other gas production and/or pipeline projects from gas production sites other than the North Slope, including what capacity from which locations will be delivered to the United States markets and when. The purpose and effect of these communications has been to enable Defendants to reach an understanding as to when and how major gas sources would be brought to market; to facilitate and support their agreement not to develop and market Alaska gas; to

6

avoid competition that would increase the supply of gas beyond what the Defendants have jointly

concluded was in their collective best interest; and to maintain gas prices at an artificially high

level.

22.    Defendants' agreement to boycott the Authority affects not only the natural gas

controlled by Defendants, but the natural gas controlled by other producers. Because the

Defendants control such a large share of North Slope gas, the boycott by them alone is enough to

stop the Authority's pipeline. Moreover, independent producers have little incentive to explore

or develop new gas resources without a pipeline to bring the gas to market.

23.    Defendants' boycott of the Authority also prevents Alaska from receiving its royalty

gas. Alaska is entitled to a 12.5 to 20% royalty on all gas produced on its lands. It is entitled to

receive this royalty "in-kind" in the form of the gas extracted or "in value." However, the State

cannot collect this royalty gas in-kind or in-value unless and until the Defendants bring their own

gas to market.

24.    In addition to the agreements not to compete, the Defendants have engaged in a series

of mergers and acquisitions that have substantially reduced competition in bringing the untapped

natural gas resources of the North Slope to market. These acquisitions have included huge

corporate transactions such as Exxon's merger with Mobil and BP's acquisitions of Amoco

Corporation and Atlantic Richfield Co., as well as the acquisition of various leaseholds and other

interests that have reduced competition. These mergers and acquisitions have substantially

lessened competition and have enabled the Defendants to cartelize gas resources and collude

without the fear that non-cartel members will disrupt their cartel. Many of the producers who

sold to the Defendants would have preferred to maintain their interests but were forced to sell

because the Defendants' market dominance, including control of the oil pipeline monopoly, prevented these producers from realizing the value of their holdings.

25.    The Defendants' conduct has had the following effects, among others:

(a)    competition for the transport or purchase of natural gas from the North Slope has been eliminated;

(b)    incentives for exploration and development of North Slope natural gas resources have been reduced or eliminated; and

(c)    the supply of natural gas to lower Alaska and the rest of United States has been artificially reduced and the price of natural gas maintained at artificially high levels.

26.    Defendants' conduct has violated every major provision of the federal antitrust laws, including Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act.  In this action, the Authority seeks to recover damages for Defendants' illegal conduct; to prevent the Defendants from continuing their joint and unlawful anticompetitive conduct – excluding the Authority from the gas transport market on the North Slope, blocking the development and marketing of North Slope natural gas, artificially reducing the output of natural gas on the North Slope, and restricting the supply and raising the prices for consumers of natural gas in lower Alaska and throughout the continental United States; and to restore competitive conditions.

## II.    JURISDICTION, VENUE, AND COMMERCE

27.    The Court has jurisdiction over this action under Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337.

8

28.    The Court has supplemental jurisdiction over the state law claims asserted in this action pursuant to 28 U.S.C. § 1367.  The federal and state law claims asserted in this action arise from a common nucleus of operative facts.

29.    Venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391.  The Plaintiff and all Defendants transact and are registered to do business in, reside in, and/or are found within this District.

30.    A substantial part of the events giving rise to the claims stated below occurred in this District, and a substantial part of the property that is the subject of the action is situated in this District.

31.    Defendants operate significant facilities in this District.  Plaintiff is a political subdivision of the State of Alaska.

32.    Numerous other businesses and persons affected by this action are located within this District.  Competing producers in Alaska of oil and gas on the North Slope have been harmed and will continue to be harmed by Defendants' anticompetitive conduct.  Similarly, Alaska consumers who purchase natural gas have been or will be injured by the higher prices and reduced supply that have resulted and will continue to result from Defendants' anticompetitive conduct.

33.    The Defendants' anticompetitive conduct has affected and is affecting a substantial volume of interstate and foreign commerce, including commerce in this District.

### III.    THE PARTIES

34.    Plaintiff AGPA is a political subdivision of the State of Alaska with its principal place of business in Fairbanks, Alaska.  AGPA was created in 1999 under Alaska Statutes 29.35.600-29.35.730 to facilitate construction of a gas pipeline system from Alaska's North

Slope to the port at Valdez, where North Slope natural gas will be distributed, including by being

liquefied and shipped by tanker.

35.     The Authority's pipeline (which will run parallel to the Trans Alaska Oil Pipeline

System ("TAPS")) and its accompanying liquid natural gas ("LNG") facility will permit natural

gas to be transported by tanker to LNG receiving facilities on the Pacific Coast, where it will be

distributed throughout the United States by means of the existing natural gas distribution

infrastructure. The Authority's pipeline will also include a spur line from Glennallen to the

Palmer area to provide gas to the Southcentral Alaska gas grid, as well as to other areas of

Alaska not currently accessible to gas.

36.     Defendant BP p.l.c. is incorporated under the laws of the United Kingdom with its

principal place of business in London, England. BP has extensive rights to oil and gas in Alaska

and elsewhere and is one of the owners of TAPS. It is the largest oil company in the world and

reported profits of $6.463 billion in the last quarter alone. It ranks behind only Wal-Mart as the

world's largest corporation. BP is currently, and has consistently been since at least 2001, the

largest producer of natural gas in the United States.

37.     Defendant BP Exploration (Alaska) Inc. is a BP p.l.c. subsidiary that holds oil and gas

interests on the North Slope. It is a Delaware corporation with its principal place of business in

Anchorage, Alaska. BP Exploration (Alaska) Inc. is the largest producer of oil on the North

Slope, and has similarly large interests in North Slope natural gas resources. BP Exploration

(Alaska) Inc. is the alter ego of BP p.l.c.

38.     Defendants BP p.l.c. and BP Exploration (Alaska) Inc. are referred to jointly in this

Complaint as "BP."

10

39.    Defendant ExxonMobil Corporation is incorporated under the laws of New Jersey with its principal place of business in Irving, Texas. ExxonMobil has extensive rights to oil and gas in Alaska and elsewhere and is one of the owners of TAPS. It is the largest oil company in the United States and the second largest oil company in the world. It reported profits of $9.92 billion in the last quarter alone. According to Fortune Magazine's 2005 Global 500, ExxonMobil is the most profitable corporation in the world, with profits of $25.33 billion last year. ExxonMobil is currently the second largest producer of natural gas in the United States.

40.    Defendant ExxonMobil Alaska Production, Inc. is a Delaware corporation with its principal place of business in Houston, Texas. ExxonMobil Alaska Production is an ExxonMobil Corporation subsidiary that holds oil and gas interests on the North Slope. ExxonMobil Alaska Production, Inc. is the alter ego of ExxonMobil Corporation.

41.    Defendants ExxonMobil Corporation and ExxonMobil Alaska Production, Inc. are referred to jointly in this Complaint as "ExxonMobil" or "Exxon."

## IV.    DEFENDANTS' ANTI-COMPETITIVE CONDUCT

42.    Since the 1960s, massive reservoirs of natural gas have been known to underlie the North Slope. Proved resources of natural gas are conservatively estimated at 25-30 TCF under the Prudhoe Bay Unit and eight TCF under the Point Thomson Unit.

43.    In addition, there are substantial additional gas reservoirs on land, in offshore state waters, and in the outer continental shelf. The U.S. Geological Survey recently assessed 23,000 square miles of the central North Slope, and estimated there is 63.5 TCF of undiscovered, technically recoverable natural gas in that area, with an additional 32 TCF in the Beaufort Sea region. The Minerals Management Service has indicated that undiscovered gas resources in arctic Alaska could be as high as 156 TCF. Similarly, in February 2005, the American Gas

11

Foundation estimated Alaska's total gas reserve potential at 251 TCF. Alaska's Department of Natural Resources has estimated potential resources in the same range.

44.    Bringing this gas to market would have a profound effect on the supply of natural gas in the United States. One producer has estimated that "[i]f developed, North Slope gas resources would increase total U.S. gas reserves by about 20 percent."

45.    At the wellhead, Alaska is already among the largest gas producing states in the United States. Since 1995, wellhead gas production in Alaska has averaged over eight billion cubic feet per day. However, almost all (more than 92%) of this production is re-injected into the ground. None of the gas produced is transported from the North Slope.

46.    Defendants' conduct has also ensured that no wells are developed to extract natural gas, despite the relative ease of doing so.

47.    Recognizing the importance of developing a means to transport the North Slope's gas reserves to market, a number of entities, beginning in the 1970's, developed competing proposals for the construction of a gas pipeline. Each effort to construct a pipeline has been blocked by the collective action of the Defendants, who have engaged in a systematic campaign to derail efforts to construct a gas pipeline in Alaska in order to: (1) withhold Alaska natural gas from domestic markets; (2) sustain higher prices to consumers and higher profits to the Defendants; and (3) secure and maintain control over the development, movement, and marketing of Alaska gas.

## A.    THE DEFENDANTS ILLEGALLY AGREED AMONG THEMSELVES NOT TO DO BUSINESS WITH THE AUTHORITY AND TO DELAY THE DEVELOPMENT AND MARKETING OF THEIR ALASKA GAS.

### 1.    No Pipeline Can Be Built Without A Commitment To Supply Gas.

48.    A practical reality of the pipeline business is that no major pipeline can be built without commitments to supply gas for the pipeline because it is impossible to obtain financing for a pipeline without such commitments, both for regulatory and commercial reasons.

49.    The CEO of ExxonMobil, Lee Raymond, understands the power that the Defendants hold over anyone interested in developing a natural gas pipeline in Alaska. He recently stated during an interview that:

> Then you have these competing pipeline proposals, which is fine if that's what you want to do. But the reality is, nobody is going to build a pipeline without the producers. You and I know how pipelines get built. The pipeline goes to the bank. The guy at the bank says, what are you going to put in your pipeline? Gas. Do you own the gas. No, I don't own the gas. Well, who does own the gas, and do you have a commitment from them that they are going to put it through the pipeline? Well, no, we don't have that. Then I don't think I'm going to give you much money to build a pipeline.

### 2.    Defendants Recognized That Neither Could Economically Refuse To Develop And Market Alaska Gas Unless It Knew That The Other Would Also Refuse.

50.    Defendants recognized that neither of them could forestall the development and marketing of Alaska gas without the other. Moreover, Defendants were aware from their participation in TAPS of the competitive disadvantage that either would have if the other entered into a long-term commitment with the Authority.

51.    The Defendants together own a majority interest in TAPS. They use this control over TAPS to charge artificially high rates for transportation of oil through the pipeline. The high pipeline tariff rate does not affect the Defendants because they are essentially paying themselves. The high rate does, however, impact competing North Slope producers who do not own a share

in TAPS. These supra-competitive transportation costs make production uneconomical for non-owner producers and discourage the development of resources that would compete with those already developed by the owner-producers.

52.     Also, because pipeline tariffs are subtracted from the price of oil before calculating state royalties and severance taxes, every tariff dollar paid by shippers costs the State approximately $0.20. At one million barrels per day, that amounts to $70 million per year in lost state royalties and severance taxes.

53.     The consequences of producer control of TAPS are dramatically illustrated by Conoco's withdrawal from the North Slope, which was a direct result of the artificially high tariffs charged by TAPS. Prior to its 2002 merger with Phillips, Conoco lacked a major interest in TAPS. In 1993, it gave up its interests in the North Slope altogether because its dependence on the pipeline prevented it from obtaining reasonable value for its oil.

54.     Conoco owned a 70% interest in Milne Point, a North Slope field about 25 miles west of Prudhoe Bay. At full production, Milne Point is responsible for slightly over 5% of North Slope oil. In 1993, however, Conoco was forced to sell its interest in Milne Point because the pipeline tariff imposed by the TAPS owner-producers rendered its continued operation of the field uneconomical. Conoco President and CEO Archie Dunham candidly admitted: "It broke my heart to trade Milne Point, but we had to do it. All the value of that property was taken away from us in the pipeline tariffs." At the same time, Conoco sold its 70% interest in the Badami field, 35 miles east of Prudhoe Bay. These assets were purchased by BP, which had an almost 50% interest in TAPS. Today, BP owns 100% of both the Milne Point Unit and the Badami Units.

55.     Conoco's experience was not unique. In 1991 there were a number of producers on
Alaska's North Slope that did not share an ownership interest in TAPS. These included such
major oil companies as Texaco, Shell, Marathon, and others. At least seven of these producers
cut back their production or departed entirely from the North Slope. With a single exception,
these producers sold their North Slope assets to one of the producers with a substantial share of
TAPS.

56.     Because of the competitive disadvantage that they would otherwise suffer, neither BP
nor ExxonMobil could in their individual self-interest refuse to commit gas to the Authority
unless they were assured that the other would also refuse.

57.     Moreover, critical purposes of refusing to deal with the Authority were to prevent
AGPA's pipeline from becoming a viable competitive delivery option and to prevent Alaska gas
from being delivered to domestic markets, with the relief of scarcity (and the high prices that
scarcity causes) that would flow from such delivery. Since those purposes would be frustrated if
either Defendant undertook to deal with AGPA, neither could accomplish their objective without
the other's cooperation.

   **3.     The Defendants Have Entered Into A Series Of Express Agreements To
           Prevent Competition In Marketing North Slope Natural Gas And To
           Enforce, Support, And Facilitate Their Overall Agreement To Prevent The
           Development And Marketing Of Alaska Gas.**

58.     Defendants have agreed that neither will develop or market their Alaska gas reserves
without the other's consent, and that neither would commit gas to the Authority.

59.     Unitization refers to the process of combining different leaseholders with interests in
one reservoir into a single unit for exploration and development purposes. When used properly,
unitization can facilitate the efficient development and utilization of oil and gas resources. In
Alaska, unitization agreements are approved and agreed to by the State.

60.    By contrast, unit operating agreements and various ancillary agreements are contracts among the leaseholders and are not approved by the State.

61.    The Defendants have entered into formal and informal unit operating and other agreements among themselves and with others, the purpose and effect of which is to keep the North Slope gas reserves, including gas owned by others, from reaching the market until Defendants jointly decide that they wish to place this additional gas into the market.

62.    Further, the Defendants have entered into formal and informal agreements among themselves and with others, the purpose and effect of which is to prevent others from constructing a gas pipeline capable of delivering gas from the North Slope to the market.

63.    These agreements are not approved by the State of Alaska, are not justified by any efficiency or pro-competitive concerns, and have the purpose and effect of unnecessarily and unreasonably restricting competition among themselves and others with interests in North Slope gas and oil. The purpose and effect of these agreements is not to develop energy resources efficiently, but instead to block and delay that development.

64.    In order to conceal the anticompetitive nature of the written agreements, the Defendants have routinely withheld them or delayed giving them to the State, as required under various statutes and regulations.

65.    The purpose and effect of these agreements is illustrated in the Point Thomson Unit. Although the Defendants have held leases and known of significant oil and gas reserves in this Unit for nearly thirty years, they have jointly refused to develop these resources and have done nothing to bring these resources to market.

66.    In addition, the Defendants have illegally agreed and coordinated among themselves to give priority to certain gas projects off the North Slope and to delay marketing their North

Slope gas in order to ensure that what they perceive as too much gas does not reach the United States markets at the same time.

67.    Some of the anticompetitive agreements reached by the Defendants are memorialized in various written agreements. Some are unwritten understandings that have not been memorialized in formal documents. Among the anticompetitive and unnecessary agreements the Defendants have made are:

    (a)    agreeing not to deal individually with pipeline companies for the marketing, transportation, or sale of North Slope gas;

    (b)    agreeing on "rules of engagement" for dealing with pipeline companies;

    (c)    agreeing not to take steps to develop or sell gas from their leases in the Prudhoe Bay unit;

    (d)    entering into a series of agreements that:  (1) eliminated the ability of individual leaseholders to bring their gas to market without the consent of the Defendants; and (2) reduced the incentives of individual leaseholders to market their gas resources;

    (e)    agreeing not to take steps to sell gas from the Point Thomson Unit;

    (f)    agreeing not to submit any meaningful development plans for the Point Thomson unit;

    (g)    agreeing not to sell, or to commit to sell, gas from any location on the North Slope for off-Slope transport to any pipeline company not controlled by the Defendants; and

    (h)    agreeing to withhold North Slope gas in order to give priority to other gas projects the Defendants are pursuing.

68.    These agreements do not have any legitimate purpose and are solely for the purpose

and effect of limiting competition.  To the extent that any of these agreements can be said to

relate to a legitimate purpose, they are unreasonably restrictive of competition and unnecessary

to achieve their legitimate purposes.

**B.    IN ACCORDANCE WITH THEIR AGREEMENTS, THE DEFENDANTS HAVE
STIFLED ALL POTENTIALLY COMPETITIVE PIPELINE PROPOSALS.**

    **1.    Alcan/Foothills.**

69.    In light of the delays and other problems associated with the construction of TAPS,

and concerned about ensuring that the lower 48 states had access to Alaska gas, Congress

enacted the Alaska Natural Gas Transportation Act in 1976.  The Act was designed to ensure that

regulatory review and certification would not serve as an undue barrier to the construction of a

gas pipeline.

70.    The President considered several competing proposals and selected a path through

Alaska and Canada.  This proposal was endorsed by both the United States and Canada, and was

memorialized in a September 20, 1977 Agreement on Principles about the pipeline project,

which would travel down from the North Slope and then through Canada.  The Alcan Pipeline

Company was responsible for the Alaskan portion – with the U.S. rights later transferred to the

Alaskan Northwest Natural Gas Transport Company ("ANNGTC") – and Foothills Pipe Lines

("Foothills") was responsible for the Canadian portion of the line.  Both ANNGTC and Foothills

are wholly owned subsidiaries of TransCanada Pipeline Corporation, a Canadian energy and

natural gas transportation company.

71.    In the meantime, however, a series of price controls and restrictions on permissible

uses for natural gas came into effect.  These restrictions had the effect of creating a gas surplus

and depressing the price. Because of this, in or about April 1982, the sponsors decided to postpone the project.

72.    Since that time, price controls and use restrictions have been lifted, and demand for, and the price of, natural gas has increased significantly. With a resurgent market for gas, there have been a number of different efforts to construct a natural gas pipeline in Alaska, each of which has been blocked by the Defendants.

### 2.    Yukon Pacific Corporation.

73.    In 1982, the Yukon Pacific Corporation ("YPC") began developing a plan to construct a pipeline from the North Slope, along the TAPS right-of-way, to Valdez. YPC was partially owned by CSX Corporation, a major railroad transportation company and one of the largest natural gas pipeline operators in America. Among other early investors in YPC were ARCO and former Alaska Governors Hickel and Egan. YPC intended to construct a full pipeline system with a liquefied natural gas terminal in Valdez, which would cool and liquefy the gas for shipment on LNG tankers. YPC succeeded in clearing significant regulatory hurdles; it secured senior permits, important rights of way, obtained an acceptable environmental impact statement, and gained permission to export the gas. YPC also succeeded in establishing that a viable market for Alaska gas existed overseas. The only thing that YPC was not able to secure was the natural gas itself, because Defendants jointly refused to sell it.

74.    Starting at least as early as 1989, YPC attempted to negotiate with the producers to purchase the necessary natural gas. Although some producers had originally supported the project, they withdrew their support when Defendants realized that they would be unable to obtain the same degree of total control over the pipeline infrastructure that they maintained over TAPS, and they made it clear that they would not support the project.

19

75.     After they withdrew their support, the Defendants in concert steadfastly refused to commit to sell gas to YPC, fully understanding that this meant that as a result YPC would not be able to bring their gas to market.

76.     While YPC was developing plans for a pipeline through Alaska to a liquefied natural gas terminal in Valdez, the Foothills group responded to the increased demand for gas by restarting its efforts to construct a pipeline running through Alaska and into Canada, where it would connect with the existing gas distribution infrastructure in Alberta, allowing gas to flow to markets in Canada and the lower 48 states.

77.     Although it is generally recognized that these two designs, *i.e.*, tracing the TAPS route to Valdez or following the Alaskan Highway to Alberta, are the only practical means of transporting North Slope gas to market, the Defendants refused to commit gas to either of these projects. Even though providing gas to either of these alternatives would have been a profitable venture for each of the Defendants, they both refused to provide either project with the necessary gas commitments because they did not want any pipeline project that they did not own and control to succeed and because they did not want North Slope gas to enter the lower Alaska and continental U.S. markets because of the effect such gas would have on gas prices in such markets. Without a committed supply of gas for the pipeline, neither project could begin construction. The investors in YPC, realizing that Defendants would continue to insist on monopoly control of the pipeline, ultimately suspended their efforts.

### 3.     MidAmerican Energy Holdings Company.

78.     MidAmerican Energy Holdings Company, a subsidiary of Warren Buffet's Berkshire Hathaway, Inc., and its subsidiary Kern River Gas Transmission Company, have extensive experience in the construction and operation of gas pipelines. For example, MidAmerican constructed and now operates the Kern River pipeline system. That pipeline system de-

bottlenecked the natural gas infrastructure in the Rocky Mountain region, enabling gas produced in, and east of, the Rocky Mountains to be transported freely to the Western United States.

79.     MidAmerican embarked on a major effort to construct a pipeline from the North Slope to existing pipelines in Canada, with plans to serve primarily the Upper Midwest. MidAmerican proposed an Alaskan gas pipeline in the Fall of 2003. MidAmerican ultimately abandoned its efforts to build a North Slope gas pipeline because Defendants made it clear that they would not commit to provide the MidAmerican pipeline with gas. As Steve Porter, Deputy Commission for the Alaska Department of Revenue, stated at the time, "If the oil and gas companies decided they didn't want to work with MidAmerican, every penny MidAmerican spent would be lost."

### 4.     TransCanada.

80.     TransCanada is a Canadian energy company that operates a system of natural gas pipelines in Canada, lines that serve gas markets in both the United States and Canada. TransCanada, through its subsidiaries ANNGTC and Foothills, was the sponsor of the original pipeline project to bring natural gas from the North Slope, the project approved by the governments of the United States and Canada in 1977. TransCanada has been working for over 25 years to construct an Alaskan natural gas pipeline to the North Slope, and in recent years, it has renewed its efforts. For example, in early 2002, TransCanada, through its subsidiary Foothills, presented a detailed, three-volume proposal to the Defendants outlining the merits of its pipeline. After MidAmerican withdrew, TransCanada submitted another proposal for a gas pipeline from the North Slope. In each case, it was confronted with the same joint refusal to deal as the other potential pipeline competitors. Although selling gas to TransCanada would clearly be a profitable venture, Defendants have jointly refused to commit to selling any gas to TransCanada.

**C.    THE AUTHORITY HAS PUT TOGETHER AN ALASKA NATURAL GAS PIPELINE PROJECT THAT REQUIRES ONLY A GUARANTEED SUPPLY OF GAS TO BEGIN CONSTRUCTION.**

81.     Federal loan guarantees available under the Alaska Natural Gas Pipeline Act of 2004, 15 U.S.C. § 720n, give the Authority and, potentially, other competitors the ability to obtain financing for a gas pipeline. The availability of federal loan guarantees eliminates a significant obstacle to financing, but any pipeline project still requires commitments to supply at least some of the necessary gas before construction can begin.

82.     The Authority was created in 1999 under Alaska Statutes 29.35.600-29.35.730 to facilitate construction of a gas pipeline system from Alaska's North Slope to the port at Valdez, where North Slope natural gas will be liquefied and shipped by tanker.

83.     The Authority has proposed construction of a 48-inch, buried pipeline from Prudhoe Bay to Valdez. In addition, the Authority will construct and operate a liquefaction/fractionation, storage, and loading plant in Valdez.

84.     From Valdez, the Alaska natural gas in LNG form will be shipped to receiving facilities on the Pacific Coast for transport throughout the existing North American gas distribution networks (or "grids"), and potentially elsewhere.

85.     The Authority has received several Memoranda of Understanding ("MOU") from Pacific Coast LNG receiving terminals interested in receiving LNG from Alaska, including Kitimat LNG, the Northern Star Natural Gas/LNG receiving terminal, Penguin LNG, and the Crystal Energy LNG regas terminal. It has also received an MOU from Totem Ocean Trailer Express for the shipment of LNG from Alaska to the Pacific Coast.

86.     Under the Authority's proposal, a 24-inch spur line would connect the gas pipeline from Glennallen to the existing Southcentral Alaska gas grid near Palmer, ensuring a ready

22

supply of natural gas for the greater Anchorage area. Gas would also be made available to serve other areas of Alaska not currently served by North Slope natural gas, such as Fairbanks.

87.    The Authority has also developed plans for construction of a separate line to the Canadian border to permit connection to a Canadian line upon its eventual construction.

88.    The Authority's proposal would result in delivering Alaskan gas to Midwest and West Coast markets, as well as Southcentral and Interior Alaska markets by the 2011-2012 timeframe.

89.    The Authority has obtained a private letter ruling from the IRS confirming that the Authority is tax exempt. This provides billions of dollars in tax savings to those involved over the life of the project.

90.    The Authority has an exclusive option to purchase YPC and its portfolio of senior permits along with all project data collected since 1982. This enables the Authority to complete a pipeline project much more quickly than any of its competitors.

91.    The Authority has a project cost estimate from Bechtel Corporation that was updated as recently as May 2005.

92.    The Authority's gas transportation project assumes a phased development, reaching full capacity at 4.3 BCFD. The volume phasing allows for rapid development of an initial phase to capture Midwestern markets in a relatively short time horizon.

93.    The initial phase will deliver LNG to the Kitimat, British Columbia, terminal. From there, this gas will be delivered to the Midwestern United States through the existing gas pipeline network.

94.    The Authority plans to deliver 0.5 BCFD in state to service Southcentral and Interior Alaska's increasing natural gas requirements.

95. Assuming a Chicago gas price of $5.00 per MMBTU (a conservative assumption well below the current market price), the Authority projects annual netback revenue to gas suppliers of $4.5 billion in 2005 dollars. At today's natural gas prices in the lower 48 states, the netback revenue would be more than triple that.

96. The Authority has filed an application with the State under the Alaska Stranded Gas Development Act, AS 43.82 *et seq*., making it one of three applicants under the Act, and is currently in negotiations with the Governor regarding its proposal.

97. In the past year, Congress amended the Alaska Natural Gas Pipeline Act of 2004, 15 U.S.C. § 720n, to make the Authority's LNG Project qualify for the $18 billion federal loan guarantee gas pipeline incentive package. Alaska Natural Gas Pipeline Act, Pub. L. 108-325, 118 Stat. 1265.

98. The construction and operation of the Authority's proposed gas pipeline and related facilities would directly result in the creation of at least 6,000 new jobs during construction and 5,000 jobs following construction.

99. The Authority estimates that under its proposal, it would receive and distribute to the State of Alaska and its municipalities $370 million per year in net revenue after expenses, in addition to the revenue that the State would receive from its royalty gas, property taxes, income tax, and severance taxes.

100. The only impediment to the Authority's plan is Defendants' concerted refusal to supply natural gas.

**D.    AS THEY HAVE DONE WITH OTHER COMPETITORS, DEFENDANTS HAVE
JOINTLY REFUSED TO NEGOTIATE WITH THE AUTHORITY ON THE
SALE OF NORTH SLOPE GAS.**

101.    The Authority has repeatedly attempted to engage the Defendants in good faith

negotiations regarding the purchase of gas from the Defendants' resources on the North Slope.

102.    On April 1, 2005, the Authority, working with Sempra Energy LNG, made a detailed

offer to the Defendants, to other producers, and to the State of Alaska to purchase Alaska North

Slope gas on a wellhead netback basis and to transport the gas to market.  Sempra Energy is a

major distributor of natural gas in the lower 48 states, but does not own significant gas producing

properties itself.

103.    During the several months that followed, the Defendants declined to sell the

Authority North Slope gas or even to discuss prices or terms.  Despite repeated efforts by the

Authority to discuss prices or terms, including letters and meetings in Alaska and elsewhere, the

Defendants continue to refuse to provide terms to sell gas to the Authority or any other Alaska

gas pipeline project.

104.    Sempra Energy recently withdrew from the Authority's project based on its concern

that the producers would never sell gas to the Authority.

105.    As of today, the Authority's offer to purchase North Slope gas remains open, but the

Defendants have refused to engage in good faith negotiations and have declined to sell any North

Slope gas to the Authority.

25

E.     **THE DEFENDANTS' JOINT REFUSAL TO MARKET THE VAST GAS RESOURCES UNDER THEIR CONTROL VIOLATES THEIR DUTY TO DEVELOP NORTH SLOPE GAS RESOURCES AND BRING THEM TO MARKET AND IS CONTRARY TO THEIR INDIVIDUAL SELF INTERESTS.**

1.     **Duties To Develop And Market.**

106.     Under oil and gas leases and unit agreements, lessees have a duty to drill, produce, and market gas in a reasonably diligent manner.

107.     Since early in the 20th Century, American courts have read into oil and gas leases a series of implied covenants in order to assure that a lessor's rights are protected. Holding leases for speculative purposes is not permitted. Defendants' leases with the State contemplate exploration and development, and not the bottling up of land for speculative or other purposes or the postponement of reasonable development. Thus, courts use implied covenants to ensure a lessee does not act opportunistically towards a lessor whose best interests might otherwise be held hostage by a lessee's unwillingness to explore, develop, produce, or market oil or gas from a leasehold.

108.     Compliance with these implied covenants is governed by the "prudent-operator standard," which requires a unit operator to act as a reasonably prudent operator. This is an objective standard.

109.     The implied covenant to market the product provides that, upon discovery of oil or gas, the lessee is under an implied duty to use due diligence to market these resources as a reasonably prudent operator, which includes marketing the product if there is a reasonable expectation of profit. Moreover, when there is evidence that additional development would probably be profitable, the lessee is under an implied duty to use due diligence to develop the leasehold as would the reasonably prudent operator.

110.    Failure to comply with the implied duty to market the product or to develop the premises constitutes breach and is grounds for termination of oil and gas leases or unit agreements.

111.    The Defendants are violating these contractual duties to develop the natural gas on their North Slope leaseholds. Moreover, they are using their anticompetitive refusal to deal as an excuse to forestall termination of their leases for non-performance, relying on the lack of a pipeline, a condition that they brought about, as a reason to be excused from their duty to develop and market the gas from their leases.

**2.    BP's Obligation To Negotiate In Good Faith With Independent Pipeline Providers.**

112.    In 1999, in order to address the State of Alaska's competitive concerns about the concentrated control of natural gas leases on the North Slope, BP and Atlantic Richfield Co. ("ARCO") agreed to a "Charter for Development of the Alaskan North Slope" that required them, among other things, to negotiate in good faith to make North Slope gas available to any third party in sufficient quantities to support a treatment and transportation project. BP's continued refusal to negotiate with the Authority and others to sell gas violated this legal obligation.

113.    Under the Charter, if a third party, as the Authority did, put forward a proposed project with the demonstrated ability to obtain construction financing, provide reasonable financial security, and obtain necessary approvals from other producers, BP and ARCO were committed to negotiate in good faith with that third party to make sufficient quantities of North Slope natural gas available at a commercially reasonable fair market price or transportation charge. In addition, BP and ARCO committed to make reasonable efforts to assist third parties,

including specifically the Authority, YPC, the State, and others, in obtaining necessary approvals

for the sale of North Slope natural gas from other producers.

114.    The Charter specifically required BP and ARCO to give fair consideration to all

reasonable treatment and transportation projects to deliver gas to market "proposed by the newly

established port authority" (referring to the Plaintiff is this action).

115.    The Charter required BP and ARCO to evaluate these projects based on both the

wellhead value for the State and other benefits to Alaska, such as the creation of infrastructure

for delivery of gas to communities within the State.  By specifically naming the Authority, a

political subdivision of the State, as a qualified third party with which BP and ARCO were

required to negotiate in good faith, the parties intended for the Authority to obtain the benefit of

the Charter.

116.    BP violated its legal obligations under the Charter, including by participating in the

joint refusal to negotiate in good faith with the Authority and others.

### 3.    The Defendants' Refusal To Deal Is Contrary To Their Self Interest In The Absence Of An Agreement.

117.    In the absence of a conspiracy, it would be in each producer's self interest to attempt

to make the best deal possible with the Authority in order to obtain the most favorable terms of

sale for its gas.  This is particularly true because, due the prevalence of long-term contracts in the

natural gas industry, it is possible that a latecomer to market could be substantially delayed or

even shut out if other producers secure market opportunities with long-term supply contracts.

### 4.    The Defendants Have Failed To Develop And Market Known Natural Gas Resources In The Prudhoe Bay Unit.

118.    Over the last two and a half decades, the Prudhoe Bay Unit ("PBU") has been one of

the most productive oil fields in the world.  The Unit has comparable gas resources, which are

extracted as a result of the oil recovery. Yet the producers have done nothing to bring the Unit's massive gas resources to market.

119.    Exxon Mobil and BP collectively own over 60% of the gas resources in the PBU. BP is the unit operator for the PBU.

120.    Defendants have entered into a number of different agreements and undertakings, both formal and informal, which have had, and continue to have, the purpose and effect of preventing the Defendants from competing in the sale of gas from the Prudhoe Bay unit and from committing gas to any competitive pipeline. To the extent that these agreements had a legitimate purpose, the restraints on competition were not necessary to achieve the legitimate purposes of the agreement. As a result of these agreements, Prudhoe Bay's vast gas resources have never been exploited commercially.

121.    The Defendants generate approximately three TCF of natural gas on the PBU per year as a byproduct of crude oil production. After a small amount of gas is extracted for in-field and North Slope use, approximately eight BCF of gas is re-injected daily into the PBU reservoir. While this re-injected gas provides pressure for crude oil production, the re-injection process is costly and a number of alternative efficient and cost-effective means are available to maintain pressure for oil production, means that would free up the gas for commercial sale if there were a pipeline to transport the gas to market. The producers have never offered a proposal to market this gas because of their illegal agreement not to do so.

### 5.    The Defendants Have Failed to Develop and Market Known Natural Gas Resources in the Point Thomson Unit.

122.    The Point Thomson Unit is located on the eastern side of the North Slope. Defendants began obtaining oil and gas leases on this unit from the State of Alaska in the 1960s.

123.    One of Defendants' duties under their leases was to develop the oil and gas resources

and bring them to market. The U.S. Department of Energy estimates that there are currently

eight TCF of proved natural gas resources in the Unit. These resources are a valuable resource

belonging to the State and its citizens.

124.    According to ExxonMobil, because of extraordinarily high gas pressure at the Point

Thomson unit, re-injection of the gas in connection with oil drilling, as is done at Prudhoe Bay,

would be difficult and inefficient. It would, therefore, be inefficient and contrary to Defendants'

self interest (other than Defendants' interest in maintaining their control and monopoly prices) to

extract oil without simultaneously extracting gas.

125.    ExxonMobil and BP own over 75% of the working interest ownership in the PTU

leases. ExxonMobil is the Unit Operator.

126.    All the leases in the PTU except one are beyond their primary term and are listed by the

Alaska Department of Natural Resources ("DNR") as "expired." Accordingly, the PTU leases

remain in effect today solely because they are incorporated into a unit.

127.    No gas from the Point Thomson Unit has ever been produced or marketed.

128.    Despite repeated requests over the years from DNR for drilling in the PTU, ExxonMobil

has submitted, and continues to submit, annual plans for the PTU that include no drilling,

development, or marketing of the PTU's gas resources.

129.    On October 27, 2005, the DNR Director of Oil and Gas issued an amended denial of

ExxonMobil's proposed plan for the development of the PTU because it did not set out a plan to

bring the PTU into commercial production within a reasonable time frame.

130.    The Director's denial of ExxonMobil's development plan is grounds for termination

of the Unit under the PTU Agreement and the state oil and gas unitization regulations, and

ExxonMobil has 90 days to cure the default or DNR may proceed with termination. Following the recent resignation and replacement of DNR Commissioner Tom Irwin, ExxonMobil requested and received an extension until May 31, 2006 to submit an appeal of this ruling.

131.    There are currently 45 state oil and gas leases committed to the PTU. All but one are beyond their primary term and are themselves subject to termination once the Unit is terminated.

132.    If the PTU Agreement terminates and the leases expire, the Defendants will lose valuable assets that they have reserved for development at some future date. This would force the Defendants to abandon the PTU or to pay significantly higher bid bonuses and higher royalty rates to enter into new lease agreements with terms imposing work commitments.

133.    Lack of a pipeline is the sole rationale proffered by the producers for not marketing gas from Point Thomson. With a pipeline, the Defendants would have no excuse not to develop their leases and market their gas. Defendants' joint refusal to market their gas is an anticompetitive agreement with the purpose and effect of keeping this resource from the market while maintaining their leases. The Defendants' conduct is not justified by any plausible efficiency rationale.

## F.    DEFENDANTS ENTERED INTO A SERIES OF MERGERS THAT CONSOLIDATED THEIR CONTROL OF THE NORTH SLOPE AND FACILITATED THEIR ANTI-COMPETITIVE GOALS.

### 1.    Exxon And Mobil.

134.    On December 1, 1998, Exxon Corporation and Mobil Corporation announced their merger to form the largest publicly traded oil company in the world. Only Saudi Arabia and Iran produce more oil. This merger, consummated on November 30, 1999, reunited the two biggest pieces, constituting 52%, of John D. Rockefeller's Standard Oil trust, which was broken up by the federal government in 1911.

31

135.    The merger of Exxon Corporation and Mobil Corporation created not only the world's biggest oil company and largest retailer of gasoline, but also the world's third largest corporation by revenue.  Although ExxonMobil has since been overtaken by BP as the world's largest oil company, it remains the largest oil company in the U.S.

136.    Through its subsidiary, ExxonMobil Pipeline, Co., ExxonMobil also has significant interests in Alaska crude oil pipelines.  ExxonMobil has a 20.34% interest in TAPS, a 21.02% interest in the 25-mile Endicott pipeline, and a 20% interest in the 55-mile Cook Inlet pipeline.

137.    Prior to the merger, Mobil held significant interests in oil and gas resources on the North Slope, including in the Prudhoe Bay and Point Thomson Units.  Those interests were consolidated with Exxon's as part of the merger.

138.    ExxonMobil currently has substantial interests in North Slope oil and gas fields.  With its 36.4% interest, ExxonMobil is the largest resource owner in the Prudhoe Bay Unit.  ExxonMobil also has the largest working interest ownership in the Point Thomson Unit, with 48.22% of the unit's estimated resources of eight TCF of natural gas.  Also on the North Slope, ExxonMobil holds smaller interests in the Kuparuk River and Duck Island Units.

**2.    BP And Amoco.**

139.    On December 30, 1998, BP and Amoco Corporation merged to form BP Amoco Corporation (later renamed BP p.l.c.).  Amoco owned oil and gas interests on the North Slope that were consolidated in this merger.  As a result of the merger, BP has prime positions in key oil and gas producing areas, retail markets, petrochemicals and emerging regions.

**3.    BP And Atlantic Richfield Co.**

140.    On April 1, 1999, BP and Atlantic Richfield Co. ("ARCO") announced that the two oil companies had reached a merger agreement.  Both the Federal Trade Commission and ExxonMobil objected to the merger on the grounds that it would lead to an unacceptable

concentration of market power with respect to ownership of the Prudhoe Bay gas and oil field. Ultimately an agreement was reached between ExxonMobil, Phillips, and BP under which ExxonMobil acquired a 36.4% stake in Prudhoe Bay, Phillips acquired a 36.6% stake, and BP received a 26.35% stake and BP became the sole operator.

141.    The merger between BP and ARCO was consummated on April 18, 2000, making it the world's largest non-state oil producer, which it remains to this day.

142.    BP operates facilities that account for more than half of all oil production in Alaska. As a result of the deal reached between BP, Phillips, and ExxonMobil in connection with BP's merger with ARCO, BP became the sole operator of Prudhoe Bay, Alaska's largest oil field and the largest oil field in the United States. BP also operates twelve other North Slope oil fields and four North Slope pipelines. In addition, BP owns a significant interest in six other producing fields and about 47% of TAPS. Production from BP's fields averages 720,000 barrels of oil equivalent per day.

143.    BP has been the largest producer of natural gas in the United States since at least 2001. With BP's 26.35% stake in Prudhoe Bay's natural gas resources and its 28.4% stake in the Point Thomson Unit, North Slope gas remains one of the largest undeveloped resources in BP's global portfolio.

144.    The impact of the BP-ARCO merger upon development of North Slope natural gas was a great concern to the State of Alaska. To address that concern, as discussed above, BP and ARCO guaranteed that any party capable of commercializing North Slope gas would have access to natural gas controlled by these parties. The "Charter for Development of the Alaskan North Slope" with BP and ARCO required, among other things, that BP and ARCO negotiate in good faith to make North Slope gas available to any third party in sufficient quantities to support a

treatment and transportation project. As discussed above, BP and ARCO ignored this obligation in refusing to negotiate with the Authority.

**4.    Other Mergers And Acquisitions.**

145.    In addition to the mergers discussed above, the producers have engaged in a series of mergers and/or acquisitions of stock and assets, including acquisition of other producers' North Slope assets. These mergers and/or acquisitions have substantially increased Defendants' market power and their ability to successfully block the development and marketing of Alaska gas.

146.    For example, as discussed above, because the pipeline tariff imposed by the TAPS owner-producers rendered its continued operation of its fields uneconomical, Conoco was forced to sell its 70% interest in the Milne Point field and its 70% interest in the Badami field, 35 miles east of Prudhoe Bay, to BP.

147.    Similarly, when BP bought Conoco's interest in Milne Point, it also purchased Chevron's 27% interest in this field. Soon after, Chevron transferred its 50% interest in two leases in the Alpine development to ARCO.

148.    Prior to its merger with Chevron, Texaco also left the North Slope. Texaco sold its 25% share of the production rights to three leases in Colville Delta to ARCO. Texaco also assigned to ARCO its 25.25% interest in the Alpine field, on the western end of the North Slope.

149.    Shell transferred its production interest in Prudhoe Bay to ARCO in 1996, and ARCO, in turn, assigned half of this acquisition to Exxon. Shell and others also sold their interests in the Northstar field to BP.

150.    A further example of this pattern is Amerada Hess. Amerada Hess was one of the largest holders of oil and gas leases in Alaska, but between 1993 and 1996, it shed over 99% of the acreage it held, including its North Slope leases, largely assigning them to ARCO and BP. Amerada Hess had a negligible interest in TAPS – 1.5%, an interest that prevented the company

34

from exercising any control over the pipeline's operation and from mitigating the effects of the artificially high tariff rates charged by the TAPS owners.

151.    These and other mergers and acquisitions have increased the Defendants' market power and substantially reduced competition in the relevant markets. With more players in the market, companies other than Defendants would have had a better ability and incentive to break from the cartel and sell gas to new competitors. This is turn would have reduced Defendants' power and control and their ability and incentives to collude.

152.    Also, because the remaining producers have a greater presence in the production of natural gas for the North American market, they have a stronger incentive and ability to withhold production in concert, in order to maintain high prices.

153.    Industry analysts evaluating these mergers have recognized that the companies' interests in controlling natural gas was a key factor influencing the mergers:

> I think natural gas was a key driver behind the formation of super-major energy companies like BP Amoco, Exxon and Mobil and now the BP Amoco-Arco merger. Executives of all the companies involved in the transactions have cited creation of a greater natural gas presence as a significant factor in their decisions to combine.
>
> For example, a top item on BP Amoco's list of reasons for acquiring Arco is control over development of the 26 TCF of natural gas in Alaska's Prudhoe Bay field. BP Amoco, Arco and Exxon are the field's principal stakeholders. BP Amoco owns 21% of Prudhoe Bay's gas, while Arco and Exxon have 32% each.

Barbara Shook, Houston Bureau Chief, Energy Intelligence Group, "Outlook for Global Gas and Electricity and Other Musings," Commonwealth North, June 8, 1999.

## V.    RELEVANT MARKETS

154.    Defendants' improper conduct affects several relevant markets, including: (1) the market for transport of natural gas from the North Slope; (2) the market for purchase of gas from

the North Slope; (3) the market for sale of natural gas within the United States/North America;

and (4) the market for sale of natural gas within Southcentral and Interior Alaska.

## A.     MARKET FOR THE TRANSPORT OF NATURAL GAS FROM THE NORTH SLOPE.

155.     As noted, Alaska's North Slope contains massive quantities of natural gas that would

have tremendous value if this gas could be transported to existing distribution infrastructure in

Southcentral and Interior Alaska and Canada, which in turn is connected to the infrastructure in

the lower 48 states. As further noted, over the last twenty years, a number of entities have taken

substantial steps to enter the market for the transportation of natural gas from the North Slope.

Although no pipeline operator currently provides pipeline service from the North Slope because

the Defendants jointly refused to deal with any new entrant, there is no question that such a

pipeline would be economical if the Defendants would commit to supplying some of their gas for

such a pipeline.

156.     There is no reasonably interchangeable substitute for a pipeline to transport natural

gas from Alaska's North Slope. Trucking or train carriage of this commodity would be

massively inefficient. Access to the sea on the North Slope is impractical due to ice. To the

extent that gas is currently used for oil production on the North Slope, the gas needed to power

North Slope operations is only a small fraction of what can be produced.

157.     The market for the transportation of natural gas from the North Slope for commercial

distribution elsewhere is a relevant market for antitrust purposes.

### *Market Power*

158.     The Defendants have monopoly power in this market because, by their own

admission, they can exclude competition: (1) by refusing to sell gas to competitors; and (2) by

refusing to allow gas owned by others, including the State of Alaska, found on units they control to be brought to market.

## B.    MARKET FOR THE PURCHASE OF NATURAL GAS FROM THE NORTH SLOPE.

159.    Another related relevant market affected by the Defendants' conduct is the market for the purchase of gas from the North Slope. In addition to acting as a carrier providing transportation services, the pipeline's operator acts as a purchaser of gas for its own account on the North Slope, which it then transports to market and sells. The structure and market dynamics of this market are essentially the same as the market for transportation of gas from the North Slope. Just as no producer can transport gas without a pipeline, no purchaser can purchase gas without a pipeline to bring the gas to market. There is no reasonable substitute for the purchase of gas capable of being transported on the pipeline because the on-site demand and use for North Slope natural gas is far less than the potential supply that is not being exploited.

160.    The Authority is a prospective purchaser of North Slope gas. It has made repeated entreaties to the Defendants to discuss the terms under which they would sell gas. While Defendants have on occasion held "courtesy meetings" with representatives of the Authority, including its construction contractor and investment bankers, and with other potential new entrants, the Defendants have steadfastly refused to discuss the prices or terms under which they would sell gas, or permit gas from units that they control to be sold, to anyone outside the Defendants' cartel. Without a commitment by at least one Defendant, neither the Authority nor anyone else will be able to compete in this market.

### *Market Power*

161.    The Defendants, acting as a cartel, also possess monopoly power in this market because they can exclude competition by refusing to sell gas to a new entrant, and without a

commitment from at least one of the Defendants to sell gas, no new entrant could successfully build a pipeline.

## C.    MARKET FOR THE SALE OF NATURAL GAS IN NORTH AMERICA.

162.    Another relevant market affected by this transaction is the market for the sale of natural gas in North America. Because of transportation costs, North America forms a separate market for the sale of natural gas from the rest of the world. This is reflected in the relative differences in the price of natural gas between the United States and the rest of the world.

163.    The Department of Energy estimates that the United States consumed approximately 22 TCF of gas in 2004. A gas pipeline from the North Slope supplying four to six BCFD would have added close to 1.5 to 2.25 TCF to national supply, or seven to ten percent of total American consumption. The producers already have a large share, a share that has been substantially increased by the mergers and acquisitions discussed above, of the domestic natural gas market and have been able to charge artificially inflated prices for that gas because North Slope gas has been excluded from that market. Had this North Slope gas been available to purchasers in the lower 48 states, the price of gas would have been at a significantly lower competitive price.

164.    Because North Slope gas has been unavailable for use off the North Slope, the price of natural gas in the United States and the rest of North America has been maintained at an artificially high level for some time. If the Defendants' illegal conduct continues, it will continue to maintain the price of gas in the United States at artificially high levels for the foreseeable future. Because the Defendants have substantial interests in natural gas from other sources, they have an economic incentive to keep North Slope gas out of the North American market in order to maintain supra-competitive prices for the sale of gas throughout the United States and the rest of North America.

***Market Power***

165.     The Defendants have market power in this market because they can exert sufficient

influence over the supply of natural gas to affect the price of gas throughout the United States.

The Defendants also have strong incentives to limit the supply of gas in the United States in

order to maintain supra-competitive prices for all their gas operations.

**D.     MARKET FOR THE SALE OF NATURAL GAS TO SOUTHCENTRAL AND
         INTERIOR ALASKA.**

166.     Southcentral and Interior Alaska, defined for the purposes of this complaint as that

part of Alaska south of the North Slope, constitutes a separate geographic market for the sale of

natural gas.  Southcentral Alaska has an existing gas distribution infrastructure that is important

to the economic vitality of southern Alaska.  Historically, the gas needs of Southcentral Alaska

have been met by supplies of gas from production areas in Southcentral Alaska itself because the

area has no infrastructure in place to:  (1) access gas produced on the North Slope; or (2) access

gas distribution sources outside Alaska.  Interior Alaska currently does not have a natural gas

distribution infrastructure.  There is, however, a high demand for natural gas in Interior Alaska

and there is no doubt that an infrastructure would be created upon receipt of assurances that gas

from the North Slope would be supplied.

167.     The supply of accessible natural gas from existing production fields in Southcentral

Alaska is currently on the downward part of the supply curve, and prices have been rising.  This

has had profound effects in Southcentral Alaska.  For example, a major fertilizer plant in the

Kenai area has recently announced that it will need to transition from natural gas to coal or

another source of energy for the production of fertilizer due to the increasing costs and

decreasing supply of Alaska natural gas, and may shut down without its needed feedstock of

natural gas.  If a pipeline is not completed within the next ten to twelve years, the situation will

become even more severe. At that point, without a new source of supply, the supply of natural gas in Southcentral Alaska will take a sharp downturn. Alaska businesses and consumers will also be forced to use more expensive and less efficient and less desirable energy sources because they do not have access to the tremendous unutilized gas resources on the North Slope.

168.    There is a separate market for the sale of natural gas in Southcentral and Interior Alaska because there are no reasonably interchangeable substitutes. While coal and other energy sources can provide heat and power, the direct and associated costs of transitioning to and using those alternatives are so high that a natural gas user would not switch to these alternatives in response to a significant increase in the cost of natural gas over the competitive price.

169.    As noted above, the Authority will provide North Slope gas to Southcentral Alaska by means of a spur line to the Palmer area.

### *Market Power*

170.    As with the other markets, the Defendants have the market power to exclude competition in the market for the sale of gas in Southcentral and Interior Alaska by refusing to cooperate with transportation companies or purchasers who intend to transport or sell North Slope gas to Southcentral Alaska.

## VI.    ANTICOMPETITIVE EFFECTS

171.    The Defendants' anticompetitive conduct has had the following anticompetitive effects, among others:

(a)    competition for the transport of natural gas off the North Slope has been reduced or eliminated;

(b)    competition for the purchase of North Slope natural gas has been reduced or eliminated;

40

(c)    incentives for exploration and development of North Slope natural gas resources have been reduced;

(d)    the supply of natural gas to Southcentral Alaska and the rest of United States has been artificially reduced and the price of natural gas maintained at artificially high levels; and

(e)    gas purchasers may be forced to lock into long-term, high-price gas contracts for gas from other sources, locking Alaska gas out of the market even after a pipeline is built.

## A.    REDUCED COMPETITION FOR THE TRANSPORT/PURCHASE OF NATURAL GAS.

172.    The actual and potential competitive effects if the Defendants are permitted to continue to monopolize and attempt to monopolize the market for transportation of gas from the North Slope are profound.

173.    If not stopped, the Defendants' anticompetitive conduct will eliminate competition from independent pipeline producers and further delay construction of a pipeline. This will further discourage investment in exploration and development of this resource and impede the commercialization of Alaska's gas resources, further inflating the price of natural gas.

## B.    REDUCED INCENTIVES FOR THE DEVELOPMENT OF ALASKA'S GAS RESOURCES.

174.    Left unchecked, the Defendants' anticompetitive conduct will continue to impede exploration for and development of North Slope natural gas.

175.    As the former Director of Alaska's Department of Natural Resources, Division of Oil and Gas, Mark Myers, recently wrote: "The explorer's inability or uncertainty in obtaining access to unregulated [processing and pipeline] facilities through commercial agreements has

41

dramatically slowed the pace of exploration on the North Slope.... While [the high pipeline and processing] fees clearly benefit the pipeline owners, they dramatically increase cost and risk to explorers and lower the North Slope's overall worldwide competitiveness."

176.    Director Myers also warned that without independent access to transport at a fair and reasonable cost "there may be no room for explorer's gas for 25 years or more. Under this scenario, exploration for gas on the North Slope and in several of the Interior basins wouldn't be very viable for a generation."

177.    Similarly, another North Slope producer, Anadarko Petroleum Company ("Anadarko"), has discussed the critical link between access to a transportation pipeline and the ability to develop natural gas. In a November 12, 2001, letter encouraging the State of Alaska to make its royalty gas available for sale, David D. Anderson, Anadarko's Manager, International Commercial Development, stated that, "Securing access to the proposed natural gas pipeline from the North Slope is a necessity for the continued exploration for natural gas within the State of Alaska." Concerned that a proposed pipeline might not have sufficient capacity to transport gas from developers such as his company, he added, "failure to secure firm transportation now could result in Anadarko's prospective gas discoveries being stranded without any means to produce and sell the gas." In testimony related to this proposed sale of royalty gas, Anadarko's Mark Hanley repeated this point. "It is critical that we obtain capacity [on a gas pipeline]. If we cannot obtain capacity, it makes no sense to explore for gas."

## C.    REDUCED OUTPUT AND HIGHER PRICES FOR GAS IN ALASKA AND THE REST OF THE UNITED STATES.

178.    As noted above, with a pipeline, the North Slope could supply approximately seven to ten percent of the United States' current natural gas needs. In the absence of the Defendants' anticompetitive conduct, a pipeline would be substantially farther along, if not already

constructed by now.  The Defendants' joint refusal has kept and will keep this gas out of the

market, the ultimate and inevitable result being that consumers will continue to pay higher prices

than they would otherwise.

**D.    ALASKA GAS COULD BE LOCKED OUT OF THE MARKET EVEN AFTER A PIPELINE IS BUILT DUE TO THE DEFENDANTS' EFFORTS TO DELAY.**

179.    In addition, because natural gas supply contracts are often long-term contracts, further

delay in the construction of the pipeline could cause large gas purchasers in the United States to

lock into contracts to purchase gas from overseas suppliers, including the Defendants, at prices

that are higher than would prevail in a competitive market.  Not only would consumers be locked

into high price gas contracts, this could have the effect of foreclosing North Slope gas from these

markets even after the pipeline is constructed.

## VII.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### Concerted Refusal to Deal and Group Boycott
### in Violation of Section One of the Sherman Act.

180.    The Authority repeats and realleges all of the allegations in all the paragraphs above

as if set forth fully herein.

181.    Defendants' agreements not to deal with the Authority or other competitive pipeline

companies are a group boycott and concerted refusal to deal by competitors with market power

that deprives the Authority of an essential input needed to compete in the markets for the

purchase and transport of natural gas from the North Slope, and in the markets for the sale of

natural gas in Southcentral and Interior Alaska and the United States.  Defendants' agreements

and boycott are a *per se* violation of Section One of the Sherman Act.

182.    Defendants' concerted refusal to deal and group boycott also unreasonably restrain

competition and foreclose a substantial share of the markets for the purchase and transport of

natural gas from the North Slope in violation of Section 1 of the Sherman Act, and unreasonably restrain competition in the Southcentral and Interior Alaska and United States markets for the sale of natural gas in violation of Section One of the Sherman Act. It is unlawful whether judged by a *per se* standard or by the rule of reason.

183.    The purpose and effect of Defendants' concerted refusal to deal and group boycott is to restrain trade and eliminate competition in all the relevant markets identified above.

184.    Defendants' concerted refusal to deal and group boycott have a substantial effect on interstate and foreign commerce.

185.    Defendants' agreements violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

186.    By reason of Defendants' violations of Section 1 of the Sherman Act, the Authority has been injured in its business or property, including through the loss of future profits, by the loss of customers and potential customers, and by the prospective destruction of its business.

187.    The Authority has suffered irreparable injury by reason of the acts, practices and conduct of the Defendants alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices and conduct.

### SECOND CLAIM FOR RELIEF
### Agreements Not To Compete
### in Violation of Section One of the Sherman Act.

188.    The Authority repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

189.    Defendants' agreements described above, taken together, constitute naked agreements not to compete with each other in supplying gas for purchase or transport off the North Slope to the Southcentral and Interior Alaska and United States markets for natural gas. As such, these agreements are *per se* violations of Section One of the Sherman Act.

44

190.    Defendants' agreements not to compete with each other also unreasonably restrain competition and foreclose a substantial share of the markets for the purchase and transport of natural gas from the North Slope in violation of Section One of the Sherman Act, and unreasonably restrain competition in the Southcentral and Interior Alaska and United States markets for the sale of natural gas.

191.    Defendants' agreements not to compete with each other, as described above, are unnecessary to accomplish the stated purposes of the Unitization Agreements or any lawful agreements, and they restrict competition in an unreasonable and unnecessary way. Defendants' agreements unreasonably restrain trade and restrict the access of the Authority and others to the markets for the transport, purchase and sale of natural gas, thereby restraining competition in those markets and foreclosing substantial interstate and foreign commerce. Defendants' agreements are unlawful whether judged by a *per se* standard or by the rule of reason.

192.    The purpose and effect of Defendants' agreements are to restrain trade and competition in the relevant markets described above.

193.    Defendants' agreements violate Section 1 of the Sherman Act, 15 U.S.C. § 1.

194.    By reason of Defendants' violations of Section 1 of the Sherman Act, the Authority has been injured in its business or property, including through the loss of future profits, by the loss of customers and potential customers, and by the prospective destruction of its business.

195.    The Authority has suffered irreparable injury by reason of the acts, practices and conduct of the Defendants alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices and conduct.

### THIRD CLAIM FOR RELIEF
**Conspiracy to Monopolize Markets for the Transportation and Purchase of Natural Gas from the North Slope in Violation of Section 2 of the Sherman Act.**

196.    The Authority repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

197.    By such acts, practices, and conduct, Defendants have conspired to monopolize the markets for the transport and purchase of natural gas on the North Slope by jointly refusing to deal with any competitive pipeline, all in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2. By establishing joint control over the most productive oil and gas units on the North Slope, and agreeing with each not to deal with other pipeline suppliers, Defendants have monopolized the supply of natural gas from the North Slope.

198.    Defendants have likewise maintained that monopoly through the practices described herein.

199.    By reason of Defendants' violations of Section 2 of the Sherman Act, the Authority has been injured in its business or property, including through the loss of future profits, by the loss of customers and potential customers, and by the prospective destruction of its business.

200.    The Authority has suffered irreparable injury by reason of the acts, practices, and conduct of Defendants alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices, and conduct.

### FOURTH CLAIM FOR RELIEF
**Attempted Monopolization of Markets for the Transportation and Purchase of Natural Gas from the North Slope in Violation of Section 2 of the Sherman Act.**

201.    The Authority repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

46

202.    The markets for the sale of gas transportation services from the North Slope of Alaska and for the purchase of natural gas from the North Slope of Alaska are relevant antitrust markets. Defendants have willfully engaged, and are illegally engaging, in a cumulative course of conduct intended to monopolize those markets, including without limitation: agreeing among themselves not to commit gas resources; failing to develop known natural gas resources in the Prudhoe Bay and Point Thompson Units; and entering into a series of mergers and asset acquisitions that consolidated control of the North Slope natural gas resources.

203.    These practices have no legitimate business justification. They restrict competition in an unnecessary and unreasonable way, and are far broader than necessary to effectuate any legitimate purpose they might have.

204.    Defendants have undertaken this course of conduct with the specific intent of monopolizing the markets described above. There is a dangerous probability that, unless restrained, Defendants' course of conduct will succeed, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

205.    By reason of Defendants' violations of Section 2 of the Sherman Act, the Authority has been injured in its business or property, including through the loss of future profits, by the loss of customers and potential customers, and by the prospective destruction of its business.

206.    The Authority has suffered irreparable injury by reason of the acts, practices, and conduct of Defendants alleged above, and will continue to suffer such injury until and unless the Court enjoins such acts, practices, and conduct.

## FIFTH CLAIM FOR RELIEF
### Unlawful Purchase, Holding and Use of Stock or Assets
### in Violation of Section 7 of the Clayton Act.

207.    The Authority repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

208.    Defendants' previous mergers, acquisitions, holding, and use of other companies' stock and assets have substantially lessened competition in relevant markets for the transportation and purchase of natural gas from the North Slope.   Such mergers, acquisitions, holding, and use have foreclosed, and will foreclose, substantial interstate and foreign commerce, and violate Section 7 of the Clayton Act, 15 U.S.C. § 18.

209.    The Authority has been and will continue to be injured as a result of Defendants' unlawful acquisition, holding, and use of these acquired assets.  Without injunctive relief, the Authority will continue to suffer irreparable injury as a result of Defendants' unlawful conduct, for which there is no adequate legal remedy.

## SIXTH CLAIM FOR RELIEF
### Violation of Alaska Unfair Trade Practice and Consumer Protection Act,
### AS 45.50.471 *et seq.*

210.    The Authority repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

211.    Defendants are engaged in trade and commerce.  In the conduct of trade and commerce, Defendants have engaged in unfair and deceptive acts or practices. The Defendants have in the past wanted to avoid appearing unwilling to sell gas to the Authority or other pipeline sponsors because, among other reasons, the Defendants did not want to risk the State's termination of their oil and gas units and leases or to foster a negative public image.  In order to avoid the appearance that they were unwilling to sell gas resources, the Defendants intentionally

misled the Authority and other pipeline sponsors that the Defendants were willing to evaluate the Authority's and other pipeline sponsors' plans on the merits and were willing to negotiate in good faith with pipeline sponsors. In fact, Defendants knew that they had no intention of engaging in serious negotiations because they had agreed they would not market gas to any pipeline operator not controlled by Defendants.

212.    In the conduct of trade and commerce, Defendants have also engaged in unfair acts or practices, as described above, including by agreeing with others not to compete in the sale of natural gas from the North Slope and agreeing not to sell natural gas to the Authority and others.

213.    The foregoing conduct constitutes unfair conduct under the Alaska Unfair Trade Practice and Consumer Protection Act because it offends public policy as expressed through statutes and regulation, it is unethical and oppressive, and it has caused substantial injury to consumers and competitors.

214.    By reason of Defendants' violations of the Alaska Unfair Trade Practice and Consumer Protection Act, the Authority has been injured in its business or property, including through the loss of future profits, by the loss of customers and potential customers, and by the prospective destruction of its business. The Authority has been injured and suffered damages in an amount to be proved at trial and, without injunctive relief, the Authority will continue to suffer irreparable injury as a result of Defendants' unlawful conduct. The Authority has no adequate remedy at law.

## SEVENTH CLAIM FOR RELIEF
### Tortious Interference with Prospective Business Opportunity.

215.    The Authority repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

49

216.    Defendants have undertaken a willful and malicious course of conduct to foreclose the Authority from conducting its business.

217.    Through its negotiations with major North Slope producers and the State of Alaska, the Authority had a prospective economic relationship with each such working and royalty interest owner for the sale and purchase, or other commitment, of gas to be transported in the Authority's pipeline.

218.    Defendants knew about the Authority's efforts to obtain gas from producers for transportation in a pipeline and sought to prevent the Authority from realizing the benefits of any such agreement with any producer, including each other.

219.    Sempra Alaska is a wholly owned subsidiary of Sempra LNG, which is in turn a wholly owned subsidiary of Sempra Energy (collectively "Sempra"), the largest retail gas distribution company in the United States and the second largest gas trading company in the United States.  Sempra is developing LNG regasification facilities in Mexico for delivery of natural gas into the United States.

220.    The Authority entered into a contract with Sempra whereby Sempra committed to assist in the development of the initial phases of the pipeline project and to fund or finance a portion of the project.  The Authority also negotiated for Sempra to buy and market all of the gas processed by the Authority's facilities.

221.    Defendants knew about the Authority's agreements with Sempra regarding the development of the pipeline project and the sale and marketing of gas to be transported by the pipeline and sought to prevent the Authority from realizing the benefits of those agreements.

222.    But for Defendants' anticompetitive conduct, there was a reasonable probability that the Authority would have been able to successfully secure business relationships with producers

or the State of Alaska for the purchase or commitment of gas to be transported in the Authority's pipeline.

223.    Because of Defendants' conduct, however, neither the State of Alaska nor any producer was or are willing to sell or otherwise commit gas to the Authority.

224.    But for Defendants' anticompetitive conduct, there was a reasonable probability that the Authority would have been able to successfully secure business relationships with Sempra for development of the pipeline and for the purchase of gas from the Authority.

225.    Because of Defendants' conduct, however, Sempra has discontinued its business relationship with the Authority and has withdrawn its agreements to support development of the pipeline and to purchase gas from the Authority.

226.    Through the anticompetitive and unjustifiable means described above, Defendants intentionally interfered with and frustrated the Authority's efforts to benefit from its prospective business relationships with the producers, the State of Alaska, Sempra, and the LNG gas purchasers.

227.    Defendants have engaged in the anticompetitive and unjustifiable means described above without legitimate justification or excuse.

228.    By reason of Defendants' violations, the Authority has been injured in its business or property, including through the loss of future profits, by the loss of customers and potential customers, and by the prospective destruction of its business. The Authority has been injured and suffered damages in an amount to be proved at trial and, without injunctive relief, the Authority will continue to suffer irreparable injury as a result of Defendants' unlawful conduct. The Authority has no adequate remedy at law. The Authority is also entitled to punitive damages for Defendants' willful and malicious conduct.

## EIGHTH CLAIM FOR RELIEF
### Against BP – Breach of Contract

229.    The Authority repeats and realleges all of the allegations in all the paragraphs above as if set forth fully herein.

230.    As set forth above, BP entered into a contract – "Charter for Development of the Alaskan North Slope" – under which it agreed, among other things, to:

    (a)    negotiate in good faith to make North Slope gas available to third parties at a commercially reasonable fair market price or transportation charge in quantities sufficient to support a treatment and transmission project;

    (b)    make reasonable efforts to assist in obtaining approval for a qualified transportation project, such as the Authority's, from the other gas producers and field interest owners; and

    (c)    give fair consideration to any reasonable project to deliver gas to market, specifically including projects sponsored by the Authority, YPC, the State, and others.

231.    The Authority was an intended beneficiary of that contract. As a political subdivision of the State, the Authority's purpose is to benefit the State of Alaska and its citizens by the construction of an independently owned gas pipeline system to transport natural gas from Alaska's North Slope to market. BP's continued refusal to negotiate with the Authority and others to sell gas constituted a breach of the contract, and frustrated the Authority from accomplishing its intended purpose. As a result of these breaches, the Authority, an intended beneficiary of the contract, has been injured in its business or property, including through the loss of future profits, by the loss of customers and potential customers, and by the prospective destruction of its business. The Authority has been injured and suffered damages in an amount

52

to be proven at trial and, without injunctive relief, the Authority will continue to suffer

irreparable injury as a result of Defendants' unlawful conduct. The Authority has no adequate

remedy at law.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that the Court:

A.     Adjudge and decree that Defendants have violated Sections 1 and 2 of the

Sherman Act, 15 U.S.C. §§ 1 and 2; and Section 7 of the Clayton Act, 15 U.S.C. § 18; that

Defendants have violated the Alaska Unfair Trade Practice and Consumer Protection Act, AS

45.50.471 *et seq.*; that Defendants have tortiously interfered with the Authority's prospective

economic advantage; and that BP's conduct constitutes breach of contract;

B.     On the Authority's First through Sixth Claims, enter judgment against Defendants

for treble the amount of the Authority's damages as proven at trial in accordance with Section 4

of the Clayton Act, 15 U.S.C. § 15, and the Alaska Unfair Trade Practice and Consumer

Protection Act, AS 45.50.531;

C.     On the Authority's Seventh and Eighth Claims, enter judgment against

Defendants for the amount of the Authority's damages as proven at trial and, on the Authority's

Sixth and Seventh Claims, for punitive damages;

D.     Grant the Authority injunctive relief pursuant to 15 U.S.C. § 26, sufficient to

restrain Defendants' continuing violations of 15 U.S.C. §§ 1 and 2;

E.     Grant the Authority injunctive relief pursuant to 15 U.S.C. § 26, sufficient to

restrain and prevent Defendants' violations of 15 U.S.C. § 18, including but not limited to

injunctive relief requiring divestiture of some or all of the assets acquired, and/or imposing

conditions on Defendants' use of some or all of the assets acquired;

53

F.     Award the Authority its costs and expenses of litigation, including attorneys' fees and expert witness fees; and

G.     Enter judgment against Defendants for such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff AGPA hereby demands trial by jury in this action on all issues so triable.

Dated: Monday, December 19, 2005          Respectfully submitted,


David Boies
Robert Silver
John F. Cove, Jr.
Kenneth F. Rossman IV
BOIES, SCHILLER & FLEXNER LLP


William M. Walker
WALKER & LEVESQUE, LLC


Charles E. Cole
LAW OFFICES OF CHARLES E. COLE

*Counsel for Plaintiff Alaska Gasline Port Authority*

54