Ronald C. Redcay (Cal. Bar No. 067236)
Matthew T. Heartney (Cal. Bar No. 123516)
Angel L. Tang (Cal. Bar No. 205396)
ARNOLD & PORTER LLP
(*Pro Hac Vice Applications Pending*)
777 South Figueroa Street, 44th Floor
Los Angeles, California  90017-5844
Telephone:  (213) 243-4000
Facsimile:  (213) 243-4199
Ronald_Redcay@aporter.com
Matthew_Heartney@aporter.com
Angel_Tang@aporter.com

Jeffrey M. Feldman (Alaska Bar No. 7605029)
FELDMAN ORLANSKY & SANDERS
500 L Street, Suite 400
Anchorage, Alaska 99501
Telephone:  (907) 272-3538
Facsimile:  (907) 274-0819
feldman@frozenlaw.com

Bradley S. McKim (Alaska Bar No. 0511089)
BP EXPLORATION (ALASKA) INC.
900 East Benson Boulevard
Anchorage, AK 99508
Telephone:  (907) 564-5154
Facsimile:  (907) 564-4031
mckimbs@bp.com

*Attorneys for Defendant*
*BP Exploration (Alaska) Inc.*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE ALASKA GASLINE PORT AUTHORITY, <br><br> Plaintiff, <br><br> v. <br><br> EXXONMOBIL CORPORATION, a New Jersey corporation; EXXONMOBIL ALASKA PRODUCTION, INC., a Delaware corporation; BP P.L.C., a United Kingdom corporation; and BP EXPLORATION (ALASKA) INC., a Delaware corporation, <br><br> Defendants. | Case No. F05-0026 CIV (RRB) <br><br> MEMORANDUM IN SUPPORT OF MOTION TO DISMISS DEFENDANT BP EXPLORATION (ALASKA) INC. <br><br> (Fed. R. Civ. P. 12(b)(6) & (7)) <br><br> Judge:  The Honorable Ralph R. Beistline |

<u>TABLE OF CONTENTS</u>

Page

I.   THE COMPLAINT FAILS TO STATE ANY ANTITRUST CLAIM  (FIRST
     THROUGH FIFTH CLAIMS FOR RELIEF) .................................................................7

     A.   Plaintiff Lacks Standing To Pursue Any Antitrust Claim ......................................7

          1.   To establish antitrust standing, a plaintiff suing as a thwarted
               prospective entrant must allege facts demonstrating its
               "preparedness" to enter the market .............................................................7

          2.   The complaint fails to allege facts demonstrating plaintiff's
               preparedness to enter the market.................................................................11

               a.   Plaintiff has not received approval from or
                    consummated a fiscal contract with the State of Alaska...............11

               b.   Plaintiff has not secured any financing for its project ..................13

               c.   Plaintiff has not taken other affirmative steps necessary
                    to enter the market .......................................................................15

               d.   Plaintiff has no experience or expertise in the natural gas
                    industry .......................................................................................17

     B.   The Complaint Fails To State Any Antitrust Claim Based Upon
          Alleged Restraints Of, Or Lessening Of Competition In, The
          Nonexistent Markets For The Transportation Or Purchase Of ANS
          Natural Gas (First Through Fifth Claims For Relief) ............................................17

     C.   The Complaint Fails To State Any Antitrust Claim Based Upon
          Alleged Restraints Of, Or Lessening Of Competition In, The Existing
          Markets For The Sale Of Natural Gas (First and Second Claims for
          Relief) ...................................................................................................................22

     D.   The Complaint Fails To State Any Antitrust Claim Based Upon BP's
          Mergers (Fifth Claim For Relief).........................................................................24

          1.   The complaint fails adequately to allege that the mergers were
               illegal............................................................................................................25

          2.   The complaint fails adequately to allege plaintiff's antitrust
               injury from the mergers ................................................................................28

          3.   Any claim based upon BP's mergers is time-barred................................29

II.     PLAINTIFF LACKS STANDING TO BRING THE UTPA CLAIM (SIXTH
        CLAIM FOR RELIEF)...................................................................................29

III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS
        INTERFERENCE BECAUSE THE ALLEGED WRONGFUL CONDUCT IS
        PRIVILEGED AS A MATTER OF LAW (SEVENTH CLAIM FOR RELIEF) .............30

IV.     THE COMPLAINT FAILS TO STATE A BREACH OF CONTRACT
        CLAIM AGAINST BPXA (EIGHTH CLAIM FOR RELIEF).........................................32

        A.      The Charter Explicitly Provides That Only Its Parties May Enforce
                This Agreement.........................................................................................34

        B.      The Charter May Be Enforced Only By Arbitration ..............................35

        C.      The Charter's Provisions Expired Prior To BPXA's Conduct
                Constituting The Purported Breach .......................................................35

V.      PLAINTIFF'S CLAIMS FOR INJUNCTIVE RELIEF SHOULD BE
        DISMISSED FOR FAILURE TO JOIN PARTIES WHOSE PRESENCE IS
        REQUIRED BY RULE 19 .................................................................................36

## TABLE OF AUTHORITIES

**FEDERAL CASES**                                                    **Page**

*Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*,
    141 F.3d 947 (9th Cir. 1998) .......................................................20

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
    190 F.3d 1051 (9th Cir. 1999) ...................................................23

*American Medicorp, Inc. v. Humana, Inc.*,
    445 F. Supp. 589 (E.D. Pa. 1977) ..............................................19

*Apartment Source of Pa., L.P. v. Philadelphia Newspapers, Inc.*,
    1999 WL 349938 (E.D. Pa. May 21, 1999) ................................19

*Ashley Creek Phosphate Co., v. Chevron USA, Inc.*,
    315 F.3d 1245 (10th Cir. 2003) ....................................................9

*Associated Gen. Contractors of Cal. Inc. v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983)...............................................................5, 7

*Atlantic Richfield Co. v. USA Petroleum Co.*,
    495 U.S. 328 (1990)...................................................................23

*Aviation Upgrade Tech., Inc. v. Boeing Co.*,
    78 Fed. Appx. 623, 625 (9th Cir. 2003)....................................17

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
    182 F.3d 1096 (9th Cir. 1999) ...................................................26

*Bourns, Inc. v. Raychem Corp.*,
    331 F.3d 704 (9th Cir. 2003) ........................................................8

*Bubar v. Ampco Foods, Inc.*,
    752 F.2d 445 (9th Cir. 1985) ....................................8, 9, 10, 12

*Car Carriers v. Ford Motor Co.*,
    745 F.2d 1101 (7th Cir. 1986) ...................................................25

*Cargill, Inc. v. Monfort of Colorado, Inc.*,
    479 U.S. 104 (1986)......................................................7, 24, 28

*Consol. Edison, Inc. v. Northeast Utils.*,
    426 F.3d 524 (2d Cir. 2005)........................................................34

*Crucible, Inc. v. Stora Kopperbergs Bergslags AB*,
    701 F. Supp. 1157 (W.D. Pa. 1988)............................................19

*E. Food Servs. Inc., v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*,
    357 F.3d 1 (1st Cir. 2004).........................................................21

*Eagle v. Star-Kist Foods, Inc.*,
    812 F.2d 538 (9th Cir. 1987) ....................................................................22

*FTC v. H.J. Heinz Co.*,
    246 F.3d 708 (D.C. Cir. 2001) ...............................................................25

*FTC v. Procter & Gamble Co.*,
    386 U.S. 568 (1967) ..................................................................................25

*FTC v. Warner Communications Inc.*,
    742 F.2d 1156 (9th Cir. 1984) ................................................................25

*Fraser v. Major League Soccer, L.L.C.*,
    284 F.3d 47 (1st Cir. 2002) .....................................................................18

*Gas Utilities Co. of Ala. v. S. Natural Gas Co.*,
    996 F.2d 282 (11th Cir. 1993) ......................................................12, 15, 16

*Gas Utils. Co. of Ala., Inc. v. S. Natural Gas Co.*,
    825 F. Supp 1551 (N.D. Ala. 1992) ..........................................................9

*Glen Holly Entertainment Inc. v. Tektronix Inc.*,
    352 F.3d 367 (9th Cir. 2003) ...................................................................22

*Go-Video, Inc. v. Matsushita Elec. Indus. Co., Ltd.*
    *(In re Dual-Deck Video Cassette Recorder Antitrust Litig.)*,
    11 F.3d 1460 (9th Cir. 1993) ............................................8, 10, 12, 16, 17

*Hayes v. Solomon*,
    597 F.2d 958 (5th Cir. 1979) ...................................................................15

*In re BP Amoco p.l.c. and Atlantic Richfield Co.*,
    Docket No. C-3938, 2000 WL 422209 (F.T.C.) (Apr. 13, 2000) ..............26, 27

*Int'l Tel. & Telegraph Corp. v. Gen. Tel. & Electronics Corp.*,
    518 F.2d 913 (9th Cir. 1975) ...................................................................29

*Jayco Sys., Inc. v. Savin Bus. Machines Corp.*,
    777 F.2d 306 (5th Cir. 1985) ................................................................9, 15

*Lee Shockley Racing v. Nat'l Hot Rod Ass'n*,
    884 F.2d 504 (9th Cir. 1989) ........................................................10, 11, 12

*McCaw Personal Communications, Inc. v. Pacific Telesis Group*,
    645 F. Supp. 1166 (N.D. Cal. 1986) .........................................................7

*NCAA v. Bd. of Regents*,
    468 U.S. 85 (1984) ...................................................................................20

*Napster, Inc. Copyright Litig. v. Hummer Winblad Venture Partners*,
    354 F. Supp. 2d 1113 (N.D. Cal. 2005) ...............................................8, 10

*Oregon Laborers - Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*,
    135 F.3d 957 (9th Cir. 1999) ..................................................................................23

*Parks v. Watson*,
    716 F.2d 646 (9th Cir. 1983) ....................................................................................8

*Queen City Pizza, Inc. v. Domino's Pizza Inc.*,
    124 F.3d 430 (3d Cir. 1997)....................................................................................21

*Rutman Wine Co. v. E. & J. Gallo Winery*,
    829 F.2d 729 (9th Cir. 1987) ..................................................................................25

*Santa Cruz Med. Clinic, Derjjan Assocs., Inc. v. Dominican Santa Cruz Hosp.*,
    1994 WL 619288 (N.D. Cal. Oct. 24, 1994).............................................................7

*SCM Corp. v. Xerox Corp.*,
    645 F.2d 1195 (2d Cir. 1981)............................................................................17, 18

*Smilecare Dental Group v. Delta Dental Plan of Cal., Inc.*,
    88 F.3d 780 (9th Cir. 1996) ....................................................................................25

*Solinger v. A&M Records, Inc.*,
    586 F.2d 1304 (9th Cir. 1978) .............................................................................8, 10

*Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Assoc.*,
    830 F.2d 1374 (7th Cir. 1987) ..................................................................................7

*Standard Oil Co. v. United  States*,
    221 U.S. 1 (1911).....................................................................................................17

*Stanley v. Univ. of S. Cal.*,
    13 F.3d 1313 (9th Cir. 1994) ..................................................................................37

*TV Communications Network, Inc. v.  Turner Network Television, Inc.*,
    964 F.2d 1022 (10th Cir. 1992) ..............................................................................21

*Tanaka v. Univ. of S. Cal.*,
    252 F.3d 1059 (9th Cir. 2001) ...........................................................................20, 21

*United States ex rel. Morongo Band of Mission Indians v. Rose*,
    34 F.3d 901 (9th Cir. 1994) ....................................................................................36

*United States v. Oracle Corp.*,
    331 F. Supp. 2d 1098 (N.D. Cal. 2004) .............................................................25, 26

*United States v. Ritchie*,
    342 F.3d 903 (9th Cir. 2003) ..................................................................................32

*Vinci v. Waste Mgmt., Inc.*,
    80 F.3d 1372 (9th Cir. 1996) ..................................................................................23

*Warren v. Fox Family Worldwide, Inc.*,
    328 F.3d 1136 (9th Cir. 2003) .................................................................24, 31

*Wilk v. American Med. Ass'n*,
    895 F.2d 352 (7th Cir. 1990) .................................................................20

## STATE CASES

*Aloha Lumber Corp. v. Univ. of Alaska*,
    994 P. 2d 991 (Alaska 1999).................................................................30

*K & K Recycling, Inc. v. AlaskaGold Co.*,
    80 P.3d 702 (Alaska 2003).................................................................30

*Monzingo v. Alaska Air Group, Inc.*,
    112 P.3d 655 (Alaska 2005).................................................................35

*Nizinski v. Currington*,
    517 P.2d 754 (Alaska 1974).................................................................30

*Odom v. Fairbanks Mem'l Hosp.*,
    999 P.2d 123 (Alaska 2000).................................................................30

*Ran Corp. v. Hudesman*,
    823 P.2d 646 (Alaska 1991).................................................................31, 32

*Sisters of Providence v. A.A. Pain Clinic, Inc.*,
    81 P.3d 989 (Alaska 2003).................................................................30

## STATUTES

9 U.S.C. § 2.................................................................35

15 U.S.C. § 1.................................................................18

15 U.S.C. § 2.................................................................18

15 U.S.C. § 15.................................................................2, 7

15 U.S.C. § 15b.................................................................29

15 U.S.C. § 18.................................................................5, 18, 24, 25

15 U.S.C. § 26.................................................................2, 7, 24, 36

15 U.S.C. § 720n(b)(1).................................................................14

15 U.S.C. § 720n(b)(2).................................................................14

15 U.S.C. § 720n(b)(4).................................................................13, 14, 15

15 U.S.C. § 720n(c)(1)...........................................................................................14

46 U.S.C. § 861 *et al.*..........................................................................................16

Fed. R. Civ. P. 12(b)(7).......................................................................................36

## MISCELLANEOUS

5B Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure
    § 521 (3d ed. 2004)..................................................................................32

5C Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure
    § 1364 (3d ed. 2004)................................................................................32

Restatement (Second) of Contracts § 302(1) (1981)......................................34

Restatement (Second) of Contracts § 309 & cmt. b (1981)..........................35

PRELIMINARY STATEMENT

Plaintiff filed this lawsuit for one obvious goal.  Plaintiff wants this Court, not the State of Alaska, to decide the most important economic decision now facing the State -- the selection of the best pipeline project to bring North Slope gas to market.  Plaintiff has proposed both to the State and to the owners of North Slope gas (which include the producer defendants, the State, and other companies not sued, the largest of which is ConocoPhillips) a project that its complaint describes as one of the two "practical means of transporting North Slope gas to market." [Complaint ("Cmpl."), ¶ 77]  The principal North Slope gas owners, including the producer defendants, have proposed an alternative project to the State, which the State currently is considering pursuant to the protocol established by the Alaska Stranded Gas Development Act, AS 43.82 *et seq.* ("SGDA").  Indeed, the complaint acknowledges that there are ongoing "negotiations with the Governor" concerning these projects.  [Cmpl., ¶ 96]  Yet, its essential thrust is that any refusal by the defendants to commit to plaintiff's proposed project the North Slope natural gas needed for either project is a federal antitrust violation, as well as a violation of state law and a breach of contract.  In short, plaintiff seeks to use this lawsuit to preempt the producer defendants' project (or any other project for that matter), to divest the State of its authority under the SGDA, and to deprive Alaskans of the best project for bringing the gas to market.  Plaintiff effectively asks this Court to assume a position as "Gas Czar" for Alaska and to order judicially what plaintiff has been unable to obtain based on the economic merits of or political support for its project.

<u>INTRODUCTION</u>

While the complaint runs 54 pages, 231 paragraphs and eight claims for relief, the theory of plaintiff's case is as simple as its goal is obvious.  The relevant allegations outlining the theory are simply that:  plaintiff has sought to acquire each defendant's North Slope natural gas, which is needed for plaintiff's proposed pipeline project, and that each defendant has declined to commit its gas to plaintiff.  Plaintiff claims that those refusals violate the federal antitrust laws and Alaska's Unfair Trade Practices and Consumer Protection Act, and constitute both tortious interference with plaintiff's prospective economic advantage and, in the case of defendants BP Exploration (Alaska) Inc. ("BPXA") and BP p.l.c. ("BP")[1], a breach of the Charter for Development of the Alaskan North Slope (the "Charter").

In order to bring a case in federal court, plaintiff needed to dress in antitrust clothes its complaint that defendants have not bowed to its demands and have declined to select its project.  So, plaintiff claims first that each defendant's refusal to commit to sell its North Slope gas to plaintiff resulted not from each defendant's independent decision-making but rather from an unlawful agreement among the defendants.  Plaintiff further alleges that those refusals were designed to lessen competition in purported "relevant" antitrust markets.  However, as hard as plaintiff tries to manufacture the necessary building blocks for a federal antitrust claim, the complaint fails in all respects.

Plaintiff's antitrust claims fail at the outset because plaintiff lacks standing to bring any antitrust claim.  Clayton Act §§ 4 and 16, 15 U.S.C. §§ 15 & 26 -- the federal antitrust laws pursuant to which plaintiff brings this case -- impose standing requirements that do not permit

---

[1] The term "BP" may refer to BP p.l.c. or any BP p.l.c. affiliate other than BPXA.

claims based on the mere speculative possibility of entering a business. Controlling case law, including Ninth Circuit opinions, require that a plaintiff have more than an intent to enter the market. Plaintiff must be adequately prepared, including obtaining financing and contracts, to enter the business on which it bases its claims. The facts, as distinct from the conclusions, set forth in the section of the complaint [Cmpl., ¶¶ 81-100] purporting to satisfy this standing requirement are insufficient to demonstrate the requisite level of preparedness. Indeed, the facts alleged there confirm that plaintiff's project is too speculative to support an antitrust claim.

Plaintiff's antitrust claims also fail because they do not satisfy the most basic element of any antitrust claim -- that the alleged wrongful conduct injured competition in an existing and relevant economic market. Two of the purported "relevant markets" identified in the complaint -- markets for the transport and purchase of North Slope natural gas [Cmpl., ¶¶ 155-161] -- do not currently exist in any economic sense. Because currently there is neither purchase nor transport of North Slope natural gas off the Slope itself, there are no corresponding markets for North Slope natural gas for defendants to monopolize or restrain. Plaintiff's attempt to base antitrust claims on purported restraints in those nonexistent markets fails as a matter of law. The claims also fail because, even if there were transactions, plaintiff could not use limited North Slope markets to define its antitrust claims. If and when an approved pipeline project makes transactions off the Slope possible, "North Slope natural gas" will not be a market by itself, but rather will be a fungible commodity competing against other sources of natural gas in broader markets. Accordingly, any antitrust claim involving North Slope gas needs to be assessed in the context of these broader gas markets.

Recognizing that North Slope gas will compete against other gas in other markets, plaintiff also alleges that defendants' refusals to commit North Slope natural gas to it restrains competition in two of the markets in which that gas someday will compete -- markets for the sale of natural gas to North America and to South Central and Interior Alaska.  [Cmpl., ¶¶ 162-170]  Those markets exist, but North Slope natural gas now does not compete in those markets.  Nor can North Slope natural gas compete in those markets unless and until a pipeline project is approved by the State and federal governments.  Therefore, as a matter of law, plaintiff cannot use conduct involving North Slope gas to base an antitrust claim on purported restraints on competition in those markets.  Moreover, plaintiff lacks antitrust standing to assert any such claim because it is not a participant in either of those markets.  Only a participant in those markets, who can allege it has suffered higher prices and reduced supply of gas as a result of defendants' purported refusal to keep gas off the market, would have standing to bring such a claim.

The Federal Rules of Civil Procedure do not permit plaintiff to evade these basic flaws in its antitrust case with conclusory "information and belief" allegations that are inconsistent with the few factual allegations in the complaint and with facts that the Court properly can take judicial notice of in ruling on a motion to dismiss.  The rules require this Court to accept for purposes of this motion the complaint's relatively few factual allegations, even though the key allegation -- that the producers have conspired to keep North Slope natural gas off the market -- is patently false.

Nonetheless, this motion does not challenge plaintiff's allegation that defendants reached their decisions not to sell ANS gas to plaintiff pursuant to an illegal agreement.  While the alleged illegal "agreements" to which the complaint refers are certainly vague and unspecified, making

any response difficult if not impossible, this motion instead focuses on the above-described antitrust issues regarding plaintiff's standing and the alleged markets.  This motion also attacks plaintiff's attempt to challenge as a violation of Clayton Act § 7 the completed acquisitions of Amoco Corporation and Atlantic Richfield Company.  Plaintiff has failed to show either that those acquisitions, which were approved by the Federal Trade Commission, were illegal or that they possibly could have had any effect on the refusal to sell plaintiff the North Slope gas that is the core of this case.  Moreover, plaintiff's challenges to those long ago completed acquisitions are time-barred.

All of these challenges to the antitrust claims raise issues of law that are properly resolved at this time.  Indeed, as the Supreme Court has advised, district courts should resolve such issues in potentially large antitrust cases like this at the pleading stage before "allowing a potentially massive factual controversy to proceed" on a defective theory of standing or violation.  *Associated Gen. Contractors of Cal. Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 528 n.17 (1983).

Plaintiff's purported claims under Alaska state law fare no better.  Plaintiff lacks standing to assert its claim under Alaska's Unfair Trade Practices and Consumer Protection Act, AS 45.50.471 *et seq*.  Because that claim is based upon the same allegations of anticompetitive conduct as the antitrust claims, it suffers the same standing defect.

Plaintiff's claim for tortious interference with prospective economic advantage fails because each defendant enjoys a privilege not to sell its North Slope gas to plaintiff.  Therefore, its refusal to sell that gas, which is the gravamen of this tort claim, cannot be tortious.

Plaintiff's breach of contract claim based on the Charter agreement with the State of Alaska fails for three independent reasons. First, plaintiff is not a party to the Charter but sues as "an intended beneficiary of" the Charter. [Cmpl., ¶ 231] However, the Charter expressly disclaims the creation of third-party beneficiary rights. Second, the Charter expressly provides that it may only be enforced in an arbitration between its parties. Third, plaintiff's complaint is based on actions and inactions in and following April 2005, but the Charter's obligations regarding ANS natural gas, on which plaintiff's claim is based [Cmpl., ¶¶ 101-105], expired on December 31, 2003. As a result, the plaintiff's claim under the Charter is not legally cognizable.

Finally, plaintiff's claims for injunctive relief should be dismissed for failure to join parties whose presence is required by Rule 19 of the Federal Rules of Civil Procedure. The complaint effectively seeks a mandate that ANS natural gas be made available to plaintiff's project. There is no way to grant that relief or indeed any of the broad injunctive relief plaintiff seeks in the absence of the State of Alaska and the other North Slope natural gas owners (most notably ConocoPhillips), none of which has been named as a party in this action.

ARGUMENT

I.    THE COMPLAINT FAILS TO STATE ANY ANTITRUST CLAIM
      (FIRST THROUGH FIFTH CLAIMS FOR RELIEF)

    A.    <u>Plaintiff Lacks Standing To Pursue Any Antitrust Claim</u>

To establish standing under the antitrust laws[2], a plaintiff must demonstrate that it has suffered actual or threatened injury to its business or property that was caused by the defendants' purported antitrust violations. *See Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 113 (1986); *Associated Gen. Contractors*, 459 U.S. at 526-27.

    1.    To establish antitrust standing, a plaintiff suing as a thwarted prospective entrant must allege facts demonstrating its <u>"preparedness" to enter the market</u>

Where, as here, the plaintiff does not operate an existing business, but is a prospective entrant into a market, antitrust standing requires the plaintiff to show that it took "substantial demonstrable steps to enter an industry and . . . is thwarted in that purpose by antitrust violations."

---

[2] Clayton Act § 4 provides, in pertinent part, "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . and shall recover threefold the damages by him sustained . . . ." 15 U.S.C. § 15. Clayton Act §16 provides, in pertinent part, "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ." 15 U.S.C. § 26.

    In evaluating whether a plaintiff has antitrust standing, the courts evaluate similar factors under both sections 4 (damages) and 16 (injunctive relief). Thus, a plaintiff who fails to establish section 4 standing is precluded from seeking damages as well as injunctive relief. *See Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 112 (1986) ("[i]t would be anomalous . . . to read the Clayton Act to authorize a private plaintiff to secure an injunction against a threatened injury for which he would not be entitled to compensation if the injury actually occurred"); *Southwest Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Assoc.*, 830 F.2d 1374, 1378 (7th Cir. 1987) ("analysis of the antitrust injury requirement [is] effectively the same under . . . sections [4 and 16]"); *McCaw Personal Communications, Inc. v. Pacific Telesis Group*, 645 F. Supp. 1166, 1169 (N.D. Cal. 1986) (section 4 factors are "instructive on the standards to be applied when a prospective purchaser asserts standing to seek damages as well as injunctive relief"); *Santa Cruz Med. Clinic, Derjjan Assocs., Inc. v. Dominican Santa Cruz Hosp.*, 1994 WL 619288, *8 (N.D. Cal. Oct. 24, 1994) (same).

*Go-Video, Inc. v. Matsushita Elec. Indus. Co., Ltd. (In re Dual-Deck Video Cassette Recorder Antitrust Litig.)*, 11 F.3d 1460, 1464-65 (9th Cir. 1993), quoting *Solinger v. A&M Records, Inc.*, 586 F.2d 1304, 1309 (9th Cir. 1978).  Plaintiff must show more than its intention to enter an industry; it must show its "preparedness to do so." *Id.* at 1466; *see also Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 711-12 (9th Cir. 2003) (potential competitor must show "preparedness" to enter market).

The Ninth Circuit considers the following four factors in evaluating whether a plaintiff can establish preparedness:  1) the background and experience of plaintiff in his prospective business; 2) affirmative action on the part of plaintiff to engage in the proposed business; 3) the ability of plaintiff to finance the business and the purchase of equipment and facilities necessary to engage in the business; and 4) the consummation of contracts by plaintiff.  *See Go-Video*, 11 F.3d at 1465; *Solinger*, 586 F.2d at 1310. A plaintiff whose acts are merely "exploratory" or "preliminary" in nature does not possess a sufficient business interest to which antitrust injury can be done. *Parks v. Watson*, 716 F.2d 646, 660 (9th Cir. 1983); *see also Bourns, Inc.*, 331 F.3d at 712 ("A 'nascent' business -- one that is merely a gleam in the eye and a hope in the heart of its promoters -- does not possess the property to which antitrust injury can be done."); *Napster, Inc. Copyright Litig. v. Hummer Winblad Venture Partners*, 354 F. Supp. 2d 1113, 1124 (N.D. Cal. 2005) ("the antitrust laws are not intended to provide a remedy for [] speculative assertions of injury").

Plaintiff cannot avoid this preparedness requirement by alleging that its lack of preparedness is caused by defendants' alleged conspiratorial conduct (here the refusal to sell it North Slope gas).  In *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 452 (9th Cir. 1985), the Ninth

Circuit held that a plaintiff cannot evade its duty to develop the requisite level of preparedness by

arguing it was prevented from doing so by the alleged conspiratorial conduct of the defendant.  In

*Bubar*, the court explained:

> The [plaintiff group] asserts that [its inability to obtain a binding contract to
> acquire assets necessary to compete] should not be a factor because the contract
> that was necessary was to be made with one of the alleged antitrust conspirators.
> Yet on the other hand, when our inquiry at this stage in the proceeding is one of
> standing, and one element is to determine how close the [plaintiff group] was to
> becoming a competitor, the lack of a contract to obtain the assets necessary to
> compete is surely a relevant factor . . . .  If the assets were to be acquired from [a]
> third party, there is no doubt that this would be a highly relevant factor and, for the
> purposes of the standing inquiry, we find it relevant here.

*Id.*  Courts in other circuits agree.  *See, e.g., Ashley Creek Phosphate Co., v. Chevron USA, Inc.*,

315 F.3d 1245, 1258-59 (10th Cir. 2003) ("[plaintiff's] futility argument boils down to an

assertion that a proposed market participant need take no further preparatory steps, even of the

most basic and preliminary nature, after an asserted violation of the antitrust laws by the party in

control of an essential facility.  Such an approach would eviscerate the standing requirement,

rendering it wholly dependent on the merits of the plaintiff''s case."); *Jayco Sys., Inc. v. Savin

Bus. Machines Corp.*, 777 F.2d 306, 314 (5th Cir. 1985) ("the fact that [plaintiff] could not have

acquired the machines from [defendant] [due to its refusal to sell] even had it satisfied all of the

above [preparedness] elements is not dispositive.  Rather, the question is whether assuming

[defendant] had been willing to supply [plaintiff] with the necessary machines, [plaintiff] would

have been prepared to bid them."); *Gas Utils. Co. of Ala., Inc. v. S. Natural Gas Co.*, 825 F. Supp

1551, 1573 (N.D. Ala. 1992) ("plaintiff cannot simply use [defendant's denial of access to a

pipeline] to create an inference of antitrust injury").

In *Bubar*, the potential purchasers of a food processing plant sued the owner and ultimate purchaser of the plant for conspiring to preclude plaintiffs from entering the market. In preparing to enter the business, plaintiffs had engaged in significant negotiations with the owner regarding the purchase of the plant, which included detailed discussions regarding the actual purchase price of the business. 752 F.2d at 446-48. Additionally, plaintiffs held multiple meetings with bank representatives and venture capital groups to discuss the structure and particulars of possible financing arrangements. *Id.* Notwithstanding these undertakings, the Ninth Circuit held that plaintiffs failed to demonstrate sufficient preparedness to enter the business and therefore lacked standing to sue. *Id.* at 452. The court, applying the *Go-Video* four-factor preparedness test, found determinative plaintiffs' lack of a "binding contract" and absence of firm financing arrangements. *Id.*

The determination of whether a plaintiff has standing to bring an antitrust suit is a question of law (*id.* at 449) that may be raised by a motion to dismiss under Rule 12(b)(6) (*Napster, Inc. Copyright Litig.,* 354 F. Supp. 2d at 1124). Dismissal is warranted when a plaintiff fails to set forth "nonconclusory facts" sufficient to support a legitimate claim for relief. *Solinger*, 586 F.2d at 1309; *see also Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d at 1124 (granting dismissal under Rule 12(b)(6) when potential investor failed to "sketch the outline of the antitrust violation with allegations of supporting factual detail"), quoting *Lee Shockley Racing v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 508 (9th Cir. 1989).

As shown below, plaintiff's complaint fails to allege facts sufficient to surmount the preparedness hurdle set forth in *Go-Video*.

2.    The complaint fails to allege facts demonstrating plaintiff's
<u>preparedness to enter the market</u>

Plaintiff's antitrust standing is based on a single premise: that plaintiff, but for defendants' alleged conspiracy to refuse to sell it North Slope gas, is fully prepared, ready and able to implement its project for transporting North Slope gas to market.  The complaint conclusorily alleges that "the only impediment to the Authority's plan is Defendants' concerted refusal to supply natural gas."  [Cmpl., ¶ 100; *see also id.,* ¶¶ 15 & 18]  This conclusory assertion, however, is inconsistent with and contradicted by the factual allegations in the complaint.  The factual allegations demonstrate that a significant number of obstacles remain, and that plaintiff has not yet taken many of the fundamental preparatory steps needed to overcome those obstacles.  As discussed in the following sections, plaintiff has not received approval of its project from the State of Alaska, an essential prerequisite.  Nor has it consummated any necessary contracts, such as those required for the development of spur lines, construction of receiving plants, purchase of shipping tankers, and sale and distribution of gas throughout North America.  Furthermore, plaintiff completely lacks experience and expertise in the natural gas industry.  As the complaint demonstrates, plaintiff's project is at best in the early stages of formation, and has yet to obtain the preparatory essentials necessary for entrance into the market.

a.    Plaintiff has not received approval from or consummated a
<u>fiscal contract with the State of Alaska</u>

A significant prerequisite to the success of any North Slope gas pipeline project is approval of the project by the State of Alaska.  The Alaska Stranded Gas Development Act ("SGDA") was enacted for the purpose of "encourage[ing] . . . develop[ment] [of] the state's stranded gas resources."  AS 43.82.010.  The SGDA authorizes the State to enter into a fiscal contract with a sponsor of a natural gas pipeline project.  AS 43.82.020, .200.  Prior to entering

into such a contract, however, the project must be selected by the State as a "qualified project." AS 43.82.020, .100. The contract prescribes the manner in which the qualified project will provide payment to the State in lieu of state and municipal taxes that otherwise would be imposed. AS 43.82.020, .210.

The complaint very clearly alleges that plaintiff is a long way from having its project approved. Plaintiff alleges only that it has "filed an application" under the SGDA and is currently "in negotiations with the Governor" regarding its project. [Cmpl., ¶ 96] These allegations, even if true, confirm that plaintiff's proposal has not been selected as a "qualified project," and that plaintiff has not entered into any fiscal contract with the State. As plaintiff candidly admits, it is at best one of multiple candidates that has applied for approval under the SGDA. [*Id.*] The complaint reveals that the State, at this time, is considering alternative proposals by multiple sponsors, including the one submitted by the defendants, and has not yet chosen the qualified project to which it will issue a fiscal contract. Plaintiff, while promoting its own project, recognizes that the defendants' proposal is "practical" and viable. [*Id.,* ¶ 77 (the "two designs . . . are the only practical means of transporting North Slope Gas to market")] Unless and until plaintiff's project is selected by the State, plaintiff lacks a key foundational block for its project. Plaintiff therefore, has no more than a speculative intent to enter the business. As made clear in *Bubar*, such intent, when unaccompanied by a "binding contract" or other indicia of concreteness, is not sufficient to establish standing for an antitrust claim. 752 F.2d at 452; *see also Go-Video,* 11 F.3d at 1465 (requiring "consummation of contracts"); *Gas Utilities Co. of Ala. v. S. Natural Gas Co.,* 996 F.2d 282, 283 (11th Cir. 1993) ("showing that someone may be interested in entering a contract . . . is not the same as having an enforceable contract").

b.     <u>Plaintiff has not secured any financing for its project</u>

The complaint also fails to set forth facts demonstrating that plaintiff has the ability to fund its proposed multi-billion dollar project.  There is no doubt that the gas pipeline project ultimately selected by the State will be the largest and most expensive infrastructure project ever constructed in North America.  Plaintiff's proposed project, for example, involves:  (1) the construction of a "48-inch, buried pipeline from Prudhoe Bay to Valdez"; (2) the construction of a "liquefaction/fractionation, storage, and loading plant in Valdez"; (3) the construction of a "spur line" connecting the pipeline from Glennallen to Southcentral Alaska; and (4) the construction of a "separate line to the Canadian border."  [Cmpl., ¶¶ 83, 86, 87]  By plaintiff's own estimate, the project will cost over 25 billion dollars to complete.  The sheer size and immensity of plaintiff's project render it compelling that, in order to establish preparedness, plaintiff must allege facts showing it possesses the ability to finance the project.

The complaint contains none of the required allegations.  Instead, the allegations confirm that plaintiff lacks even a *single* source of financing.  Plaintiff alleges that "it has *available* to it approximately 18 billion dollars in federal loan guarantees" under the Alaska Natural Gas Pipeline Act of 2004 ("ANGPA").  [Cmpl., ¶¶ 18, 81, 97]  Plaintiff suggests that no further actions need to be taken to obtain the federal loan guarantees besides defendants' agreement to sell it ANS gas.  [*Id.*]  But the ANGPA sets forth at least three conditions for obtaining a loan guarantee, none of which the complaint alleges plaintiff has satisfied:

- *First*, the project must be selected by the Federal Energy Regulatory Commission ("FERC") as the "qualified project."  15 U.S.C. § 720n(b)(4).  *See also id.*, § 720n(b)(1) ("In no case shall loan guarantees be issued for more than one qualified project.").

- *Second*, the project must either: 1) obtain a "certificate of public convenience and necessity authorizing the construction and operation of an Alaska natural gas transportation project" from the FERC;[3] or 2) receive a determination from the Secretary of Energy that it is a "qualified entity to construct and operate a liquefied natural gas project." *Id.*, § 720n(b)(1).

- *Third*, the project must receive a loan from an "eligible lender." *Id.,* § 720n(b)(2).

Plaintiff has not alleged facts showing that it has satisfied any of these conditions. Plaintiff does not allege that it has been selected as the sole "qualified project," that it has received a "certificate of public convenience and necessity" from FERC or a determination of qualification by the Secretary of Energy, or that it has entered into any loan agreements with any lender, much less one that has been approved as a "qualified lender." In fact, plaintiff does not even allege that it has *applied* for such funding. Furthermore, the ANGPA only provides funding for up to 80% of the total cost of a pipeline project. 15 U.S.C. § 720n(c)(1) ("the amount of loans and other debt obligations guaranteed under this section for a qualified infrastructure project shall not exceed 80 percent of the total capital costs of the project"). Plaintiff does not alleged that it

---

[3] The process for obtaining a certificate of public convenience and necessity is a lengthy and involved one. Before such a certificate may be issued, the applicant must satisfy a number of requirements, including 1) obtaining an environmental impact statement by FERC and 2) satisfying the requirements imposed under the National Environmental Policy Act of 1969, 42 U.S.C. § 4332(2)(c). *Id.*, § 720b. Plaintiff's complaint contains no allegations claiming that it has fulfilled such requirements.

has or is able to obtain the remaining 20% of the necessary funds. Plaintiff simply makes no attempt to state the manner in which it intends to fund this multi-billion dollar project.[4]

Even if plaintiff could adequately plead facts showing "available" financing, such a showing would still be insufficient to defeat a motion to dismiss. Antitrust standing laws make clear that the "mere possibility of financing being available in the abstract is not enough." *Jayco Sys., Inc.*, 777 F.2d at 315, quoting *Hayes v. Solomon*, 597 F.2d 958, 975 (5th Cir. 1979). Plaintiff must show that it has "secured" the funds necessary for its project. *Gas Utils. Co. of Ala.*, 996 F.2d at 283 (holding gas distributor was not prepared to enter new geographic market because it had not yet "*secure[d]* financing" or "*consummated* its contracts") (emphasis in original).

c.    Plaintiff has not taken other affirmative steps necessary<br>to enter the market

In addition to not yet obtaining the required approval and funding, plaintiff also has failed to obtain numerous other commitments essential to developing its business. As the complaint illustrates, plaintiff's pipeline project proposes much more than the construction of a trans-Alaska gas pipeline. Additional plans include the building of a "liquefaction/fractionation, storage, and loading plant in Valdez" [Cmpl., ¶ 83], purchasing of tankers to ship the gas from Valdez to the Pacific Coast [*id.*, ¶¶ 35, 84], constructing spur lines connecting the pipeline to other parts of Alaska and to Canada [*id.,* ¶¶ 35, 86-87], and developing the infrastructure needed to distribute

---

[4] Plaintiff alleges that Sempra Energy is a potential source of funding [Cmpl., ¶ 220], but the complaint later discloses that Sempra has withdrawn from participation in plaintiff's project [*id.,* ¶ 225 ("Sempra has discontinued its business relationship with the Authority and has withdrawn its agreements to support development of the pipeline and to purchase gas from the Authority . . . .")].

gas throughout North America [*id.,* at ¶ 85].  Plaintiff proposes an enormous project.  Its complaint, though, fails to shed any light on how it plans to execute these grand plans.  How, for example, will plaintiff finance the construction of the receiving plants or purchase of the shipping tankers?  How does it plan to obtain a waiver from having to comply with the shipping restrictions imposed by the Jones Act, 46 U.S.C. § 861 *et al.*?[5]  What plans have been drawn regarding the development of the spur lines?  What permits, if any, have been obtained for the implementation of these plans?

None of plaintiff's allegations cures its fatal pleading deficiencies.  Although plaintiff asserts that it has "developed or acquired significant senior permits, engineering studies, cost estimates, and plans necessary to build a natural gas pipeline," it fails to support that conclusion with any facts.  [Cmpl., ¶ 18]  Similarly unavailing is plaintiff's claim that it has received "several Memoranda of Understanding" from receiving terminals and a shipping company [*id.,* ¶ 85], since plaintiff does not allege that it has entered into any arrangements with such companies.  Finally, plaintiff's claim that it possesses the "exclusive option to purchase YPC [Yukon Pacific Corporation] and its portfolio of senior permits" [*id.,* ¶ 90] is likewise insufficient because plaintiff does not demonstrate that it has taken steps to purchase those permits.

The *Go-Video* preparedness test requires that plaintiff take "significant demonstrable steps" towards developing its business.  While plaintiff may have inquired and investigated some possible business contingencies, these preliminary actions fall far short of what is required for standing.  *See Gas Utilities Co. of Ala.*, 996 F.2d at 283 ("[i]nquiry into procedures is insufficient

---

[5]  The Jones Act would require plaintiff to transport goods via approved (and effectively more expensive) shipping vessels.  *Id.*

to establish preparedness"); *Aviation Upgrade Tech., Inc. v. Boeing Co.*, 78 Fed. Appx. 623, 625 (9th Cir. 2003) ("investigation is not enough to show affirmative action").

> d.  Plaintiff has no experience or expertise in the natural gas <u>industry</u>

Plaintiff also fails to meet the fourth factor of the *Go-Video* preparedness test, which requires evaluation of plaintiff's experience in the gas market.  Plaintiff is a statutorily-created entity formed by three local governments in 1999.  [Cmpl., ¶ 34]  Although plaintiff claims that it was formed to "facilitate construction of a gas pipeline" [*id.*], it does not allege that it or its members have any expertise or experience in the natural gas industry.

Courts, in deciding whether a plaintiff is sufficiently prepared to enter into a new business, "[u]niformly . . . draw the line at the point where promotion transcends the level of hopes, desires, and expectations, and reaches a certain stage of maturity and concreteness, a stage where it is accompanied by certain indicia of ultimate success." *Go-Video, Inc.*, 11 F.3d at 1466.  Here, plaintiff's project does not come close.  As discussed above, plaintiff has not consummated any necessary contracts, secured financing, gained expertise in the industry, or otherwise taken any affirmative steps to bring its project to fruition.  Preparedness is an essential requirement for standing and plaintiff simply is not prepared to enter this business.  Thus, plaintiff lacks standing to pursue all of its antitrust claims, and this Court should dismiss those claims.

> B.  The Complaint Fails To State Any Antitrust Claim Based Upon Alleged Restraints Of, Or Lessening Of Competition In, The Nonexistent Markets For The Transportation Or Purchase Of ANS Natural Gas (First Through <u>Fifth Claims For Relief)</u>

The federal antitrust laws were enacted to protect competition in economic markets.  *See SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1203 (2d Cir. 1981), citing *Standard Oil Co. v. United*

*States,* 221 U.S. 1, 58 (1911).  Each of the antitrust laws that plaintiff alleges defendants violated expressly reflects the requirement that the allegedly illegal conduct have anticompetitive effects in a market.[6]  Plaintiff's complaint recognizes the need to allege that the conduct of defendants that it challenges affected competition in an economic market.  To that end, the complaint identifies four purported "relevant markets":  "(1) the market for transport of natural gas from the North Slope; (2) the market for purchase of gas from the North Slope; (3) the market for sale of natural gas within the United States/North America; and (4) the market for sale of natural gas within Southcentral and Interior Alaska."  [Cmpl., ¶ 154]  All five of the complaint's antitrust claims are based on purported effects on competition in markets (1) and (2).  Two of the antitrust claims, the first and second, also allege restraints in markets (3) and (4).

The third through fifth claims, as well as the first and second to the extent based on markets (1) and (2),[7] fail to state a claim, because those markets do not exist as a matter of law.  Conduct can violate the antitrust laws only if it affects competition in an *existing* market.  *See, e.g., Fraser v. Major League Soccer, L.L.C.,* 284 F.3d 47, 69 (1st Cir. 2002) ("[w]here there is no existing market, there can be no reduction in the level of competition"); *SCM,* 645 F.2d at 1209 (competition could not have been restrained when there were no transactions in the purported market).  A "relevant market" for determining an antitrust violation is defined only in terms of existing purchase and sale transactions.  *SCM,* 645 F.2d at 1211 ("[t]he existing market provides

---

[6] Sherman Act § 1, 15 U.S.C. § 1 ("in restraint of trade or commerce"); Sherman Act § 2, 15 U.S.C. § 2 ("monopolize any part of the trade or commerce"); Clayton Act § 7, 15 U.S.C. § 18 ("where in any line of commerce or in any activity affecting commerce . . . the effect . . . may be substantially to lessen competition, or to tend to create a monopoly").

[7] For reasons discussed at pp. 22-24, below, the first and second claims also do not state a claim based upon alleged anticompetitive effects in markets (3) and (4).

the framework in which the probability and extent of an adverse impact upon competition must be measured"); *Apartment Source of Pa., L.P. v. Philadelphia Newspapers, Inc.,* Civ. No. 98-5472, 1999 WL 349938, *24 (E.D. Pa. May 21, 1999) ("The definition of the relevant market must be based on the market existing at the time of the alleged [violation], not on a market that might possibly exist in the future."); *Crucible, Inc. v. Stora Kopperbergs Bergslags AB*, 701 F. Supp. 1157, 1161 (W.D. Pa. 1988) ("a finding of no relevant market in PM high speed steel products is mandated by the fact that commercial production and marketing of PM high speed steel products in the United States did not begin until 1971, four years after the [allegedly wrongful] acquisitions"); *American Medicorp, Inc. v. Humana, Inc.*, 445 F. Supp. 589, 597 (E.D. Pa. 1977) ("The basic tests developed by the Supreme Court in defining product and geographic markets only have meaning in the context of transactions between buyer and seller.").

Under these standards, the first two of the complaint's purported markets currently do not exist. There are no transactions between buyers and sellers for either the transport or purchase of natural gas off the North Slope.[8] Because there are no such transactions, there is no market, and there can be no antitrust violations based upon hypothetical effects in these nonexistent markets.

The complaint's description [Cmpl., ¶¶ 181, 189] of the first and second claims as "*per se*" violations cannot overcome this defect at least to the extent that those claims depend upon competitive effects in these nonexistent "North Slope markets."[9] Regardless of whether a *per se* or rule of reason test is used, "the criterion to be used in judging the validity of a restraint on trade

---

[8] There are some relatively small volume sales on the North Slope.

[9] A violation of Sherman Act § 1 exists only where the anticompetitive effects are "unreasonable." Unreasonableness can be established in either of two ways -- presumptively under a "*per se*" rule or by balancing the anticompetitive and procompetitive effects of the restraint under the "rule of reason."

is its impact on competition." *NCAA v. Bd. of Regents*, 468 U.S. 85, 104 (1984); *Wilk v. American Med. Ass'n*, 895 F.2d 352, 358 (7th Cir. 1990) ("The purpose of both approaches . . . is to decide the restraint's competitive significance."). Thus, if there is no market for the alleged restraint to impact there can be no unreasonable effect on competition even under the *per se* rule. Moreover, the alleged refusal by defendants to sell plaintiff North Slope gas does not fit within the limited category of boycotts that are *per se* illegal, namely, only those boycotts where firms "boycott suppliers or customers *in order to discourage them from doing business with a competitor*." *Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 950 (9th Cir. 1998) (emphasis in original). The complaint alleges no such purpose here.

This Court can decide those issues of law on a motion to dismiss. *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1065 (9th Cir. 2001) (affirming dismissal of complaint because plaintiff failed to identify a relevant market for antitrust purposes). To be sure, the complaint alleges that each of the four markets it relies on "is a relevant market for antitrust purposes." [Cmpl., ¶ 157] However, conclusory allegations regarding what constitutes the relevant market as a matter of antitrust law are insufficient where, as here, factual allegations in the complaint are inconsistent with that conclusion. *Tanaka,* 252 F.3d at 1063.

In this case, the complaint concedes all the facts necessary to establish that the first two purported markets do not exist: First, the complaint admits that there currently is no pipeline for the transport of North Slope gas, and that "[t]here is no reasonably interchangeable substitute for a pipeline to transport natural gas from Alaska's North Slope." [Cmpl., ¶¶ 15, 156] Since there currently is no transportation of North Slope natural gas, there is no existing market for the transport of that gas. Second, the complaint concedes that there are no purchase transactions for

North Slope gas, and cannot be any such transactions until a pipeline is in place: "[j]ust as no producer can transport gas without a pipeline, no purchaser can purchase gas without a pipeline to bring the gas to market." [*Id.*, ¶ 159]

The complaint also contains factual allegations establishing that the antitrust claims based upon "North Slope gas markets" fail for another reason. Even if there were purchase and transportation transactions in North Slope gas, plaintiff has not established that there is or ever will be a "North Slope gas" market. North Slope gas itself is not a market. Rather, it is a fungible commodity that someday will compete against other natural gas in those markets to which it ultimately is transported. Indeed, the complaint recognizes this basic fact by alleging two downstream markets in which North Slope gas will be sold in competition with natural gas from other producing areas. [*Id.*, ¶¶ 62-70]

The Ninth Circuit in *Tanaka* recently affirmed the dismissal of a complaint because the relevant market alleged there was too limited and did not consider competing alternatives. The court noted that:

> the term "relevant market" encompasses notions of geography as well as product use, quality, and description. The geographic market extends to the " 'area of effective competition' . . . where buyers can turn for alternative sources of supply." The product market includes the pool of goods or services that enjoy reasonable interchangeability of use and cross-elasticity of demand.

252 F.3d at 1063. *Tanaka* is just one of many opinions affirming the dismissal of a complaint that alleges a relevant market consisting of only a single product, rather than the pool of all products to which consumers can turn to satisfy their demand. *See also, e.g., E. Food Servs. Inc., v. Pontifical Catholic Univ. Servs. Ass'n, Inc.*, 357 F.3d 1, 6 (1st Cir. 2004); *Queen City Pizza, Inc. v. Domino's Pizza Inc.*, 124 F.3d 430, 436 (3d Cir. 1997); *TV Communications Network, Inc. v.*

*Turner Network Television, Inc.*, 964 F.2d 1022, 1025 (10th Cir. 1992).  These opinions mandate dismissal of plaintiff's antitrust claims based upon markets that plaintiff claims are limited to North Slope gas.

       C.        The Complaint Fails To State Any Antitrust Claim Based Upon Alleged Restraints Of, Or Lessening Of Competition In, The Existing Markets For The Sale Of Natural Gas (First and Second Claims for Relief)

The complaint also alleges two "relevant markets" where transactions do currently exist: those for the sale of natural gas in North America and in Southcentral and Interior Alaska. [Cmpl., ¶¶ 162, 166]  But, those markets are not *relevant markets* for this case for two separate, but related, reasons.  First, plaintiff is not a participant in those markets, nor could it be a participant unless and until its project were approved.  Plaintiff therefore lacks standing to bring an antitrust claim based upon any alleged restraint of trade in those markets.  Second, all of defendants' alleged wrongful conduct involves North Slope natural gas, which is not a product currently competing in those markets; and it will not be a product able to complete until after a pipeline is built.  Hence, defendants' alleged wrongful conduct could not restrain trade in those markets.

Ninth Circuit cases make clear that a plaintiff cannot bring claims based upon asserted anticompetitive effects in markets in which the plaintiff does not participate.  The most basic requirement for antitrust standing is "that the injured party be a participant in the same market as the alleged malefactors." *Glen Holly Entertainment Inc. v. Tektronix Inc.*, 352 F.3d 367, 372 (9th Cir. 2003) (internal quotations and citations omitted).  "In other words, the party alleging the injury must be either a consumer of the alleged violator's goods or services or a competitor of the alleged violator *in the restrained market.*"  *Id.*, quoting *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d

538 (9th Cir. 1987) (emphasis added).  The Ninth Circuit repeatedly has dismissed on standing

grounds claims of "parties who are clearly not participants of any kind in the restrained market."

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.,* 190 F.3d 1051, 1058 (9th Cir. 1999), citing, among

others, *Oregon Laborers - Employers Health & Welfare Trust Fund v. Philip Morris, Inc.,* 135

F.3d 957 (9th Cir. 1999); *Vinci v. Waste Mgmt., Inc.*, 80 F.3d 1372 (9th Cir. 1996).[10]

     Plaintiff unquestionably does not sue either as a consumer or a competitor in the markets

for the sale of natural gas in North America or in Southcentral or Interior Alaska.  In fact, plaintiff

does not sue in any way as a participant in those markets.

     The alleged anticompetitive effect in these markets is that the supply of natural gas has

been "artificially reduced and the price of natural gas maintained at artificially high levels."

[Cmpl., ¶ 171(d)]  Plaintiff's antitrust claims are not based upon its having suffered from these

effects in either of these markets.  Therefore, it lacks standing to challenge the alleged restraints in

these markets.[11]

     Moreover, the complaint concedes that North Slope gas cannot compete in either market

until a pipeline project is in place.  [Cmpl., ¶ 15 (North Slope gas could compete "if there were a

pipeline system to transport this gas to market"), *id.*, ¶ 166 ("the gas needs of Southcentral Alaska

have been met by supplies of gas from production areas in Southcentral Alaska itself because the

---

[10] In *American Ad Management*, 190 F.3d at 1057 n.5, the Ninth Circuit also noted the extremely narrow exception for plaintiffs who are not market participants, but whose injuries are "inextricably intertwined" with the injuries of market participants.  A party like plaintiff that simply claims it has lost a commercial relationship with participants in the existing gas sales markets suffers injury that is at most incidental to and not inextricably intertwined with the alleged restrains in those markets.

[11] Plaintiff's labeling of those claims as involving "*per se*" illegal conduct does not save them. First, the same standing requirements apply to *per se* claims as to rule of reason claims.  *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344 (1990).  Second, for reasons discussed above, plaintiff's claims do not come within the *per se* rule.

area has no infrastructure in place to: (1) access gas produced on the North Slope")]  Because an approved pipeline is a *sine qua non* for North Slope gas to enter either market, plaintiff cannot rely on defendants' conduct with regards to North Slope gas to state an antitrust claim based upon purported restraints of competition in those markets.

D.    The Complaint Fails To State Any Antitrust Claim Based Upon BP's
      Mergers (Fifth Claim For Relief)

The Fifth Claim alleges that defendants violated Clayton Act § 7, 15 U.S.C. § 18.  It identifies the mergers between BP and Amoco and Atlantic Richfield.[12]  To state a Clayton Act § 7 claim, a plaintiff must allege facts showing that (1) the merger's effect "may be substantially to lessen competition, or to tend to create a monopoly" in a properly-defined antitrust market, and (2) plaintiff has suffered "threatened loss or damage" of the "type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful."  *See* Clayton Act § 7, 15 U.S.C. § 18; *Cargill, Inc.*, 479 U.S. at 113; Clayton Act § 16, 15 U.S.C. § 26.

As the basis of its Clayton Act § 7 claim, plaintiff alleges the bare conclusion that (1) the mergers "substantially lessened competition" in the alleged North Slope gas markets,[13] and (2) plaintiff "has been and will continue to be injured" as a result.  [Cmpl., ¶¶ 208-09]  But federal pleading requirements are not satisfied by merely conclusory allegations of competitive impact and injury to plaintiff.  *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir.

---

[12] BPXA does not believe that this claim is properly directed against it.  Nonetheless, because the complaint asserts the claim against "defendants" [Cmpl., ¶ 208], BPXA will address these two mergers involving BP.  This motion does not address the complaint's allegations regarding mergers by defendant ExxonMobil that purportedly violated Clayton Act § 7.  No claim against BPXA under the Clayton Act could possibly be asserted with respect to them.

[13] Plaintiff's claim under Clayton Act § 7 rests on alleged competitive harm inflicted upon the alleged markets for the "transportation and purchase" of North Slope natural gas.  Because no such markets exist, as shown above, this claim fails at the outset.  *See* pp. 18-22.

2003) (Fed. R. Civ. P. 12(b) not satisfied by "legal conclusions . . . cast in the form of factual allegations"). Plaintiff alleges none of the essential facts from which these conclusions might follow, and states "no set of facts which, if true, would constitute an antitrust offense." *Smilecare Dental Group v. Delta Dental Plan of Cal., Inc.*, 88 F.3d 780, 783 (9th Cir. 1996), quoting *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 735 (9th Cir. 1987). "[I]f the facts [alleged] 'do not at least outline or adumbrate' a violation of the Sherman Act, the plaintiffs 'will get nowhere merely by dressing them up in the language of antitrust.'" *Rutman Wine Co.*, 829 F.2d at 736, quoting *Car Carriers v. Ford Motor Co.*, 745 F.2d 1101, 1106 (7th Cir. 1986). Under these standards the complaint states no Clayton Act § 7 claim.

1.   The complaint fails adequately to allege that the mergers were illegal

A merger violates Clayton Act § 7 when it is shown to be "reasonably likely to cause anticompetitive effects" in the relevant antitrust market. *United States v. Oracle Corp.*, 331 F. Supp. 2d 1098, 1109 (N.D. Cal. 2004); *see FTC v. Warner Communications Inc.*, 742 F.2d 1156, 1160 (9th Cir. 1984), quoting *FTC v. Procter & Gamble Co.*, 386 U.S. 568, 577 (1967) (the "core question [in a Section 7 case] is whether a merger may substantially lessen competition") (brackets in original). "[P]laintiffs establish a prima facie case of a section 7 violation by 'show[ing] that the merger would produce 'a firm controlling an undue percentage share of the relevant market, and [would] result [] in a significant increase in the concentration of firms in the market.'"" *Oracle Corp.,* 331 F. Supp. 2d at 1110, quoting *FTC v. H.J. Heinz Co.*, 246 F.3d 708, 715 (D.C. Cir. 2001) (brackets in original).

The complaint in this case alleges no facts sufficient to "outline or adumbrate" any basis to establish that the mergers with Amoco or Atlantic Richfield violated Clayton Act § 7.

**Merger with Amoco Corporation.**  With respect to the merger with Amoco Corporation, the *sole* facts alleged are (1) the merger occurred in December 1998 and (2) Amoco owned unidentified "oil and gas interests on the North Slope" that were acquired by BP.  [Cmpl., ¶ 139] Although the complaint elsewhere makes clear that the vast bulk of known North Slope natural gas reserves are located in the Prudhoe Bay and Point Thomson Units [*e.g., id.*, ¶ 42], it nowhere alleges that Amoco held interests in these Units.  This omission, however, is not surprising because Amoco in fact did not own any interests in the Prudhoe Bay or Point Thomson Units. Thus, plaintiff cannot show that BP's "percentage share of the relevant market" increased due to the merger, and it cannot show how the merger might allegedly have "increase[d] . . . the concentration of firms" in any relevant market.[14]  *Oracle Corp.*, 331 F. Supp. 2d at 1110; *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104-05 (9th Cir. 1999) (dismissal required by failure to "allege facts demonstrating that Defendants' conduct has an anticompetitive effect" on the market).

**Merger with Atlantic Richfield Company.**  Plaintiff observes that the FTC at one time objected to the merger with Atlantic Richfield [Cmpl., ¶ 140].  But plaintiff omits the undisputed fact that the FTC then approved the merger, after BP, as part of a consent decree, "divest[ed] itself of] all of ARCO's assets in Alaska to Phillips Petroleum Company," (*In re BP Amoco p.l.c. and Atlantic Richfield Co.*, Docket No. C-3938, 2000 WL 422209 (F.T.C.) (Apr. 13, 2000), p. 30, Statement of Commissioners Anthony, Swindle, and Leary), which included ARCO's pre-merger interests in Prudhoe Bay and other North Slope production or exploration units, and all leases,

---

[14] The court also may take judicial notice that the Amoco merger was scrutinized by, and received antitrust clearance from, the Federal Trade Commission ("FTC").

infrastructure and TAPS interest (*id.* at pp. 12-13, Order).[15]  BP acquired *no* additional North

Slope natural gas assets as a result of the merger, and experienced *no* increase in its "percentage

share" of the alleged markets.  This divestiture, the Commission found, fully "remed[ied] the

antitrust concerns" allegedly raised by the merger.  *Id.* at 30.  Phillips Petroleum (now

ConocoPhillips), which received the divested assets, is today a capable and resourceful Alaska

competitor.

The complaint ignores BP's divestiture and contains no explanation of how, in light of the

divestiture, the merger possibly could have adversely impacted competition in any market

involving the divested Alaskan assets.  Instead, in paragraphs 140-142, plaintiff misleadingly

attempts to change the subject by referring to a separate agreement reached between BP,

ExxonMobil and Phillips that redistributed certain liquid/natural gas equity interests which these

companies held in the Prudhoe Bay Unit.  [*See, e.g.*, Cmpl., ¶ 140 ("an agreement was reached

between ExxonMobil, Phillips, and BP")]  The Fifth Claim challenges BP's "unlawful

acquisition, holding and use of" assets via mergers, not this separate agreement.[16]  [*Id.*, ¶ 209]  In

---

[15] Again, the court may take judicial notice of this formal action by a federal agency.  In addition, the complaint concedes that BP entered into the Charter to "address the State of Alaska's competitive concerns" with this merger, and that the Charter contained provisions addressing the development of North Slope natural gas.  [Cmpl., ¶ 112]

[16] Plaintiff alleges that BP's agreement with ExxonMobil and Phillips Petroleum was entered into "in connection" with the merger. [Cmpl., ¶ 142] While BP does not agree that this conclusory allegation states any basis to treat the agreement as part of plaintiff's Clayton Act § 7 claim, doing so would have no effect on this motion.  As described in the complaint, this agreement left BP with a Prudhoe Bay stake of only "26.35%," far less than the "36.4%" stake held by ConocoPhillips which is not named a defendant.  Moreover, the complaint alleges no "before and after" facts showing how either (1) the agreement by itself or (2) the agreement in conjunction with the merger affected the ownership and distribution of North Slope natural gas assets.  Regardless of the agreement, no facts sufficient to state a Clayton Act § 7 violation are alleged.

sum, the complaint alleges no facts explaining how the merger with Atlantic Richfield caused any "anticompetitive effects" of the kind required to establish a Clayton Act § 7 violation.[17]

> 2.     The complaint fails adequately to allege plaintiff's antitrust injury
> <u>from the mergers</u>

The complaint also fails to allege facts establishing any "loss or damage" to plaintiff of the "type the antitrust laws were designed to prevent." *Cargill*, 479 U.S. at 111.  The theory of plaintiff's case (reiterated throughout the complaint) is that ExxonMobil and BP possess "such a large share of North Slope gas" that "the boycott by them alone" is enough "to stop the Authority's pipeline."  [Cmpl., ¶ 22; *see also id.*, ¶¶ 15, 100]  In addition to all the reasons discussed above, that theory fails to state an antitrust claim because the complaint alleges no logical connection between plaintiff's alleged injury (*i.e.*, its inability to proceed with its project) and the mergers.  To make such a linkage under its theory, plaintiff would need to allege facts demonstrating that, absent these mergers, sufficient North Slope natural gas assets would be held by producers other than ExxonMobil or BP to allow plaintiff to proceed with its project.  Not only is this not alleged, but other facts that are alleged establish that no such conclusion is possible.

Taking the Prudhoe Bay Unit, which is alleged to contain "25-30 TCF" in known gas reserves, BP's share of the Unit is alleged to be "26.35%," compared to "36.4%" for ExxonMobil and "36.6%" for ConocoPhillips (a non-defendant).  [*Id.*, ¶¶ 42, 140]  Clearly, very substantial

---

[17] The complaint refers in passing to other mergers or transactions, such as BP's acquisition from Conoco of interests in the Milne Point and Badami fields, and its acquisition from Shell of an interest in the Northstar field.  [Cmpl., ¶¶ 146, 149] These transactions are not alleged to involve the Prudhoe Bay or Point Thomson Units, which contain the vast bulk of known North Slope gas reserves, and no other facts are alleged that show that these transactions had any anticompetitive effect upon the purported markets at issue here.  Moreover, because the complaint specifically states that those transactions occurred between 1993 and 1996 [*id.*, ¶¶ 54, 145-50.] any claims based on them are time-barred [*see* discussion on p. 29].

North Slope gas reserves remain in the hands of producers other than ExxonMobil or BP.  It is impossible to conclude that these mergers in themselves had anything to do with whether or not ExxonMobil and BP could block plaintiff's pipeline project.

3.    <u>Any claim based upon BP's mergers is time-barred</u>

Any claim based on a purported violation of Clayton Act § 7 must be filed within 4 years of the alleged wrongful act.  Clayton Act § 4B, 15 U.S.C. § 15b (damages claims are "forever barred unless commenced within four year after the cause of action accrued."); *Int'l Tel. & Telegraph Corp. v. Gen. Tel. & Electronics Corp.*, 518 F.2d 913, 929 (9th Cir. 1975), *overruled on other grounds*, *California v. American Stores Co.,* 495 U.S. 271 (1990) (injunctive relief claims are barred by a 4-year laches period), 928 ("[t]he proper approach is to use the [Clayton Act] § 4B's four-year limitations on § 4 [damages] actions as a guideline in computing the laches period under § 16 [injunctive relief]").  Plaintiff alleges that BP's merger activities occurred in December 1998 and April 2000.  [Cmpl. ¶¶ 139, 141].  Although the complaint does not set forth the specific dates the mergers were completed, there is no dispute that the mergers closed prior to four years of the filing of the complaint, or December 2001.  Accordingly, plaintiff's Clayton Act § 7 claims are time-barred and should be dismissed.

II.    PLAINTIFF LACKS STANDING TO BRING THE UTPA CLAIM (SIXTH CLAIM FOR RELIEF)

Plaintiff's Sixth Claim alleges that defendants engaged in "unfair" and "deceptive" conduct that violated the Alaska Unfair Trade Practices and Consumer Protection Act, AS 45.50.471 *et seq*. ("UTPA").  [Cmpl., ¶¶ 210-14]  The claim is based on the same allegations of anticompetitive conduct as the antitrust claims stated in plaintiff's First through Fifth Claims for Relief.  [*See, e.g.*, *id.* at ¶ 212 (defendants agreed "not to compete in the sale of natural gas from

the North Slope" and "not to sell natural gas to [plaintiff]")]  Under Alaska law, a plaintiff who bases a UTPA claim on purported anticompetitive conduct is required to demonstrate that it has standing to sue under the antitrust laws.  *See Aloha Lumber Corp. v. Univ. of Alaska*, 994 P. 2d 991, 1002 (Alaska 1999) ("if the anti-competitive part of the Act could be read to be a generally applicable, antitrust statute, [plaintiff] would need antitrust standing to complain").  As discussed above, plaintiff lacks standing to bring the antitrust claims.  Thus, it also lacks standing to assert the UTPA claim.

III.    **THE COMPLAINT FAILS TO STATE A CLAIM FOR TORTIOUS INTERFERENCE BECAUSE THE ALLEGED WRONGFUL CONDUCT IS PRIVILEGED AS A MATTER OF LAW (SEVENTH CLAIM FOR RELIEF)**

The Seventh Claim asserts a state law tort claim for of intentional interference with prospective economic advantage.  [Cmpl., ¶¶ 215-28]  Plaintiff claims that, through allegedly "anticompetitive and unjustified means," defendants "intentionally interfered with . . . the Authority's efforts to benefit from its prospective business relationships with the [ANS] producers, the State of Alaska, Sempra, and the LNG gas purchasers."  [Cmpl., ¶ 226]  This count must be dismissed because defendants' alleged conduct is privileged as a matter of Alaska law.

An essential element of a viable claim of intentional interference with prospective economic advantage is "absence of privilege or justification for the defendant's conduct."  *K & K Recycling, Inc. v. AlaskaGold Co.*, 80 P.3d 702, 717 (Alaska 2003).  Under Alaska law, to establish a prima facie case and avoid dismissal, a plaintiff must plead and prove facts establishing the absence of justification or privilege.  *See Sisters of Providence v. A.A. Pain Clinic, Inc.*, 81 P.3d 989, 997 (Alaska 2003); *Odom v. Fairbanks Mem'l Hosp.*, 999 P.2d 123, 132 (Alaska 2000).  A claim is subject to dismissal under Rule 12(b)(6) when the complaint itself

shows the existence of circumstances creating a privilege. *See, e.g.*, *Nizinski v. Currington*, 517 P.2d 754, 755-56 (Alaska 1974) (affirming Rule 12(b)(6) dismissal of libel action where complaint on its face revealed existence of privilege); *see generally* 5B CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 521, at 701 (3d ed. 2004) (observing that dismissal is likely to be granted if "plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to securing relief").

The Alaska Supreme Court recognizes a "direct financial interest privilege," such that, when a defendant has a direct financial interest, it is privileged to interfere with plaintiff's prospective business opportunities in order to further its own economic interests. *See Ran Corp. v. Hudesman,* 823 P.2d 646, 648-49 (Alaska 1991).

In the present case, plaintiff has alleged that defendants acted "without legitimate justification or excuse." [Cmpl., ¶ 227]  But reliance on these "legal conclusions . . . cast in the form of factual allegations" is insufficient to avoid dismissal. *Fox Family Worldwide,* 328 F.3d at 1139.  More important, the facts that plaintiff pleads in the complaint establish that defendants' conduct, which supposedly supports the Seventh Claim, is privileged as a matter of Alaska law. Defendants' alleged wrongdoing consists of their "refusal to supply natural gas" to plaintiff. [Cmpl., ¶ 100 ("only impediment to the Authority's plan" is defendants' "refusal to supply natural gas")]  Yet plaintiff concedes that, as leaseholders, BPXA and ExxonMobil enjoy the right to "drill, produce and market gas" located within their leaseholds.  [*Id.,* ¶ 106]  Unquestionably, defendants are entitled to protect their own economic interests in deciding whether or not to accept an offer from plaintiff to purchase its North Slope natural gas.  BPXA's decision not to sell gas to plaintiff is privileged as a matter of state tort law.

In *Ran Corp.*, the Alaska Supreme Court applied the rule of privilege in just this manner. There, an owner-landlord was held to be privileged to interfere with a tenant's proposed assignment of his lease to the leased property.  823 P.2d at 649-50.  Notwithstanding that the owner's interference may have constituted a breach of the lease, "it was privileged from a tort standpoint because of [the owner's] pre-existing interest as a property owner/lessor."  *Id.* at 650. BPXA is similarly privileged from a tort standpoint because of its pre-existing interest in the North Slope natural gas that plaintiff seeks to purchase.  Plaintiff's "prospective business opportunity" to contract with third parties to transport and sell this gas cannot trump BPXA's right to protect its "direct financial interest" in its own gas.

Because the complaint establishes that the alleged wrongful conduct is privileged from a tort standpoint, the Seventh Claim must be dismissed.

## IV. THE COMPLAINT FAILS TO STATE A BREACH OF CONTRACT CLAIM AGAINST BPXA (EIGHTH CLAIM FOR RELIEF)

The Eighth Claim rests on alleged breaches of the Charter For Development of the Alaskan North Slope, entered into by the State of Alaska, BP p.l.c., and ARCO Alaska, Inc., on December 2, 1999.[18]  [Cmpl., ¶¶ 112-15, 229-31]  This claim must be dismissed in its entirety for three reasons.  First, the Charter provides explicitly that only signatories to the Charter (which

---

[18] Only certain Charter provisions involve undertakings by BP p.l.c.  *See* Charter Part IV ("BP Amoco, p.l.c.'s Commitments").

A copy of the Charter is attached as Exhibit 1.  Consideration of the document that plaintiff alleges was violated is proper, notwithstanding that plaintiff did not attach or formally incorporate it into the complaint.  *United States v. Ritchie,* 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if . . . the document forms the basis of the plaintiff's complaint. . . .  The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6).") (internal citations omitted); *see generally* 5C CHARLES A. WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1364, at 136 & n.29 (3d ed. 2004).

plaintiff is not) may enforce its terms.  Second, even as to these parties, the provisions of the Charter that plaintiff relies on -- the North Slope natural gas provisions stated in Paragraph I.J. -- may be enforced only by arbitration.  Third, the Charter's North Slope natural gas provisions that plaintiff relies on expired on December 31, 2003, while the conduct that plaintiff relies on as an alleged violation of the Charter occurred more than a year later, when BPXA allegedly failed to engage in "good faith negotiations" in response to an offer to purchase North Slope gas that plaintiff submitted on April 1, 2005.

In its complaint, plaintiff paraphrases certain of the Charter's provisions and neglects to mention others of obvious import.  Relevant Charter provisions are set forth below:

I.    BP and ARCO's Commitments Regarding Competition, Diversity and Growth.

* * *

J.    Natural Gas.

1.    *During the period after the merger is completed through December 31, 2003*, BP and Arco shall negotiate in good faith to make available to third parties at a commercially reasonable fair market price or transportation charge that is mutually agreeable to BP and Arco, the third party and the State, Alaska North Slope natural gas in sufficient quantities to support a qualified treatment and transmission project . . . .

* * *

4.    During this period, BP and ARCO will give fair consideration to all reasonable approaches, projects and plans proposed by the State, joint interest owners and others, including LNG projects developed or proposed by the newly established port authority [and others] . . . .

* * *

5.    The obligations to negotiate with third parties does not preclude BP and ARCO from proceeding with their own project or projects to commercialize Alaska North Slope gas.

* * *

7.      The parties agree that the terms of paragraph I.J. of
this Charter shall be *enforceable exclusively by arbitration
between the State and BP and ARCO under the rules of the
American Arbitration Association*.

\* \* \*

V.      General Provisions.

\* \* \*

D.      Construction. . . .  This Charter will be binding on the parties
and their respective successors and assigns, and *is not intended to
confer any rights or remedies upon any other persons* . . . .

A.      The Charter Explicitly Provides That Only Its Parties May Enforce
        <u>This Agreement</u>

Two separate provisions of the Charter, as quoted above, state explicitly that only the

parties to the Charter may enforce it.  Paragraph V.D. states that the Charter is "not intended to

confer any rights or remedies" upon any party other than its signatories.  Paragraph I.J.7 states

unequivocally that "the terms of paragraph I.J. [] shall be enforceable exclusively by arbitration

between the State and BP and ARCO . . . ."  These terms make clear that plaintiff, who is not a

party, may not sue to enforce the provisions.

Plaintiff asserts that it is an intended beneficiary of the Charter.  [Cmpl., ¶ 231]  But

merely because a person may benefit from the terms of a contract entered into by other parties

does not entitle that person to enforce the contract.  "To create a third party right to enforce a

contract, the language of the contract must clearly evidence an intent to permit enforcement by the

third party." *Consol. Edison, Inc. v. Northeast Utils.*, 426 F.3d 524, 528 (2d Cir. 2005) (internal

quotations and punctuation omitted); *see generally* RESTATEMENT (SECOND) OF CONTRACTS §

302(1) (1981) ("a beneficiary of a promise is an intended beneficiary if recognition of a right to

performance in the beneficiary is appropriate to effectuate the intention of the parties").  Here,

two separate Charter provisions expressly negate plaintiff's attempt to enforce the Charter as an intended beneficiary.

When entering into the Charter agreement, the parties expressly and unambiguously agreed that no persons apart from themselves could enforce its terms. The court must give effect to the parties' agreement in this regard. *See, e.g., Monzingo v. Alaska Air Group, Inc.,* 112 P.3d 655, 660 (Alaska 2005) ("When interpreting contracts, the trial court's goal is to give effect to the reasonable expectations of the parties.") (internal quotations omitted).

B. <u>The Charter May Be Enforced Only By Arbitration</u>

Even the parties who may enforce the North Slope natural gas provisions of the Charter may do so only through arbitration, and not litigation. Paragraph I.J.7 of the Charter states that these provisions may be enforced only in "arbitration between the State and BP and ARCO under the rules of the American Arbitration Association." Such an agreement is fully enforceable, and constitutes a further bar to plaintiff's lawsuit. *See* RESTATEMENT (SECOND) OF CONTRACTS § 309 & cmt. b (1981) ("Where there is a contract, the right of a beneficiary is subject to any limitations imposed by the terms of the contract."); *see also, e.g.*, 9 U.S.C. § 2 (written agreement to arbitrate dispute "involving commerce" is "valid, irrevocable, and enforceable . . . .").

C. The Charter's Provisions Expired Prior To BPXA's Conduct Constituting
<u>The Purported Breach</u>

Under paragraph I.J.1 of the Charter, BPXA's commitment to negotiate with third parties regarding the sale or transportation of North Slope gas expired on December 31, 2003. However, plaintiff rests its claim for breach of the Charter on the allegation that BPXA refused to negotiate in good faith in response to the offer to purchase ANS gas that plaintiff submitted to BPXA and ExxonMobil on April 1, 2005. [Cmpl., ¶¶ 19, 102-05 (all referring to BPXA's alleged refusal to

BPXA's Memo. in Support of Motion to Dismiss

*Alaska Gasline Port Authority v. ExxonMobil, et al.*, Case No. F05-0026 CIV (RRB)          35

negotiate in 2005)]  By its terms, the Charter imposed no obligation on BPXA to negotiate with

third parties after 2003.  The complaint describes no conduct that occurred before December 31,

2003, that allegedly breached the Charter and caused injury to plaintiff.  Thus, on its face,

plaintiff's breach of contract claim fails for this additional reason.

## V.   PLAINTIFF'S CLAIMS FOR INJUNCTIVE RELIEF SHOULD BE DISMISSED FOR FAILURE TO JOIN PARTIES WHOSE PRESENCE IS REQUIRED BY RULE 19

Rule 19 of the Federal Rules of Civil Procedure requires plaintiff to join all "persons

needed for just adjudication" of the claims in this lawsuit.  More specifically, plaintiff must join

all parties whose presence is needed to afford complete relief (*id.* at 19(a)(1)), or to protect the

interests of the absent parties  (*id.* at 19(a)(2)).  Failure to do so is grounds for dismissal.  Fed. R.

Civ. P. 12(b)(7).

Here, plaintiff's claims for injunctive relief should be dismissed because the Court cannot

grant the complete relief plaintiff seeks in the absence of the other owners of North Slope gas,

including the State of Alaska and ConocoPhillips.  Further, the failure to join such parties will

lead to the increased likelihood of future litigation, and the deprivation of those parties' rights to

defend their interests.  *United States ex rel. Morongo Band of Mission Indians v. Rose*, 34 F.3d

901, 908 (9th Cir. 1994) (the purpose of Rule 19 "is to protect the legitimate interests of absent

parties, as well as to discourage multiplicitous litigation.").

Plaintiff seeks injunctive relief pursuant to Clayton Act § 16, 15 U.S.C. § 26, "to restrain

Defendants' continuing violations" of sections 1 and 2 of the Sherman Act.  [Cmpl., Prayer for

Relief, ¶ D]  Although the complaint is unclear as to scope of the precise relief sought, it appears

that plaintiff is requesting that the Court enjoin defendants from refusing to commit their North

Slope gas to plaintiff.  If that is the case, plaintiff is essentially asking the Court to issue a

mandatory injunction directing defendants to sell North Slope gas to plaintiff.  Not only is such a form of relief highly disfavored,[19] it simply cannot practicably be fashioned here.  While defendants own North Slope gas, they are not the only owners, nor are they the entities with the final authority to decide who may build a pipeline.  In practice, it must be clear that only one pipeline for North Slope gas will be built.  For the Court to mandate that defendants must supply North Slope gas to plaintiff effectively would ensure that plaintiff's pipeline project will be the only means of transporting North Slope gas to market.  Such a mandate would affect all parties who own North Slope gas, not just the defendants.  The absence of these parties compromises their ability to fully protect their interests.

Plaintiff cannot discriminatorily select the North Slope gas owners against which it seeks this broad injunctive relief if such selection results in the inability of the Court to fashion a complete remedy or the deprivation of the rights of the absent parties.  Such is the case here.  Thus, plaintiff's claims for injunctive relief should be dismissed.

///

///

///

///

///

///

///

---

[19] *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1320 (9th Cir. 1994) (mandatory injunctions are "particularly disfavored").

<u>CONCLUSION</u>

For the reasons discussed above, the Court should dismiss the complaint. Because plaintiff cannot allege facts either to establish antitrust standing or to convert BPXA's refusal to commit North Slope natural gas to plaintiff's project into a federal antitrust claim, the dismissal should be without leave to amend.

Dated this 8th day of February, 2006.

Ronald C. Redcay
Matthew T. Heartney
Angel L. Tang
ARNOLD & PORTER LLP

Jeffrey M. Feldman
FELDMAN ORLANSKY & SANDERS

Bradley S. McKim
BP EXPLORATION (ALASKA) INC.

By:    s/Jeffrey M. Feldman
Jeffrey M. Feldman
ALASKA BAR NO. 7905029
*Attorneys for Defendant*
*BP Exploration (Alaska) Inc.*

390047v.6

## Certificate of Service

I hereby certify that on February 8, 2006, a copy of the foregoing Motion to Dismiss Defendant BP Exploration (Alaska) Inc., Memorandum in Support of Motion to Dismiss Defendant BP Exploration (Alaska) Inc. and [proposed] Order were served electronically on Kevin Barry, John F. Cove Jr., Kenneth F. Rossman, IV, Robert Silver, and William M. Walker, via U.S. Mail to Charles E. Cole

By:    s/Jeffrey M. Feldman