# CHARTER FOR DEVELOPMENT
## of the Alaskan North Slope

This **Charter for Development of the Alaskan North Slope** is entered between the State of Alaska, BP and ARCO on December 2, 1999.

BP and ARCO historically have been major participants in the development of oil resources on the North Slope of Alaska. ARCO discovered the giant Prudhoe Bay oil field in 1968. BP participated in the discovery of Kuparuk the following year. Both were leaders in building the Trans Alaska Pipeline System. Today, they are two of the largest interest owners and operators on the North Slope.

The environment for finding, developing and producing oil and gas is challenging and complex, in Alaska and the world. The giant Prudhoe Bay and Kuparuk fields are in decline. World energy markets continue to experience price volatility, competition for capital and opportunities, and financial and technical challenges to discover, develop and produce new fields. These challenges have led to large-scale industry consolidation in recent years.

Earlier this year, BP and ARCO proposed to merge. The merger and its potential impact on Alaska have been analyzed and discussed by the Governor, his Cabinet-level review team, the Legislature and the public in private, in hearings and in the media since the announcement.

There is potential both for benefit and risk to Alaska in the merger as initially proposed. In BP and ARCO's view, Alaska would benefit from the combination's financial strength and expertise, and the increased efficiencies and synergies of the combination would help make Alaska more attractive in a global oil marketplace. But Alaska would, in the State's view, lose a measure of competition, diversity and balance in the exploration, development and production of North Slope resources, and Alaska would lose the varied contributions of a leading corporate citizen.

The State of Alaska is committed to maintaining and enhancing competition, diversity and balance in the exploration, development and production of North Slope resources, sustaining and growing both oil and gas production, and ensuring that the State's natural resources are developed in an environmentally and socially sensitive and responsible manner. The State has determined therefore that its support for the merger must be conditioned upon BP and ARCO making substantial marketplace and community commitments to Alaska.

Therefore, in order to provide for greater competition, diversity, corporate responsibility, renewal and growth in the exploration, development and production of Alaskan North Slope oil and gas, the State, BP and ARCO agree to this Charter and its terms as set forth below.

## I. BP and ARCO's Commitments Regarding Competition, Diversity and Growth.

**A. Sale of Current Production.** After the merger is completed, BP and ARCO will sell the following properties in the following manner:

    **1. Sale of Production.** BP and ARCO will sell interests in North Slope properties producing in aggregate share not less than 175,000 barrels of gross working interest production per day to one or more purchasers. For purposes of this paragraph I.A., quantity will be measured by 1999 average daily production, except the Colville River Unit will be deemed to produce a total of 80,000 barrels of production per day.

    **2. Sale of Interests including Kuparuk.** As part of the sale required by subparagraph 1, BP and ARCO will enter into a contract of sale with a single qualified company ("Buyer A") for at least 125,000 barrels of gross working interest production per day, including at least 50.01% of the Kuparuk River Unit total interest, and will take all reasonable available steps to enable that company to become the operator of that unit. In no event will BP or ARCO continue as operator of that unit after sale of the working interest production. For purposes of this subparagraph 2, "qualified company" means a company which is currently a joint interest owner in the Kuparuk River Unit, or a company primarily in the energy business with assets of not less than $8 billion.

    **3.**     **Sale of Interest in Alpine.** As part of the sale required by subparagraph 1, BP and ARCO will enter into a contract of sale with a single qualified company ("Buyer B") for at least 40% of the total Colville River Unit interest and will take all reasonable available steps to enable that company to become the operator of that unit. In no event will BP or ARCO continue as operator of that unit after sale of the interest. For purposes of this subparagraph 3, "qualified company" means a company which is currently a joint interest owner in the Colville River Unit, or a company primarily in the energy business with assets of not less than $3 billion.

    **4.**     **Sale of Share of Pipelines.** BP and ARCO will enter into a contract of sale with Buyer A and Buyer B for a commensurate interest in TAPS and intermediate pipelines as provided in paragraph H.

**B. Sale of NPRA Lease Interests.** BP and ARCO will sell not less than 220,000 net acres of their aggregate NPRA holdings to one or more purchasers. BP and ARCO will enter a contract of sale with either Buyer A or Buyer B for not less than 100,000 net NPRA acres, including at least 50.01% of BP and ARCO's combined interests in one of the sections of the NPRA designated on Exhibit A to this Charter, and will take all reasonable available steps to enable that company to become the exploration operator in that section.

**C. Sale or Relinquishment of State Leases.** BP and ARCO will sell or relinquish at least 400,000 net acres of undeveloped state leases, including sufficient interests in

onshore/non-unitized state leases to reduce their aggregate holdings in such leases to not more than 500,000 net acres. BP and ARCO will manage the sale of this acreage to result in two exploration operatorships other than BP or ARCO in material and significant geologic play fairways on the North Slope (lease groupings which the parties agree meet this requirement are listed in Exhibit B to this Charter). As part of this sale or relinquishment of State acreage, BP and ARCO will enter contracts of sale with Buyer A and Buyer B in the combined amount of not less than 250,000 net acres of undeveloped state leases, including a minimum of 75,000 net acres for each buyer. BP and ARCO agree to meet and confer with representatives of the Alaska Department of Natural Resources, beginning within 10 days after the merger is completed and continuing for the period reasonably necessary to review the number, status, prospectivity and possible transfer options for all such holdings, as well as intended marketing or relinquishment plans.

**D. Terms of Sales.** Contracts for the full aggregate amount of the interests sold under paragraphs I.A. and I.B. will be signed within 6 months after the merger is completed and those transactions will be closed not later than 12 months after the merger is completed. Transfers under paragraph I.C. will be made within the period prescribed by law. All transfers of whole or partial interests in the properties and pipelines referenced in paragraphs I.A.-I.C. will be absolute, in good faith and with no minimum price. BP and ARCO agree that they will not reacquire interests transferred under paragraphs I.A.-I.C. by any means without advance approval of the State. Except as specifically provided in paragraphs I.A-I.C. and otherwise in this Charter, the sales contemplated in paragraphs I.A.-I.C. may be to various parties and include interests from various units and leases as determined by BP and ARCO. BP and ARCO may retain an interest in the units and leases it sells under paragraphs I.A.-I.C., subject to the requirement that any interest retained in exploration leases be subject to non-consent provisions permitting investment by other interest owners without BP or ARCO's consent. Any transfer under paragraphs I.A-I.C. will be subject to all necessary state and federal regulatory approvals and other requirements. BP and ARCO will use their best efforts to secure such approvals.

**E. Data Availability.** After the merger is completed, BP and ARCO will make their proprietary North Slope seismic and well data publicly available for purchase by any person where they have the legal right to do so. Where they do not currently have the legal right to do so, they will diligently and in good faith seek permission from the other joint interest owners to make the data available. Unless otherwise approved by the State, BP and ARCO will make the data available by contracting with a third party company, acting as marketing agent for BP and ARCO, that will market the data at prices it independently determines; except that, with respect to data generated before 1975, BP and ARCO will make the data publicly available without charge in such reasonable manner as it may determine. BP and ARCO will ensure that the data is publicly available as soon as is reasonably practicable but in all events not longer than 3 months after the merger is completed. BP and ARCO will provide the State with (1) a list of which of their North Slope seismic and well data can be made available on their own and which requires the consent of parties other than BP or ARCO, and (2) a list or lists showing all of BP and

ARCO's North Slope seismic and well data from 1958 on indicating the acquisition area, the size of the acquisition area, the ownership status (sole, joint, group shoot, trade, purchase or license), when the data was acquired, the survey type, and the operator and the contractor. For data acquired after 1984, these lists will be provided as soon as is reasonably practicable but in all events before December 31, 1999. For data acquired before 1985, these lists will be provided as soon as is reasonably practicable but in all events within 3 months after the merger is completed. This paragraph applies to data generated prior to and through the date this Charter is first signed by the parties.

F. **Facilities Access.**

   1. In the State's view, the Commissioner of Natural Resources possesses the statutory, regulatory and contractual authority to require working interest owners to provide others access to production and other facilities, on terms that are non-discriminatory, just and reasonable. The Commissioner may require access whenever necessary to maximize the economic and physical recovery of the State's oil or gas resources, maximize competition among parties seeking to explore and develop the resources, minimize the adverse effects of exploration, development, production and transportation activity, or otherwise to protect the best interests of the State. Binding arbitration between BP or ARCO and others under subparagraph 2 does not affect the Commissioner's authority to resolve questions of facility access.

   2. BP and ARCO currently take no position on the State's view. BP and ARCO nevertheless commit that, after the merger is completed, neither BP nor ARCO will unreasonably withhold their voting support as facilities owners for allowing nearby satellites to have access to existing unit facilities on reasonable commercial terms. BP and ARCO agree that if a nearby satellite owner reasonably and diligently negotiates to unsuccessful impasse with facilities owners that include BP or ARCO, and after 90 day advance notice to BP and ARCO, BP and ARCO agree to subject themselves to binding arbitration governed by the rules of the American Arbitration Association on the question of reasonable commercial terms for that access.

G. **Purchases From Qualified Producers.** After the merger is completed, BP and ARCO agree to offer to purchase any qualified producer's ANS leasehold production on the terms reflected in the form purchase contract which is Exhibit C to this Charter. BP and ARCO may limit the total purchased under all such contracts to 30,000 barrels per day. For purposes of this paragraph I.G., "qualified producer" means a person or entity with assets of less than $1 billion (all parents, subsidiaries, affiliates and controlling parties inclusive) which produces not more than 10,000 barrels of gross working interest ANS liquid hydrocarbons per day at the time of proposed contract entry. In the event that any purchase contract under this paragraph I.G. is in effect and no RIK sales are made in a month, the State agrees to calculate the average value it received for RIV in that month for use as an alternative reference marker, and to update that average monthly to reflect retroactive revisions. The parties agree that the price at which the crude oil is purchased, and the pricing formula components of Exhibit C, will not be precedent in any royalty or severance tax proceeding or matter between them.

**H. Divestiture of TAPS and Feeder Lines.**

1. In order to satisfy the State's concern that the purchasers of the production interests sold under paragraph I.A. of this Charter (the "Transferee(s)") be similarly situated to BP and ARCO by ownership in TAPS, within the time frame established for paragraph I.A. transfers, BP or ARCO will enter into a contract with each Transferee to sell a share of BP or ARCO's interest in TAPS sufficient to carry the production sold to that Transferee. For purposes of this paragraph I.H., production quantity will be measured in the same manner as under paragraph I.A. and TAPS capacity will be measured in accordance with the Amended and Restated Capacity Settlement Agreement in the fixed amount of 1380 mbd.

2. After all contracts contemplated in subparagraph 1 have been entered, and during the remaining term of this Charter, BP or ARCO will offer to sell additional interests in TAPS to any person requesting to purchase a share in TAPS, up to a total aggregate amount under this paragraph I.H. of 22.295% of total TAPS ownership. The additional transfers contemplated by this subparagraph 2 will be in minimum increments of 2% of total TAPS ownership, valued at not more than the ad valorem tax value as of the time of the offer, less 5%. The parties agree that the price at which the TAPS interest is sold will not be precedent in any property tax proceeding regarding the value of TAPS.

3. Within the time frame established for paragraph I.A. transfers, BP and ARCO will enter into a contract with each Transferee to sell to that Transferee a separate share of BP and ARCO's aggregate interest in the Oliktok pipeline and in each of the intermediate crude oil common carrier pipelines serving the specific units in which the production interests to be transferred to that Transferee are located (the "relevant intermediate pipelines"). The ownership interest in each relevant intermediate pipeline to be sold to each Transferee will be equal to the percentage which the production sold under paragraph I.A. to that Transferee flowing through that pipeline bears to the overall throughput of that pipeline. The relevant production and throughput levels will be measured in the same manner as under paragraph I.A. The percentage of the Oliktok pipeline to be sold will be equal to the percentage share of the KRU sold pursuant to subparagraph I.A.2.

4. Any transfer under this paragraph I.H. will be subject to all necessary state and federal regulatory approvals and any preference rights and required approvals of the other TAPS and relevant intermediate pipeline owners. BP and ARCO will use their best efforts to secure such approvals. BP and ARCO will vote their entire interest in TAPS and the relevant intermediate pipelines in support of any such transfer. In the event any other TAPS or relevant intermediate pipeline owner exercises its preference rights with respect to the sale of a pipeline interest pursuant to subparagraphs 1, 2 or 3 hereof, the sale to that other owner will be considered a sale satisfying the obligations of that subparagraph. BP and ARCO agree that they will not reacquire interests transferred under this paragraph I.H. by any means without advance approval of the State.

**I. Offer to Sell Excess Jones Act Ships.** If BP's and ARCO's combined long-term ANS Jones Act fleet requirements are such that one or more ships becomes surplus of

those requirements, BP or ARCO (as the case may be), will offer to sell the surplus ship or ships to other ANS producers on reasonable commercial terms. If BP or ARCO does not own the ship or ships, it will not object to arrangements by another ANS producer to acquire the ship or ships from the owner. Further, in the event that the purchaser of the ship or ships seeks ship operation services from the Alaska Tanker Company, Inc., BP will not object. Nothing in this paragraph requires BP or ARCO to assume any liability of another ANS producer concerning any of these transactions.

**J. Natural Gas.**

1. During the period after the merger is completed through December 31, 2003, BP and Arco shall negotiate in good faith to make available to third parties at a commercially reasonable fair market price or transportation charge that is mutually agreeable to BP and Arco, the third party and the State, Alaska North Slope natural gas in sufficient quantities to support a qualified treatment and transmission project to domestic and/or international markets. A qualified treatment and transmission project must have the demonstrated ability to:
   a. obtain project construction financing;
   b. provide reasonable financial security with respect to a long term 100% take or pay arrangement if the project requires a long term gas sales commitment from the producer(s) (including, if commercially reasonable, an assignment or other back-to-back pass-through of the purchaser's take-or-pay commitment from a creditworthy ultimate purchaser); and
   c. obtain necessary approvals from other field interest owners.

2. BP and ARCO shall make reasonable efforts to assist in obtaining the approvals specified in subparagraph 1.c.

3. The delivery point for gas committed to the project will be the residue gas discharge point of the Low Temperature Separators at the Prudhoe Bay Central Gas Facility, or such other point as agreed by the parties.

4. During this period, BP and ARCO will give fair consideration to all reasonable approaches, projects and plans proposed by the State, joint interest owners and others, including LNG projects developed or proposed by the newly established port authority, the gas sponsor group, Yukon Pacific Corporation and any others, pipelines to the lower 48 including those currently proposed, gas-to-liquids projects, and any other reasonable approach, project or plan for the commercialization of North Slope gas. In giving fair consideration to these various approaches, projects and plans, BP and ARCO will consider, among other things, (a) achieving the highest total project wellhead value for the State and for the sellers over the life of the project(s) and (b) other potential benefits to Alaska such as bringing gas infrastructure for the delivery of North Slope gas to communities in Alaska. BP and ARCO will meet and confer with project sponsors on reasonable request. Not less than every six months during this period, BP and ARCO will provide the Commissioner of Natural Resources with a report that identifies the

name of the contact person for each project sponsor which contacted BP and ARCO during the prior 6 month period and the general nature and current status of the sponsor's project, subject to confidentiality requirements of the sponsor.

    5. The obligation to negotiate with third parties does not preclude BP and ARCO from proceeding with their own project or projects to commercialize Alaska North Slope gas.

    6. The obligations imposed by this section terminate before December 31, 2003 if BP and ARCO enter into a contract or contracts before that date committing Alaska North Slope gas to a qualified treatment and transmission project or projects for volumes that in the aggregate would constitute BP and ARCO's share of a Major Gas Sale under Article 26, Section 26.002 of the Prudhoe Bay Unit Operating Agreement or if the Board of Directors of BP and ARCO sanction the construction of such a project or projects before that date.

    7. The parties agree that the terms of paragraph I.J. of this Charter shall be enforceable exclusively by arbitration between the State and BP and ARCO under the rules of the American Arbitration Association.

## II. BP and ARCO's Environmental and Community Commitments.

**A. North Slope Environmental Commitments.** After the merger is completed, BP and ARCO will take the following steps to improve and protect the environment on the North Slope.

    **1. Cleanup of Abandoned Sites.** BP and ARCO will take a leadership role in the assessment and environmental clean up of the North Slope "orphan sites" identified in Exhibit D1 (as currently written and as modified in accordance with the terms of this paragraph II.A.1.), and will spend $10,000,000 (or such greater amount as may be created by ADEC funding requests under paragraph II.A.7.) in performance of this commitment. In carrying out this role, BP and ARCO will consult with the Alaska Department of Environmental Conservation (ADEC) concerning site goals, standards and methods and will substantially complete the assessment and cleanup to the standards approved by ADEC under applicable law within six years after the merger is completed. In addition, BP and ARCO will work cooperatively with ADEC to develop a joint database of North Slope contaminated and solid waste "orphan sites" which includes the nature and location of the sites, the responsible parties and the relative priority for cleanup of each site based upon preliminary evaluation of the risk of harm to human health and the environment posed by the site. BP and ARCO will meet and confer with ADEC from time to time thereafter to arrange for priority re-ordering and substitutions and additions to Exhibit D1 as requested by ADEC, subject to the availability of funding in the spending amount identified above and to the further requirements that there is no known viable responsible party for any substitute or additional site and the site has been wholly vacated. The parties recognize that the available funding in the amount identified

above may not be sufficient to assess and cleanup in full all sites identified in Exhibit D1 now or as it may be amended, and nothing in this subparagraph II.A.1. shall preclude the State from pursuing other parties for reimbursement or from seeking other funding sources for additional assessment or cleanup on any orphan site.

**2. Cleanup of Abandoned Empty Barrels.** BP and ARCO will require contractors conducting seismic or exploration work for them to collect and deliver abandoned empty barrels to BP or ARCO operations for handling, to inventory and map locations of empty barrels and barrels containing product, and to report any visible signs of ground contamination associated with the barrels. BP and ARCO will periodically report to ADEC regarding this effort and provide ADEC with the inventory lists, maps and reports which are developed.

**3. Cleanup of Existing BP and ARCO Sites.** BP and ARCO will assess and clean to the standards approved by ADEC under applicable law the contaminated sites listed on Exhibit D2. BP and ARCO will work cooperatively with ADEC and the land manager to develop cleanup plans and schedules to complete required assessment and cleanup activities at these sites. Assessment and cleanup activities at sites which are currently accessible will be substantially completed by year-end 2005 for the sites listed as "high" priority sites in Exhibit D2 and by year-end 2007 for the remainder. Sites which due to operational restrictions cannot be fully cleaned until facility or equipment abandonment will be identified by BP, ARCO and ADEC for completion according to a mutually agreed schedule. Nothing in this paragraph is intended to eliminate or supercede any other obligations BP or ARCO may have to assess, cleanup or restore these or any other sites.

**4. Closure of Inactive Reserve Pits.** BP and ARCO will comply with the requirements of 18 AAC 60.440 with respect to their inactive reserve pit sites and will close the inactive reserve pits subject to the Order dated May 3, 1993 in *Natural Resources Defense Council Inc. v. ARCO Alaska, Inc.*, No. A88-287 CIV (D. Alaska) as amended within the designated time period established by the court in that matter, and will close other ARCO and BP inactive reserve pits listed on Exhibit D3A by the end of 2007 (except that in the event of currently unprojected operational delay affecting any BP site, that site may be completed on a separate mutually agreed schedule). BP and ARCO will close the ARCO and BP inactive reserve pits listed on Exhibit D3B according to a mutually agreed schedule that ends a reasonable period after work on the D3A sites has been completed.

**5. Commitment to North Slope Spill Response.** BP and ARCO will support, at their proportionate share, an independent professional North Slope spill response organization, such as Alaska Clean Seas or a substantially equivalent organization, and will encourage the fullest possible participation in this organization by all North Slope producers. BP and ARCO will support and vote in favor of funding to the North Slope oil spill response organization for an Arctic spill response research and development program (jointly agreed to by the spill response organization, BP, ARCO and ADEC) at

an average annual level of not less than $200,000 during the 10 year period following completion of the merger.

   **6. Commitment to Corrosion Monitoring.** BP and ARCO will, in consultation with ADEC, develop a performance management program for the regular review of BP's and ARCO's corrosion monitoring and related practices for non-common carrier North Slope pipelines operated by BP or ARCO. This program will include meet and confer working sessions between BP, ARCO and ADEC, scheduled on average twice per year, reports by BP and ARCO of their current and projected monitoring, maintenance and inspection practices to assess and to remedy potential or actual corrosion and other structural concerns related to these lines, and ongoing consultation with ADEC regarding environmental control technologies and management practices.

   **7. Additional Expenditure Commitment.** BP and ARCO will pay or spend up to an aggregate total of $500,000 each year during the 10 year period following completion of the merger for any combination of the following as requested annually in writing by the ADEC Commissioner: additional orphan site assessment or cleanup in excess of cap established in subparagraph 1; additional Arctic spill response research and development in excess of amount established in subparagraph 5; and/or an expert or experts chosen by ADEC to provide expert advice to ADEC regarding pipeline corrosion and/or other pipeline structural issues.

   **8. Payment of Unspent Funds.** In the event that BP and ARCO fail to spend (or support and vote in favor of spending in the case of arctic spill response research and development) in the full amounts provided for under paragraphs II.A.1. ($10,000,000), II.A.5. ($2,000,000) or II.A.7. ($5,000,000) when and as required in those paragraphs, then BP and ARCO will pay any unspent or unsupported balance as directed by the ADEC Commissioner.

**B. Marine Environmental Commitments.**

   **1. Renewed Commitment to OPA 90.** BP and ARCO renew their commitment that neither of them will seek to be relieved of the vessel retirement or replacement requirements of the federal Oil Pollution Act of 1990 ("OPA 90"), nor will either of them lobby for a reduction in its current requirements, nor will they take any other action to extend the retirement dates of the non-double-hulled tankers in their combined fleet beyond the currently scheduled retirement dates. In the event that any trade association or other group of which BP or ARCO is a member takes a different or contrary position, BP and ARCO will, upon notification and request by ADEC, issue a statement clarifying that BP and ARCO do not join in that different or contrary position, and reaffirming the position stated in the first sentence of this paragraph.

   **2. Replacement Vessels.** In furtherance of their continuing commitment to meet or exceed the OPA 90 standards and timetable, BP and ARCO will complete the purchase and delivery of the three ARCO Millennium class tankers on current order to replace

single hulled tankers now used in the combined ANS fleet, and will order and purchase additional tankers to meet their combined ANS fleet requirements on average one year earlier than required by OPA 90, with the expected result that the combined ANS fleet (including both owned and chartered vessels) will be entirely double-hulled by mid-year 2007. These additional purchased tankers will each have safety related attributes substantially equivalent to or better than Millennium or Cape class tankers, including new build double-hulls (wholly new construction), main power plant redundancy, twin propellers, twin rudders, twin independent sets of steering gear, and proven electronics (including navigation, course tracking, collision alarms, engine room monitoring, cargo and ballast monitoring, and fire and safety systems). In addition, BP and ARCO will continue to support a ship escort response vessel system for Prince William Sound at current or better levels of effectiveness.

      **3. Marine Operations.** After the merger is completed, BP and ARCO will continue to encourage and support the company operating ANS tankers for them in using a performance management program for the regular review of its practices related to its management and operations including a safe environment, training and qualifications, and vessel operation, maintenance and management procedures. The parties expect this program will include meet and confer working sessions between the operating company and ADEC, scheduled on average once per year, reports at those working sessions by the operating company of their current and anticipated management and operations practices, ongoing consultation between the operating company and ADEC regarding ANS trade tanker management and operations practices, and the involvement of BP and ARCO in those sessions and consultations on a monitoring basis. In addition, BP and ARCO will encourage the operating company to allow the opportunity for ADEC to observe, and to be provided a copy of the written results of, management and vessel audits performed as part of a certification or re-certification process for the International Maritime Organization's International Safety Management Code or for the International Standards Organization.

**C. Continued Commitment to Alaska Hire.**

      **1. Alaska Hire Program.** BP and ARCO agree that, after the merger is completed, they will continue with and extend their commitment to the people of Alaska to utilize a voluntary program to employ residents of Alaska and to use Alaska businesses. It is expected by the parties that this program will include the attributes that:

      a. BP and ARCO will comply with all valid federal, State and local hiring laws in hiring Alaska residents and contractors and will not discriminate against Alaska residents or contractors, and within the constraints of law will employ Alaska residents and contractors to the extent they are available and qualified;

      b. When recruiting for new hires, BP and ARCO will advertise for available positions locally and use Alaska job service organizations to notify the Alaskan public;

      c. BP and ARCO will use best efforts to contract with Alaska firms and fabricate modules in Alaska whenever feasible (in determining feasibility, BP and ARCO will consider commercial, health, safety, and environmental conditions and requirements to ensure maintenance of BP and ARCO's operational standards); and

      d. BP and ARCO will, to the extent permitted by law, encourage its contractors to employ, and train when necessary, residents of Alaska.

    **2. Reporting.** BP and ARCO agree to submit to the Director, Division of Oil and Gas, for transmission to the Department of Labor, an annual report that details the specific measures that they and their contractors and subcontractors have taken or are planning to take to recruit qualified Alaska residents for available jobs, describes on-the-job training opportunities, and describes their efforts to use Alaska businesses for work in connection with their leases and associated activities. BP and ARCO will also furnish the Department of Labor a quarterly report regarding their employment of Alaska residents. The report will include statistical data concerning the number of resident personnel hired within the previous year.

    **3. Construction.** The program and reporting described in this paragraph are intended to be fully consistent with the 1996 amendments to paragraphs 41 (1980 leases) and 31 (1983 lease) of the Northstar Unit leases between the State and BP.

    **4. Alaska Native Recruitment, Training and Hire.** BP and ARCO further acknowledge their continuing support for the recruiting, training and hiring of Alaska Natives and the parties' common understanding of the desirability of providing Alaska's first citizens opportunities to participate in the economic benefits of oil and gas development, most of which takes place in rural Alaska.

**D. Community Charitable Commitment.** Within three months after the merger is completed, BP and ARCO will establish a charitable entity dedicated to funding organizations and causes within Alaska. The entity will provide 30% of its giving to the University of Alaska Foundation and the remainder to general community needs. Funding decisions by the entity will be made by BP and ARCO, with the advice of a board of community advisors. BP and ARCO will provide ongoing funding to this entity in an amount that is equal to .2% of BP's and ARCO's combined aggregate net Alaska liquids production after royalty times the price for WTI. Specific entity funding levels will be calculated annually, on the same date each year, referencing the liquids production and the average NYMEX WTI prompt month settlement price for the 12 months immediately preceding the calculation.

**E. Annual Report.** Once every year beginning in March 2001, and continuing thereafter for the term of this Charter, BP and ARCO will provide the State and the public with a written report describing BP and ARCO's performance of the commitments in this Section II during the prior calendar year. Public distribution will be accomplished by posting the report on a company internet site and such other reasonable means of public distribution as BP and ARCO may choose. The report provided for under subparagraph

II.C.2. will satisfy this paragraph II.E. as well with respect to its subject matter so long as that report is also publicly distributed, and timing differences will be disregarded so long as the II.C.2 report is provided and distributed according to the schedule applying to subparagraph II.C.2.

### III. Alaska's Commitments.

The State of Alaska finds that this Charter adequately addresses the concerns raised by the State during its merger review, that this Charter will provide for greater competition, diversity, corporate responsibility, renewal and growth in the exploration, development and production of Alaskan North Slope oil and gas and is by virtue of these significant benefits in the best interest of Alaska and its people. The State accordingly agrees that, in exchange for BP's and ARCO's fulfillment of their obligations under this Charter, it will not seek to enjoin the merger or seek additional orders or judgments under AS 45.50.580 related to a claim that the merger is unlawful under AS 45.50.568.

### IV. BP Amoco, p.l.c.'s Commitments.

BP Amoco, p.l.c. acknowledges that, after the merger is completed, it will be the ultimate parent company of the BP and ARCO corporate entities owning the Alaska assets which are the subject of this Charter and which accordingly are the primary parties with the State of Alaska herein. In order to provide further assurance to the State that the commitments made in this Charter by these primary parties are fulfilled in all respects, BP Amoco, p.l.c. guarantees that (1) these BP and ARCO corporate entities, or such other BP/ARCO Group companies to which the obligations under this Charter are assigned or otherwise transferred, will remain fully capable during the term of this Charter to fulfill all commitments made by them herein and (2) if for any reason a commitment made by them in this Charter goes unfulfilled past the time performance is due, BP Amoco, p.l.c. will cause that performance to be otherwise fulfilled.

### V. General Provisions.

**A. Definitions.** As used in this Charter: "State" and "State of Alaska" means the State of Alaska, through its Governor, Attorney General and Commissioners of Natural Resources and Revenue; "BP" means BP Exploration (Alaska) Inc.; "ARCO" means ARCO Alaska, Inc.; "merger" means the proposed merger between BP and ARCO's parent companies; the merger is "completed" on the earliest of the date of closing, the effective date of the merger, or the first day after ARCO parent stock is exchanged for BP parent stock; "sell" and "transfer" mean divest; "gross working interest production" means BP and ARCO's share of actual liquid hydrocarbon production, including any State royalty share; "well data" includes, in digital and analog format, any mud log, lithology log, wireline well logs, conventional core and sidewall core descriptions, repeat formation tester, log curve, directional survey, velocity survey, vertical seismic profile, geologic markers, test result, test summary, porosity and permeability data, biostratigraphic data, palynology and paleontology data, geochemical data, vitrinite reflectance data, petrographic data, and

completion reports, regarding onshore or offshore exploration acreage west of the Canning River onshore and west of and including the Kuvlum prospect offshore; "seismic data" includes all seismic and ancillary data required to interpret or reprocess a seismic survey including digital files in standard exchange formats containing survey and location data, original field records, final stack and migrated processed data, final stacking and migration velocities, and a report describing the acquisition and processing of the data, regarding onshore or offshore acreage west of the Canning River onshore and west of and including the Kuvlum prospect offshore; "fair market" as used in paragraph I.J.1. will be determined with reference to the well-head netbacks pertinent to the available market(s) reasonably accessed by North Slope gas.

**B. Enforcement.** This Charter is governed by Alaska law. The parties agree that, except as provided in paragraphs I.J.7. and V.C., it may be enforced as a contract by (a) the Attorney General (for Alaska) and (b) its authorized representatives (for BP and ARCO) in any state or federal court in Alaska, the commitments made in this Charter may be specifically enforced, a trustee may be appointed by the court in such an action to effectuate any property transfers not accomplished as committed, and the court may also order any other appropriate remedy consistent with law. If BP, ARCO and the Federal Trade Commission enter into a consent decree or other agreement related to the merger, the terms of that decree or agreement that relate directly to or affect Alaskan assets or activities within or touching Alaskan waters may be incorporated by the State into this Charter by reference, and are enforceable by the State as though fully set forth herein. BP and ARCO acknowledge that they are subject to the personal jurisdiction of any state or federal court within the State of Alaska for the purposes of enforcing the terms of this Charter. BP Amoco, p.l.c. consents to the jurisdiction of any state or federal court within the State of Alaska for the purposes of enforcing its commitments under section IV of this Charter. No action alleging a failure of performance under this Charter may be commenced more than four years after the alleged failure, and no action alleging a failure of performance under this Charter may be commenced in any event after January 15, 2009, except that an action as provided in the final sentence of paragraph V.C. may be commenced through January 15, 2011.

**C. Enforcement of Section II. Commitments.** In the event that BP and ARCO fail to perform their commitments under subparagraph II.A.8. or paragraph II.E., the State may bring an action to enforce those provisions. The other provisions of Section II of this Charter are corporate citizenship commitments to the Alaskan community at large. The parties do not intend for these other commitments of Section II to be enforced by lawsuits, and no right of action is created with respect to them.

**D. Construction.** This Charter may be amended only in writing by the principals to this agreement or their successors. This Charter will be binding on the parties and their respective successors and assigns, and is not intended to confer any rights or remedies upon any other persons (as used herein, "assigns" includes a transferee of substantially all of the assets of BP or ARCO but does not otherwise include a transferee of property, under this Charter or otherwise). Except as otherwise provided in this Charter, nothing

herein shall be construed to impose a duty or obligation on BP or ARCO to make any additional agreements with or concessions to any other governmental or regulatory body. Where an act required of BP or ARCO under this Charter is subject to regulatory approval or action, the time limits stated in this Charter will be deemed extended as may be necessary to accommodate the time involved in securing those regulatory approvals if BP and ARCO have acted with reasonable diligence in obtaining those approvals.

**E. Reporting, Notice and Access to Records.**

    1.    BP and ARCO will submit an initial compliance report at the time they execute this Charter and will submit additional compliance reports beginning thirty (30) days from the date when this Charter is entered, and every thirty (30) days thereafter until the divestitures required under Section I have been completed or a trustee is appointed. Such reports will be in writing and each such report shall include, for each person who during the preceding thirty (30) days made an offer, expressed an interest or desire to acquire, entered into negotiations to acquire, or made an inquiry about acquiring any ownership interest in all or any portion of the divestiture assets, the name, address, and telephone number of that person and a detailed description of each contact with that person during that period. BP and ARCO will maintain full records of all efforts made to divest the assets under Section I.

    2.    BP and ARCO will notify the State of any proposed divestiture within two (2) business days following execution of a letter of intent or agreement for sale of the assets under Section I. The notice shall set forth the details of the proposed transaction and list the name, address, and telephone number of each person not previously identified who offered or expressed an interest in or desire to acquire any ownership interest in the divestiture assets. Within ten (10) days after receipt of the notice, the State may request additional information concerning the proposed divestiture, the proposed Purchaser, and any other potential Purchaser. BP Amoco and ARCO will furnish the additional information within ten (10) days of the receipt of the request. Within twenty (20) days after receipt of the notice or within ten (10) days after receipt of the additional information, whichever is later, the State will notify BP and ARCO in writing if it objects to the proposed divestiture. If the State fails to object within the period specified, or if the State provides notice that it does not object, then the divestiture may be consummated. If the State objects, the proposed divestiture may not be accomplished unless ordered by a court of competent jurisdiction.

    3.    For the purpose of determining or securing compliance with this Charter, and subject to any legally recognized privilege and reasonable notice, the State will be permitted access during office hours to inspect and copy all books, ledgers, accounts, correspondence, memoranda, and other records and documents in the possession or under the control of BP or ARCO relevant to BP or ARCO's compliance with this Charter. Subject to the reasonable convenience of BP and ARCO, and without restraint or interference from them, the State may interview their directors, officers, employees, and agents regarding any such matters. No information or documents

obtained by the State under this paragraph shall be divulged by any representative of the State to any person other than a duly authorized representative of the Attorney General, except in the course of legal proceedings to which the State is a party, or for the purpose of securing compliance with this Charter, or as otherwise required by law.

**F. Effectiveness.** This Charter shall be effective as of the date it is entered as written above. This Charter shall remain fully effective thereafter, except in the event that the merger agreement between BP and ARCO's parent companies is terminated, then any party may terminate this Charter by written notice to all other parties, in which event this Charter shall become null and void and of no effect, as if it were never entered.

**G. Attorneys Fees.** Within 30 days of the effective date of this Charter, BP and ARCO will pay the State $1,512,198 as reimbursement for its attorney's fees and costs reasonably incurred in connection with the merger through the date of this Charter. In addition, BP and ARCO will make supplemental payments to reimburse the State for reasonable attorney's fees and costs incurred by the State related to Charter implementation and compliance between the date of this Charter and 12 months after the merger is completed. These supplemental payments will be made within 30 days after the State submits a reasonably supported written request to BP and ARCO for reimbursement.

**H. Warranty of Authority.** Each of the persons signing below on behalf of a corporate party represents and warrants that he has the authority to execute this Charter on behalf of the party for which he signs. Each of the persons signing below on behalf of the State represents and warrants that he holds the office shown and is authorized to exercise the powers of that office on behalf of the party for which he signs. In addition, BP and ARCO specifically warrant and represent that they are fully authorized and able to make, and to ensure the performance of, the commitments made herein and that, with respect to any Alaska assets currently owned by affiliates, they have taken or will take such steps as are necessary to ensure that the commitments they make herein are accomplished.

[TEXT CONTINUED ON NEXT PAGE]

I. **Other Obligations Not Reduced.** Nothing in this Charter is intended to reduce, eliminate or supersede any other obligations BP or ARCO may have under any State or federal law or regulation.

**Signatures:**

STATE OF ALASKA

by _/s/ Tony Knowles_
Tony Knowles, Governor

by _____
Bruce Botelho, Attorney General

by _/s/_
John Shively, Commissioner of Natural Resources

by _/s/_
Wilson Condon, Commissioner of Revenue

BP EXPLORATION (ALASKA) INC.

by _/s/_
Richard Campbell, President

ARCO ALASKA, INC.

by _/s/ Kevin O. Meyers_
Kevin Meyers, President

BP AMOCO, p.l.c.

by _____
John Browne, CEO

by _/s/_
Rodney Chase, Deputy CEO

**I. Other Obligations Not Reduced.** Nothing in this Charter is intended to reduce, eliminate or supersede any other obligations BP or ARCO may have under any State or federal law or regulation.

## Signatures:

**STATE OF ALASKA**

by_____
Tony Knowles, Governor

by _/s/ Bruce Botelho_____
Bruce Botelho, Attorney General

by_____
John Shively, Commissioner of Natural Resources

by_____
Wilson Condon, Commissioner of Revenue


**BP EXPLORATION (ALASKA) INC.**

by_____
Richard Campbell, President


**ARCO ALASKA, INC.**

by_____
Kevin Meyers, President


**BP AMOCO, p.l.c.**

by_____
John Browne, CEO

by_____
Rodney Chase, Deputy CEO

**I. Other Obligations Not Reduced.** Nothing in this Charter is intended to reduce, eliminate or supersede any other obligations BP or ARCO may have under any State or federal law or regulation.

## Signatures:

STATE OF ALASKA

by_____
Tony Knowles, Governor

by_____
Bruce Botelho, Attorney General

by_____
John Shively, Commissioner of Natural Resources

by_____
Wilson Condon, Commissioner of Revenue


BP EXPLORATION (ALASKA) INC.

by_____
Richard Campbell, President


ARCO ALASKA, INC.

by_____
Kevin Meyers, President

BP AMOCO, p.l.c.

by___/s/ signature___
John Browne, CEO

by_____
Rodney Chase, Deputy CEO