Donald B. Craven (DC Bar No. 221424)
**AKIN GUMP STRAUSS HAUER & FELD LLP**
1333 New Hampshire Avenue, N.W.
Washington, DC  20036
(202) 887-4000; (202) 887-4288 (fax)
dcraven@akingump.com

William B. Rozell
(Alaska Bar No. 7210067)
623 Basin Road
P.O. Box 20720
Juneau, AK  99801
(907) 586-0142; (907) 463-5647 (fax)
bartrozell@aol.com

David J. Beck (Texas Bar No. 00000070)
**BECK, REDDEN & SECREST**
1221 McKinney Street, Suite 4500
Houston, TX  77010
(713) 951-3700; (713) 951-3720 (fax)
dbeck@brsfirm.com

Douglas J. Serdahely (Alaska Bar No. 7210072)
**PATTON BOGGS LLP**
601 West 5th Avenue, Suite 700
Anchorage, AK  99501
(907) 263-6315; (907) 263-6345 (fax)
dserdahely@pattonboggs.com

*Attorneys for Defendant Exxon Mobil Corporation and
Exxon Mobil Production Alaska, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| THE ALASKA GASLINE PORT AUTHORITY,<br>　　　　　Plaintiff,<br>vs.<br>EXXONMOBIL CORPORATION, a New Jersey corporation; EXXONMOBIL ALASKA PRODUCTION, INC. a Delaware corporation; BP P.L.C. a United Kingdom corporation; and BP EXPLORATION (ALASKA) INC., a Delaware corporation,<br>　　　　　Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 4:05-cv-00026-RRB |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS OF
DEFENDANTS EXXON MOBIL CORPORATION AND EXXON MOBIL
<u>CORPORATION, et al., EXXON MOBIL ALASKA PRODUCTION, INC.</u>**

TABLE OF CONTENTS

INTRODUCTION ...................................................................................................1

STATEMENT OF THE CASE.................................................................................4

I.      BACKGROUND ..........................................................................................4

        A.      Efforts to Commercialize Alaska Natural Gas.......................................4

        B.      The Stranded Gas Development Act......................................................6

        C.      The Port Authority and Its Proposed Project .......................................6

        D.      The Alaska Natural Gas Pipeline Act....................................................7

II.     THE PORT AUTHORITY'S ALLEGATIONS ..........................................8

        A.      ExxonMobil's Alleged Refusal to Sell Gas ..........................................8

        B.      Alleged Illegal Agreements...................................................................9

        C.      Claims for Relief ................................................................................10

ARGUMENT........................................................................................................11

I.      THE FEDERAL ANTITRUST CLAIMS SHOULD BE DISMISSED FOR LACK
        OF STANDING ........................................................................................12

        A.      To Establish Standing to Sue, Plaintiffs Claiming Unlawful Exclusion
                from a Prospective Business Must Allege that They Have Appropriate
                "Background and Experience" in the Prospective Business and the
                "Ability to Finance Entry" ..................................................................12

        B.      Standing Is Lacking Because the Allegations in the Complaint Fail to
                Show that the Port Authority Has Any "Background and Experience in the
                Prospective Business" of Developing and Operating a Uniquely Expensive
                and Complex Natural Gas Pipeline System .........................................15

        C.      Standing Is Lacking Because the Allegations in the Complaint Are
                Insufficient as a Matter of Law to Show that the Port Authority Has the
                "Ability to Finance Entry" ..................................................................17

                1.      The Port Authority Has Not Pled Facts Sufficient to Show that It
                        Can Meet the Requirements for Obtaining the Federal Loan
                        Guarantees that Allegedly Will Enable It to Finance Its Proposed
                        Project .....................................................................................18

                2.      The Port Authority Has Not Pled Facts Sufficient to Show that It
                        Has the "Ability to Finance" the Substantial Project Costs Not
                        Covered by Federal Loan Guarantees.......................................21

                3.      The Courts Have Repeatedly Dismissed Antitrust Claims Where,
                        as Here, the Plaintiff's Ability to Obtain Needed Governmental
                        Approvals or Financing Is Speculative .....................................22

II.   THE FEDERAL ANTITRUST CLAIMS SHOULD BE DISMISSED FOR
      FAILURE TO PLEAD SUFFICIENT FACTS TO SUPPORT THE ALLEGED
      CAUSES OF ACTION ...................................................................................26

      A.   The Port Authority's Fifth Claim for Relief Fails to State a Claim Under
           Section 7 of the Clayton Act ..................................................................26

           1.   The Complaint's Merger-Related Antitrust Damages Claim Is
                Barred by the Statute of Limitations..........................................27

           2.   The Doctrine of Laches Bars the Complaint's Injunctive Relief
                Claim............................................................................................28

           3.   The Complaint Fails to Plead the Required Elements of a Clayton
                Act § 7 Claim ..............................................................................31

      B.   The Port Authority's Fourth Claim for Relief Fails to State a Claim for
           Attempted Monopolization .....................................................................33

      C.   The Port Authority's First, Second, and Third Claims for Relief Should Be
           Dismissed for Failure Adequately to Plead Conspiracy ........................35

           1.   The Complaint Fails to Allege Sufficient Facts to State a Claim .............35

           2.   ExxonMobil Should Not Be Required to Speculate About the
                Bases for the Conspiracy Allegations ........................................38

III.  THE STATE LAW CLAIMS SHOULD BE DISMISSED ...............................................39

      A.   The Port Authority's Claims Under the Alaska Unfair Trade Practice and
           Consumer Protection Act (Sixth Claim for Relief) Have Been
           Inadequately Pled..................................................................................39

      B.   The Claim for Tortious Interference with Prospective Business
           Opportunity (Seventh Claim for Relief) Is Deficient as a Matter of Law .............40

           1.   The Port Authority Has Failed to Allege Facts Showing an Existing
                Prospective Business Relationship ............................................40

           2.   The Port Authority Has Failed to Allege Facts Showing that
                ExxonMobil Acted Without Privilege.........................................41

IV.   THE PORT AUTHORITY LACKS AUTHORITY TO PROSECUTE THIS
      ACTION AS A MATTER OF STATE LAW ....................................................42

      A.   State-Law Preemption Constrains the Actions of Political Subdivisions of
           the State of Alaska .................................................................................43

      B.   The Port Authority's Attempt to Prosecute this Lawsuit Is Preempted by
           the Stranded Gas Development Act .........................................................45

           1.   The Port Authority's Prosecution of this Action Contravenes
                Section 43.82.600 of the Stranded Gas Act ...............................47

           2.   The Port Authority's Prosecution of this Lawsuit Interferes with
                the Effective Functioning of the Stranded Gas Act....................48

CONCLUSION................................................................................................................49

TABLE OF AUTHORITIES

**FEDERAL CASES**

*Alabama v. Blue Bird Body Co.*, 71 F.R.D. 606 (M.D. Ala. 1976) ...................................33

*Andrx Pharm. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001) ..............................23

*Antoine L. Garabet, M.D., Inc. v. Autonomous Tech. Corp.*, 116 F. Supp. 2d 1159
   (C.D. Cal. 2000)..........................................................................................................30

*Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245 (10th Cir.
   2003) ...............................................................................................................14, 16

*Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*,
   459 U.S. 519 (1983)............................................................................................ 12, 39

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096 (9th Cir. 1999)................35

*Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704 (9th Cir. 2003) ..................12, 13, 16, 26, 40

*Bubar v. Ampco Foods, Inc.*, 752 F.2d 445 (9th Cir. 1985) .........................................13, 25

*Cable Holdings of Ga., Inc., v. Home Video, Inc.*, 825 F.2d 1559 (11th Cir. 1987) .........23

*Cairo v. Skow*, 510 F. Supp. 201 (E.D. Wisc. 1981) .........................................................37

*California v. Am. Stores Co.*, 495 U.S. 271 (1990) ...........................................................29

*Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104 (1986) .............................................13

*Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869 (9th
   Cir. 1987) ...................................................................................................................35

*City of Auburn v. Qwest Corp.*, 260 F.3d 1160 (9th Cir. 2001)....................................40, 41

*City of Phil. v. Beretta U.S.A. Corp.*, 126 F. Supp. 2d 882 (E.D. Pa. 2000), *aff'd
   on other grounds,* 77 F.3d 415 (3d Cir. 2002) ...........................................................41

*City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998) ....................22, 23

*City of Rohnert Park v. Harris*, 601 F.2d 1040 (9th Cir. 1979)....................................13, 29

*Clegg v. Cult Awareness Network*, 18 F.3d 752 (9th Cir. 1994) .................................12, 17

*Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846 (9th Cir. 1985)..............29

*Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117 (9th Cir. 1980) ................................27

*DM Research, Inc. v. Coll. of Amer. Pathologists*, 170 F.3d 53 (1st Cir. 1999) ........38, 39

*In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 11 F.3d 1460 (9th Cir. 1993) ...................................................................................14, 16, 25

*Equifax, Inc. v. Fed. Trade Comm'n*, 618 F.2d 63 (9th Cir. 1980) ..............................31, 32

*Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213 (4th Cir. 1994) .............37

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042 (D. Minn. 1992).................................................................................36, 38

*Florida Seed Co. v. Monsanto Co.*, 915 F. Supp. 1167 (M.D. Ala. 1995) ........................14

*Fraser v. Major League Soccer, L.L.C.*, 284 F.3d 47 (1st Cir. 2002) ..............................32

*Gas Utils. Co. v. S. Natural Gas Co.*, 825 F. Supp. 1551 (N.D. Ala. 1992), *aff'd*, 996 F.2d 282 (11th Cir. 1993) ....................................................................24

*Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439 (1945)..............................................28, 29

*Hawaii v. Standard Oil*, 405 U.S. 251 (1972) ..................................................................28

*Hayes v. Solomon*, 597 F.2d 958 (5th Cir. 1979).............................................................25

*Hecht v. Pro-Football, Inc.*, 570 F.2d 982 (D.C. Cir. 1977), *cert. denied*, 436 U.S. 956 (1978)...........................................................................................14

*Indium Corp. v. Semi-Alloys, Inc.*, 781 F.2d 879 (Fed. Cir. 1985)...................................14

*Int'l Telephone and Telegraph Corp. (IT&T) v. Gen. Tel. & Elec. Corp.*, 518 F.2d 913 (9th Cir. 1975), *overruled on other grounds*, *California v. Am. Stores Co.*, 495 U.S. 271 (1990)................................................................................27, 29

*Invictus Records, Inc. v. Am. Broad. Cos.*, 98 F.R.D. 419 (E.D. Mich. 1982).................33

*Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027 (9th Cir. 2005)...........................................................................................12

*Justice v. Nat'l Collegiate Athletic Ass'n*, 577 F. Supp. 356 (D. Ariz. 1983) ...................13

*Knickman v. Prince George's County*, 187 F. Supp. 2d 559 (D. Md. 2002) ....................27

*Lake Hill Motors, Inc. v. Jim Bennett Yacht Sales, Inc.*, 246 F.3d 752 (5th Cir. 2001) ...............................................................................................................12

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504 (9th Cir. 1989)..............34

*Logan Farms v. HBH, Inc.*, 282 F. Supp. 2d 776 (S.D. Ohio 2003) ................................26

*Martin v. Phillips Petroleum Co.*, 365 F.2d 629 (5th Cir. 1966).......................................16

*Medtronic Minimed Inc. v. Smiths Medical MD Inc.*, 371 F. Supp. 2d 578 (D. Del. 2005) ...................................................................................................................13

*Midwestern Mach. Co. v. Northwest Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004)......28, 31

*In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122 (9th Cir. 1973)...........................29

*Nat'l Constructors Ass'n v. Nat'l Elec. Contractors Ass'n*, 498 F. Supp. 510 (D. Md. 1980)...............................................................................................................35

*Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001) ...............................................................11

*Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380 (3d Cir. 1994) ..................27

*Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104 (9th Cir. 1999) ......................42

*Parker v. Brown*, 317 U.S. 341 (1943) ............................................................................35

*Rosenthal Collins Group v. Trading Tech. Int'l, Inc.*, No. 05-4088, 2005 WL. 3557947 (N.D. Ill. Dec. 26, 2005) ..............................................................................13

*Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729 (9th Cir. 1987) ......................34

*SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981)...............................................32

*S. Concrete Co. v. U.S. Steel Corp.*, 394 F. Supp. 362 (N.D. Ga. 1975) .........................33

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ..........................................33, 34

*In re Tableware Antitrust Litigation*, 363 F. Supp. 2d 1203 (N.D. Cal. 2005)............36, 37

*Terrabonne Parish School Bd. v. Mobil Oil Corp.*, 310 F.3d 870 (5th Cir. 2002)............41

*United States v. Marine Bancorp.*, 418 U.S. 602 (1974) ...................................................31

*United States v. Oracle Corp.*, 331 F. Supp. 2d 1098 (N.D. Cal. 2004)...........................31

*W. Mining Council v. Watt*, 643 F.2d 618 (9th Cir. 1981)................................................12

*Windy City Circulating Co. v. Charles Levy Circulating Co.*, 550 F. Supp. 960 (N.D. Ill. 1982)..............................................................................................................33

*Zimmerman v. Pepsico, Inc.*, 836 F.2d 173 (3d Cir. 1988)...............................................36

**STATE CASES**

*Allstate Ins. Co. v. Municipality of Anchorage*, 599 P.2d 140 (Alaska 1979).............41, 42

*Aloha Lumber Corp. v. Univ. of Alaska*, 994 P.2d 991 (Alaska 1999)..............................39

*Bendix Corp. v. Adams*, 610 P.2d 24 (Alaska 1980)..........................................................41

*Brown v. Wood*, 575 P.2d 760 (Alaska 1978)....................................................................42

*Ellis v. City of Valdez*, 686 P.2d 700 (Alaska 1984)..........................................................41

*K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702 (Alaska 2003).....................40, 41

*Kotzebue Lions Club v. City of Kotzebue*, 955 P.2d 921 (Alaska 1998)...........................42

*Jacobson v. Montana Dept. of Social & Rehab. Servs.,* 1990 WL. 161008 (9th Cir. Oct. 22, 1990) ........................................................................................................27

*Liberati v. Bristol Bay Borough*, 584 P.2d 1115 (Alaska 1978)........................................42

*McCormick v. City of Dillingham*, 16 P.3d 735 (Alaska 2001)........................................42

*Municipality of Anchorage v. Repasky*, 34 P.3d 302 (Alaska 2001) ................................42

*RAN Corp. v. Hudesman, ,* 823 P.2d 646 (Alaska 1991)..............................................41, 42

*Simpson v. Municipality of Anchorage*, 635 P.2d 1197 (Alaska Ct. App. 1981) ........41, 42

*Sisters of Providence v. A.A. Pain Clinic, Inc.*, 81 P.3d 989 (Alaska 2003) ....................41

*State ex rel. Univ. of Minn. v. Chase*, 220 N.W. 951 (Minn. 1928) .................................41

*Univ. of Alaska v. Nat'l Aircraft Leasing, Ltd.*, 536 P.2d 121 (Alaska 1975)...................41

## DOCKETED CASES

*State of Alaska v. Exxon Corp.*, No. A99-618cv...............................................................30

## FEDERAL STATUTES AND RULES

15 U.S.C. § 15 ...................................................................................................................12

15 U.S.C. § 15b..................................................................................................................27

15 U.S.C. § 26 ...................................................................................................................12

15 U.S.C. § 717f(e).............................................................................................................19

15 U.S.C. § 719(4)...............................................................................................................4

15 U.S.C. §§ 719-719o ........................................................................................................4

15 U.S.C. §§ 719c, 719e, 719f.............................................................................................5

15 U.S.C. §§ 720a(a)-(c) ...............................................................................7

15 U.S.C. § 720a(b) ...............................................................................19, 20

15 U.S.C. § 720b ...........................................................................................20

15 U.S.C. § 720b(d) ........................................................................................7

15 U.S.C. § 720d(d) ........................................................................................8

15 U.S.C. § 720e .............................................................................................8

15 U.S.C. § 719g ...........................................................................................20

15 U.S.C. § 720n .................................................................................3, 8, 18

15 U.S.C. §§ 720n(a)-(b) ...............................................................................17

15 U.S.C. § 720n(b)(1) .......................................................3, 8, 17, 18, 20, 21

15 U.S.C. § 720n(b)(4) ....................................................................................8

15 U.S.C. § 720n(c)(1) ...................................................................................21

Fed. R. Civ. P. 8 ................................................................................3, 33, 35

## FEDERAL REGULATORY MATERIALS

70 Fed. Reg. 30,707 (May 27, 2005) .............................................................21

*Northwestern Alaskan Pipeline Co.*, 19 F.E.R.C. (CCH) ¶ 63,068 (1982) .........................5

Staff Report of the Federal Energy Regulatory Commission to the United States
Senate Committee on Energy and Natural Resources Regarding the Alaska
Natural Gas Transportation Act, January 18, 2001 .............................................4

## FEDERAL LEGISLATIVE MATERIALS

127 Cong. Rec. 28,291 (1981) ..........................................................................5

127 Cong. Rec. 31,093 (1981) ..........................................................................5

H.R.J. Res. 97-341 (1981) ................................................................................5

H.R. Rep. No. 97-350 (1981) ...........................................................................5

S.J. Res. 97-115 (1981) ....................................................................................5

S. Rep. No. 97-272 (1981) ...............................................................................5

## STATE STATUTES AND REGULATIONS

Alaska Stat. § 29.35.600-730 ..................................................................6

Alaska Stat. § 29.35.605(c) ..............................................................6, 7, 45

Alaska Stat. § 38.05.180 ....................................................................47

Alaska Stat. § 43.82 ........................................................................1, 6

Alaska Stat. § 43.82.010 ...................................................................6, 44

Alaska Stat. § 43.82.110 ....................................................................44

Alaska Stat. § 43.82.200-.230 .................................................................6

Alaska Stat. § 43.82.220 ....................................................................47

Alaska Stat. § 43.82.410 ....................................................................44

Alaska Stat. § 43.82.435 ....................................................................44

Alaska Stat. § 43.82.440 ....................................................................44

Alaska Stat. § 43.82.600 ...............................................................43, 45, ii

Alaska Stat. § 45.50.471, *et seq.* ...........................................................11

Alaska Stat. § 45.50.531(a) ..................................................................40

1998 SLA ch. 104, Findings § 1 ...........................................................6, 43

1998 SLA ch. 104, Findings §§ 8-15 ...........................................................43

1998 SLA ch. 104, Findings § 16 ..............................................................44

## STATE LEGISLATIVE MATERIALS

*Stranded Gas Act Hearings of 1998:  Hearing on H.B. 393 Before the House
    Resources Standing Committee,* 20th Legislature, 2d Session (Mar. 26, 1998) .........43

## LOCAL REGULATIONS

City of Valdez, Alaska, Ordinance No. 99-11 § 6(1) (1999) .............................................42

Fairbanks North Star Borough, Alaska, Ordinance No. 99-059 § 6(1) (1999) .................42

North Slope Borough, Alaska, Code of Ordinances § 4.01.060(1) (1999) ......................42

**OTHER AUTHORITIES**

P. Areeda and H. Hovenkamp, II Antitrust Law § 320c5 (2d ed. 2000) ....................28, 30

Wright & Miller, *Federal Practice & Procedure: Civil 2d*, §§ 1215, 1233...............36, 38

Wright & Miller, *Federal Practice & Procedure: Civil 2d*, § 1357................................27

Defendants Exxon Mobil Corporation and ExxonMobil Alaska Production, Inc. (collectively "ExxonMobil") submit this memorandum in support of their motion to dismiss the Complaint.

## INTRODUCTION

For nearly 30 years, pipeline companies, producers, federal and state agencies, and other entities have made substantial efforts to commercialize the abundant natural gas resources underlying the North Slope of Alaska. Hundreds of millions of dollars, countless hours, and enormous energy have been devoted to trying to solve the technical and economic challenges presented by what would be the largest and most expensive private infrastructure project ever undertaken in North America. In recent years, changes in market conditions have rekindled hopes for developing a project. At the same time, the risks associated with attempting to commercialize a resource that the Alaska legislature has determined to be "stranded" remain daunting. *See* Alaska Stranded Gas Development Act, Alaska Stat. Ch. 43.82.

In light of those risks, the State of Alaska enacted the Stranded Gas Development Act to create a special legislative scheme for encouraging investment to commercialize this important resource. Sponsors of various projects, including ExxonMobil, have filed applications under the Act. One applicant is the plaintiff in this litigation, the Alaska Gasline Port Authority. Created in 1999, the Port Authority is a relative newcomer to the effort to commercialize North Slope natural gas.

In April 2005, the Port Authority wrote to ExxonMobil expressing an interest in purchasing North Slope gas. Complaint ¶ 102. That led to a series of discussions within ExxonMobil and between ExxonMobil and the Port Authority about the technical and economic viability of the Port Authority's proposed project. While the Port Authority complains that those discussions have not yet yielded potential prices and terms (*id.* ¶ 103), it does not allege that

1

ExxonMobil or anyone else actually has rejected its offer or refused to engage in further negotiations. Nevertheless, the Port Authority has broken off discussions and executed a flanking maneuver designed to enable it to pursue its objectives through the federal courts, and not through the process envisioned by the State when it enacted the Stranded Gas Development Act. Indeed, while the Complaint sheds little light on the Port Authority's desired injunctive relief, its apparent endgame is to obtain an order from this Court compelling defendants to sell it North Slope gas – a result that would be completely incompatible with the process envisioned by the Stranded Gas Development Act.

The Port Authority's flanking maneuver fails at square one. To pursue its request for relief under the antitrust laws, the Port Authority must plead facts sufficient to show that it has "antitrust standing." That it has failed to do. Here, the Complaint's core allegation – that the defendants' refusal to sell the Port Authority North Slope gas has prevented it from pursuing its proposed project – cuts across all five of the purported antitrust causes of action. To have antitrust standing, the Port Authority, like any plaintiff claiming that it has been blocked from starting a new business, must show sufficient "preparedness" to commence business operations. Otherwise, there will be no potential for harm to a sufficiently concrete property interest to confer antitrust standing.

Among the factors that the courts consider, at the motion to dismiss stage, in determining preparedness are whether a plaintiff has pled sufficient facts to show the appropriate background and experience to be a successful entrant and the ability to obtain the financing needed to fund the proposed new business. Where such facts are not alleged, the plaintiff's potential injury is considered speculative, and the Ninth Circuit and other courts have repeatedly held that the plaintiff's antitrust claims should be dismissed for lack of standing.

That is precisely the situation here.  The Port Authority nowhere alleges that it possesses the background and experience necessary to complete the truly massive undertaking that would be required to build and operate the proposed pipeline system.  Nor does it plead facts sufficient to show that it has the requisite financial wherewithal to fund this multi-billion dollar project.  According to the Port Authority, the $18 billion of federal loan guarantees "available under the Alaska Natural Gas Pipeline Act of 2004, 15 U.S.C. § 720n, give [it] . . . the ability to obtain financing for a gas pipeline."  Compl. ¶ 81; *see also id.* ¶ 97.  But the cited legislation specifically provides that "in no case shall loan guarantees be issued for more than one project," 15 U.S.C. § 720n(b)(1), and the Port Authority nowhere alleges it is that "one project."  In fact, the Port Authority has not alleged that it has taken even the first steps necessary to obtain the regulatory approvals required by the federal legislation to qualify for the loan guarantees.  The Port Authority's antitrust claims therefore should be dismissed for lack of standing.

The Complaint's federal antitrust claims suffer from other fatal flaws.  The Complaint's attacks on mergers and acquisitions that occurred in the 1990s are barred by the applicable four-year statute of limitations and laches.  In addition, the Complaint is deficient as a matter of law because it fails to allege that ExxonMobil is a participant in the markets relevant to the merger and acquisition claims.  Similarly, the claim that the defendants engaged in an attempted-monopolization conspiracy is not cognizable under section 2 of the Sherman Act, which is aimed solely at single-firm conduct.  The Complaint's conspiracy claims lack sufficient information about the alleged agreements to meet the notice pleading requirements of Fed. R. Civ. P. 8.

Moreover, by prosecuting this lawsuit, the Port Authority has acted in excess of its authority.  As a creature of state law, the Port Authority is constrained by the Stranded Gas Act's specific preemption of conflicting state and municipal law and the State's pervasive regulation

and management of Alaska's oil and gas resources.  This lawsuit should be dismissed because the Port Authority is on a wholly unauthorized collision course with the goals and policies of overriding state legislation as well as the State's scheme for regulating vital North Slope resources.

**STATEMENT OF THE CASE**

## I.    BACKGROUND

This section provides the Court with information about the context in which this action arises.  Some of the matters described in this section by way of background are neither set forth in the Complaint nor part of the public record.  In moving to dismiss, ExxonMobil does not rely on such matters.  Rather, the arguments made in this memorandum are based solely on the allegations of the Complaint.

### A.    Efforts to Commercialize Alaska Natural Gas

Since the 1960s, it has been known that significant volumes of natural gas resources underlie the North Slope of Alaska.  Compl. ¶ 42.  In the 1970s, tight energy supplies generated substantial interest in commercializing North Slope gas.  *See id.* ¶ 47.  This interest resulted in a contentious administrative proceeding in which three competing projects vied for selection by the Federal Power Commission.  In 1976, because of concerns about the suitability of traditional regulatory and judicial review processes for addressing issues unique to an Alaska natural gas pipeline, Congress passed the "Alaska Natural Gas Transportation Act" ("ANGTA"), now codified at 15 U.S.C. §§ 719-719o.[1]  In ANGTA, Congress transferred the project-selection decision, under an expedited process, to the President, with Congressional concurrence.  15

---

[1] *See* 15 U.S.C. § 719(4); 719a; *see also* Staff Report of the Federal Energy Regulatory Commission to the United States Senate Committee on Energy and Natural Resources Regarding the Alaska Natural Gas Transportation Act, January 18, 2001 ("Staff Report") at 4; Compl. ¶ 69.

U.S.C. §§ 719c, 719e, 719f.  In 1977, Congress approved President Carter's designation under ANGTA of a project, known as the Alaska Natural Gas Transportation System or  ANGTS.  Staff Report at 4; *see also* Compl. ¶ 70.

From early on, obtaining financing for this multi-billion dollar project has been a challenge.  To enhance its financing prospects, the ANGTS project consortium enlisted the support of the three major North Slope producers.  In May 1981, the consortium and the producers agreed on the general principles of a project financing plan.  Later that year, Congress took action to lift certain impediments to producer participation in the project.[2]

Nevertheless, the project still could not attract sufficient private financing.  In May 1982, the ANGTS project sponsors advised the Federal Energy Regulatory Commission ("FERC") that "they had been unable to secure the [necessary] financing."  *Northwestern Alaskan Pipeline Co.,* 19 FERC (CCH) ¶ 63,068 at 65,207 (1982).  The sponsors explained that their financing prospects had been damaged by "changing circumstances . . . beyond the control of the project, such as the current short-term excess world energy supply, depressed crude oil prices, lower levels of economic activity in the United States and abroad, and uncertainties in financial markets."  *Id.*  (internal quotations omitted).

From time-to-time in the 1980s and 1990s, changes in market conditions prompted new studies and proposals for commercializing North Slope gas.  ExxonMobil itself conducted a variety of internal studies of potential ways to market the gas.  None of the studies or proposals yielded a viable project.  Ultimately, the State of Alaska determined that special legislative measures were needed.

---

[2]  H.R. J. Res. 341, 97th Cong., *reprinted at* H.R. Rep. No. 97-350, at 2 (1981), *approved* 127 Cong. Rec. 28,291 (1981); S.J. Res. 97-115, *reprinted at* S. Rep. No. 97-272, at 1 (1981), *approved* 127 Cong. Rec. 31,093 (1981).

B.      **The Stranded Gas Development Act**

In 1998, the state legislature enacted the Alaska Stranded Gas Development Act (Alaska Stat. Ch. 43.82) to promote the commercialization of Alaska gas that was "stranded from commercial development because of the high cost associated with providing markets for that gas." 1998 SLA ch. 104, Findings § 1. A principal purpose of the legislation is to encourage new investment to develop those stranded resources. *See* Alaska Stat. § 43.82.010(1). The Act authorizes the Alaska Commissioner of Revenue to negotiate contracts with "qualified sponsors" of "qualified projects" addressing several enumerated matters, including payments in lieu of taxes and state royalties. *See* Alaska Stat. § 43.82.200-.230. Alaska owns royalty interests in a large number of Alaska natural gas leases and will be entitled to collect royalties if and when gas from those leases is produced and sold from those leases. Alaska also will be entitled to tax revenues from production and sale of Alaskan gas. The Act permits the State to negotiate fiscal terms relating to these entitlements "to be tailored to the particular economic conditions of the project and to establish those fiscal terms in advance with as much certainty as the Constitution of the State of Alaska allows." Alaska Stat. § 43.82.010(2).

C.      **The Port Authority and Its Proposed Project**

In late 1999, the City of Valdez, the North Slope Borough, and Fairbanks North Star Borough formed the Alaska Gasline Port Authority pursuant to the Municipality Port Authority Act, Alaska Stat. § 29.35.600-730. Under that Act, the Port Authority is "an instrumentality of the . . . municipalities creating it," Alaska Stat. § 29.35.605(c), and as such "is a political subdivision of the State of Alaska." Compl. ¶ 34.

The Port Authority alleges that it intends to build a pipeline to bring natural gas from the North Slope to Valdez, where it will develop facilities to liquefy the gas for tanker shipment to receiving facilities on the Pacific Coast. *See id.* ¶¶ 9, 35, 82-84. The Port Authority also

proposes to build a spur line that will connect to the existing Southcentral Alaska grid. *Id. ¶ 86.* The Port Authority states that it has developed plans for constructing a separate line to the Canadian border (*id. ¶ 87*), but it does not allege an intention to build this separate line.

### D.    The Alaska Natural Gas Pipeline Act

In 2001 and 2002, ExxonMobil participated in a $125 million study of the feasibility of constructing an Alaska natural gas pipeline. That study estimated the cost of the project (in 2001 dollars) to be approximately $20 billion, assuming that the pipeline would be constructed for delivery to Chicago.[3] The study concluded that, under then-existing conditions, the risks of a project outweighed the potential benefits. Nevertheless, ExxonMobil has continued to pursue steps that would help make the project feasible, including the submission of an application under the Stranded Gas Development Act. It also participated in efforts to obtain passage of federal legislation to facilitate permitting and construction of a project. Ultimately, in October 2004, Congress enacted and the President signed such legislation – the Alaska Natural Gas Pipeline Act ("ANGPA"), Pub. L. No. 108-324, 118 Stat. 1255 (2004).

ANGPA enables a qualified applicant to obtain, on an expedited basis, the necessary federal approvals for the construction of a pipeline to transport to the lower 48 states the substantial natural gas resources located in Alaska. *See* 15 U.S.C. 720a(a)-(c). ANGPA also includes various other provisions intended to expedite or reduce regulatory barriers to an Alaska natural gas pipeline. For example, the legislation places time limits on the review process under the National Environmental Policy Act, s*ee* 15 U.S.C. 720b(d), and requires all federal agencies

---

[3] The projected cost for just the Alaska-to-Alberta segment of the pipeline, including the gas treatment plant, was approximately $14.1 billion (in 2001 dollars). Even if the pipeline were not built all the way to Chicago, firm transportation commitments comparable in value to the cost of that portion would need to be made on connecting downstream pipelines for ultimate delivery of Alaska gas to markets in the lower 48 states.

to expedite actions relating to an Alaska natural gas pipeline.  *See* 15 U.S.C. § 720d(d).  Further, ANGPA includes special judicial review provisions.  *See* 15 U.S.C. § 720e.

Of particular relevance to this motion, section 116 of ANGPA authorizes the Secretary of Energy to issue a federal loan guarantee of up to $18 billion to finance up to 80% of the cost of an Alaska natural gas pipeline project.  15 U.S.C. § 720n; *see also* Compl. ¶ 81.  After ANGPA's enactment, Congress amended this provision to permit the Secretary of Energy to issue a loan guarantee for "a liquefied natural gas project to transport liquefied natural gas from Southcentral Alaska to West Coast States."[4]  15 U.S.C. § 720n(b)(1); *see* Compl. ¶ 97.

There are, however, important criteria that must be met before the Secretary can issue a loan guarantee under ANGPA.  Section 720n provides:

> The Secretary may issue a Federal guarantee instrument for a qualified infrastructure project only after a certificate of public convenience and necessity under section 720a(b) of this title or an amended certificate under section 719g of this title has been issued for the project, or after the Secretary certifies there exists a qualified entity to construct and operate a liquefied natural gas project to transport liquefied natural gas from Southcentral Alaska to West Coast States.  In no case shall loan guarantees be issued for more than one qualified project.

15 U.S.C. § 720n(b)(1).  The statute also dictates that "[s]uch loan guarantee[s] may be utilized only by the project chosen by the Federal Energy Regulatory Commission as the qualified project."  15 U.S.C. § 720n(b)(4).

## II.    THE PORT AUTHORITY'S ALLEGATIONS

### A.    ExxonMobil's Alleged Refusal to Sell Gas

Notwithstanding the breadth of the Complaint's rhetoric, the essence of the Port Authority's claims boil down to a single grievance – namely, that the defendants' alleged refusal

---

[4] This section was added to the original Act by Pub. L. 108-199, § 146, 118 Stat. 444, on January 23, 2004.

to agree to sell it North Slope gas has prevented it from proceeding with its pipeline and LNG proposal.[5] According to the Port Authority, the "only impediment to [its] plan" is the defendants' alleged "concerted refusal to supply" natural gas.  Compl. ¶ 100.

Despite its overall length, the Complaint discusses only briefly the Port Authority's actual efforts to purchase gas from ExxonMobil.  *See id.* ¶¶ 19; 101-105, 211.  The Port Authority alleges that, in conjunction with Sempra LNG, it made an offer in April 2005 to the defendants "and others" to purchase North Slope gas.  *Id.* ¶ 102.  According to the Port Authority, "Defendants refused to discuss prices or terms regarding the sale of gas" or "to engage in serious negotiations in an effort to kill the Authority's proposal."  *Id.* ¶ 19; *accord id.* ¶¶ 103, 105.  The Port Authority does not allege, however, that either defendant actually has rejected its offer.  In fact, it alleges that the defendants have acted as though they "were willing to evaluate the Authority's and other pipeline sponsors' plans on the merits and were willing to negotiate in good faith with pipeline sponsors."  *Id.* ¶ 211.  The Port Authority asserts that those apparent good-faith negotiations were actually intended to deceive.  *Id.*

### B.    Alleged Illegal Agreements

As noted, the Port Authority alleges a collusive refusal to sell North Slope gas.  Compl. ¶ 105.  According to the Port Authority, that refusal to sell violates the producers' duty to develop and market the North Slope oil and gas leases that they own and operate.  *Id.* ¶¶ 106-133.  The

---

[5] The Port Authority makes a variety of allegations completely unrelated to its project or to any injury it allegedly has suffered.  For example, the Complaint includes allegations about operations of the TransAlaska Pipeline System, a crude oil pipeline.  *See* Compl. ¶¶ 50-55.  The Port Authority also complains about defendants' alleged interference with various proposed projects in which it was not a participant.  *Id.* ¶¶ 73-80.  In addition, throughout the Complaint, the Port Authority alleges or alludes to harm to consumers as a result of the defendants' supposed efforts to withhold North Slope gas from the U.S. market.  *See, e.g., id.* ¶¶ 7, 25(c), 47, 57, 164, 178.  Nowhere, however, does the Port Authority allege that it is a consumer of natural gas or that it has suffered any harm in such capacity.

Port Authority does not and cannot allege that it is a party to those leases or otherwise is entitled to enforce their provisions. Nor does it acknowledge the existing, comprehensive mechanisms through which the State carefully monitors and regulates development and production of North Slope oil and gas.

The Port Authority asserts that the defendants' delay in developing and marketing North Slope gas and their alleged refusal to sell those resources are inconsistent with each company's individual interest. *See, e.g*., Compl. ¶ 20, 56-57. The defendants would not engage in such actions, the Port Authority contends, unless they were colluding. *Id.* The Port Authority thus alleges that, "to prevent competing pipeline sponsors from obtaining financing and building a pipeline, the Defendants have entered into a series of agreements to block the sale of Alaska natural gas." *Id.* ¶ 17; *see also id.* ¶ 58. Although the alleged anticompetitive agreements are central to the Port Authority's claims, the Complaint describes them in only the most general of terms. *See id.* ¶¶ 59, 61-65, 67.

### C.    Claims for Relief

The Port Authority wraps its dissatisfaction with the course of its negotiations with ExxonMobil in a variety of packages. In its First and Second Claims for Relief, the Port Authority invokes section 1 of the Sherman Act, asserting that defendants' alleged refusal to sell natural gas constitutes, respectively, an illegal group boycott and "naked agreements not to compete." *See* Compl. ¶¶ 180-195. In its Third and Fourth Claims for Relief, the Port Authority relies on section 2 of the Sherman Act, alleging that the defendants have conspired to

monopolize, or to attempt to monopolize, the markets for transporting and purchasing North Slope natural gas through their refusal to deal with any competitive pipeline. *Id.* ¶¶ 196-200.[6]

The attempted monopolization claim is based on allegations that defendants not only have agreed to refrain from developing and selling North Slope gas, but also have participated in a series of mergers and acquisitions that have substantially reduced competition for bringing North Slope gas to market. *Id.* ¶ 202. In the case of ExxonMobil, the complained-of transactions are limited to the 1999 merger between Exxon and Mobil and Exxon's 1996 acquisition (through Arco) of half of Shell Oil's interest in the Prudhoe Bay Unit. *Id.* ¶¶ 134-38, 140, 149. In its Fifth Claim for Relief, the Port Authority also relies on its merger allegations, asserting that the transactions "have substantially lessened competition in relevant markets for the transportation and purchase of natural gas from the North Slope" and "have foreclosed, and will foreclose, substantial interstate and foreign commerce" in violation of section 7 of the Clayton Act. *Id.* ¶ 208.

Finally, in its Sixth and Seventh Claims for Relief, the Port Authority makes two state-law claims, asserting, respectively, that the defendants have violated the Alaska Unfair Trade Practice and Consumer Protection Act (Alaska Stat. § 45.50.471, *et seq.*) and that they have tortiously interfered with a prospective business opportunity. *See* Compl. ¶¶ 210-228.

## ARGUMENT

A motion to dismiss "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). A court "must assume that [the plaintiff] can prove the facts alleged in its . . . complaint. It is not, however, proper to assume that the [plaintiff] can prove facts that it

---

[6] The Port Authority alleges that the two markets referred to above are relevant markets for antitrust purposes, notwithstanding that a premise of its claims is that North Slope gas is being neither transported nor sold.

has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *see also Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 (9th Cir. 2005). Moreover, "the court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network,* 18 F.3d 752, 754-55 (9th Cir. 1994); *see also W. Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir. 1981).

## I.    THE FEDERAL ANTITRUST CLAIMS SHOULD BE DISMISSED FOR LACK OF STANDING

### A.    To Establish Standing to Sue, Plaintiffs Claiming Unlawful Exclusion from a Prospective Business Must Allege that They Have Appropriate "Background and Experience" in the Prospective Business and the "Ability to Finance Entry"

Standing to sue is an essential element of a private antitrust action. *Associated Gen. Contractors*, 459 U.S. at 520-21, 535 n.31 (granting Rule 12(b)(6) dismissal for lack of standing); *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 712 (9th Cir. 2003) ("Standing to bring an antitrust action is a requirement because antitrust injury is a necessary element of an antitrust suit").[7] The Port Authority asserts claims under two related standing statutes, sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26. Section 4 applies to antitrust claims seeking treble damages for injuries to a plaintiff's "business or property," and section 16 applies to antitrust claims seeking injunctive relief "against threatened loss or damage."[8] *Id.* As the Supreme Court

---

[7] The doctrine of antitrust standing is distinct from the doctrine of constitutional standing under Article III. *Associated Gen. Contractors,* 459 U.S. at 535 n.31 ("Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make the further determination whether the plaintiff is a proper party to bring a private antitrust action.")

[8] Section 4 of the Clayton Act provides: "[Any] person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . .

has explained, "Sections 4 and 16 are . . . best understood as providing complementary remedies for a single set of injuries." *Cargill, Inc. v. Monfort of Colo., Inc.,* 479 U.S. 104, 113 (1986); *see also Lake Hill Motors, Inc. v. Jim Bennett Yacht Sales, Inc.,* 246 F.3d 752, 755 (5th Cir. 2001) ("[A] plaintiff seeking injunctive relief under § 16 of the Clayton Act can only obtain that relief when they show a significant threat of some injury to their business or property from a violation of the antitrust laws.").[9]

Courts closely examine the standing of antitrust plaintiffs, like the Port Authority here, who claim that they have been unlawfully prevented from embarking upon a new business venture. Where the actual entry prospects are speculative because of a lack of sufficient "intent" or "preparedness," courts routinely hold that the plaintiff lacks standing to sue. As the Ninth Circuit has held, "[o]nly an actual competitor or one ready to be a competitor can suffer antitrust injury." *Bourns*, 331 F.3d at 711. "A 'nascent' business – one that is merely a gleam in the eye and a hope in the heart of its promoters – does not possess the property to which antitrust injury can be done." *Id.* at 712; *accord Bubar v. Ampco Foods, Inc.*, 752 F.2d 445, 450 (9th Cir. 1985) (to establish antitrust standing, a potential competitor must demonstrate "a genuine intent to enter the market and a preparedness to do so"); *City of Rohnert Park v. Harris*, 601 F.2d 1040, 1043-

---

and shall recover threefold the damages by him sustained . . . ." 15 U.S.C. § 15. Section 16 of the Clayton Act provides: "Any person . . . shall be entitled to sue for and have injunctive relief . . . against threatened loss or damage by a violation of the antitrust laws . . . ." 15 U.S.C. § 26.

[9] *See also Medtronic Minimed Inc. v. Smiths Medical MD Inc.*, 371 F. Supp. 2d 578, 584-85 (D. Del. 2005) (finding antitrust standing lacking where plaintiff sought section 16 injunction but had not "manifested an intention to enter the business and . . . demonstrated [its] preparedness to do so.") (citing *Sports Racing Servs., Inc. v. Sports Car Club of Am., Inc.*, 131 F.3d 874, 885 (10th Cir. 1997)); *Rosenthal Collins Group v. Trading Tech. Int'l, Inc.*, No. 05-4088, 2005 WL 3557947, at *5 (N.D. Ill. Dec. 26, 2005) (dismissing antitrust claims under section 4 and section 16 where court found that allegations of harm were too speculative and remote to establish antitrust injury) (attached hereto); *Justice v. Nat'l Collegiate Athletic Ass'n*, 577 F. Supp. 356, 376 (D. Ariz. 1983) (denying standing under section 16 because the existence of so many "contingencies" made the threat of actual injury too speculative).

45 (9th Cir. 1979) (dismissal of antitrust claim for lack of Section 16 standing proper where alleged injury to plaintiff municipality's "own proprietary interest is speculative").

In the Ninth Circuit, a potential market entrant must satisfy four "preparedness" criteria to establish standing to sue. "To separate those who have suffered antitrust injury on account of alleged monopolistic barriers to entry, from those who have not, we consider  (1) the plaintiff's background and experience in the prospective business, (2) '[a]ffirmative action on the part of [the] plaintiff to engage in the proposed business,' (3) the plaintiff's ability to finance entry, and (4) consummation of contracts."[10]  *In re Dual-Deck Video Cassette Recorder Antitrust Litigation*, 11 F.3d 1460, 1465 (9th Cir. 1993) (quoting *Solinger v. A & M Records, Inc.*, 586 F.2d 1304, 1310 (9th Cir. 1978)).  Moreover, a plaintiff cannot excuse its lack of "preparedness" by pointing to defendants' alleged antitrust violations.  *Ashley Creek Phosphate Co. v. Chevron USA, Inc.,* 315 F.3d 1245, 1258-59 (10th Cir. 2003).

The Port Authority's Complaint contains inadequate allegations on all four factors.  For example, to engage in the business of transporting natural gas in interstate commerce, the Port Authority would have to obtain a certificate of public convenience and necessity from FERC.

---

[10] Other courts have enumerated similar factors.  *See, e.g., Indium Corp. v. Semi-Alloys, Inc.*, 781 F.2d 879, 882 (Fed. Cir. 1985) (affirming dismissal of antitrust claim for lack of antitrust standing because plaintiff "was not prepared" to enter the market until long after the alleged antitrust violation such that "there was no connection between any conduct and Indium's alleged 'harm'"); *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 944 (D.C. Cir. 1977), *cert. denied*, 436 U.S. 956 (1978) ("Indicia of preparedness include adequate background and experience in the new field, sufficient financial capability to enter it, and the taking of actual and substantial affirmative steps toward entry, 'such as the consummation of relevant contracts and procurement of necessary facilities and equipment'"); *Florida Seed Co. v. Monsanto Co.*, 915 F. Supp. 1167, 1176 (M.D. Ala. 1995) (complaint alleging plaintiff had been unlawfully blocked from entering the non-selective herbicides market dismissed under Rule 12(b)(6) for lack of standing because of failure to allege sufficiently the key elements of being a likely entrant:  financial ability to enter the market, the appropriate background and experience, and steps evidencing an intent to enter the market.)

That is an enormous undertaking involving the preparation of numerous complex environmental and other studies and analyses. The Complaint is silent on any affirmative actions that the Port Authority has taken to prepare itself for meeting FERC's requirements, thereby failing to satisfy the second factor. Similarly, the Complaint is devoid of facts showing that the Port Authority has lined up essential contracts, such as contracts for materials, labor, and LNG tankers, thus failing to satisfy the fourth factor. The following sections of this memorandum, however, focus more closely on the first and third factors – "background and experience in the prospective business" and "ability to finance entry" – where the Complaint's insufficiencies as a matter of law are especially stark.

> **B.**   **Standing Is Lacking Because the Allegations in the Complaint Fail to Show that the Port Authority Has Any "Background and Experience in the Prospective Business" of Developing and Operating a Uniquely Expensive and Complex Natural Gas Pipeline System**

The Complaint lacks any allegations describing the Port Authority's "background and experience" in any business, much less the "prospective business" of developing, designing, financing, constructing, and operating a natural gas pipeline system costing more than $20 billion. The Port Authority fails to plead that it has *any* experience in any of the various constituent elements of the proposed business outlined in the Complaint: (1) developing, designing, financing, constructing, and operating a massive natural gas pipeline system; (2) managing a pipeline transportation business; (3) developing, designing, financing, constructing, and operating an LNG facility; and (4) operating and managing an LNG ocean-shipping business. This complete default compels dismissal of the Complaint for lack of standing.

The Ninth Circuit has held that to satisfy the "background and experience" criterion, a plaintiff must establish the relevant background and experience necessary to compete in the *specific market* from which it was allegedly excluded. In *Bourns,* for example, plaintiff claimed

it was unlawfully prevented from entering the business of manufacturing PPTCs, electronic

devices for controlling power surges.  331 F.3d at 711-12.  The court held that plaintiff lacked

standing to sue because of lack of "preparedness" to enter the new market even though it *was*

*already a successful manufacturer of other electronic products.*  As the court explained, the fact

> that Bourns was an electronics firm did not establish that it 'had
> the experience and background necessary to manufacture PPTCs.'
> Bourns had no experience working with carbon black or with the
> processes of extrusion and lamination.  Bourns did not have a place
> or equipment to produce the PPTCs.

*Id.*

Similarly, in *In re Dual-Deck,* the plaintiff claimed that it was unlawfully excluded from

the business of manufacturing certain high-end consumer electronic products, such as dual-deck

digital audio tape recorders and high-definition televisions.  11 F.3d at 1465-66.  In affirming

dismissal on summary judgment of plaintiff's antitrust claims for lack of standing, the Ninth

Circuit rejected the plaintiff's argument that "experience with dual-deck VCRs gives it

experience in the consumer electronics market" sufficient to establish the requisite

"preparedness" to enter the new product lines.  *Id.* at 1465; *see also Ashley*, 315 F.3d at 1258

(finding no standing where plaintiff failed to establish that it had the necessary experience to

enter the mining industry; while experienced in "acquiring and selling" mineral properties,

plaintiff had never "developed or operated" a mine); *Martin v. Phillips Petroleum Co.,* 365 F.2d

629, 631, 634 (5th Cir. 1966) (finding no standing where plaintiff claimed that an unlawful

conspiracy had denied him the opportunity to enter the gas processing business; plaintiff was an

"oil and gas operator" but had "no experience in the operation of a gas plant").

The plaintiffs in each of the above cases had significant "background and experience" in

businesses having some relationship to the markets that they wished to enter.  Nevertheless, those

qualifications were held insufficient to establish standing to sue.  Here, where the Port Authority

has not alleged that it has *any* background and experience related in any way to the business it purportedly plans to enter, *a fortiori,* it should be held to lack standing to sue.

    **C.**     **Standing Is Lacking Because the Allegations in the Complaint Are Insufficient as a Matter of Law to Show that the Port Authority Has the "Ability to Finance Entry"**

    The Complaint alleges that the "availability of" ANGPA's federal loan guarantees "eliminates a significant obstacle to financing" and that those guarantees "give the Authority . . . the ability to obtain financing for a gas pipeline." Compl. ¶ 81; *accord id.* ¶ 97.[11] But the Port Authority's ability to access the loan guarantees is far from automatic. ANGPA specifically provides that "[i]n no case shall loan guarantees be issued for more than one qualified project," 15 U.S.C. § 720n(b)(1), and the Complaint admits that there will be "competitors" for the guarantees. Compl. ¶ 81. While the Complaint asserts the legal conclusion that Congress amended ANGPA in 2004 "to make the Authority's LNG Project qualify for the $18 billion federal loan guarantee gas pipeline incentive package," *id.* ¶ 97, in fact ANGPA nowhere mentions "the Authority's LNG Project" *or creates any loan guarantee entitlement whatsoever.* *See Clegg*, 18 F.3d at 754-55 ("[T]he court is not required to accept legal conclusions cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged."). Instead, the referenced amendment simply expands the loan guarantee provision so that such guarantees may be sought not only by holders of FERC certificates issued under ANGPA or ANGTA but also by entities determined by the Secretary of Energy to be "qualified to

---

[11] The Port Authority erroneously cites to Pub. L. 108-325 ¶ 97 of the Complaint. The correct cite for the Act is Pub. L. 108-324.

construct and operate an" LNG project "to transport liquefied natural gas from Southcentral Alaska to West Coast States."[12]

A review of the Complaint shows that the Port Authority has not taken even the first steps required by ANGPA to become the "one project" that will obtain the guarantees. The Port Authority fails to allege that it has applied for the guarantees or for any of the prerequisite government approvals that ANGPA requires. As a matter of law, the Port Authority has failed to plead the facts needed to show that it possesses the "ability to finance entry." The Port Authority's antitrust claims must therefore be dismissed for lack of standing.

> **1.      The Port Authority Has Not Pled Facts Sufficient to Show that It Can Meet the Requirements for Obtaining the Federal Loan Guarantees that Allegedly Will Enable It to Finance Its Proposed Project**

To show its ability to finance this enormous project, the Port Authority relies *solely* on the purported availability of $18 billion in federal loan guarantees. But the federal government is not going to extend multi-billion dollar guarantees to just anyone. Rather, it will issue such guarantees to only "one qualified project," and the ANGPA requirements for becoming a such a "qualified project" are rigorous. Section 720n of ANGPA provides:

> The Secretary may issue a Federal guarantee instrument for a qualified infrastructure project only after a certificate of public convenience and necessity under section 720a(b) of this title or an amended certificate under section 719g of this title has been issued for the project, or after the Secretary certifies there exists a qualified entity to construct and operate a liquefied natural gas project to transport liquefied natural gas from Southcentral Alaska to West Coast states. In no case shall loan guarantees be issued for more than one qualified project.

15 U.S.C. § 720n(b)(1). Thus, as a preliminary matter, even to be "in the running" for the loan guarantee, the Port Authority would need to: (1) acquire a "certificate of public convenience and

---

[12] 15 U.S.C. §§ 720n(a)-(b).

necessity under section 720a(b);" (2) acquire "an amended certificate under section 719g;" or (3) have the Secretary certify it as a "qualified entity to construct to construct and operate a liquefied natural gas project." *Id.* As described below, none of these qualification requirements is perfunctory, and the Complaint nowhere alleges that the Port Authority has filed *any* applications for the necessary approvals. The Port Authority's ultimate ability to obtain loan guarantees must therefore be considered speculative as a matter of law.

### a.    Section 720a(b) Certificate of Public Convenience and Necessity

Section 720a(b) of ANGPA requires an applicant to demonstrate to FERC that it has satisfied the requirements of 15 U.S.C. § 717f(e), with the exception of two presumptions set forth in § 720a(b) (*i.e.*, presumed public need for North Slope gas and presumed adequacy of downstream capacity to move the gas to markets in the contiguous United States). The requirements of 15 U.S.C. § 717f(e) are substantial. In relevant part it provides:

> (e) Granting of certificate of public convenience and necessity
>
> [A] certificate shall be issued to any qualified applicant therefor, authorizing the whole or any part of the operation, sale, service, construction, extension, or acquisition covered by the application, if it is found that the *applicant is able and willing properly to do the acts and to perform the service proposed and to conform to the provisions of this chapter and the requirements, rules, and regulations of the Commission thereunder*, and that the proposed service, sale, operation, construction, extension, or acquisition, to the extent authorized by the certificate, is or will be required by the present or future public convenience and necessity; otherwise such application shall be denied.

15 U.S.C. § 717f (e) (emphasis added). Before the Commission can issue a certificate of public convenience and necessity, it must review, approve, and issue a final environmental impact statement, which adds complexity and uncertainty to the regulatory process. *See* 15 U.S.C.

§ 720b.  Moreover, the Port Authority has not alleged that it has conducted the required studies or analyses to comply with the environmental review process.

Even if, hypothetically, years down the road, the Port Authority's proposal overcomes the environmental and other significant regulatory hurdles and results in a certificate of public convenience and necessity under section 720a(b) of ANGPA, the Port Authority would still not know whether it could obtain the loan guarantees.  At that point, it would still be in the Secretary of Energy's discretion whether or not the Port Authority's proposal would be the "one project" ultimately selected.  *Id.* § 720n(b).  Thus, even if the Port Authority had already filed the required applications – and the Complaint nowhere alleges any such fact – its chance of ultimate success would be a matter of significant speculation.

### b.       Acquiring an Amended Certificate Under § 719g

The second way in which the Port Authority theoretically could become eligible for the federal loan guarantees is by acquiring an amended certificate under § 719g.  15 U.S.C. § 720n(b)(1).  But section 719g applies only to certificates originally issued under ANGTA.  The Port Authority has not alleged that it is the holder of an ANGTA certificate and, in fact, alleges that TransCanada, through its subsidiaries, was the sponsor of the project selected under the 1976 legislation.  *See* Compl. ¶¶ 70, 80.

### c.       Certification by the Secretary

The final way in which the Port Authority could become eligible for the federal loan guarantees is through certification by the Secretary of Energy under section 720n(b)(1).  The statutory text provides that the "Secretary may issue a Federal guarantee instrument for a qualified infrastructure project . . . after the Secretary certifies that there exists a qualified entity to construct and operate a liquefied natural gas project to transport liquefied natural gas from

Southcentral Alaska to West Coast States." 15 U.S.C. § 720n(b)(1). The Complaint, however, does not allege that the Port Authority has applied to the Secretary for certification.[13]

Moreover, on the face of the Complaint, the Port Authority's plan would not qualify for certification. ANGPA authorizes the Secretary to certify a project that will transport LNG "from Southcentral Alaska to *West Coast States.*" *Id.* (emphasis added). The Complaint, however, alleges that, at least during its initial phase, the Port Authority's project "will deliver LNG to the Kitimat, British Columbia, terminal," not to West Coast States. Compl. ¶ 93. Under the terms of the statute, the Secretary could not certify such a project.

In short, based on the Complaint's allegations, the Port Authority's "ability to finance entry" through receipt of federal loan guarantees is highly speculative at best.

> **2.     The Port Authority Has Not Pled Facts Sufficient to Show that It Has the "Ability to Finance" the Substantial Project Costs Not Covered by Federal Loan Guarantees**

The Complaint suffers from a telling omission. Nowhere does it mention the statutory cap on the percentage of project costs that the federal loan guarantees may support. ANGPA provides that federal loan guarantees may "not exceed 80 percent of the total capital costs of the project." 15 U.S.C. § 720n(c)(1). Assuming that the Port Authority were to receive the full $18 billion of federal loan guarantees that it hopes to obtain, *see* Compl. ¶ 97, the remaining 20

---

[13] The Department of Energy is in the process of deciding the procedures and standards that will govern the implementation of ANGPA's loan guarantee provisions. In May 2005, DOE issued a Notice of Inquiry "seeking comments and information from the public to assist [it] in developing a possible advance notice of proposed rulemaking or notice of proposed rulemaking concerning the loan guarantee provisions of the 'Alaska Natural Gas Pipeline Act.'" 70 Fed. Reg. 30,707 (May 27, 2005). DOE has not yet published its response to the comments or the approach it plans to take. At this point, no one knows the regulatory procedures or standards that will govern applications to qualify for the federal loan guarantees, thereby underscoring the speculative nature of the Port Authority's financing allegations.

percent of project costs would *exceed $4 billion* – a substantial sum by any measure.[14]  The Port

Authority has failed to plead facts sufficient to show that it is capable of financing such an

amount.  The Complaint does not even acknowledge that it will need any independent, non-

guaranteed financing, much less allege that the Port Authority can meet that requirement.  As a

consequence, the Court must conclude that the Port Authority's "ability to finance entry" is

speculative.

> **3.    The Courts Have Repeatedly Dismissed Antitrust Claims Where, as Here, the Plaintiff's Ability to Obtain Needed Governmental Approvals or Financing Is Speculative**

In the leading case of *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256 (3d Cir.

1998), the Third Circuit considered an antitrust claim that, as here, was dependent on the

contention that new market entry would occur even though required government approval had

not been obtained.  The City of Pittsburgh sued two electric power providers claiming that their

proposed merger (and an earlier agreement not to compete) would eliminate competition that

otherwise would have taken place to supply power to two "Redevelopment Zones."  *Id.* at 258.

The court of appeals affirmed the district court's Rule 12(b)(6) dismissal of the City's complaint

for lack of standing under both sections 4 and 16 of the Clayton Act because one of the power

providers lacked regulatory approval to serve the redevelopment zones.  Even though the

provider had applied for approval, the court of appeals determined that, until approval actually

occurred, it was speculative whether the two providers would actually have competed had there

been no merger.

---

[14] Given the 80% loan guarantee limitation, if the full $18 billion of loan guarantees were issued, the total project cost would equal at least $22.5 billion, leaving at least $4.5 billion that would need to be financed independently.

The court reasoned that the regulatory approval procedures, like the FERC certification and federal loan guarantee requirements here, were not "mere administrative formalities." *Id.* at 267. The court stated: "Since the realization of competition is in the hands of regulators there is no way that the City can show that competition would have occurred absent the concerted activity between the two utilities." *Id.* at 267. Furthermore, the court held that there was no standing to pursue a claim for injunctive relief under section 16 of the Clayton Act because "the threatened loss is contingent on the [public utility commission's] permitting competition within the City in the first instance. . . . Allegheny Power was not legally able to provide power in the Redevelopment Zones and we do not know whether the [public utility commission] would ever have granted the permission for it to do so." *Id.* (internal quotations omitted).

The court's analysis in *City of Pittsburgh* is directly applicable here. The competition that the Port Authority allegedly would provide in the absence of the defendants' purported unlawful activity is entirely "contingent" on the uncertain outcome of lengthy and complex administrative-approval processes. Indeed, the level of speculation here is even higher because, unlike in *City of Pittsburgh*, no applications for the numerous government approvals required by the loan guarantee statute have been filed.[15]

---

[15] The existence of regulatory obstacles has been the dispositive factor in other decisions where courts have concluded that the plaintiff lacked antitrust standing. *See Andrx Pharm. v. Biovail Corp. Int'l*, 256 F.3d 799, 804 (D.C. Cir. 2001) (Rule 12(b)(6) dismissal for lack of standing where plaintiff, a generic drug manufacturer, alleged that FDA application had been filed but did not allege that approval was probable); *Cable Holdings of Ga., Inc., v. Home Video, Inc.*, 825 F.2d 1559, 1562-63 (11th Cir. 1987) (plaintiff claimed defendants conspired to block it from entering new cable television territory; court held plaintiff lacked standing, concluding that, "in the capital intensive cable industry, Cable Holdings was simply unprepared to expand its services into the western territory" in part because it "had never applied for or obtained FCC approval for frequency allocations to serve the western territory").

In a case involving the natural gas pipeline industry, the Eleventh Circuit considered a would-be pipeline competitor's claim that defendants had conspired to block a tap into an existing interstate pipeline in order to insulate themselves from competition in the transportation of gas to industrial customers.  *Gas Utils. Co. v. S. Natural Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993).[16]  The court held that the plaintiff lacked standing to sue because it had not "secured financing or consummated its contracts" related to the potential pipeline project:

> *"The mere possibility of financing being available in the abstract is not enough.  Showing that someone somehow could possibly obtain financing is not the same as showing that plaintiffs themselves were able and prepared to"* . . . .  Likewise, showing that someone may be interested in entering into a contract if the price is right is not the same as having an enforceable contract.  Gas Utilities' other activities were merely preliminary steps taken in anticipation of preparing to enter the market such as communication with the licensing authority, investigation of costs and feasibility, and inquiry regarding FERC regulation and eminent domain rights.

*Id.* at 283 (quoting *Hayes v. Solomon,* 597 F.2d 958, 975 (5th Cir. 1979) (emphasis added)).

Here, the Port Authority has alleged only the "mere possibility of financing," not that it is "able and prepared to" get it.  Similarly, the Port Authority has alleged no facts showing that it has consummated contracts for materials, labor, LNG tankers, and other integral elements of its proposed project.

In another case involving the need to show financing ability, the Fifth Circuit held that the plaintiffs had no standing to pursue an antitrust claim charging defendants with conspiracy to prevent plaintiffs from building a shopping center.  The court stated that plaintiffs had "failed . . . to offer substantial evidence that they were capable of securing the money that would have been

---

[16] *See Gas Utils. Co. v. S. Natural Gas Co*., 825 F. Supp. 1551 (N.D. Ala. 1992), *aff'd*, 996 F.2d 282 (11th Cir. 1993), for a more in-depth discussion of the facts concerning the market at issue in that case.

needed to build a shopping center, a sum their own experts said would exceed $14,000,000."

*Hayes v. Solomon,* 597 F.2d 958, 975 (5th Cir. 1979).  In concluding that plaintiff had not shown

that it was sufficiently prepared to carry out the construction project, the court commented:  "The

antitrust laws were not designed to protect such shopping centers in the air which are so easily

built."  *Id.* at 977.[17]

      The Ninth Circuit has similarly ruled that, in purported market-exclusion cases, plaintiffs

who fail to show the "ability to obtain financing" lack standing to sue.  In *Bubar,* for example, a

group of executives sought to enter the potato-processing business by acquiring their employer.

The Ninth Circuit held that they lacked standing to bring a suit charging that an unlawful

conspiracy had thwarted their plans.  Noting that "determination of standing is a question of

law," the court held that, because the executive group had failed to demonstrate that they had

secured firm financial commitments, there was "lack of a showing of the financial resources to

complete the purchase" and thus "serious doubt as to . . . preparedness to enter the market."  752

F.2d at 452-53.

      Similarly, in *In re Dual-Deck,* the Ninth Circuit ruled that an electronics manufacturer

lacked standing to challenge its alleged exclusion from the high-end consumer electronics

market.  The court based that conclusion largely on the manufacturer's failure to show a

"demonstrated ability to raise the money to enter the market." [18]  11 F.3d at 1465; *see also*

---

[17] The court was referencing a classic passage from Henrick Ibsen, The Master Builder III:  "Castles in the air are so easy to take refuge in.  And so easy to build too."  597 F.2d at 977 n.12 (internal quotations omitted).

[18] The court explained that, to establish antitrust standing, more than plans and intentions are needed:

> Sometimes it may be hard to say exactly where the line falls
> between an idea for entry and entry into a business, insufficient to
> confer standing, and "significant demonstrable steps," sufficient

*Bourns*, 331 F.3d at 711 (finding no standing where plaintiff "was wishing; it was not assembling the personnel, the equipment, the facilities nor acquiring the knowledge, nor allocating the capital to put it into the production of [its planned product]. It was unprepared to compete").

In sum, the law in this and other circuits strongly supports dismissal of the Port Authority's claims because of its failure to allege facts showing that it can obtain the government approvals required to secure financing to undertake the project.

## II.    THE FEDERAL ANTITRUST CLAIMS SHOULD BE DISMISSED FOR FAILURE TO PLEAD SUFFICIENT FACTS TO SUPPORT THE ALLEGED CAUSES OF ACTION

### A.    The Port Authority's Fifth Claim for Relief Fails to State a Claim Under Section 7 of the Clayton Act

The Complaint's Fifth Claim for Relief purports to allege violations of section 7 of the Clayton Act based on ExxonMobil's "previous mergers, acquisitions holding, and use of other companies' stock and assets." Compl. ¶ 208. The Complaint, however, mentions only two specific mergers and acquisitions involving ExxonMobil: (1) the 1999 merger of the Exxon and Mobil corporations (*id.* ¶¶ 134-138) and (2) Exxon's 1996 acquisition of half of Shell's relatively small production interest in Prudhoe Bay. *Id.* ¶ 149. The Port Authority's belated attack on these

---

for standing . . . . One can be a "promoter," though he be a pauper, a tyro, and a dreamer; it is a question of where the line shall be drawn. Uniformly, the courts have drawn the line at the point where promotion transcends the levels of hopes, desires, and expectations, and reaches a certain stage of maturity and concreteness, a stage where it is accompanied by certain indicia of ultimate success. Put another way, the courts have held that a potential competitor cannot achieve standing merely by demonstrating his *intention* to enter a field; he must also demonstrate his *preparedness* to do so

*Id.* at 1466 (citing *Hecht*, 570 F.2d at 994).

transactions is barred by the four-year Clayton Act statute of limitations and the doctrine of laches.[19]

### 1.    The Complaint's Merger-Related Antitrust Damages Claim Is Barred by the Statute of Limitations

To the extent that the Fifth Claim for Relief seeks damages, it is barred by section 4b of the Clayton Act, which provides that private antitrust damages actions are "forever barred unless commenced within four years after the cause of action accrued."  15 U.S.C. § 15b.  Because the Complaint was filed on December 19, 2005, the four-year statute of limitations reaches back only to December 2001.  The challenged transactions, however, occurred in 1996 and 1999.  The damage claims are therefore time-barred and should be dismissed.  The Ninth Circuit has warned about the "abuses which would occur" if antitrust plaintiffs "were permitted to search the history of other firms and challenge at their pleasure any possible violations, no matter how old."  *Int'l Telephone and Telegraph Corp. (IT&T) v. Gen. Tel. & Elec. Corp.*, 518 F.2d 913, 929 (9th Cir. 1975), *overruled on other grounds*, *California v. Am. Stores Co.*, 495 U.S. 271 (1990).

The Eighth Circuit recently addressed statute-of-limitations issues in the section 7 merger context where the plaintiff challenged the 11-year-old merger of Northwest Airlines and

---

[19] Where, as here, a complaint on its face establishes that claims are time-barred, dismissal under Rule 12(b)(6) is proper.  *See Conerly v. Westinghouse Elec. Corp.,* 623 F.2d 117, 119 (9th Cir. 1980) ("When the running of the statute is apparent from the face of the complaint, . . . then the defense may be raised by a motion to dismiss."); *Jacobson v. State of Montana Dept. of Soc. & Rehab. Servs., No. 90-35036, 1990 WL 161008, at *1* (9th Cir. 1990) ("The court may dismiss an action on statute of limitations grounds if the expiry of the statute is apparent from the face of the complaint.") (attached hereto); *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1385 n.1 (3d Cir. 1994) (Motion to dismiss may be granted "where the complaint facially shows noncompliance with the limitations period."); *Logan Farms v. HBH, Inc.,* 282 F. Supp. 2d 776, 790 (S.D. Ohio 2003) (Court dismissed case based on laches, noting "strong presumption of laches where the analogous statute of limitations has elapsed."); *Knickman v. Prince George's County*, 187 F. Supp. 2d 559, 565 n.4 (D. Md. 2002) ("Like the statute of limitations defense, laches may be raised in a motion to dismiss."); *see also* 5A Wright and Miller, *Federal Practice and Procedure: Civil 2d*, § 1357.

Republic Airlines. *Midwestern Mach. Co. v. Northwest Airlines, Inc*., 392 F.3d 265 (8th Cir. 2004). The court held that the plaintiff's damage claims were barred by the four-year statute of limitations, rejecting plaintiff's theories that the merger was a "continuing violation" of section 7 and that the "holding and use" of the acquired Republic assets after the merger constituted acts restarting the limitations period. The court stated: "o[]nce a merger is completed, the plan to merge is completed, and no overt acts can be undertaken to further that plan. Unlike a conspiracy or the maintaining of a monopoly, a merger is a discrete act, not an ongoing scheme." *Id.* at 271. Thus, the court held that "[o]nce a merger is completed, there is no continuing violation possible under § 7 that would justify extending the statute of limitations beyond four years." *Id.*

The court stated that the post-merger "holding and use" of acquired assets could only potentially restart the limitations period if the "assets are used in a different manner from the way that they were used when the initial acquisition occurred and the new use injures the plaintiff." *Id.* at 273. Here, the Port Authority has made no allegation that assets have been used in a "different manner" following the acquisition. Indeed, the Complaint alleges that ExxonMobil (including its predecessors) used all its relevant North Slope natural gas resources in the *identical* way for more than 20 years, *i.e.*, refusing to develop the resources and sell the natural gas output. There is no basis to claim that the statute of limitations has failed to run.[20]

## 2. The Doctrine of Laches Bars the Complaint's Injunctive Relief Claim

---

[20] *See also* P. Areeda and H. Hovenkamp, II Antitrust Law § 320c5 at 221 (2d ed. 2000) ("*First,* § 7 of the Clayton Act makes it unlawful to 'acquire' and says nothing about the independent lawfulness of post-merger prices, even if they are monopolistic. Thus the merger is unlawful only if the acquisition itself is unlawful, and the acquisition is generally public and occurs on a reasonably certain date. *Second,* any 'continuing violation' rule . . . . would leave mergers open to perpetual challenge. Clearly, Congress did not intend to exempt mergers from the antitrust statute of limitation.").

To the extent that the Fifth Claim for Relief seeks injunctive relief under section 16 of the Clayton Act, the doctrine of laches bars the claim. As a political subdivision of the state, the Port Authority is treated as a private party under the antitrust laws, not as the state itself suing in a *parens patriae* capacity.[21] The Supreme Court has held that "equitable defenses such as laches . . . may protect consummated transactions from belated attacks by private parties." *California v. Am. Stores Co.,* 495 U.S. 271, 296 (1990). In *IT&T,* the Ninth Circuit discussed the importance of the laches doctrine in limiting challenges to consummated mergers:

> Without the equitable doctrine of laches, § 16 could seriously interfere with a rival's business operations, at a time of the plaintiff's own choosing, yet the public would enjoy none of the safeguards of the public-interest standards and expertness which presumably guide the government when it is a plaintiff. We do not believe that Congress intended, in passing § 16 of the Clayton Act, to permit potential plaintiffs to sleep through their competitors' antitrust violations and then sue many years later.

*Id.* at 926-927. The court held that "[t]he proper approach is to use *§ 4B's four-year limitation on § 4 [damages] actions as a guideline in computing the laches period under § 16.*" *Id.* at 928

---

[21] The concept of *parens patriae* is an English common-law doctrine that has been adopted by the United States judicial system to provide the federal government and the states the ability in "appropriate circumstances [to] sue as *parens patriae* to vindicate interests of their citizens." *In re Multidistrict Vehicle Air Pollution*, 481 F.2d 122, 131 (9th Cir. 1973) (citing *Hawaii v. Standard Oil*, 405 U.S. 251, 257-60 (1972); *Georgia v. Pennsylvania R.R. Co.*, 324 U.S. 439 (1945)). While it is clear that states and state attorneys generals may sue on behalf of their allegedly injured citizens, this right does not extend to political subdivisions, such as cities, counties, or state agencies. *Colorado River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir. 1985) ("We have held that political subdivisions . . . cannot sue as *parens patriae* because their power is derivative and not sovereign."); *City of Rohnert Park,* 601 F.2d at 131 (same; holding that city could sue to redress alleged injuries only to its own "proprietary interests").

(emphasis added).[22]  Because the ExxonMobil transactions challenged here occurred in 1996 and

1999, well outside the four-year period, laches should apply.

Equitable considerations strongly support this result.  The Complaint alleges that the Port

Authority "was created in 1999 to build a gas pipeline system" and that ExxonMobil and its

predecessors had been refusing to develop and sell North Slope gas resources since the 1970s.

Compl. ¶¶ 9, 47.  All claims by any party alleging that the mergers resulted in a substantial

lessening of competition in violation of section 7 of the Clayton could, and should, have been

brought long ago.  And, indeed, such a claim against the Exxon/Mobil merger was brought – *by

the State of Alaska* – resulting in a Consent Decree and Final Judgment filed in this Court on

December 1, 1999, permitting consummation of the merger subject to the divestiture of certain

Alaska assets.  *State of Alaska v. Exxon Corp.,* No. A99-618cv, Consent Decree and Final

Judgment (D. Ak. Dec. 1, 1999).[23]  It is unreasonable for a political subdivision of the State of

Alaska to come into this Court now, more than six years later, seeking, in effect, to overturn the

State's decision to approve the merger.  Laches clearly bars the Port Authority's section 7

claims.[24]

----

[22] *See also* P. Areeda and H. Hovenkamp, II Antitrust Law § 1205b at 299 (2d ed. 2003) (supporting Ninth Circuit rule that Clayton Act four-year statute of limitations should govern laches defense in § 7 suits for equitable relief, and adding that, "if the two periods should differ, laches should be shorter because divestiture is a draconian remedy that often causes significant disruption to the post-merger firm and sometimes to other firms as well.")

[23] The Consent Decree and Final Judgment is available at http://www.abanet.org/antitrust/committees/state-antitrust/ak-exxonmobil.pdf.  The States of California, Oregon, and Washington were also plaintiffs in this case.   The Federal Trade Commission, too, brought an action and obtained a consent order permitting the merger to close subject to certain divestiture requirements.  *See* In the Matter of Exxon Corporation et al., File No. 991-0077, Agreement Containing Consent Orders (FTC, Nov. 30, 1999), available at http://www.ftc.gov/os/1999/11/exxonmobilagr.pdf.

[24] *See Antoine L. Garabet, M.D., Inc. v. Autonomous Tech. Corp.*, 116 F. Supp. 2d 1159, 1172 (C.D. Cal. 2000) (holding laches barred § 7 claims for equitable relief where plaintiffs

### 3.    The Complaint Fails to Plead the Required Elements of a Clayton Act § 7 Claim

In addition to being time-barred, the Port Authority's purported Clayton Act claim cannot proceed because it completely defaults in alleging the required elements of a section 7 violation. The Complaint states the bare legal conclusion that the 1999 and 1996 transactions "have substantially lessened competition in relevant markets for the transportation and purchase of natural gas from the North Slope."  Compl. ¶ 208.  The Complaint, however, fails to allege not only the respective market shares of the involved companies (Exxon, Mobil, Shell, or ExxonMobil) in the "markets for the transportation and purchase of natural gas from the North Slope," but also whether any of those companies (or any other firm) even participated in either market.  Thus, under the allegations of the Port Authority's Fifth Claim for Relief, the Port Authority is attacking mergers between non-competitors in non-existent markets.  Such allegations do not state a claim under section 7 of the Clayton Act.

The Supreme Court has held that "[d]etermination of the relevant product and geographic market is 'a necessary predicate'" to a section 7 claim.  *United States v. Marine Bancorp.*, 418 U.S. 602, 618 (1974) (quoting *United States v. E.I. duPont de Nemours & Co.*, 353 U.S. 586, 593 (1957); *Equifax, Inc. v. Fed. Trade Comm'n,* 618 F.2d 63, 66 (9th Cir. 1980).  To "establish a prima facie case of a section 7 violation," a plaintiff must show that the merger "would produce 'a firm controlling an undue share of the relevant market and [would] result . . . in a significant increase in the concentration of firms in that market.'"  *United States v. Oracle Corp.*, 331 F.

---

exercised no diligence and defendant would be greatly prejudiced by the remedy sought); *Midwestern Mach. Co.*, 392 F.3d at 277 (holding claims for equitable relief barred by doctrine of laches where Plaintiff had no reasonable justification for the delay in filing suit and Defendant "did nothing to conceal the merger . . . or to dissuade [plaintiff] from filing suit in a timely manner.")

Supp. 2d 1098, 1110 (N.D. Cal. 2004) (quoting *Fed. Trade Comm'n v. H J Heinz Co.*, 246 F.3d

708, 715 (D.C. Cir. 2001) and *United States v. Philadelphia Nat'l Bank,* 374 U.S. 321, at 363

(1963)).  With no market-share allegations and no allegations that the merging firms were even

competing in the two alleged markets, the Port Authority's Complaint does not – and cannot –

allege that the mergers produced a firm controlling an "undue" share of the alleged relevant

markets, or that either merger resulted in a "significant increase" in market concentration.

In *Equifax,* the Ninth Circuit dismissed an action brought by the Federal Trade

Commission under section 7 of the Clayton Act because the agency failed to show that the

merging firms competed in the same alleged relevant market:

> The FTC did not sustain its burden of establishing that Equifax and
> [the acquired companies] were operating within the same . . .
> market.  *Consequently, this necessary predicate to finding a section
> 7 violation is absent and the FTC's order finding such a violation
> must be vacated . . . .*

618 F.2d at 67 (emphasis added).  Here, as in *Equifax,* because the Complaint fails to allege that

the merging firms were competing with each other – or were even participating in any way – in

the two alleged markets, the "necessary predicate to finding a section 7 violation is absent."  The

Port Authority's section 7 claim should therefore be dismissed.[25]

---

[25] *See also Fraser v. Major League Soccer, L.L.C.* 284 F.3d 47, 69-71 (1st Cir. 2002) (§ 7 claim rejected because no market existed at the time of the merger; court ruled that to show a merger unlawful under § 7, plaintiff must show that the merged firm "operates within a relevant economic market that is *presently* concentrated") (emphasis added)**;** *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195, 1211 (2d Cir. 1981) (finding no § 7 violation because alleged market did not exist at time of acquisition; "[t]he existing market provides the framework in which the probability and extent of an adverse impact on competition may be measured . . . .  Where, as here,  it is conceded that the relevant product market . . . did not exist until eight years [following the challenged acquisition] . . . as a matter of law the [acquisition] did not violate § 7").

**B.      The Port Authority's Fourth Claim for Relief Fails to State a Claim for Attempted Monopolization**

The Complaint alleges that defendants jointly have attempted to monopolize two markets through "agreeing among themselves not to commit gas resources; failing to develop known gas resources . . . and entering into a series of mergers and asset acquisitions." Compl. ¶ 202. The Complaint further alleges that "Defendants have undertaken this course of conduct with the specific intent of monopolizing the markets described above.  There is a dangerous probability that, unless restrained, Defendants' course of conduct will succeed." *Id.* ¶ 204.  The attempted monopolization claim should be dismissed for three reasons.

First, to the extent that the claim is based upon an attack on mergers involving Exxon and Mobil, it is time-barred, as discussed above.

Second, the claim effectively charges defendants with conspiring to attempt to monopolize, which is not a Sherman Act offense. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 454 (1993) ("§ 2 [of the Sherman Act] addresses the actions *of single firms* that  . . . attempt to monopolize.") (emphasis added); *Windy City Circulating Co. v. Charles Levy Circulating Co.*, 550 F. Supp. 960, 967 (N.D. Ill. 1982) ("While section 2 of the Sherman Act creates causes of action for attempts to monopolize and conspiracies to monopolize, it does not create a cause of action based on an alleged conspiracy to attempt to monopolize."); *Alabama v. Blue Bird Body Co.*, 71 F.R.D. 606, 609 (M.D. Ala. 1976) ("Defendants have also pointed out that 15 U.S.C. § 2 does not create a cause of action for conspiracy to attempt to monopolize.  The court agrees . . ."); *Invictus Records, Inc. v. Am. Broad. Cos.*, 98 F.R.D. 419, 434 n.3 (E.D. Mich. 1982) ("[C]onspiracy to attempt to monopolize . . . is not an offense under Sherman § 2."); *S. Concrete Co. v. U.S. Steel Corp.*, 394 F. Supp. 362, 372 (N.D. Ga. 1975) (granting summary judgment dismissing claim for conspiracy to attempt to monopolize).

Third, the Complaint fails to allege the required elements of an attempted monopolization claim against ExxonMobil individually. To charge attempted monopolization, a plaintiff must allege the following: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports*, 506 U.S. at 456. The Court clarified the third prong of this test by holding that "the dangerous probability of monopolization in an attempt case . . . requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Id*. at 459.

Here, the markets that are alleged to be the object of the attempted monopolization are the same two non-markets alleged in the § 7 claim – namely, the purported markets for "the sale of gas transportation services from the North Slope of Alaska and for the purchase of natural gas from the North Slope of Alaska." Compl. ¶ 202. The Complaint, however, nowhere alleges ExxonMobil's market share in either of these purported markets and even fails to allege that ExxonMobil is *in* either of these markets. This alone provides grounds for dismissal of the claim. *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987) (affirming Rule 12(b)(6) dismissal of attempted monopolization claim for failure to allege that defendant possessed monopolistic market share in relevant market). Nor does the Complaint allege that ExxonMobil individually has a "dangerous probability of achieving monopoly power" in either market. Instead, the Complaint simply alleges conspiracy, attributing the alleged likely monopolization to "*Defendants'* course of conduct." Compl. ¶ 204 (emphasis added). For all these reasons, the Court should dismiss Claim Four of the complaint.

**C.    The Port Authority's First, Second, and Third Claims for Relief Should Be Dismissed for Failure Adequately to Plead Conspiracy**

The First, Second, and Third Claims for Relief are premised on the alleged existence of a conspiracy between the defendants.  In the introductory portion of the Complaint, the Port Authority alleges that the current action "arises from illegal contracts, combinations, and conspiracies" between ExxonMobil and BP.  Compl. ¶ 1.  But merely parroting the conspiracy element of antitrust claims is not enough to state a claim under the notice pleading standard of Fed. R. Civ. P. 8 ("Rule 8").  Rule 8 requires that a plaintiff "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Big Bear Lodging Ass'n v. Snow Summit, Inc.,* 182 F.3d 1096, 1101 (9th Cir. 1999) ("The allegations in the Complaint . . . must 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'").  As described below, the Complaint fails to provide sufficient information about the alleged conspiracy to support valid antitrust claims or to enable ExxonMobil to respond to them.

**1.    The Complaint Fails to Allege Sufficient Facts to State a Claim**

The entire conspiracy allegation centers around the assertion that defendants have entered into "agreements."  The Complaint repeatedly asserts the existence of numerous and various alleged anticompetitive agreements.  *See, e.g.*, Compl. ¶¶ 7, 8, 17, 21, 22, 58, 61, 63, 66, 68, 120-21, 181, 185, 189-91, 193.  The Complaint specifically refers to unit agreements.  But, as the Complaint notes, such agreements were "approved and agreed to by the State" and thus cannot form the basis of antitrust liability.[26]  *Id.* ¶ 59.

The Complaint also alleges that "[t]he Defendants have entered into formal and informal unit operating and other agreements among themselves and with others . . . ."  *Id.* ¶ 61; *see also*

---

[26]  *See generally Parker v. Brown*, 317 U.S. 341 (1943); *Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.*, 810 F.2d 869 (9th Cir. 1987).

*id.* ¶ 62.  But the Complaint nowhere provides facts identifying when or where those supposed

agreements occurred or describing how they operated.  Rather, the Complaint contains only

conclusory allegations about the subjects purportedly covered by some of the "agreements," (*see*,

*e.g.*, *id.*¶¶ 67, 69-80, 118, 122), and states that the alleged "agreements" were entered into over

the course of decades.  *Id.* 47, 65, 155.  Those open-ended allegations fall far short of providing

adequate notice.

Courts repeatedly have found that a complaint "must, at a minimum, sketch the outline of

the antitrust violation with allegations of supporting detail."  *Les Shockley Racing, Inc. v. Nat'l*

*Hot Rod Ass'n*, 884 F.2d 504, 507-08 (9th Cir. 1989) (citing *Rutman Wine*, 829 F.2d at 736; *see*

*also Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1048 (D. Minn.

1992) ("[G]eneral allegations of conspiracy, without a statement of 'the facts constituting the

conspiracy, its object and accomplishment,' are inadequate to state a cause of action.") (citing

*Baxley-DeLamar Monuments v. American Cemetery Ass'n*, 843 F.2d 1154, 1156 (8th Cir. 1988)

(quoting *Larry R. George Sales Co. v. Cool Attic Corp.*, 587 F.2d 266, 273 (5th Cir. 1979)).

Although *Les Shockley* involved insufficient pleading of antitrust injury, its reasoning

applies equally to conspiracy allegations.  "[I]n order to adequately allege an antitrust

conspiracy, the pleader 'must provide, whenever possible, some details of the time, place and

alleged effect of the conspiracy; it is not enough merely to state that a conspiracy has taken

place."  *Estate Constr. Co. v. Miller & Smith Holding Co.*, 14 F.3d 213, 221 (4th Cir. 1994)

(quoting *Nat'l Constructors Ass'n v. Nat'l Elec. Contractors Ass'n*, 498 F. Supp. 510, 528 (D.

Md. 1980)).[27]  This is particularly true here, where it should have been *possible* for the Port

---

[27] Note that ExxonMobil is not suggesting that the court apply a heightened pleading
standard to the Complaint.  *See In re Tableware Antitrust Litigation*, 363 F. Supp. 2d 1203 (N.D.

Authority to provide identifying information about at least some of the alleged agreements.  For example, the Complaint affirmatively alleges that defendants have entered into "written agreements" (*e.g.*, Compl. ¶ 67) but provides no facts regarding these unnamed agreements.  Further, in the case of agreements that the Complaint identifies by category (*i.e.*, unit operating agreements), it fails to allege which provisions of those agreements violate the antitrust laws.

In light of these pleading deficiencies, dismissal under Rule 12(b)(6) is justified.  Courts have dismissed claims based on similarly insufficient conspiracy allegations.  *See, e.g.*, *Cairo v. Skow*, 510 F. Supp. 201, 206 (E.D. Wisc. 1981) (holding that to "plead a conspiracy, a litigant must do more than allege in a conclusory fashion that a conspiracy exists") (citation omitted).  In *Cairo*, the plaintiff alleged that "at all times relevant hereto, all of the defendants acted together, conspired and acted in concert by common agreement and design to willfully and intentionally deprive [plaintiff] of his constitutional rights."  *Id.* at 206.  The court found the allegation a "conclusory statement" that "contain[ed] no factual allegation whatsoever."  *Id.*; *see also Estate Constr. Co.*, 14 F.3d at 221 (affirming 12(b)(6) dismissal in part because plaintiffs "fail to provide any factual support for their allegations that a conspiracy existed"); ("[d]ismissal of a 'bare boned' allegation of antitrust conspiracy without any supporting facts is appropriate . . . .") (citing *Pennsylvania* ex rel. *Zimmerman v. Pepsico, Inc.*, 836 F.2d 173, 180 (3d Cir. 1988) (quoting *Heart Disease Research Found. v. General Motors Corp.*, 463 F.2d 98, 100 (2d Cir. 1972)).

---

Cal. 2005).  There, the court rejected the defendants' argument that plaintiffs were required to "'allege when [the conspiracy] conversations took place, how many occurred, who participated, where the conversations took place, [and] what topics were discussed' as well as specify 'meeting dates,' 'meeting places' and name 'individuals employed by . . . Defendants who allegedly participated.'"  *Id.* at 1206.  Here, by contrast, ExxonMobil is arguing only that, where plaintiff alleges the existence of numerous agreements over a 30-year span, Rule 8 requires it to provide at least some identifying information.

2.      **ExxonMobil Should Not Be Required to Speculate About the Bases for the Conspiracy Allegations**

The "test" of a sufficiently pled complaint "is whether the document's allegations are detailed enough to enable the defendant to respond" and "prepare an adequate responsive pleading."  5a Wright & Miller, *Federal Practice and Procedure:  Civil 2d*, §§ 1215, 1233; *cf. Five Smiths, Inc. v. Nat'l Football League Players Ass'n* 788 F. Supp. 1042, 1047 (D. Minn. 1992) (dismissing complaint where the pled allegations were "too vague to provide adequate notice of the factual grounds on which plaintiffs' broader price-fixing claims rests").  The Complaint fails this test.  Faced with numerous allegations of unspecified "agreements" spanning several decades, ExxonMobil simply is not able to answer the allegations or prepare to defend against these conspiracy-based claims.

Given the serious nature and potential repercussions of the allegations, the Port Authority should not be permitted to force ExxonMobil to guess what provisions of the generally "referenced unit operating agreements" allegedly constitute violations of antitrust laws, or to attempt to refute the existence and nature of numerous other unidentified formal and informal, written and unwritten, bilateral and multilateral "agreements" over a 30-plus year timeframe.  Given such far-reaching but undefined allegations, what is a defendant to do – comb through its files for the past three decades trying to find unspecified "agreements" that the plaintiff may believe contravene the antitrust laws?  There is no justification for imposing that type of burden here.

Such insufficient and conclusory allegations "are a danger sign that plaintiff is engaged in a fishing expedition."  *DM Research, Inc. v. Coll. of Amer. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) (affirming Rule 12(b)(6) dismissal).  Here, that "danger sign" is flashing red.  By expounding at great length concerning supposed antitrust violations that stemmed from the

38

numerous alleged "agreements," the Port Authority is attempting to divert attention away from its insufficient allegations regarding the "agreements" themselves. Simply put, the Port Authority is trying to use liberal pleading standards to enter into discovery and fish for evidence to support its conclusory antitrust allegations. But "the price of entry, even to discovery, is for the plaintiff to allege a *factual* predicate concrete enough to warrant further proceedings, which may be costly and burdensome." *DM Research, Inc.*, 170 F.3d at 56. The Port Authority has failed to allege such a predicate.

In a "case of this magnitude," the Court should exercise its "power to insist upon some specificity in pleading before allowing [this] potentially massive factual controversy to proceed." *Associated Gen. Contractors of California, Inc. v. California State Counsel of Carpenters*, 459 U.S. at 528 n.17 (1983). Because the Complaint fails to allege any facts, outside of the existence of routine unit operating agreements, to support Port Authority's allegation of a conspiracy, the Authority has failed to plead valid antitrust claims.

## III.    THE STATE LAW CLAIMS SHOULD BE DISMISSED

### A.    The Port Authority's Claims Under the Alaska Unfair Trade Practice and Consumer Protection Act (Sixth Claim for Relief) Have Been Inadequately Pled

In invoking the Unfair Trade Act's prohibition against unfair and deceptive practices, the Complaint re-alleges the same purportedly anticompetitive conduct on which its federal antitrust claims rest – namely, that defendants have agreed "not to sell gas to" the Port Authority. Compl. ¶ 212. As with the federal antitrust claims, the Port Authority must show that it has antitrust standing when asserting that defendants have violated the Unfair Trade Act by engaging in anticompetitive conduct. *See Aloha Lumber Corp. v. Univ. of Alaska,* 994 P.2d 991, 1002 (Alaska 1999). In fact, in a private action under the Unfair Trade Act, the plaintiff must allege an "ascertainable loss of money or property as the result of another person's act or practice declared

unlawful by AS 45.50.471."  Alaska Stat. § 45.50.531(a).  As shown in Part I, the interests pled

in the Port Authority's Complaint are simply too speculative to confer antitrust standing under

the federal antitrust laws.  For the same reasons, the Authority has failed to allege facts sufficient

to show it has sustained or will sustain a definite *ascertainable* injury under the Unfair Trade

Act.

> **B.    The Claim for Tortious Interference with Prospective Business Opportunity**
> **(Seventh Claim for Relief) Is Deficient as a Matter of Law**

Under Alaska law, a plaintiff claiming tortious interference with a prospective business

opportunity must plead facts sufficient to satisfy the following six separate elements:

> (1) an existing prospective business relationship between it and a
> third party; (2) defendant's knowledge of the relationship and
> intent to prevent its fruition; (3) failure of the prospective
> relationship to culminate in pecuniary benefit to the plaintiff; (4)
> conduct of the defendant interfering with the prospective
> relationship; (5) damages caused by the defendant; and (6) absence
> of privilege or justification for the defendant's conduct.

*K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 717 (Alaska 2003).  Here, the Port

Authority has failed in at least two respects.  It has not pled facts sufficient to show an *existing*

prospective business relationship or the absence of a privilege or justification for ExxonMobil's

actions.

> **1.    The Port Authority Has Failed to Allege Facts Showing an Existing**
> **Prospective Business Relationship**

In an effort to meet the first requirement for tortious interference, the Port Authority

asserts that it had a "prospective economic relationship" based on its "negotiations" with the

producers and the State.  Compl. ¶ 217.  But, as discussed above in Part I, the facts alleged in the

Complaint show that the Port Authority's proposal is no more than a "gleam in the eye and a

hope in the heart."  *Bourns*, 331 F.3d at 712.  It has not alleged facts sufficient to show an ability

to establish a viable existing prospective business relationship.

In *K & K Recycling, Inc.,* the court rejected the plaintiff's tortious interference claim where it had failed to secure the third-party commitments necessary to create a viable business venture.  80 P.3d at 717.  Similarly, the Port Authority here has failed to allege that it has taken the steps necessary to position itself to be a legitimate potential competitor.  Those steps include satisfying the requirements to be eligible for consideration as a possible federal loan guarantee recipient, lining up financing for project funds not covered by federal guarantees, conducting the necessary studies and other work needed to obtain a FERC certificate, and arranging for contractual commitments for materials, labor, LNG tankers, and other critical project needs.  The Port Authority's purported business opportunity is therefore speculative and insufficient as a matter of law to sustain a claim of tortious interference.

## 2.     The Port Authority Has Failed to Allege Facts Showing that ExxonMobil Acted Without Privilege

To state a claim for tortious interference, a plaintiff must plead that the allegedly harmful act was not privileged or justified.  *K & K Recycling,* 80 P.3d at 717; *RAN Corp. v. Hudesman, ,* 823 P.2d 646, 648 (Alaska 1991);  *Sisters of Providence v. A.A. Pain Clinic, Inc.*, 81 P.3d 989, 997 (Alaska 2003) (citing *Odom v. Fairbanks Mem'l Hosp.*, 999 P.2d 123, 132 (Alaska 2000) for the proposition that the plaintiff bears the burden of proof on this element).  The plaintiff's burden in this regard is especially high when it is claiming an interference with merely prospective business opportunities.  "[G]enerally persons are allowed more leeway to interfere with prospective economic relations than they are to interfere with existing contractual relations."  *See Ellis v. City of Valdez*, 686 P.2d 700, 707 n.14 (Alaska 1984).

"[T]he essential question in determining if interference is justified is whether the [defendant's] conduct is motivated by a desire to protect [its] economic interest, or whether it is motivated by spite, malice, or some other improper objective."  *Bendix Corp. v. Adams*, 610 P.2d

24, 31 (Alaska 1980); *RAN Corp.,* 823 P.2d at 649.  Thus, a defendant's interference with

existing or prospective economic relations is privileged when the defendant holds a "direct

financial interest" in the subject matter of the economic relations.  *See id.*.  Here, the Port

Authority has acknowledged that ExxonMobil, as a leaseholder, enjoys the right to drill, produce,

and market natural gas subject to its leases.  Compl. ¶ 106.  As recognized in *RAN Corp.,*

ExxonMobil is entitled to advance and protect its leasehold interests, and its alleged decision not

to sell those interests to the Port Authority is immune, as a matter of law, from tort liability.  823

P.2d at 650 (conduct "privileged from a tort standpoint because of [leaseholder's] pre-existing

interest as a property owner/lessor").

## IV.    THE PORT AUTHORITY LACKS AUTHORITY TO PROSECUTE THIS ACTION AS A MATTER OF STATE LAW

Apart from the Port Authority's failure to plead viable claims for relief, its action must

also fail because it lacks authorization, as a matter of state law, to prosecute these claims.

Questions involving state-law constraints on the actions of political subdivisions of the states are

ordinarily decided by state courts.  But, when properly presented with such issues, federal courts

apply state-law preemption doctrine as they would any other state rule of decision.  In *City of

Auburn v. Qwest Corp.*, 260 F.3d 1160 (9th Cir. 2001), for example, the Ninth Circuit ruled that

municipal licensing and franchise ordinances purporting to require telecommunications providers

to obtain local as well as territorial franchise rights for wireline facilities were preempted under

Washington law.  *Id.* at 1174; *accord Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104,

1107 (9th Cir. 1999) (applying general principle that "political subdivisions," like municipalities,

lack "standing in the federal courts to attack state legislation as violative of the federal

Constitution, on the ground that they have no rights against the state of which they are a

creature.") (internal quotation omitted).[28]  Here, Alaska preemption doctrine requires dismissal because the Port Authority's filing of this action contravenes the express preemption provision of the Stranded Gas Development Act and impermissibly interferes with the operation of that Act and other state statutes governing the development of gas resources.

A.     **State-Law Preemption Constrains the Actions of Political Subdivisions of the State of Alaska**

Political subdivisions of the State of Alaska are creatures of state law and bound by its strictures.  *See Allstate Ins. Co. v. Municipality of Anchorage*, 599 P.2d 140, 143 (Alaska 1979) ("It is clear that the powers and duties of the [Anchorage Equal Rights] Commission, as an agency of municipal government, are limited by the restrictions on the general powers of a municipality."); *Univ. of Alaska v. Nat'l Aircraft Leasing, Ltd.,* 536 P.2d 121, 127 (Alaska 1975) ("a municipal corporation, however independent it may be under its charter, is an agency of [local] government for the accomplishment of local purposes" (quoting *State ex rel. Univ. of Minn. v. Chase*, 220 N.W. 951 (Minn. 1928)).  Alaska preemption principles are most commonly applied to municipalities.  *E.g.*, *Simpson v. Municipality of Anchorage*, 635 P.2d 1197, 1200 (Alaska Ct. App. 1981) (home rule municipality could not enact drunk driving ordinance inconsistent with state law).  They are equally applicable, however, to other political subdivisions.  *See Allstate*, 599 P.2d at 143; *Brown v. Wood*, 575 P.2d 760, 766 (Alaska 1978)

---

[28]  *See also, e.g., Terrabonne Parish School Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 878-83 (5th Cir. 2002) (dismissing School Board's state-law tort claims as time-barred; state Constitution did not extend to political subdivisions the privileged treatment accorded to the State as civil plaintiff); *City of Phil. v. Beretta U.S.A. Corp.*, 126 F. Supp. 2d 882, 889-90, 894-95 (E.D. Pa. 2000) (municipality's action in filing lawsuit preempted by state statutes barring municipal efforts to regulate firearms and to recoup expenditures on law enforcement and health services), *aff'd on other grounds,* 77 F.3d 415 (3d Cir. 2002).

(although structured as separate corporate entity, state university functions as instrumentality of the state to carry out prescribed public purposes).

The Port Authority is one such political subdivision of the State of Alaska. It derives its powers – including, most notably, its authority to file suit – from municipal ordinances enacted pursuant the Municipal Port Authority Act. Each of the municipal ordinances that created the Port Authority contains a "sue and be sued" clause identical to the corresponding provision of the Port Authority Act.[29]

The Alaska Supreme Court has held that preemption principles prohibit the State's political subdivisions from taking action that (1) contravenes "an express legislative direction"; (2) places the subdivision in "direct conflict with a [state] statute"; or (3) "substantially interferes with the effective functioning of a state statute or regulation or its underlying purpose." *Liberati v. Bristol Bay Borough*, 584 P.2d 1115, 1122 (Alaska 1978); *accord McCormick v. City of Dillingham*, 16 P.3d 735, 740-41 (Alaska 2001); *Kotzebue Lions Club v. City of Kotzebue*, 955 P.2d 921, 922 (Alaska 1998). The Alaska courts subject municipal action to especially searching review where the legislature has expressly provided that state law preempts conflicting municipal action. *See Simpson,* 635 P.2d at 1200 (state-law preemption of drunk driving ordinance). In determining whether municipal action is fatally inconsistent with state law, Alaska courts give special weight to the need for uniformity in areas pervasively regulated at the state level. *Id.* at 1203; *Municipality of Anchorage v. Repasky*, 34 P.3d 302, 311 (Alaska 2001) (when operating in a field "subject to 'pervasive' state control," preemption principles "preclude[ ] even home rule municipalities from acting unless they [are] exercising power delegated by the legislature").

---

[29]   *Compare* North Slope Borough, Alaska, Code of Ordinances § 4.01.060(1) (1999); Fairbanks North Star Borough, Alaska, Ordinance No. 99-059 § 6(1) (1999); and City of Valdez, Alaska, Ordinance No. 99-11 § 6(1) (1999), *with* AS 29.35.620(1).

**B.    The Port Authority's Attempt to Prosecute this Lawsuit Is Preempted by the Stranded Gas Development Act**

In crafting the Stranded Gas Development Act's carefully articulated mechanisms for encouraging new investment to develop the State's stranded gas resources, the Alaska legislature expressly addressed the relationship between the Act and existing state law.  In particular, the legislature directed that the Act should take precedence over other state law, stating that "if a provision of this chapter conflicts with another provision of state or municipal law, the provision of this chapter governs."  Alaska Stat. § 43.82.600.  The legislative history underscores the legislature's understanding that this provision would establish new "rules of the game" for stranded gas pipeline projects, in part by barring inconsistent municipal enactments.[30]

The legislature's decision that the Act must take precedence over other state and municipal laws followed naturally from the Act's purposes and structure.  The Act grew out of legislative findings that "a vast quantity of gas in Alaska [including North Slope gas] is stranded from commercial development" (1998 SLA ch. 104, Findings, § 1); that long-term certainty concerning levels of state and municipal taxation is necessary for development of any project to bring the stranded gas to market (*id.* §§ 8-15); and that "stranded gas development projects are a matter of statewide interest because they are an important potential source of revenue to the state,

---

[30] During a hearing on the House Bill that became the Stranded Gas Act, a legislator asked the State Commissioner of Revenue whether this preemption language was "fairly standard," and received the following response:

Commissioner Condon:  *"Yes.  If you're passing a piece of legislation that you want to establish the rules of the game, you want to make sure there isn't something that's gonna come in from a* [indistinct] *that will change those rules."*

*Stranded Gas Act Hearings of 1998:  Hearing on H.B. 393 Before the House Resources Standing Committee,* 20th Legislature, 2d Session (Mar. 26, 1998) (statement of Wilson Condon, Commissioner, Alaska Department of Revenue, responding to question from Rep. Scott Ogan, Co-Chair House Resources Standing Committee) (emphasis added).

job opportunities for the people of the state, and gas use for communities through out the state" (*id.* § 16).  In keeping with these findings, the Act's provisions are designed to "encourage new investment to develop the state's stranded gas resources" by allowing the state-law "fiscal terms" applicable to a qualifying project "to be tailored to the particular economic conditions of the project" and specified in advance of project construction "with as much certainty as the Constitution of the State of Alaska allows."  Alaska Stat. § 43.82.010(1)-(2).

To advance these critical statewide objectives, the Alaska legislature established an elaborate process for the formulation and implementation of project-specific fiscal terms.  The first step involves the negotiation of reductions in revenues that Alaska and its municipalities would otherwise receive from a gas pipeline project.  The Act calls upon the Alaska Commissioners of Revenue and Natural Resources to negotiate tax and royalty rates with qualified project sponsors.  Alaska Stat. § 43.82.110, .130, .200-220.  This authority extends to the formulation of proposals for qualified project sponsors to pay pre-set fees in lieu of otherwise applicable municipal taxes, although the Act prescribes special procedures and standards for the determination of payments in lieu of taxes to affected municipalities.  AS 43.82.500-.520.  The endpoint of the Commissioners' work is a proposed contract specifying state tax and royalty treatment of a qualifying stranded gas project.  No such contract can take effect, however, until it has been subject to public notice-and-comment, Alaska Stat. § 43.82.410, and approved by the state legislature, Alaska Stat. § 43.82.435.  *See also* Alaska Stat. § 43.82.440 (providing for judicial review of constitutional challenges to legislative authorization and challenges to enforceability of final contracts).

Under applicable preemption principles, this lawsuit is precluded because it violates the terms of the Act and, alternatively, because it prevents the Act from operating in a manner that will achieve its intended purposes.

### 1. The Port Authority's Prosecution of this Action Contravenes Section 43.82.600 of the Stranded Gas Act

The Stranded Gas Act's express preemption provision, Alaska Stat. § 43.82.600, ensures that the Act's provisions take precedence over any conflicting "state or municipal law." The body of subordinated state and municipal law includes the earlier, more general provisions of the Municipal Port Authority Act of 1992[31] and municipal ordinances enacted pursuant to that Act. In filing this lawsuit, however, the Port Authority has invoked powers purportedly granted by its foundational statute and municipal ordinances to take action that conflicts with the Stranded Gas Act. In particular, the Port Authority has invoked an unrestrained – and consequently unsustainable – view of its "sue and be sued" authority to file a lawsuit that will prevent the Stranded Gas Act from operating in the manner that the Alaska Legislature intended.

The Stranded Gas Act, as shown in the summary above, provides a carefully crafted mechanism for the elimination of state-related financial obstacles to gas development that, in the judgment of the Alaska legislature, had caused North Slope gas to be economically "stranded."[32] The Port Authority acknowledges that it has "filed an application with the State under the

---

[31] The Municipal Port Authority Act provides generally for the organization of port authorities, without any special focus on natural gas pipelines or facilities. *See* Alaska Stat. § 29.35.605(a)(1) (authorizing governing bodies of municipalities to "create by ordinance a port authority as a public corporation of the municipality").

[32] The Alaska legislature's determination that North Slope gas is stranded – *viz.*, not economically recoverable under current law without the cost savings and added certainty that the Stranded Gas Act is intended to provide – contradicts the Port Authority's central premise that defendants are simply unwilling to develop the gas S*ee* Compl. ¶¶ 118-33. If the gas is stranded, as the legislature has determined, there is no existing market for the transportation or sale of such gas.

Stranded Gas Act," that two other applications are currently pending, and that the Authority is

"currently in negotiations with the Governor regarding its proposal." Compl. ¶ 96. In the Port

Authority's view, however, its authority to litigate, conferred by municipal ordinances enacted

under the Port Authority Act, allows it to play a double game – to seek whatever advantage it

may obtain under the Stranded Gas Act process while simultaneously prosecuting a federal

lawsuit for relief that would severely distort that process.

The threat that this lawsuit poses to the proper operation of the Stranded Gas Act is

apparent on the face of the Port Authority's Complaint. The Complaint seeks injunctive relief

"to restrain Defendants' continuing violations" of section 7 of the Clayton Act and sections 1 and

2 of the Sherman Act. *Id.* Prayer for Relief, ¶ D. Although the Complaint does not specify the

scope of the desired injunction, the Authority evidently seeks an order requiring the defendants

to sell it North Slope gas. *See id.* ¶¶ 26, 100 (alleging that defendants have excluded Authority

"from the gas transport market on the North Slope" and that "Defendants' concerted refusal to

supply natural gas" represents the "only impediment to the Authority's plan"). Such an order

would upend the Stranded Gas Act process, which presumes that Alaska officials will be able to

evaluate the economics of competing pipeline projects by comparing costs and contractual

commitments. Indeed, the pendency of a lawsuit seeking such an order, by itself, has the

potential to distort the Stranded Gas Act process by adding enormous uncertainty to the

projections that the Act requires state officials and legislators to make in setting the fiscal terms

for competing stranded gas development projects.

> **2.** **The Port Authority's Prosecution of this Lawsuit Interferes with the
> Effective Functioning of the Stranded Gas Act**

Even if the Alaska legislature had not specifically mandated that the Stranded Gas Act's

provisions take precedence over inconsistent provisions of state and municipal law, the Port

Authority's expansive interpretation of its "sue and be sued" authority still would be foreclosed. That interpretation, the necessary predicate for the filing of this lawsuit, impermissibly interferes with the operation of the Stranded Gas Act, for the reasons described above.  In addition, to the extent that this lawsuit seeks to challenge the State's administration of natural gas leases, including its authority to review and approve unitization and unit agreements (*see* Compl. ¶¶ 58-64), it also threatens impermissible interference with the intended operation of the State's oil and gas lease management authorities (*e.g.,* Alaska Stat. § 38.05.180), and associated judicial review authorities.  *See also* Alaska Stat. § 43.82.220 (Stranded Gas Act royalty provisions, which presume continued operation of Title 38 authorities).

## CONCLUSION

The Complaint should be dismissed with prejudice.

DATED at Anchorage, Alaska this 8th  day of February, 2006.

s/Douglas J. Serdahely
Douglas J. Serdahely
PATTON BOGGS LLP
601 West Fifth Avenue, Suite 700
Anchorage, Alaska  99501
Phone: (907) 263-6310
Fax:  (907) 263-6345
Email:  dserdahely@pattonboggs.com
Alaska Bar No. 7210072

49

## CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of February, 2006, a copy of the foregoing document to be served electronically on the following:

**Kevin Barry**
kbarry@bsfllp.com
skalas@bsfllp.com

**Kenneth F. Rossman, IV**
krossman@bsfllp.com
sphan@bsfllp.com

**William M. Walker**
bill-wwa@ak.net
shelley-wwa@ak.net
karen-wwa@ak.net

**John F. Cove, Jr**
jcove@bsfllp.com

**Jeffrey M. Feldman**
feldman@frozenlaw.com
carper@frozenlaw.com
anderson@frozenlaw.com

and served on the following via ☑US Mail  ☐Fax  ☐ Hand-Delivery

**Charles E. Cole**
Law Office of Charles Cole
406 Cushman Street
Fairbanks, AK 99701

**Bradley S. McKim**
BP Exploration (Alaska), Inc.
900 East Benson Boulevard
PO Box 196612
Anchorage, AK 99519-6612

**Ronald C. Redcay**
Matthew T. Heartney
Angel L. Tang
ARNOLD & PORTER LLP
777 South Figueroa Street, 44th Floor
Los Angeles, CA 90017-5844

By:     s/Nina E. Bingham
        Nina E. Bingham, Legal Secretary
        PATTON BOGGS LLP

*ALASKA GASLINE PORT AUTHORITY V. EXXON MOBIL CORP., No.4:05-cv-00026-RRB*

47282v1