David Boies
Robert Silver
**BOIES, SCHILLER & FLEXNER LLP**
333 Main Street, Armonk, NY 10504
914.749.8200; 914.749.8300 (fax)
dboies@bsfllp.com; rsilver@bsfllp.com

John F. Cove, Jr.
Kenneth F. Rossman IV
**BOIES, SCHILLER & FLEXNER LLP**
1999 Harrison St., Suite 900, Oakland, CA 94612
510.874.1000; 510.874.1460 (fax)
jcove@bsfllp.com; krossman@bsfllp.com

| | |
|---|---|
| William M. Walker (SBN 8310155) | Charles E. Cole (SBN 5503004) |
| **WALKER & LEVESQUE, LLC** | **LAW OFFICES OF CHARLES E. COLE** |
| 731 N Street, Anchorage, AK 99501 | 406 Cushman Street, Fairbanks, AK 99701 |
| 907.278.7000; 907.278.7001 (fax) | 907.452.1124; 907.456.2523 (fax) |
| bill-wwa@ak.net | colelaw@att.net |

*Counsel for Plaintiff Alaska Gasline Port Authority*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE ALASKA GASLINE PORT AUTHORITY, <br><br> Plaintiff, <br><br> v. <br><br> EXXONMOBIL CORPORATION, a New Jersey corporation; EXXONMOBIL ALASKA PRODUCTION, INC., a Delaware corporation; BP P.L.C., a United Kingdom corporation; and BP EXPLORATION (ALASKA) INC., a Delaware corporation, <br><br> Defendants. | CASE NO.: 4:05-cv-00026-RRB <br><br><br> **CONSOLIDATED OPPOSITION OF ALASKA GASLINE PORT AUTHORITY TO MOTIONS TO DISMISS OF EXXON MOBIL CORPORATION AND EXXON MOBIL ALASKA PRODUCTION, INC. (#33), BP P.L.C. (#44), AND BP EXPLORATION (ALASKA) INC. (#30)** |

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................... v

PRELIMINARY STATEMENT ............................................................................ 1

FACTUAL BACKGROUND .................................................................................. 6

   I.   The Port Authority And Its Proposal To Construct A Natural Gas Pipeline System. ........ 6

      A.   The Port Authority's comprehensive gas pipeline plan. ................................................. 6

      B.   The Port Authority's agreements with necessary third parties. ..................................... 6

      C.   The Port Authority's financing arrangements. ............................................................... 8

      D.   Defendants' refusal to supply natural gas. .................................................................... 8

   II.   Defendants' Anticompetitive Conduct. .......................................................................... 9

      A.   Defendants' efforts to block construction of a gas pipeline. ........................................ 9

      B.   Defendants' anticompetitive agreements. ..................................................................... 9

      C.   Defendants' failure to develop and market North Slope natural gas. ............................ 10

      D.   Defendants' anticompetitive mergers. .......................................................................... 11

   III.   Defendants Possess Market Power In The Relevant Markets. ....................................... 11

   IV.   The Anticompetitive Effects Of Defendants' Unlawful Conduct. ................................. 12

ARGUMENT ........................................................................................................ 13

   I.   The Port Authority Satisfied The Rule 8 Notice Pleading Standard. ............................. 13

   II.   The Complaint States Federal Antitrust Claims. ........................................................... 14

      A.   The Complaint alleges antitrust standing. ..................................................................... 14

         1.   Legal standard. ......................................................................................................... 15

         2.   The preparedness inquiry is factually complex and inappropriate for resolution on a motion to dismiss. ........................................................................ 15

         3.   Standing will be found where a defendant's anticompetitive conduct renders further efforts to prepare futile. .............................................................. 17

         4.   The Complaint supports all four factors of the preparedness analysis. ................... 19

            a)   In the six years it has worked to construct a pipeline, the Port Authority has taken meaningful affirmative steps to enter the market. ................................ 19

i

*Alaska Gasline Port Authority v. ExxonMobil Corp., et al.*, No. 4:05-cv-00026-RRB

b)    Through contracts and relationships with major private corporations, the Port Authority has the necessary background and experience and has taken the necessary steps to enter the business. ................................................... 20

c)    The Complaint shows the Port Authority can finance the project. ...................... 22

    i.    Because the pipeline would be robustly profitable, obtaining financing is highly likely............................................................................ 22

    ii.    Attempting to obtain binding financing commitments without a commitment of gas would be futile. ................................................. 23

B.    The Port Authority provides sufficient factual allegations about the conspiracy to state claims under Sections 1 and 2 of the Sherman Act. ...........................................25

C.    The Port Authority pleads the relevant markets for the transportation and purchase    of North Slope natural gas. ..........................................................................29

    1.    The Port Authority's conspiracy claims do not require allegations of a relevant market.................................................................................... 29

    a)    The Port Authority's First and Second Claims do not require allegations of a relevant market. ....................................................... 30

    b)    The Port Authority's conspiracy to monopolize claim does not require allegations of a relevant market. ......................................... 31

    c)    Under a rule of reason analysis, evidence of adverse anticompetitive effect can eliminate the need for market definition. ......................................... 32

    2.    The Complaint properly pleads relevant markets affected by Defendants' illegal conduct............................................................................... 32

    a)    Market definition is question of fact that should not be resolved on a motion to dismiss. ...................................................................... 33

    b)    The Complaint properly defines relevant markets.................................. 34

    c)    Downstream markets for the sale of natural gas are not inconsistent with upstream markets for the purchase and transport of North Slope gas. ................. 35

    d)    Current transactions are not necessary to define a relevant market for antitrust purposes. ..................................................................... 36

    e)    Defendants' authorities do not support their argument........................................ 38

D.    The Port Authority's Attempted Monopolization Claim is sufficient as a matter of law and is supported by factual allegations. .........................................................40

    1.    The Port Authority properly alleges that Defendants unlawfully attempted to monopolize in violation of Section 2 of the Sherman Act, not that they "conspired to attempt" to monopolize. ...................................................................... 41

ii

2.    The Port Authority alleges facts establishing a dangerous probability that Defendants will monopolize North Slope natural gas markets.................................. 42

E.    The Complaint states a Section 7 claim. ........................................................................44

1.    Resolution of Defendants' arguments that Section 7 claims are untimely is not proper at this stage of the case. ................................................................... 45

a)    Application of the statute of limitations is premature............................................ 45

b)    Application of the doctrine of laches is premature. ............................................. 47

2.    The Complaint states a Section 7 claim against each Defendant............................ 48

III.    The Complaint States Claims Under Alaska Law. ...................................................... 52

A.    The Port Authority's Tortious Interference with Prospective Business Opportunity claim is sufficient under Alaska law. .............................................................................52

1.    The Port Authority adequately alleges facts showing an existing prospective business relationship with the State of Alaska, Sempra, and others.......................... 52

2.    The Port Authority adequately alleges that Defendants' anticompetitive conduct and intentional interference lack justification or privilege........................... 53

B.    The Port Authority properly pleads an Unfair Trade Practices and Consumer Protection Act claim. .....................................................................................................55

C.    The Port Authority adequately alleges BP breached its contractual obligation to negotiate in good faith arising from the Charter for Development of the Alaska North Slope. ....................................................................................................................55

1.    BP's improper conduct predated any contractual deadline....................................... 55

2.    The Port Authority is an intended third-party beneficiary of the Charter................. 56

IV.    Defendants' Other Arguments Provide No Support For Dismissal Of Plaintiff's Claims. ......................................................................................................... 58

A.    The Port Authority is authorized to bring this lawsuit, which is not preempted by the Stranded Gas Development Act.........................................................................58

1.    This lawsuit is consistent with the Stranded Gas Development Act. ....................... 58

2.    The Port Authority's lawsuit is not expressly preempted by the Stranded Gas Development Act. ................................................................................................. 60

3.    The Port Authority's lawsuit does not substantially interfere with the Stranded Gas Development Act or any other State act. ........................................................... 60

iii

B.   BP's Rule 12(b)(7) Motion to Dismiss for failure to join indispensable parties is entirely without merit...........................................................................................................61

CONCLUSION...........................................................................................................................63

*Alaska Gasline Port Authority v. ExxonMobil Corp., et al.*, No. 4:05-cv-00026-RRB

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Alabama v. Blue Bird Body Co.*,
  71 F.R.D. 606 (M.D. Ala. 1976) .......................................................................... 41

*American Needle, Inc. v. New Orleans La. Saints*,
  385 F. Supp. 2d 727 (D. Ill. 2005) ...................................................................... 35

*Amtrol, Inc. v. Vent-Rite Valve Corp.*,
  646 F. Supp. 1168 (D. Mass. 1986) ..................................................................... 14

*Anchorage v. Repasky*,
  34 P.3d 302 (Alaska 2001) ................................................................................... 61

*Andrx Pharm. v. Biovail Corp. Int'l*,
  256 F.3d 799 (D.C. Cir. 2001) ....................................................................... 16, 25

*Apartment Source of Pa., L.P. v. Philadelphia Newspapers, Inc.*,
  No. Civ. A. 98-5472, 1999 WL 349938 (E.D. Pa. May 21, 1999) .......................... 40

*Ashley Creek Phosphate Co. v. Chevron USA, Inc.*,
  315 F.3d 1245 (10th Cir. 2003) ........................................................................... 18

*Associated General Contractors of California v. California State Council of Carpenters*,
  459 U.S. 519 (1983) ............................................................................................ 16

*Aurora Enters., Inc. v. Nat'l Broad. Co., Inc.*,
  688 F.2d 689 (9th Cir. 1982) ............................................................................... 42

*Bendix Corp. v. Adams*,
  610 P.2d 24 (Alaska 1980) ................................................................................... 54

*Biagro Western Sales, Inc. v. Helena Chemical Co.*,
  160 F. Supp. 2d 1136 (E.D. Cal. 2001) ................................................................ 63

*Blanton v. Mobil Oil Corp.*,
  721 F.2d 1207 (9th Cir. 1983) ............................................................................. 33

*Blue Shield of Virginia v. McCready*,
  457 U.S. 465 (1982) ............................................................................................ 15

*Brett v. First Fed. Savings & Loan Ass'n.*,
  461 F.2d 1155 (5th Cir. 1972) ............................................................................. 28

v

*Brownlee v. Applied Biosystems Inc.*,
   No. C 88 20672 RPA, 1989 WL 53864 (N.D. Cal. Jan. 9, 1989)............................................ 37

*Calderone Enterprises Corp. v. United Artists Theatre Circuit, Inc.*,
   454 F.2d 1292 (2d Cir. 1971).................................................................................... 14

*California ex rel Lockyer v. Mirant Corp.*,
   266 F. Supp. 2d 1046 (N.D. Cal. 2003) ................................................. 48, 49, 50, 51

*California v. American Stores Co.*,
   495 U.S. 271 (1990)................................................................................................ 47

*Century Federal, Inc. v. City of Palo Alto*,
   579 F. Supp. 1553 (N.D. Cal. 1984) ...................................................................... 16

*City of Columbia v. Omni Outdoor Adver., Inc.*,
   499 U.S. 365 (1991)................................................................................................ 26

*City of Pittsburgh v. West Penn Power Co.*,
   147 F.3d 256 (3d Cir. 1988).................................................................................... 16

*Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*,
   690 F.2d 1240 (9th Cir. 1982) ................................................................................ 26

*Coastal Fuels Inc. v. Caribbean Petroleum Corp.*,
   79 F.3d 182 (1st Cir. 1996)..................................................................................... 35

*Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*,
   411 F.3d 1030 (9th Cir. 2005) ......................................................................... 42, 43

*Conley v. Gibson*,
   355 U.S. 41 (1957).................................................................................................. 13

*Consolidated Gas Co. v. City Gas Co.*,
   880 F.2d 297 (11th Cir. 1989) ............................................................................... 38

*Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co.*,
   99 F.3d 937 (9th Cir. 1996) .................................................................................... 26

*County of Monroe v. Consolidated Rail Corp.*,
   No. 83-0167, 1983 WL 1813 (M.D. Pa. Mar. 2, 1983) .......................................... 19

*Crucible, Inc. v. Stora Kopparbergs Bergslags AB*,
   701 F. Supp. 1157 (W.D. Pa. 1988)........................................................................ 40

*Danjaq v. Sony,*
    263 F.3d 942 (9th Cir. 2001) ................................................................... 48

*Destec Energy, Inc. v. So. Cal. Gas Co.,*
    5 F. Supp. 2d 433 (S.D. Tex. 1997) ......................................................... 35

*DM Research, Inc. v. College of Am. Pathologists,*
    170 F.3d 53 (1st Cir. 1999) ...................................................................... 28

*Earth Movers of Fairbanks, Inc. v. Alaska Dept. of Trans. & Pub. Facilities,*
    824 P.2d 715 (Alaska 1992) ..................................................................... 56

*Equifax, Inc. v. FTC,*
    618 F.2d 63 (9th Cir. 1980) ...................................................................... 50

*Estate Constr. Co. v. Miller & Smith Holding Co. Inc.,*
    14 F.3d 213 (4th Cir. 1994) ...................................................................... 28

*Fine v. Barry & Enright Prods.,*
    731 F.2d 1394 (9th Cir. 1984) .................................................................. 15

*Five Smiths, Inc. v. Nat'l Football League Players Ass'n,*
    788 F. Supp. 1042 (D. Minn. 1992) .......................................................... 28

*Fleer Corp. v. Topps Chewing Gum, Inc.,*
    415 F. Supp. 176 (E.D. Pa. 1976) ............................................................ 18

*Florida Seed Co. v. Monsanto Co.,*
    915 F. Supp. 1167 (M.D. Ala. 1995) ........................................................ 16

*Fragale & Sons Beverage Co. v. Dill,*
    760 F.2d 469 (3d Cir. 1985) ..................................................................... 30

*Fraser v. Major League Soccer,*
    284 F.3d 47 (1st Cir. 2002) ................................................................. 39, 50

*Freedom Holdings, Inc. v. Spitzer,*
    357 F.3d 205 (2d Cir. 2004) ..................................................................... 30

*FTC v. H.J. Heinz Co.,*
    246 F.3d 708 (D.C. Cir. 2001) .................................................................. 49

*FTC v. Indiana Fed'n of Dentists,*
    476 U.S. 447 (1986) ............................................................................ 32, 37

vii

*Gas Utilities. Co. of Alabama., Inc v. Southern Natural Gas Co.,*
 825 F. Supp. 1551 (N.D. Ala. 1992) ................................................................ 19, 44

*General Electric Co. v. Bucyrus-Erie Co.,*
 563 F. Supp. 970 (S.D.N.Y. 1983) ........................................................................ 43

*George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.,*
 554 F.2d 551 (2d Cir. 1977) ................................................................................... 14

*Gerlinger v. Amazon.Com, Inc.,*
 311 F. Supp. 2d 838 (N.D. Cal. 2004) ................................................................... 51

*Gilligan v. Jamco Dev. Corp.,*
 108 F.3d 246 (9th Cir. 1997). ................................................................................. 13

*Heerwagen v. Clear Channel Communs.,*
 435 F.3d 219 (2d Cir. 2006) ............................................................................ 32, 33

*Himschoot v. Dushi,*
 953 P.2d 507 (Alaska 1998) .................................................................................... 56

*Hosp. Bldg. Co. v. Trustees of Rex Hosp.,*
 425 U.S. 738 (1976) ......................................................................................... 14, 26

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.,*
 627 F.2d 919 (9th Cir. 1980) ............................................................... 13, 26, 29, 43

*Huron Valley Hosp., Inc. v. City of Pontiac,*
 666 F.2d 1029 (6th Cir. 1981) ............................................................................... 22

*Image Tech. Servs. v. Eastman Kodak Co.,*
 125 F.3d 1195 (9th Cir. 1997) ............................................................................... 33

*In re Airport Car Rental Antitrust Litig.,*
 474 F. Supp. 1072 (N.D. Cal. 1979) ..................................................................... 18

*In re Indep. Serv. Orgs. Antitrust Litig.,*
 964 F. Supp. 1454 (D. Kan. 1997) ........................................................................ 22

*In re Napster Copyright Litigation,*
 354 F. Supp. 2d 1113 (N.D. Cal. 2005) ................................................................. 16

*In re Visa Check/Mastermoney Antitrust Litigation,*
 No. 96-CV-5238 (JG), 2003 WL 1712568 (E.D.N.Y. Apr. 1, 2003) ..................... 42

viii

*Int'l Tel. & Telegraph Corp. v. Gen. Tel. & Electronics Corp.*,
   351 F. Supp. 1153 (D. Haw. 1972) ......................................................... 46

*Int'l Tel. & Telegraph Corp. v. Gen. Tel. & Electronics Corp.*,
   518 F.2d 913 (9th Cir. 1975) ............................................... 45, 46, 48

*Intellective, Inc. v. Mass. Mut. Life Ins. Co.*,
   190 F. Supp. 2d 600 (S.D.N.Y. 2002) .................................................. 42

*Int'l Boxing Club of N.Y., Inc. v. United States*,
   358 U.S. 242 (1959) ........................................................................... 33

*Invictus Records, Inc. v. American Broad. Co.*,
   98 F.R.D. 419 (E.D. Mich. 1982) ......................................................... 41

*Jablon v. Dean Witter & Co.*,
   614 F.2d 677 (9th Cir. 1980) .............................................................. 46

*Jayco Sys., Inc. v. Savin Bus. Machs. Corp.*,
   777 F.2d 306 (5th Cir. 1985) .............................................................. 19

*K & K Recycling, Inc. v. Alaska Gold Co.*,
   80 P.3d 702 (Alaska 2003) ........................................................... 52, 53

*Kotzebue Lions Club v. City of Kotzebue*,
   955 P.2d 921 (Alaska 1998) ............................................................... 61

*Lantec, Inc. v. Novell, Inc.*,
   306 F.3d 1003 (10th Cir. 2002) .......................................................... 31

*Les Shockley Racing v. Nat'l Hot Rod Ass'n*,
   884 F.2d 504 (9th Cir. 1989) .............................................................. 28

*Liberati v. Bristol Bay Borough*,
   584 P.2d 1115 (Alaska 1978) ......................................................... 60, 61

*Makah Indian Tribe v. Verity*,
   910 F.2d 555 (9th Cir. 1990) ......................................................... 62, 63

*McCormick v. Dillingham*,
   16 P.3d 735 (Alaska 2001) ................................................................ 61

*McKenzie-Willamette Hosp. v. Peacehealth*,
   No. Civ. 02-6032-HA, 2003 WL 23537980 (D. Or. Aug 15, 2003) ......................... 31

ix

*MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*,
    62 F.3d 967 (7th Cir. 1995) ......................................................... 33

*Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*,
    No. Civ.S-04-2728 (FCD), 2005 WL 2615523 (E.D. Cal. Oct. 14, 2005) .............. 44

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
    167 F.3d 439 (8th Cir. 1999) ................................................... 47, 51

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
    392 F.3d 265 (8th Cir. 2004) ...................................................... 45

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
    990 F. Supp. 1128 (D. Minn. 1998) ................................................ 46

*Midwestern Machinery Co. v. Northwest Airlines, Inc.*,
    No. Civ.97-1438 DWF/ABJ, 2003 WL 262414 (D. Minn. Feb. 5, 2003) .............. 47

*N. Pac. Ry. Co. v. United States*,
    356 U.S. 1 (1958) ................................................................ 30

*Nat'l Collegiate Athletic Ass'n v. Bd. Of Regents of the Univ. of Okla.*,
    468 U.S. 85 (1984) ............................................................... 30

*Newman v. Universal Pictures*,
    813 F.2d 1519 (9th Cir. 1987) .................................................... 13

*Nizinski v. Currington*,
    517 P.2d 754 (Alaska 1974) ....................................................... 55

*Norfolk Monument Co. v. Woodlawn Mem'l Gardens*,
    394 U.S. 700 (1969) .............................................................. 26

*Northwest Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985) .............................................................. 31

*Norville v. Carr-Gottstein Foods Co.*,
    84 P.3d 996 (Alaska 2004) ........................................................ 57

*Odom v. Fairbanks Mem'l Hosp.*,
    999 P.2d 123 (Alaska 2000) .............................................. 53, 54, 55

*Ostrofe v. H.S. Crocker Co.*,
    740 F.2d 739 (9th Cir. 1984) ............................................ 15, 18, 37

x

*Paladin Assocs. v. Montana Power Co.*,
  328 F.3d 1145 (9th Cir. 2003) ............................................................ 33, 34

*Pepsi Cola Bottling Co. of Anchorage v. New Hampshire Ins. Co.*,
  407 P.2d 1009 (Alaska 1965).............................................................. 57

*Pine Ridge Recycling, Inc. v. Butts County*,
  855 F. Supp. 1264 (M.D. Ga. 1994) ................................................... 21

*PPG Indus., Inc. v. Pilkington plc*,
  825 F. Supp. 1465 (D. Ariz. 1993) ..................................................... 44

*Radiant Burners, Inc. v. People's Gas Light & Coke Co.*,
  364 U.S. 656 (1961)............................................................................. 30

*RAN Corp. v. Hudesman*,
  823 P.2d 646 (Alaska 1991)................................................................ 54

*Rebel Oil Co. v. Atl. Richfield Co.*,
  51 F.3d 1421 (9th Cir. 1995) .............................................................. 36

*Rolite, Inc. v. Wheelabrator Envtl. Sys., Inc.*,
  958 F. Supp. 992 (E.D. Pa. 1997) ...................................................... 44

*Rutman Wine Co. v. E. & J. Gallo Winery*,
  829 F.2d 729 (9th Cir. 1987) .............................................................. 44

*SCFC ILC, Inc. v. Visa USA, Inc.*,
  801 F. Supp. 517 (D. Utah 1992)........................................................ 51

*Scheuer v. Rhodes*,
  416 U.S. 232 (1974)............................................................................. 13

*Schnabel v. Lui*,
  302 F.3d 1023 (9th Cir. 2002) ............................................................ 62

*SCM Corp. v. Xerox Corp.*,
  645 F.2d 1195 (2d Cir. 1981)................................................... 39, 40, 50

*Simpson v. Anchorage*,
  635 P.2d 1197 (Alaska App. 1981)..................................................... 60

*Sisters of Providence v. A.A. Pain Clinic, Inc.*,
  81 P.3d 989 (Alaska 2003).................................................................. 55

*Smalley v. Juneau Clinic Bldg. Corp.*,
  493 P.2 1296 (1972) ........................................................................ 58

*Solinger v. A & M Records*,
  586 F.2d 1304 (9th Cir. 1978) ......................................................... 16

*Sourdough Dev. Serv., Inc. v. Riley*,
  85 P.3d 463 (Alaska 2004) ............................................................... 57

*Southern Concrete Co. v. United States Steel Corp.*,
  394 F. Supp. 362 (N.D. Ga. 1975) .................................................... 41

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) .............................................................. 41, 42, 44

*Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*,
  940 F. Supp. 1026 (E.D. Tex. 1996) ................................................. 27

*Stewart-Smith Haidinger, Inc. v. Avi-Truck, Inc.*,
  682 P.2d 1108 (Alaska 1984) ........................................................... 56

*Supermail Cargo, Inc. v. United States*,
  68 F.3d 1204 (9th Cir. 1995) ........................................................... 46

*Telecor Communs., Inc. v. Southwestern Bell Tel. Co.*,
  305 F.3d 1124 (10th Cir. 2002) .................................................. 32, 35

*Thompson v. Metro. Multi-List, Inc.*,
  934 F.2d 1566 (11th Cir. 1991) ....................................................... 17

*Todd v. Exxon Corp.*,
  271 F.3d 191 (2d Cir. 2001) ............................................................ 33

*Tose v. First Pennsylvania Bank*,
  492 F. Supp. 246 (E.D. Pa. 1980) .................................................... 23

*TV Signal Co. v. AT&T*,
  617 F.2d 1302 (8th Cir. 1980) ......................................................... 30

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
  676 F.2d 1291 (9th Cir. 1982) .................................................... 33, 44

*Twombly v. Bell Atl. Corp.*,
  425 F.3d 99 (2d Cir. 2005) ...................................................... passim

xii

*United States v. E.I. DuPont deNemours & Co.,*
   353 U.S. 586 (1957) ........................................................................................ 48

*United States v. Andreas,*
   216 F.3d 645 (7th Cir. 2000) ......................................................................... 30

*United States v. Enova Corp.,*
   107 F. Supp. 2d 10 (D.D.C. 2000) ................................................................. 35

*United States v. ITT Continental Baking Co.,*
   420 U.S. 223 (1975) .................................................................................. 50, 51

*United States v. Topco Assocs., Inc.,*
   405 U.S. 596 (1972) ........................................................................................ 30

*Usher v. City of Los Angeles,*
   828 F.2d 556 (9th Cir. 1987) ......................................................................... 13

*Utah Gas Pipelines Corp. v. El Paso Natural Gas Co.,*
   233 F. Supp. 955 (D. Utah 1964) ................................................................... 17

*Washington Alder LLC v. Weyerhaeuser Co.,*
   No. CV 03-753-PA, 2004 WL 1119822 (D. Or. May 19, 2004) .................... 35

*Welch v. American Psychoanalytic Ass'n,*
   No. 85 Civ. 1651 (JFK), 1986 WL 4537 (S.D.N.Y. Apr. 4, 1986) ............... 43

*Windy City Circulating Co. v. Charles Levy Circulating Co.,*
   550 F. Supp. 960 (N.D. Ill. 1982) ................................................................. 41

*Woods Exploration & Producing Co. v. Aluminum Co. of America,*
   438 F.2d 1286 (5th Cir. 1971) .................................................................. 20, 25

*Xechem, Inc. v. Bristol-Myers Squibb Co.,*
   274 F. Supp. 2d 937 (N.D. Ill. 2003) ............................................................ 16

*Xechem, Inc. v. Bristol-Myers Squibb Co.,*
   372 F.3d 899 (7th Cir. 2004) .................................................................... 16, 25

## Statutes

15 U.S.C. § 18 .............................................................................................. 45, 48

15 U.S.C. § 720n ..................................................................................... 8, 22, 24

AS 29.35.400 ...................................................................................................... 59

AS 43.82.010 ................................................................................................ 59

AS 43.82.020 ................................................................................................ 59

**Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................. 13, 16, 25, 49

Fed. R. Civ. P. 12(b)(7) ...................................................................... 61, 62, 63

Fed. R. Civ. P. 19 ................................................................................ 61, 62, 63

**Treatises**

2 P. Areeda & D. Turner, *Antitrust Law* § 335c ........................................ 14

**Constitutional Provisions**

A.K. Const. art. X, § 1 .................................................................................. 59

**Other Authorities**

U.S. Dept. of Justice & FTC, Antitrust Guidelines for the Licensing of
    Intellectual Property § 3.2.3 (April 6, 1995) ........................................... 37

*Alaska Gasline Port Authority v. ExxonMobil Corp., et al.*, No. 4:05-cv-00026-RRB

Plaintiff Alaska Gasline Port Authority ("Port Authority") respectfully submits this Consolidated Opposition to the motions of Defendants ExxonMobil Corporation and ExxonMobil Alaska Production, Inc. (collectively "ExxonMobil") and BP p.l.c. and BP Exploration (Alaska) Inc. (collectively "BP") to dismiss this Complaint. [1]

## PRELIMINARY STATEMENT

As is plain from its face, the Complaint provides much more than Rule 8 requires in stating proper bases for its claims. In moving to dismiss, Defendants make two basic errors, each of which is independently sufficient to require that their motions be denied. First, Defendants disregard the Rule 12(b)(6) standard that governs their motions and repeatedly ask the Court both to ignore facts alleged and to find facts not alleged. Second, Defendants repeatedly assert legal propositions so sweeping and radical that they would simply place Defendants' conduct – no matter how collusive and anticompetitive – beyond the reach of antitrust law. In effect, Defendants assert that their very success in undermining competition and consumer welfare justifies the unprecedented immunity their motions demand. The Court should reject Defendants' request to be rewarded for the success of their misconduct, deny the motions, and move this case expeditiously forward to the factual development necessary to resolve the claims at issue.

The Complaint alleges that ExxonMobil and BP, the world's two largest energy companies, own over two-thirds of the proved natural gas resources on Alaska's North Slope and control the development of almost all of the known North Slope gas resources they do not own.

---

[1] In this Consolidated Opposition, references to the memorandum filed by ExxonMobil Corporation and ExxonMobil Alaska Production Inc. (Docket #34) use the form "XOM Memo." and references to the memorandum filed by BP Exploration (Alaska) Inc. and BP p.l.c. (Docket #31) use the form "BP Memo." The Port Authority attempts to address all arguments raised by the Defendants and expressly opposes all grounds for dismissal.

1

Although vast natural gas resources exist beneath the North Slope, and although Defendants cannot avoid extracting gas as they extract oil – they currently extract and re-inject approximately eight billion cubic feet of natural gas per day – Defendants have agreed not to market any North Slope natural gas.  The Complaint alleges that Defendants colluded not only with regard to individual units but across the entire North Slope.  Their agreements to withhold sorely needed Alaska natural gas from domestic markets in Alaska and the rest of the United States have resulted and will continue to result in artificially high prices for consumers and higher profits for Defendants – each of which has recently reported record profits.  These collusive agreements have also injured the Port Authority by foreclosing its opportunity to build an independent pipeline and to purchase and sell natural gas.

Bringing North Slope natural gas to market would result in significant benefits for consumers and businesses in Alaska and throughout the United States.  Natural gas from the North Slope could moderate the steady climb in natural gas prices by supplying at least four to six billion cubic feet per day (equivalent to approximately seven to ten percent of current natural gas consumption in the United States) for at least the next 35 years, but only if there were a pipeline system to transport this gas to market.  Over the years, several well-qualified firms, including the Port Authority, have labored to develop just such a pipeline to free the gas on the North Slope and bring it to market.  These efforts have been repeatedly thwarted by Defendants' concerted refusal to deal.  At the same time, the companies have increased their market power by a series of anticompetitive mergers and acquisitions.  Defendants have made it abundantly clear that together they have both the power and the intent to prevent a competitive pipeline from being built.  As ExxonMobil's CEO Lee Raymond bluntly stated when discussing an Alaska natural gas pipeline:

> Then you have these competing pipeline proposals, which is fine if that's what you want to do. But the reality is, nobody is going to build a pipeline without the producers. You and I know how pipelines get built. The pipeline goes to the bank. The guy at the bank says, what are you going to put in your pipeline. Gas. Do you own the gas. No, I don't own the gas. Well, who does own the gas, and do you have a commitment from them that they are going to put it through the pipeline? Well, no, we don't have that. Then I don't think I'm going to give you much money to build a pipeline.

In furtherance of their scheme, Defendants have jointly refused to negotiate in good faith with any pipeline sponsor. Instead, by eliminating competition that could threaten their control over the development, marketing, and pricing of natural gas, Defendants have jointly used their North Slope holdings to prevent the free market from responding to the increased demand for natural gas, to block development and marketing of Alaska's North Slope gas, and to derail any competitive gas pipeline, including that of the Port Authority.

The Port Authority, which was created in 1999 to build a gas pipeline system to transport natural gas from the North Slope to Valdez for liquefaction and shipping, has been injured by Defendants' illegal conduct. The Port Authority has developed or acquired the rights to significant senior permits, engineering studies, cost estimates, and plans necessary to build a natural gas pipeline. It has worked with the world's leading pipeline construction company, Bechtel Corporation, and a number of other leaders in their respective fields. Its pipeline will have a robust level of profitability and cash flow, even under the most pessimistic price scenarios. In addition, it has approximately $18 billion in federal loan guarantees available for the project. At this point, it requires only one significant element to commence the pipeline project: a commitment by Defendants to sell the North Slope natural gas that they are already obligated to develop under their leases.

3

Last year, the Port Authority made a detailed offer to Defendants to purchase North Slope gas and transport it to market. Despite repeated efforts by the Port Authority, Defendants refused to discuss prices or terms regarding the sale of gas. The offer remains open, but Defendants have refused to engage in good faith negotiations in an effort to kill the proposal.

Defendants' conduct with respect to Alaska North Slope natural gas is part of a pattern of manipulating and constricting supply in order to raise prices and increase their control of relevant markets. For example, in the mid-90s, BP sold Alaska oil in Asia at prices lower than it could have gotten in the U.S. in order to tighten U.S. oil supplies and raise the price of crude shipped to refineries in California and Washington State. This scheme was set out in a June 2, 1995 email exchange between BP managers, in which they discussed "shorting the West Coast market" to achieve "West Coast price uplift scenarios" and "leverage up" prices. In the email, one of the managers stated: "Even if [Far East] netback is slightly below [West Coast] netback, we may choose to export some to [the Far East] in order to 'leverage up' our [West Coast Alaska North Slope crude] prices." BP's conduct resulted in artificially high prices at the pump for gasoline across the West Coast. Here, Defendants' joint refusal to deal with the Port Authority has similarly resulted in artificially high prices to consumers.

Defendants attempt to deflect attention from their unlawful conduct by attacking the Port Authority and suggesting that the lawsuit is politically motivated. These arguments are an exercise in misdirection. The Complaint clearly states serious claims under well-accepted antitrust principles. Defendants' attempts to argue otherwise by ignoring the facts alleged are improper on a motion to dismiss.

Defendants' motions to dismiss also attempt to turn their success in enforcing their illegal cartel into a virtue, arguing that because they have successfully prevented gas from being

4

brought to market off the North Slope, the Port Authority cannot have standing, and that markets described in the Complaint – markets entirely foreclosed by their anticompetitive conduct – do not exist.  Similarly, Defendants argue that the Port Authority's claims are premature because it has not demonstrated preparedness, while at the same time arguing that its Section 7 claims are barred as untimely.  Defendants' arguments, if accepted, would immunize any cartel that was entirely successful in withholding the supply of any good and are contrary to law and common sense.

Finally, Defendants' attempts to use the Stranded Gas Development Act to preempt this litigation are disingenuous at best.  Having successfully demanded and negotiated enormous financial concessions under the SGDA from the State as a reward for suppressing output over the course of decades, Defendants now seek to use the Act to immunize their illegal conduct.  The Legislature passed the Act in response to years of inactivity in bringing North Slope gas to market in the hope that providing additional inducements, including tax breaks and royalty concessions, would encourage the development and marketing of stranded gas.  The SGDA was never intended to be the exclusive means for development of a natural gas pipeline, and it was certainly not intended to immunize Defendants from scrutiny under the federal antitrust laws.  The notion that the Port Authority cannot be a competitor because it is not seeking tax concessions from the State under the Act is dead wrong.  The Act does nothing to insulate Defendants from their joint illegal conduct.

In short, if the facts alleged in the Complaint are proven at trial, there is no question that antitrust liability will attach.  This Court should deny the motions to dismiss.

## FACTUAL BACKGROUND

**I.    The Port Authority And Its Proposal To Construct A Natural Gas Pipeline System.**

**A.    The Port Authority's comprehensive gas pipeline plan.**

The Port Authority, a political subdivision of the State of Alaska, was created in 1999 under Alaska Statutes 29.35.600-29.35.730 to construct a gas pipeline system from Alaska's North Slope to the port at Valdez.  (Compl. ¶¶ 35, 82.)  Pursuant to this mandate, the Port Authority has developed and begun to implement a detailed plan to construct a natural gas pipeline from the North Slope to Valdez.  (*Id.* ¶¶ 83-84, 86, 92-94, 98-99.)  The Port Authority will build a 48-inch, buried pipeline running parallel to TAPS from Prudhoe Bay to Valdez, where it will construct and operate a liquefaction, storage, and loading facility.  (*Id.* ¶ 83.)  North Slope gas will then be shipped in liquefied natural gas ("LNG") form to receiving facilities on the Pacific Coast for transport through the existing North American gas distribution networks. (*Id.* ¶ 84.)  To ensure a supply of natural gas for the greater Anchorage area and other parts of Alaska not currently served by North Slope gas, the Port Authority will build a 24-inch spur line from Glennallen to the existing Southcentral Alaska grid.  (*Id.* ¶ 86.)  The Port Authority has also developed plans for construction of a separate spur from Delta Junction to the Canadian border. (*Id.* ¶ 87.)

**B.    The Port Authority's agreements with necessary third parties.**

The Port Authority has negotiated and contacted with the firms necessary to construct the pipeline and LNG distribution network, and to transport, distribute, and market the gas.  (Compl. ¶¶ 85, 90-91, 102, 220.)  These firms include some of the world's leading energy and construction firms, such as Bechtel Corporation and Sempra Energy.  (*Id.* ¶¶ 91, 102.)  The Port Authority has worked with and received a project cost estimate from Bechtel Corporation, which was updated as recently as May 2005.  (*Id.* ¶ 91.)  This past year, the Port Authority worked with

6

Sempra Energy LNG, a major distributor of natural gas in the lower 48 states, to prepare and submit its detailed offer for purchase of natural gas from Defendants. (*Id.* ¶ 102.) The Port Authority's contract with Sempra committed Sempra to assist in the development of the pipeline and to fund a portion of the project. (*Id.* ¶ 220.)

The Port Authority also has the necessary agreements for the transport of gas from Valdez and for its delivery to Pacific Coast LNG receiving terminals. A Memoranda of Understanding ("MOU") from Totem Ocean Trailer Express provides for the shipment of LNG from Alaska to these terminals, and the Port Authority has also received MOUs from several Pacific Coast LNG receiving terminals themselves. (*Id.* ¶ 85.) These terminals include Kitimat LNG, the Northern Star Natural Gas/LNG receiving terminal, Penguin LNG, and Crystal Energy LNG re-gas terminal. (*Id.*).

The Port Authority has also considered and planned for the environmental and regulatory permits necessary for its pipeline. The Port Authority has acquired the exclusive option to purchase the assets of the Yukon Pacific Corporation ("YPC"), a company that spent years laying the groundwork for development of a gas pipeline to Valdez, along with its portfolio of senior environmental and regulatory permits, rights of way, and all project data collected since 1982. (*Id.* ¶¶ 73-77, 90.) YPC previously developed a plan to construct a pipeline to Valdez and a liquefied natural gas terminal, a plan supported by ARCO and former Alaska Governors Hickel and Egan. (*Id.* ¶ 73.) It satisfied the regulatory hurdles, obtained senior permits and rights of way, obtained a Final Environmental Impact Statement, and gained permission to export natural gas. (*Id.*) As they have done with the Port Authority, Defendants blocked YPC's efforts to construct a pipeline by jointly refusing to sell natural gas. (*Id.* ¶¶ 73-77.)

7

### C.  The Port Authority's financing arrangements.

The Port Authority has taken all steps necessary to date to finance the proposed pipeline. (Compl. ¶¶ 81, 89-91, 97.)  The Alaska Natural Gas Pipeline Act of 2004, 15 U.S.C. § 720n, gives the Port Authority the ability to obtain financing.  (*Id*. ¶ 81.)  In 2005, Congress specifically amended the Act to make the Port Authority's LNG project eligible for an $18 billion federal loan guarantee gas pipeline incentive package.  (*Id*. ¶ 97.)  The Port Authority has also obtained a private letter ruling from the IRS confirming that it is tax exempt, which will provide billions of dollars in tax savings over the life of the project.  (*Id*. ¶ 89.)  The Port Authority also has demonstrated that, even assuming a natural gas price of $5.00 per MBTU in the lower 48, well below any current or recent market price, the project would generate immense cash flow, easily meeting its financing commitments.  (*Id*. ¶¶ 95, 99.)  In connection with the proposal submitted to Defendants, the Port Authority secured a commitment from Sempra to fund or finance a portion of the project.  (*Id*. ¶ 220.)  The only impediment to obtaining financing is Defendants' refusal to supply gas.  (*Id*. ¶ 100.)  As Defendants have openly acknowledged, the Port Authority requires a commitment from Defendants to supply gas before it can obtain these loans.  (*Id*. ¶¶ 48-49.)

### D.  Defendants' refusal to supply natural gas.

The Port Authority has taken the necessary steps for construction of a pipeline, and the only remaining impediment to its ability to construct the pipeline is Defendants' joint refusal to supply it with gas.  (Compl. ¶¶ 85-91, 96, 100.)  The Port Authority has repeatedly attempted to engage Defendants in good faith negotiations.  (*Id*. ¶¶ 101-03.)  On April 1, 2005, the Port Authority made a detailed offer to Defendants to purchase North Slope gas on a wellhead netback basis and to transport the gas to market.  (*Id*. ¶ 102.)  Defendants refused to sell the Port Authority North Slope gas or even to discuss prices or terms.  (*Id*. ¶ 103.)  Despite the Port

8

Authority's good faith and repeated attempts to engage them in negotiations, Defendants have continued to refuse to engage in good faith negotiations and declined to sell any North Slope gas to the Port Authority.  (*Id*. ¶¶ 101-05.)  No major pipeline can be built without Defendants' commitments to supply gas.  (*Id*. ¶¶ 48-49.)

## II.  Defendants' Anticompetitive Conduct.

### A.  Defendants' efforts to block construction of a gas pipeline.

Defendants, acting in concert, have blocked various proposals for the construction of a natural gas pipeline from the North Slope.  (Compl. ¶¶ 47, 72-80.)  Defendants jointly refused to sell gas to YPC when it sought to construct a pipeline from the North Slope to Valdez.  (*Id*. ¶¶ 73-77.)  Defendants jointly rejected a pipeline proposal by MidAmerican, a Berkshire Hathaway subsidiary with extensive experience in the construction and operation of gas pipelines.  (*Id*. ¶¶ 78-79.)  Defendants similarly rejected successive proposals by TransCanada, an energy company that operates natural gas pipelines in Canada.  (*Id*. ¶ 80.)  Defendants thwarted each and every gasline project by their concerted refusal to supply gas.  (*Id*. ¶¶ 73, 78, 80.)

### B.  Defendants' anticompetitive agreements.

Defendants have agreed that neither will develop or market their Alaska gas resources, and that neither will commit gas to the Port Authority.  (Compl. ¶ 58.)  They have entered into formal and informal agreements to keep the North Slope gas reserves from reaching the market by preventing the Port Authority and others from constructing a gas pipeline capable of delivering gas to market.  (*Id*. ¶¶ 61-62.)  These anticompetitive agreements include, but are not limited to:  (1) agreements not to deal with pipeline companies individually; (2) "rules of engagement" for dealing with pipeline companies; (3) agreements not to develop or sell gas from the Prudhoe Bay Unit ("PBU") or the Point Thomson Unit ("PTU"); (4) agreements designed to restrain individual leaseholders; and (5) agreements not to commit to any pipeline company not

9

controlled by Defendants. (*Id*. ¶ 67.) Some of Defendants' agreements have been concealed and withheld from the State and the public. (*Id*. ¶ 64.) The agreements were intended to and did reduce competition and block marketing of North Slope gas. (*Id*. ¶¶ 63, 68, 71.)

## C. Defendants' failure to develop and market North Slope natural gas.

Defendants have conspired to withhold known natural gas resources in the PBU and the PTU by agreeing not to develop and market this gas as they are obligated to do under their leases from the State. (Compl. ¶¶ 65, 118-33.) Collectively, Defendants own over 60% of the gas resources in the PBU and over 75% of the working interest ownership of the PTU. (*Id*. ¶¶ 119, 125.) Defendants also control the operation of these units; BP is the PBU unit operator, and ExxonMobil is the PTU unit operator. (*Id*. ¶¶ 119, 125.) Although Defendants control the massive amounts of natural gas in these units, they have essentially done nothing to exploit these valuable assets. (*Id*. ¶¶ 42, 44, 65, 118, 123.) These agreements have limited competition and artificially restricted the supply of North Slope gas. (*Id*. ¶¶ 119-20, 125.) Contrary to their own self interests, Defendants have jointly agreed not to market gas from these units. (*Id*. ¶¶ 57, 67, 117, 133.) In the absence of a conspiracy, it would be in Defendants' self interest to attempt to make the best deal possible with the Port Authority for the sale of its gas. (*Id*. ¶ 117.)

Defendants' refusal to produce and market North Slope gas violates their legal and contractual duties. (*Id*. ¶¶ 106-33.) Oil and gas leases contain implied covenants to act prudently, to avoid opportunistic behavior, and to diligently market resources. (*Id*. ¶¶ 107-09.) In violation of these duties, Defendants have refused to deal with pipeline companies in order to forestall termination of their leases and excuse their duty to develop and market gas. (*Id*. ¶ 111.) In 1999, BP and Atlantic Richfield Co. ("ARCO") agreed to a charter that required them to negotiate in good faith to make North Slope gas available to any third party in sufficient quantities to support a treatment and transportation project. (*Id*. ¶¶ 112-13.) BP and ARCO

10

committed to make reasonable efforts to assist third parties, including the Port Authority, in obtaining necessary approvals for the sale of North Slope gas.  (*Id.* ¶¶ 113-15, 144.)  BP has not negotiated in good faith, in violation of that charter.  (*Id.* ¶ 116.)

### D.   Defendants' anticompetitive mergers.

In order to secure control of Alaska's North Slope gas, Defendants entered into a series of mergers that facilitated their anticompetitive goals.  (Compl. ¶¶ 134-53.)  As recognized by industry participants and analysts, Defendants' interest in controlling natural gas was a key factor influencing these mergers.  (*Id.* ¶ 153.)  Ultimately, these mergers and acquisitions have increased Defendants' market power and reduced competition in the relevant markets.  (*Id.* ¶ 151.)

### III. Defendants Possess Market Power In The Relevant Markets.

As a result of their conduct, Defendants have obtained market power in the market for transport of natural gas from the North Slope.  (Compl. ¶¶ 155-58.)  Transport of gas off the North Slope by ship, truck, or train would be impractical and massively inefficient.  (*Id.* ¶ 156.)  There is no reasonably interchangeable substitute for a pipeline to transport gas from the North Slope.  (*Id.*)  Defendants can and do exclude competition from the market for the transportation of North Slope gas by refusing to provide gas to a competitive pipeline operator and by refusing to allow other working interest owners to sell gas from the units they control.  (*Id.* ¶ 158)

Defendants also possess market power in the market for the purchase of North Slope gas.  (*Id.* ¶¶ 159-60.)  Just as no producer can transport gas without a pipeline, no purchaser can purchase gas without a pipeline to bring the gas to market.  (*Id.* ¶ 159.)  There is no reasonable substitute for the purchase of gas capable of being transported on a pipeline because the on-site demand and use for North Slope gas is far less than the potential supply not being exploited.  (*Id.* ¶¶ 158-59.)  Through their anticompetitive conduct and control over North Slope gas,

11

Defendants have obtained market power over the markets for the transport and purchase of North Slope natural gas.  (*Id*. ¶¶ 155-61.)

Defendants' anticompetitive conduct has also affected the natural gas markets in North America and Southcentral and Interior Alaska.  (*Id*. ¶¶ 163-64, 166-67.)  Due to transportation costs, North America forms a separate market for the sale of natural gas.  (*Id*. ¶ 162.)  Defendants have been able to maintain artificially high prices in this market by keeping North Slope gas out of North America.  (*Id*. ¶¶ 163-64.)  Similarly, the area of Alaska south of the North Slope also constitutes a separate market which has suffered from rising natural gas prices.  (*Id*. ¶¶ 166-67.)  Suppliers from outside of Alaska cannot readily provide gas at competitive prices to consumers and businesses inside the State.  (*Id*. ¶ 166.)  Through their anticompetitive conduct and control over the North Slope, Defendants have obtained market power in all of these four markets.  (*Id*. ¶¶ 155-70.)

## IV. The Anticompetitive Effects Of Defendants' Unlawful Conduct.

Defendants' course of conduct – their concerted refusals to deal with pipeline operators, their concerted refusal to market PBU gas or to develop the PTU, and their anticompetitive mergers – has had readily apparent anticompetitive effects.  (Compl. ¶¶ 171-79.)  These anticompetitive effects include the elimination of competition for transportation and purchase of natural gas (*id*. ¶¶ 45-46, 172-73), reduced incentives for the development of Alaska's gas resources (*id*. ¶¶ 174-77), and reduced output and higher prices for gas in Alaska and the rest of the United States (*id*. ¶ 178).

*Alaska Gasline Port Authority v. ExxonMobil Corp., et al.*, No. 4:05-cv-00026-RRB

## ARGUMENT

**I.  The Port Authority Satisfied The Rule 8 Notice Pleading Standard.**

The Federal Rules of Civil Procedure require only that the plaintiff provide "'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957); Fed. R. Civ. P. 8. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley*, 355 U.S. at 45-46; *Gilligan v. Jamco Dev. Corp.*, 108 F.3d 246, 248 (9th Cir. 1997). In ruling on a motion to dismiss, the court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party." *Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).

Rule 8 contains "a powerful presumption against rejecting pleadings for failure to state a claim." *Gilligan*, 108 F.3d at 249. In reviewing the sufficiency of a complaint, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

Antitrust claims are subject to the same Rule 8 notice pleading standard as other federal claims. To survive a Rule 12(b)(6) motion, a complaint stating antitrust claims "need only allege sufficient facts from which the court can discern the elements of an injury resulting from an act forbidden by the antitrust laws." *Newman v. Universal Pictures*, 813 F.2d 1519, 1522 (9th Cir. 1987). Courts have consistently rejected heightened pleading standards for antitrust claims. *See Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 107-13 (2d Cir. 2005) (vacating dismissal of antitrust claims) (citing cases); *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980) ("There is no special rule requiring more factual specificity in antitrust pleadings.").

13

On the contrary, "in antitrust cases, where the proof is largely in the hands of the alleged conspirators, dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) (quotation omitted). The plaintiff need only plead a factual predicate that includes conspiracy among the realm of plausible possibilities, *see Twombly*, 425 F.3d at 111, and the discovery process will, as it is designed to, provide whatever additional sharpening of the issues that may be necessary. *See George C. Frey Ready-Mixed Concrete, Inc. v. Pine Hill Concrete Mix Corp.*, 554 F.2d 551, 553-54 (2d Cir. 1977).

## II. The Complaint States Federal Antitrust Claims.

### A. The Complaint alleges antitrust standing.

Seeking to benefit from the success of their misconduct in completely suppressing competition for the purchase and transport of North Slope natural gas, Defendants contend that the Port Authority lacks standing because it never purchased or transported gas. This warped claim for immunity must fail. At bottom, the doctrine of antitrust standing is meant to deter excessive litigation where "the infinite universe of possible entrants and plaintiffs may seem unduly large." 2 P. Areeda & D Turner, *Antitrust Law* § 335c, at 174. Since the consequences of antitrust violations can extend throughout large areas of the economy, unlimited standing might open the "flood-gates" of litigation and "result in an over-kill, due to an enlargement of the private weapon to a caliber far exceeding that contemplated by Congress." *Calderone Enters. Corp. v. United Artists Theatre Circuit, Inc.*, 454 F.2d 1292, 1295 (2d Cir. 1971). Thus, it is important that a plaintiff seeking antitrust remedies has taken steps that distinguish it from the large universe of unprepared entrants. *See Amtrol, Inc. v. Vent-Rite Valve Corp.*, 646 F. Supp. 1168, 1177 (D. Mass. 1986). "At the core of the inquiry is the question whether the

litigant is a serious potential competitor, distinguishable from the great horde of opportunists who 'would've, could've, or might've.'"  *Id.*

Clearly, the Port Authority, which was created for the sole purpose of developing a natural gas pipeline, is not an "opportunist," and this action will not open the floodgates of litigation.  The Port Authority is the most direct victim of Defendants' anticompetitive behavior, and is capable of efficiently vindicating the "expansive remedial purpose" of the antitrust laws. *See Blue Shield of Virginia v. McCready*, 457 U.S. 465, 473 (1982).  To deny standing to the Port Authority would render Defendants' actions virtually unchallengeable.  Thus, dismissing this case would likely "leave a significant antitrust violation undetected or unremedied" and would frustrate the essential purpose of the antitrust laws.  *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739, 747 (9th Cir. 1984).  In any event, the Complaint is more than sufficient to meet the requirements for antitrust standing.

### 1.  Legal standard.

When a competitor is a prospective entrant into a market, it must establish both its intention and its preparedness to enter that market.  *Fine v. Barry & Enright Prods.*, 731 F.2d 1394, 1397 (9th Cir. 1984).  Courts look to four factors in evaluating intention and preparedness: (1) affirmative action on the part of the plaintiff to engage in the proposed business; (2) the background and experience of the plaintiff in the prospective business; (3) the ability of the plaintiff to finance the business; and (4) the consummation of contracts by the plaintiffs.  *Id.* Plaintiffs have pleaded abundant detail on all four factors.

### 2.  The preparedness inquiry is factually complex and inappropriate for resolution on a motion to dismiss.

As courts have repeatedly recognized, the preparedness inquiry is fact intensive, and thus seldom presents a situation appropriate for a determination as a matter of law.  *See Solinger v.*

*A&M Records, Inc.*, 586 F.2d 1304, 1310 (9th Cir. 1978); *see also Century Fed., Inc. v. City of Palo Alto*, 579 F. Supp. 1553, 1555 n.4 (N.D. Cal. 1984) ("preparedness to enter the market is a factual issue. . . . On this motion to dismiss, the Court certainly cannot reject plaintiff's allegations that it is prepared to enter the market.") (emphasis omitted). Thus, where, as here, the plaintiff pleads basic facts showing that it would enter the market "but for" the defendants' antitrust violation, the motion to dismiss must be denied and the question reserved for summary judgment or trial. *See, e.g., Xechem, Inc. v. Bristol-Myers Squibb Co.*, 274 F. Supp. 2d 937, 944 (N.D. Ill. 2003) ("Plaintiffs may have been in the position to file for [government] approval . . . as early as 1998, but for Defendant's [anticompetitive conduct]. Although . . . Plaintiffs may not have received [government] approval once they applied and [] it may have taken years to obtain such approval . . . these again are factual inquiries . . . [and] it is premature to find that Plaintiffs cannot establish antitrust injury."), *rev'd on other grounds*, 372 F.3d 899, 902 (7th Cir. 2004) ("a prediction that the plaintiff will be unable to meet its challenges is not a good reason to dismiss a complaint under Rule 12(b)(6)"). This is why virtually every decision cited by Defendants in their discussions of antitrust standing was decided in a context other than a 12(b)(6) motion.[2]

---

[2] None of the Rule 12(b)(6) cases cited by Defendants were dismissed because, although the plaintiffs made factual allegations demonstrating preparedness, those allegations were insufficient: (1) complaint "devoid of any facts" showing intention and preparedness, *Florida Seed Co. v. Monsanto Co.*, 915 F. Supp. 1167, 1176 (M.D. Ala. 1995); (2) complaint failed to allege causation as an element of antitrust injury, *City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 269 (3d Cir. 1988); (3) claims improperly brought by investor for injury suffered by the company, *In re Napster Copyright Litigation*, 354 F. Supp. 2d 1113, 1118 (N.D. Cal. 2005); (4) existence of more direct victims and potential for duplicative recovery resulted in lack of standing, *Associated General Contractors of California v. California State Council of Carpenters*, 459 U.S. 519, 545-46 (1983); and (5) despite lack of government approval, plaintiff able to allege intent and preparedness by alleging that government approval was probable, *Andrx Pharmaceuticals, Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 808 (D.C. Cir. 2001) (vacating dismissal).

For instance, in *Utah Gas Pipelines Corp. v. El Paso Natural Gas Co.*, 233 F. Supp. 955 (D. Utah 1964), the court denied dismissal of Sherman Act claims where the plaintiff alleged it would have been able to enter the natural gas pipeline market absent the defendants' conspiracy. According to the complaint, "plaintiff was deprived of sources of supply and was twice prevented from completing agreements by reason of the conspiracy among the defendants." *Id.* at 958. Defendants countered by arguing that: (1) plaintiff had "no business to be damaged"; (2) plaintiff had not engaged in any "real preparation"; (3) there was no "feasible way that plaintiff could have entered the industry"; (4) plaintiff had not obtained a "certificate of public convenience and necessity" from the State; and (5) plaintiff had not "consummated" any contracts. *Id.* at 964. Rejecting these arguments, the court reasoned that, if standing required that the plaintiff obtain approval from a state or federal agency, "competition could be frustrated with impunity by established companies through the simple expedient of picking off and eliminating potential competition before it could reach the certification stage." *Id.* The court explained that it could not yet determine, based on the complaint alone, whether the plaintiff had not succeeded because "it failed to lay . . . a proper basis for [application to the State agency], had inadequate capital or lacked inherent capability to succeed, or because it was prevented from developing its business or utilizing its property as a proximate result of conspiracy or attempts at monopoly among the defendants." *Id.* at 965.

**3. Standing will be found where a defendant's anticompetitive conduct renders further efforts to prepare futile.**

A "defendant cannot benefit by the application of the standing doctrine from the fact that it is able to prevent the plaintiff from becoming a consumer of its product." *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991). Thus, courts routinely reject the proposition that plaintiffs lack antitrust standing where, as alleged here, further efforts to enter

the market would have been futile because of the defendants' anticompetitive behavior. For instance, in *Fleer Corp. v. Topps Chewing Gum, Inc.*, 415 F. Supp. 176 (E.D. Pa. 1976), plaintiff alleged defendants had engaged in anticompetitive behavior in the market for baseball cards. In denying the motion to dismiss, the court found plaintiff, though not yet a market participant, had repeatedly attempted to enter the market: "Fleer tried different approaches to the problem of entry, but ceased each attempt when its futility became apparent." *Id.* at 180. The court explained:

> We cannot find that Fleer's steps toward entry were insubstantial if it is true that the taking of any further steps would have been a sheer waste of resources. It would be inconsistent with one purpose of the Clayton Act – to protect the business interests of the victims of monopolistic practices – to require an antitrust plaintiff to pay a courtroom entrance fee in the form of an expenditure of substantial resources in a clearly futile competitive gesture.

*Id.*

Courts have repeatedly recognized this fact-intensive futility doctrine in antitrust standing decisions. *See, e.g.*, *Ostrofe*, 740 F.2d at 743 (law does not require a futile gesture to establish antitrust standing); *In re Airport Car Rental Antitrust Litig.*, 474 F. Supp. 1072, 1102 (N.D. Cal. 1979) (finding standing, though plaintiff may not have sought entry into the market, where facts showed failure could be excused for "futility"). Indeed, permitting defendants to avoid antitrust liability by making their conspiracy so successful that any potential entrant was completely thwarted and unable to reach the requisite level of preparation would simply reward defendants for successful exclusionary behavior.[3]

---

[3] Defendants cite a few summary judgment decisions purporting to indicate that a plaintiff cannot "alleg[e] that its lack of preparedness is caused by defendants' alleged conspiratorial conduct," (BP Memo. at 8), but these decisions do not stand for any such proposition, and indeed most discuss the futility doctrine with approval. *See Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1258 (10th Cir. 2003) (affirming summary

18

### 4. The Complaint supports all four factors of the preparedness analysis.

#### a) In the six years it has worked to construct a pipeline, the Port Authority has taken meaningful affirmative steps to enter the market.

The Port Authority was created pursuant to Alaska Statutes 29.35.600-29.35.730 for the explicit purpose of building "a gas pipeline system to transport natural gas from Alaska's North Slope to Valdez for liquefaction and shipping to market." (Compl. ¶¶ 9, 35.) In the six years since it was formed, it has been singularly devoted to the construction of a pipeline to transport North Slope natural gas. (*See id.* ¶¶ 82-99, 101-02.) This fact alone weighs heavily in favor of finding standing, given that municipalities creating a corporation for a specific purpose are likely to be serious about competing in the market. *See County of Monroe v. Consol. Rail Corp.*, No. 83-0167, 1983 WL 1813, at *2 (M.D. Pa. Mar. 2, 1983) ("the formation of the County's railroad authority supports a finding that the 'preparedness' element [of antitrust standing] has been satisfied").

The Port Authority has taken all the major steps necessary at this stage to enter the market. For instance, it has developed a workable proposal for the construction of a "48-inch, buried pipeline from Prudhoe Bay to Valdez," and for the liquefaction and shipping of the gas

---

judgment on standing grounds, but noting "in order to show preparation to enter a given market, an antitrust plaintiff need not take those steps which would have been rendered futile by an alleged monopolist"); *Jayco Sys., Inc. v. Savin Bus. Machs. Corp.,* 777 F.2d 306, 315 (5th Cir. 1985) (affirming summary judgment on standing grounds, but noting that "any efforts subsequent to [the defendant's] refusal to deal would have been in vain" militated in favor of finding antitrust standing). In *Gas Utilities. Co. of Alabama., Inc v. Southern Natural Gas Co.,* 825 F. Supp. 1551, 1573 (N.D. Ala. 1992), the court, in granting summary judgment, simply made the unremarkable observation that a refusal to deal, standing alone, could not create an inference of antitrust injury, where the plaintiff was no better situated than many other possible entrants who, if standing were found, could subject the defendants to "multiplicative recoveries." Finally, in *Bubar v. Ampco Foods, Inc.,* 752 F.2d 445 (9th Cir. 1985), the court, in granting summary judgment, found no antitrust standing primarily because the plaintiffs were potential minority shareholders in a corporation not yet formed, and as potential shareholders could not assert damages on behalf of a non-existent corporation. *Id.* at 450-51.

19

from Valdez to the Pacific Coast of the United States.  (Compl. ¶¶ 82-85.)  The Port Authority

has acquired "significant senior permits, engineering studies, cost estimates, and plans necessary

to build" the pipeline.  (*Id*. ¶¶ 18, 73, 90.)  While a project of this magnitude obviously will

require ongoing additional work, the Port Authority has clearly demonstrated the intention and

preparedness to accomplish the project by completing all that it can despite Defendants'

concerted refusal to deal.  *See Woods Exploration & Producing Co. v. Aluminum Co. of America*,

438 F.2d 1286, 1310 (5th Cir. 1971) (where defendants controlled 90% of a natural gas field, and

plaintiff sought to compete in the extraction of gas from the field but was thwarted by

defendants' refusal to deal, plaintiff had demonstrated "the intention and the preparedness to

construct an extraction plant," even though this plant "was simply a proposal and not a tangible

reality").

> b) **Through contracts and relationships with major private corporations, the Port Authority has the necessary background and experience and has taken the necessary steps to enter the business.**

A major natural gas pipeline system, of course, requires expertise in construction,

transportation, distribution, and marketing.  As set out in the Complaint, the Port Authority has

developed relationships and agreements in all these areas with the leading firms in their

respective fields.  (Compl. ¶¶ 85, 90-91, 102.)  For example, it has engaged the Bechtel

Corporation for technical and development support.  (*Id*. ¶ 91.)  Bechtel is a leading global

project management company which has overseen the development and construction of large-

scale oil and gas pipelines around the world, including the Trans-Alaska oil Pipeline System in

the 1970s.

The Port Authority has drawn on the significant background and experience of the Yukon

Pacific Corporation ("YPC"), an affiliate of CSX Corporation, which was one of the largest

natural gas pipeline operators in North America.  (*Id*. ¶¶ 73, 90.)  YPC worked for years to

20

construct its own natural gas pipeline and had made significant progress toward this goal, but it was ultimately stymied by Defendants' concerted refusal to sell gas.  (*Id.* ¶¶ 73-77.) Nevertheless, YPC developed a portfolio of senior permits, important rights of way, an environmental impact statement, engineering studies and plans, and an export license, all of which are available to the Port Authority.[4]  (*Id.* ¶¶ 73, 90.)

The Port Authority has also worked with Sempra Energy, a major distributor and marketer of natural gas in the lower 48 states.  (*Id.* ¶ 102.)  Specifically, the Port Authority had a contract with Sempra "whereby Sempra committed to assist in the development of the initial phases of the pipeline project," "to fund or finance a portion of the project," and "to buy and market all of the gas processed by the Authority's facilities."  (*Id.* ¶ 220.)   In April 2005, the Port Authority and Sempra made a detailed offer to Defendants to purchase North Slope natural gas and transport it to the market.  (*Id.* ¶ 102.)

The Port Authority received Memoranda of Understanding ("MOU") with four LNG receiving terminals on the Pacific Coast, including the Kitimat, Northern Star, Penguin, and Crystal Energy LNG receiving terminals.  (*Id.* ¶ 85.)  It has also received a MOU from Totem Ocean Trailer Express, a major shipping company that hauls cargo aboard large vessels sailing between Alaska and the Pacific Coast, for the shipment of LNG from Alaska to the Pacific Coast.  (*Id.*)  These agreements demonstrate that the Port Authority has the means to transport natural gas from Valdez to the Pacific Coast, and to then distribute the natural gas in the continental United States.

---

[4] BP claims that the Port Authority's exclusive option to purchase YPC and its permits is "insufficient because plaintiff does not demonstrate that it has taken steps to purchase those permits."  (BP Memo. at 16.)  But the law does not require further steps to be taken; the acquisition of this exclusive option is sufficient.  *See Pine Ridge Recycling, Inc. v. Butts County*, 855 F. Supp. 1264, 1272 (M.D. Ga. 1994) (an option to buy land showed preparedness to enter the landfill industry).

In sum, the Port Authority has consummated vitally important contracts that are necessary steps in the construction of a natural gas pipeline. The Port Authority's allegations amply demonstrate its preparedness, and thus, antitrust standing. *Compare In re Indep. Serv. Orgs. Antitrust Litig.*, 964 F. Supp. 1454, 1466 (D. Kan. 1997) (finding standing even where the plaintiff had presented "very little evidence of . . . contracts it consummated").[5]

### c) The Complaint shows the Port Authority can finance the project.

Defendants assert that because the Port Authority has not yet secured binding financing commitments, it lacks standing. This argument fails for two reasons: (1) the facts alleged in the Complaint show that the Port Authority has the ability to obtain financing – indeed obtaining financing is not only a reasonable inference, but highly likely; and (2) to the extent that the Port Authority has not yet secured financing commitments, it would be futile to attempt to do so in light of Defendants' illegal conduct.

### i. Because the pipeline would be robustly profitable, obtaining financing is highly likely.

The Port Authority has available $18 billion in federal loan guarantees under the Alaska Natural Gas Pipeline Act, 15 U.S.C. § 720n. (Compl. ¶ 97.) The Port Authority's analyses show

---

[5] BP argues that the Port Authority's lack of a fiscal contract with the State of Alaska shows a lack of preparedness. (BP Memo. at 11-12.) This argument fails for several reasons. First, a fiscal contract with the state is absolutely not necessary to commence construction. Second, that an entrant has not signed every contract or acquired every license conceivably necessary to compete in the market does not equate to lack of standing. Rather, the proper inquiry is whether, under the facts and circumstances of the particular case, the plaintiff has pleaded sufficient preparatory work, including where appropriate the execution of contracts, to show that entrance is not speculative. *See, e.g.*, *Huron Valley Hosp., Inc. v. City of Pontiac*, 666 F.2d 1029, 1033 (6th Cir. 1981) (reversing district court's grant of summary judgment in favor of defendants where the plaintiffs, who were attempting to build a hospital, had been denied a necessary certificate from a state agency, holding that plaintiffs had taken other steps, such as entering into some contracts, that were "sufficient to establish a legitimate business interest" for standing purposes). The Port Authority's allegations of several significant contracts are more than enough at this stage.

that even at prices far below today's natural gas prices, the pipeline would be robustly profitable. (*Id.* ¶ 95.) Investors would receive an additional layer of protection because gas in LNG form could be sold in international markets if the U.S. price, against all forecasts, dropped precipitously. In addition, the Port Authority "has obtained a private letter ruling from the IRS confirming that the Authority is tax-exempt," a ruling that will provide billions of dollars in tax savings as the project moves forward, (*id*. ¶ 89), an obvious benefit in obtaining financing. Under these circumstances, it is a more than reasonable to infer that the Port Authority has the ability to obtain financing and, in fact, will readily obtain financing in the capital markets. And, indeed, the Port Authority already had a partial financing commitment from Sempra. (*Id*. ¶ 220.)

### ii. Attempting to obtain binding financing commitments without a commitment of gas would be futile.

As discussed above, an antitrust plaintiffs will not be found to lack standing if failure to obtain financing was due to the defendants' conspiratorial conduct. *See Tose v. First Pa. Bank*, 492 F. Supp. 246, 255 (E.D. Pa. 1980) (denying summary judgment despite plaintiff's failure to obtain financing where this failure was caused by the defendants' conspiracy); Argument Section II.A.3, *supra*. ExxonMobil has admitted that it would be futile to attempt to secure financing without first having a commitment for a supply of natural gas. (Compl. ¶¶ 16, 48, 49.) The Port Authority's relationship with Sempra confirms the futility of seeking financing without a commitment for a supply of gas. The Port Authority and Sempra had an agreement in which Sempra agreed to assist in the development of the pipeline, including providing financing, in return for Sempra's ability to buy and market gas processed by the Port Authority's facilities. (*Id*. ¶ 220.) However, Sempra withdrew from the project once it became evident that Defendants would never commit to supplying the Port Authority's pipeline with gas. (*Id*. ¶ 225.)

ExxonMobil argues that because the Port Authority has not yet obtained a certificate of public necessity or a final environmental impact statement, it could not obtain financing. (XOM Memo. at 19-20.) Merely listing additional steps that are futile at this point due to Defendants' conspiratorial conduct, but need to be taken at some point, does not show a lack of standing. *See Xechem*, 274 F. Supp 2d at 944 (reversing dismissal of antitrust action where the plaintiff, which had not yet sought government approval for its new drug, could nonetheless show standing if it would have been in the position to seek such approval several years ago "but for" the defendants' anticompetitive behavior).

As to a final environmental impact statement, ExxonMobil ignores the allegation that shows the Port Authority has the rights to existing licenses and permits already obtained by YPC, and that this, among other things, enables the Port Authority to complete a pipeline more quickly than any other pipeline proposal. (Compl. ¶¶ 73, 90.) In terms of preparedness, the Complaint shows that the Port Authority is substantially further along than any other pipeline sponsor in clearing regulatory hurdles, and there is nothing to suggest that it will not be able to conclude the approval process once Defendants' conspiratorial roadblock is removed.[6]

Finally, it is irrelevant that other pipeline proposals may be eligible for federally guaranteed financing. While it is possible that another pipeline operator could at some point

---

[6] Another way to qualify for the federal loans is to receive a certification from the Secretary of Energy under 15 U.S.C. § 720n(b)(1), but as ExxonMobil concedes, the Department of Energy is in the process of deciding the application procedure to obtain this certification, and thus it would be impossible for the Port Authority to have obtained this certification at this juncture. (XOM Memo. at 21.) Nonetheless, contrary to ExxonMobil's assertion that the Port Authority would not qualify for the certification because its proposed project will not serve West Coast states, the Port Authority's plan calls for the transport of LNG from Southcentral Alaska through Pacific Coast receiving facilities to markets in the United States, thereby meeting a threshold requirement for the certification. (Compl. ¶¶ 84, 88 ("From Valdez, the Alaska natural gas in LNG form will be shipped to receiving facilities on the Pacific Coast for transport throughout the existing North American gas distribution networks. . . . The Authority's proposal would result in delivering Alaskan gas to Midwest and West Coast markets.").)

24

secure these guarantees, it is more likely, if the decades-long delay in bringing this gas to market is any guide, that no other proposal will make any meaningful progress at all in the next several years. Defendants' speculative prediction that the Port Authority will not ultimately receive the federally backed loan guarantees does not warrant dismissal. *See, e.g.*, *Xechem*, 372 F.3d at 902 ("That Xechem *still* has not filed [for government approval of its drug] . . . is a hurdle that it must vault to establish injury. But a prediction that the plaintiff will be unable to meet its challenges is not a good reason to dismiss a complaint under Rule 12(b)(6).") (emphasis original); *Andrx Pharm. v. Biovail Corp. Int'l*, 256 F.3d 799, 808 (D.C. Cir. 2001) (complainant could adequately allege preparedness to enter a market that required government approval merely "by claiming that approval was probable").

### B. The Port Authority provides sufficient factual allegations about the conspiracy to state claims under Sections 1 and 2 of the Sherman Act.

ExxonMobil seeks dismissal of the First, Second, and Third Claims, arguing the Port Authority's conspiracy allegations are insufficient to state a claim under Rule 8 and do not provide sufficient notice of the claims against them. (XOM Memo. at 35-37.) It further argues dismissal is warranted because an asserted lack of detail in the Complaint renders it unable to answer the allegations or to prepare its defense. (XOM Memo. at 38-39.) These arguments should be rejected because the Complaint details the conspiracy between ExxonMobil and BP, describing its nature, timing, and effects. Nothing more is required under Rule 8. Further, the Complaint provides adequate notice of the basis of the Port Authority's conspiracy claims and does not require Defendants to speculate about the nature of the claims against them.[7]

---

[7] ExxonMobil argues in passing that unit agreements cannot form the basis of antitrust liability because they are approved by the state. (XOM Memo. at 35.) This is a nonsequitur for several reasons. First, the mere fact of state approval, of course, does not bestow any such broad antitrust immunity, especially where the state is acting as a market participant. *See Woods Exploration & Producing Co. v. Aluminum Co. of Am.*, 438 F.2d 1286 (5th Cir. 1971) (rejecting

As discussed above, dismissal for failure to state a claim is only proper where "it is clear that the plaintiff could prove no set of facts within the framework of the complaint that would entitle him to relief." *Hunt-Wesson Foods*, 627 F.2d at 924. "There is no special rule requiring more factual specificity in antitrust pleadings." *Id*. Indeed, the "special rule" in antitrust conspiracy cases is that courts should err against granting dismissal. *See Hosp. Bldg. Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746 (1976) ("in antitrust cases, where 'the proof is largely in the hands of the alleged conspirators,' dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly"); *Norfolk Monument Co. v. Woodlawn Mem'l Gardens*, 394 U.S. 700, 704 (1969) ("summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, [and] the proof is largely in the hands of the alleged conspirators").

The Port Authority alleges that ExxonMobil and BP engaged in a joint campaign to manipulate and constrict North Slope natural gas to increase control, raise prices, and derail competitive pipeline proposals. (Compl. ¶¶ 11, 14, 21.) As part of this joint campaign, Defendants entered into a range of agreements, including but not limited to those relating to operations in the Prudhoe Bay and Point Thomson Units, that were intended to suppress

---

defendants' argument after summary judgment and trial that oil and gas unitization agreements are immune); *see also City of Columbia v. Omni Outdoor Adver., Inc.*, 499 U.S. 365, 374-75 (1991) ("immunity does not necessarily obtain where the State acts not in a regulatory capacity but as a commercial participant in a given market"); *Cost Mgmt. Servs., Inc. v. Wash. Natural Gas Co.*, 99 F.3d 937, 943 (9th Cir. 1996) (noting immunity requires state supervision, which is a factual issue "inappropriately resolved in the context of a motion to dismiss."); *Clipper Express v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1263 (9th Cir. 1982) ("An antitrust violation does not enjoy immunity simply because an element of that violation involves an action which itself is not illegal."). Second, while the State may have approved certain unitization agreements, it did not: (1) approve or even know of many of the written and unwritten agreements made by the Defendants; (2) approve of concerted action by different unit operators relating to different units; or (3) approve of the restriction of supply in order to manipulate the total supply of natural gas reaching U.S. market. (Compl. ¶¶ 61-64.)

competition, stop construction of a pipeline, restrict marketing of North Slope gas, and prevent natural gas from reaching consumers in Alaska and North America. (*Id*. ¶¶ 7, 61-62, 66-68.) The nature of these agreements and objectives is set out in detail. For example, the Complaint includes factual allegations concerning the specific parties to these agreements, (*id*. ¶¶ 36-41, 61-62, 67), the specific timeline for these agreements, (*id*. ¶¶ 74-77, 79-80), and the specific and intended anticompetitive effects of those agreements, including limited competition, reduced supply, and artificially increased prices, (*id*. ¶¶ 25, 61, 62). To cite just a few examples, the Complaint alleges that Defendants agreed "not to submit any meaningful development plans for the Point Thomson unit" and to "withhold North Slope gas in order to give priority to other gas projects the Defendants are pursuing." (*Id*. ¶ 67.) In addition, the Complaint specifically alleges both that these agreements are often informal and that Defendants sought to conceal them. (*Id*. ¶¶ 61-62, 64, 67.)

There is no basis in the law for ExxonMobil's contention that this amount of detail is insufficient. Ignoring the broad sweep of Plaintiff's allegations and focusing on a single subset of the agreements mentioned in the Complaint, it suggests that to state a claim adequately, the Port Authority must identify specific provisions of unit operating agreements that violate the antitrust laws. (XOM Memo. at 37.) Rule 8 requires no such specificity at this stage. *See Twombly v. Bell Atl. Corp.*, 425 F.3d 99, 116 (2d Cir. 2005) ("neither the Federal Rules nor the Supreme Court has placed on plaintiffs the requirement that they plead with special particularity the details of the conspiracies whose existence they allege."); *Stewart Glass & Mirror, Inc. v. U.S.A. Glas, Inc.*, 940 F. Supp. 1026, 1034 (E.D. Tex. 1996) (denying motion to dismiss and holding plaintiff's minimal factual allegations of the existence of an agreement were sufficient even though "Plaintiffs do not explain in detail the precise nature of Defendants' agreement

among themselves and with insurance companies"). Indeed, to maintain a claim, a plaintiff need

not even allege an actual agreement, but just facts sufficient to infer such an agreement. *See*

*Twombly*, 425 F.38 at 114-119; *Brett v. First Fed. Sav. & Loan Ass'n.*, 461 F.2d 1155, 1158 (5th

Cir. 1972) ("Although plaintiffs may be unable to allege specific facts proving actual acts of

agreement or conspiracy, the pleadings are sufficient if they set forth facts from which an

inference of unlawful agreement can be drawn.").[8]

These allegations are more than sufficient to enable ExxonMobil to answer the charges

and prepare its defense. (*See, e.g.*, Compl. ¶¶ 61-67.) ExxonMobil argues dismissal is warranted

because it is unable to "answer the allegations or prepare to defend" against the Port Authority's

claims due to the purportedly vague nature of the agreement-related allegations and because the

"Complaint fails to allege any facts, outside of the existence of routine operating agreements" to

support the allegation of conspiracy. (XOM Memo. at 38-39.) First, for ExxonMobil to

characterize the agreements as "routine" is to dispute a factual allegation, an improper exercise

on a motion to dismiss. Second, the Port Authority alleges that Defendants entered into

agreements *in addition to* Defendants' unit operating agreements, (Compl. ¶ 61-64), so

ExxonMobil's assertion mischaracterizes the Complaint. The Port Authority has filed a 50-page

---

[8] The decisions that ExxonMobil relies upon do not support its argument. (*See* XOM Memo. at 36-37); *see, e.g.*, *Les Shockley Racing v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507-09 (9th Cir. 1989) (dismissal for failure to adequately allege injury to competition, not failure to allege sufficient details of the conspiracy); *Estate Constr. Co. v. Miller & Smith Holding Co. Inc.*, 14 F.3d 213, 221-22 (4th Cir. 1994) (complaint lacked "*completely* any allegations of communications, meetings, or other means through which one might infer the existence of a conspiracy" and "merely reiterat[ed] mechanically the words of the Sherman Act") (emphasis added); *Five Smiths, Inc. v. Nat'l Football League Players Ass'n*, 788 F. Supp. 1042, 1048 (D. Minn. 1992) (failure to allege *any* specific agreements between the defendants which would support the claim or how such agreements had an anticompetitive effect); *DM Research, Inc. v. College of Am. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999) (mere use of the terms "conspiracy" or "agreement" is not sufficient, but such terms "might well be sufficient in conjunction with a more specific allegation – for example, identifying a written agreement or even a basis for inferring a tacit agreement").

28

*Alaska Gasline Port Authority v. ExxonMobil Corp., et al., No. 4:05-cv-00026-RRB*

Complaint detailing Defendants' illegal activities relating to the development and marketing of natural gas on Alaska's North Slope. The detailed allegations in the Complaint far exceed the bare-bones allegations in the decisions cited and relied upon by ExxonMobil, where plaintiffs merely recited the elements of the offense with no detail whatsoever.

If the factual allegations described above are accepted as true for the purpose of this motion, as required, there is no question that the Port Authority could prove a "set of facts within the framework of the complaint" that would entitle it to relief. *See Hunt-Wesson Foods*, 627 F.2d at 924. Defendants are liable for agreeing not to deal with the Port Authority, for agreeing not to compete with each other, and for conspiring to monopolize the North Slope markets – actions that are decidedly illegal under the Sherman Act. Defendants simply cannot contest that, if proven, the facts alleged entitle the Port Authority to relief.

### C. The Port Authority pleads the relevant markets for the transportation and purchase of North Slope natural gas.

Defendants' various arguments that the Port Authority fails to properly allege relevant markets are without merit. First, those arguments have no application to the alleged *per se* Section 1 violations or to the conspiracy to monopolize claim, which do not require allegations of a relevant market, or to claims analyzed under the rule of reason that are based on "naked" restraints. Second, for claims governed by the rule of reason analysis, the Port Authority properly pleads relevant markets for the transportation and purchase of North Slope natural gas, and for the sale of natural gas in North America and in Southcentral and Interior Alaska.

### 1. The Port Authority's conspiracy claims do not require allegations of a relevant market.

BP argues the First, Second, and Third Claims should be dismissed because the alleged markets are inadequate. BP's arguments are unavailing because: (1) the First and Second Claims allege *per se* unlawful conduct that is presumptively anticompetitive; (2) the Third Claim

29

alleges a conspiracy to monopolize, which does not require allegations defining a relevant market; and (3) even under a rule of reason analysis, evidence of adverse anticompetitive effect can eliminate the need for market definition.

### a) The Port Authority's First and Second Claims do not require allegations of a relevant market.

"Horizontal agreements among competing sellers to fix prices or restrict output are, absent more, *per se* violations of Section 1 of the Sherman Act." *Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 225 (2d Cir. 2004) (citing *Nat'l Collegiate Athletic Ass'n v. Bd. Of Regents of the Univ. of Okla.*, 468 U.S. 85, 100 (1984) ("*NCAA*")). "Functionally, an agreement to restrict output works in most cases to raise prices above a competitive level, and for this reason, output restrictions have long been treated as *per se* violations." *United States v. Andreas*, 216 F.3d 645, 667 (7th Cir. 2000). Allegations of a relevant market definition are not required in *per se* cases. *Fragale & Sons Beverage Co. v. Dill*, 760 F.2d 469, 473 (3d Cir. 1985) (citing *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958)); *TV Signal Co. v. AT&T*, 617 F.2d 1302, 1310 (8th Cir. 1980) (citing *United States v. Topco Assocs., Inc.*, 405 U.S. 596 (1972) and *Radiant Burners, Inc. v. People's Gas Light & Coke Co.*, 364 U.S. 656 (1961)). In *per* se cases, there is no need to plead harm to competition in a particular market because harm is presumed. *See NCAA*, 468 U.S. at 103-04; *N. Pac. Ry.*, 356 U.S. at 5. BP ignores this basic rule, but it cannot avoid it.

Here, the Port Authority alleges two *per se* violations, neither of which requires an analysis of the competitive effects in any market. First, it alleges that Defendants engaged in a *per se* illegal concerted refusal to deal and group boycott, depriving the Port Authority of an essential input. (Compl. ¶¶ 180-87.) Second, it alleges that Defendants entered into *per se* illegal agreements not to compete with each other in supplying natural gas for purchase or

30

transport off the North Slope.  (*Id.* ¶¶ 188-95.)  Because the First and Second Claims allege *per se* unlawful conduct, they cannot be dismissed for failure to allege a relevant market.

BP argues that the Defendants' refusal to sell the Port Authority North Slope gas does not fit within the category of boycotts that are *per se* illegal.  That argument is inconsistent with the Supreme Court's holding in *Northwest Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284 (1985).  In *Northwest Wholesale*, the Court held that a "plaintiff seeking application of the *per se* rule must present a threshold case that the challenged activity falls into a category likely to have predominantly anticompetitive effects."  472 U.S. at 298.  The *per se* analysis, the Court held, is appropriate where boycotting parties together "possess[] market power or unique access to a business element necessary for effective competition."  *Id.* Here, the Port Authority alleges that Defendants possess both market power and unique access to the North Slope's natural gas, an element plainly "necessary for effective competition."  (Compl. ¶¶ 16-17, 158, 161.)  The Complaint also alleges that, in the absence of any pro-competitive rationale for Defendants' concerted refusal to deal with the Port Authority, their actions can only be viewed as anticompetitive.  (*Id.* ¶¶ 68, 183.)  Thus, the *per se* analysis should be applied to Defendants' group boycott and concerted refusal to deal.

### b) The Port Authority's conspiracy to monopolize claim does not require allegations of a relevant market.

Conspiracy to monopolize does not require allegations or proof of relevant markets. *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1024 (10th Cir. 2002); *accord McKenzie-Willamette Hosp. v. Peacehealth*, No. Civ. 02-6032-HA, 2003 WL 23537980, at *13 (D. Or. Aug 15, 2003) (citing *Freeman v. San Diego Ass'n of Realtors*, 322 F.3d 1133, 1154 (9th Cir. 2003)).

31

      **c)   Under a rule of reason analysis, evidence of adverse anticompetitive effect can eliminate the need for market definition.**

Even if the Port Authority's claims are evaluated under the rule of reason, the Complaint has still met its burden of pleading that Defendants' agreements to withhold gas and not to compete with each other are unreasonable restraints and violate the rule of reason.  (*See, e.g.*, Compl. ¶ 68 (The agreements "do not have any legitimate purpose," "are solely for the purpose and effect of limiting competition," and "are unreasonably restrictive of competition."); ¶¶ 182-83, 190-92.)  Since the purpose of the inquiries into market definition and market power is to determine whether an arrangement has the potential for genuine adverse effects on competition, 'proof of actual detrimental effects, such as a reduction of output,' can obviate the need for an inquiry into market power, which is but a 'surrogate for detrimental effects.'"  *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986) (citing 7 P. Areeda, Antitrust Law ¶ 1511, at 429 (1986)).  Even under a rule of reason analysis, where a complaint alleges actual anticompetitive effects based on a naked restraint on output, no "elaborate market analysis" is necessary to find the restraint unreasonable.  *See id.* at 460-61.  The Complaint here, of course, alleges profound anticompetitive consequences – the complete suppression of output of North Slope gas.  (Compl. ¶¶ 7-8, 46-47, 58-63, 171.)  Thus, no elaborate market analysis is necessary even for those claims governed by the rule of reason.

    **2.   The Complaint properly pleads relevant markets affected by Defendants' illegal conduct.**

In any event, the Complaint properly pleads harm in relevant markets.  "The relevant market inquiry has two components: geographic market and product market."  *Telecor Communs., Inc. v. Southwestern Bell Tel. Co.*, 305 F.3d 1124, 1130 (10th Cir. 2002); *Heerwagen v. Clear Channel Communs.*, 435 F.3d 219, 227 (2d Cir. 2006).  The geographic market, or "area of effective competition," is "the area[] in which the seller operates and where consumers can

32

turn, as a practical matter, for supply of the relevant product." *Heerwagen*, 435 F.3d at 227

(citing *Tampa Elec. Co. v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).  The relevant product

market consists of "products that have reasonable interchangeability for the purposes for which

they are produced – price, use and qualities considered."  *Paladin Assocs. v. Montana Power

Co.*, 328 F.3d 1145, 1156 n.10 (9th Cir. 2003) (quoting *Int'l Boxing Club of N.Y., Inc. v. United

States*, 358 U.S. 242, 250 (1959)).

     The Complaint alleges four separate relevant markets:  (1) transport of natural gas from

the North Slope, (Compl. ¶¶ 155-58); (2) purchase of natural gas from the North Slope, (*id*. ¶¶

159-61); (3) sale of natural gas in North America, (*id*. ¶¶ 162-65); and (4) sale of natural gas in

Southcentral and Interior Alaska, (*id*. ¶¶ 166-70).

     **a)  Market definition is question of fact that should not be resolved on a motion
to dismiss.**

  "The definition of the relevant market is basically a fact question dependent upon the

special characteristics of the industry involved … ."  *Twin City Sportservice, Inc. v. Charles O.

Finley & Co.*, 676 F.2d 1291, 1299 (9th Cir. 1982); *see Image Tech. Servs. v. Eastman Kodak

Co.*, 125 F.3d 1195, 1203 (9th Cir. 1997) ("what constitutes a relevant market is a factual

determination for the jury"); *Blanton v. Mobil Oil Corp.*, 721 F.2d 1207, 1213 (9th Cir. 1983)

("question whether a particular relevant market does or does not exist is one of fact").  "Because

market definition is a deeply fact-intensive inquiry, courts hesitate to grant motions to dismiss

for failure to plead a relevant product market."  *Todd v. Exxon Corp.*, 271 F.3d 191, 199-200 (2d

Cir. 2001) (citing cases); s*ee also MCM Partners, Inc. v. Andrews-Bartlett & Assocs.*, 62 F.3d

967, 977 (7th Cir. 1995) (reversing dismissal of antitrust claims because it was "not

inconceivable" that plaintiff "could prove a set of facts supporting the relevant market definition

alleged in its complaint").

### b)  The Complaint properly defines relevant markets.

The Port Authority's allegations are more than sufficient to define the relevant markets. There are a number of potential entrants in these markets, including the Port Authority.  (Compl. ¶¶ 69-80, 155, 220.)  The markets for the transportation and purchase of natural gas from the North Slope would be thriving, active markets but for Defendants' anticompetitive conduct.  (*See id*. ¶¶ 171-78.)  There are no viable alternative means of transporting or purchasing gas from the North Slope for use off the North Slope other than through a pipeline.  (*Id*. ¶¶ 156, 159.)  There is no "reasonably interchangeable substitute" for a pipeline because truck or train carriage would be massively inefficient and sea access is impractical due to ice.  (*Id*. ¶ 156.)  Likewise, there is no reasonably interchangeable substitute for the purchase of North Slope natural gas because no purchaser or reseller can purchase North Slope gas for resale to a market of any significance without a means of transport to bring that gas to market.  (*Id*. ¶ 159.)  Further, purchase for resale in the small area in which a pipeline would not be required – such as on-site at the oil production units – is not a reasonably interchangeable substitute for purchase for resale beyond the North Slope because demand on the North Slope dwarfs the supply left untapped.  (*Id*.)  The allegations in the Complaint describe particular markets foreclosed by Defendants.

There is ample precedent for markets such as the ones alleged in the Complaint.  For example, in *Paladin*, the Ninth Circuit found that "[n]atural gas and natural gas transportation services are sold separately," and held that the relevant market was the non-interruptible transportation of natural gas from Canada to Montana via a particular pipeline.  328 F.3d at 1151, 1156 n.10.  The court held that this definition was proper because no transportation product had reasonable interchangeability, noting that "[i]t does not appear from the record that a buyer of Canadian gas has any alternative means of transporting non-interruptible gas to Montana other than through the NOVA [pipeline] system."  *Id.*; *see also United States v. Enova*

34

*Corp.*, 107 F. Supp. 2d 10, 12 (D.D.C. 2000) (considering whether to allow merger that could produce anticompetitive effects due to merging company's "monopoly over natural gas transportation and storage services in southern California"); *Destec Energy, Inc. v. S. Cal. Gas Co.*, 5 F. Supp. 2d 433, 439 (S.D. Tex. 1997) (assessing whether "defendant monopolized or attempted to monopolize the natural gas transportation market in Kern County, California").

### c) Downstream markets for the sale of natural gas are not inconsistent with upstream markets for the purchase and transport of North Slope gas.

BP appears to argue that, because there is a broader downstream market for the sale of natural gas (as alleged in the Complaint), there cannot be a narrower upstream market for the purchase of an input.  (BP Memo. at 21-22.)  This proposition does not follow.  Courts have frequently found upstream markets for the purchase of inputs that are narrower than the downstream market for outputs.  *See, e.g.*, *American Needle, Inc. v. New Orleans La. Saints*, 385 F. Supp. 2d 727, 728-31 (D. Ill. 2005)  (recognizing relevant input markets for purchase of licenses for trademarks while denying motion to reconsider recognition of output markets for production of products displaying those trademarks that are sold to consumers); *Coastal Fuels Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182, 196-98 (1st Cir. 1996) (involving relevant market for sale of residual fuel oil to bunker fuel resellers, not the broader fuel market); *Washington Alder LLC v. Weyerhaeuser Co.*, No. CV 03-753-PA, 2004 WL 1119822, at *3, *7 (D. Or. May 19, 2004) (relevant product market for alder sawlogs, which is confined geographically to the Pacific Northwest).[9]

---

[9] *See also Telecor*, 305 F.3d at 1134, 1136 (finding that relevant consumers of pay telephone contracts are location owners, not end-users of telephones, and noting that the Sherman Act "does not confine its protection to consumers, or to purchasers, or to competitors, or to sellers. . . . [It] is comprehensive in its terms and coverage, protecting all who are made victims of the forbidden practices by whomever they may be perpetrated.") (quoting *Mandeville Island Farms v. American. Crystal Sugar Co*., 334 U.S. 219, 235-36 (1948)).

35

**d) Current transactions are not necessary to define a relevant market for antitrust purposes.**

Defendants argue that the alleged markets are "nonexistent" because there have not been any transactions in those markets, and thus no antitrust liability can arise.[10]  (BP Memo. at 17-21; XOM Memo. at 34.)  This is wrong.  The Complaint identifies a specific commodity known to exist in commercial quantities for which there is a strong demand and which could profitably be transported via pipeline, and a group of potential competitors, including both the Port Authority and Defendants, in the relevant markets for the purchase, transport, and sale of this commodity.[11]  Further, the Complaint alleges that there have been no transactions in the market precisely because Defendants' conduct has excluded competition.  This is sufficient to plead existence of the relevant markets for antitrust purposes.

The Ninth Circuit has held that a market may exist even when a defendant has not actually transacted business in the defined market.  Under the antitrust laws, a market is defined as "any grouping of sales whose sellers, if unified by a monopolist or a hypothetical cartel, *would have* market power in dealing with any group of buyers."  *Rebel Oil Co. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995) (emphasis added).  Stated differently, a market may be defined as "the group of sellers or producers who have the 'actual *or potential* ability to deprive each other of significant levels of business.'"  *Id.* at 1434 (quoting *Thurman Indus. v. Pay 'N Pak Stores*, 875 F.2d 1369, 1374 (9th Cir. 1989)) (emphasis added).  The court's reference to

---

[10] In fact, as the Complaint notes and as ExxonMobil concedes, there are currently some gas sales taking place on the North Slope.  "There are some relatively small volume sales on the North Slope."  (XOM Memo. at 19 n.8; *see also* Compl. ¶ 121.)

[11] If they were ever to build a pipeline, Defendants would purchase and/or transport natural gas sold by others in addition to transporting and selling their own gas.

potentiality makes clear that a history of market activity is not a prerequisite to determining a relevant market for the purpose of an antitrust action. Current transactions are unnecessary.[12]

Similarly, the Department of Justice and the FTC have stated that antitrust principles and enforcement resources should be directed to "innovation markets" that involve "competition to develop new or improved goods or processes." U.S. Dept. of Justice & FTC, Antitrust Guidelines for the Licensing of Intellectual Property § 3.2.3 (April 6, 1995), *available at* http://www.usdoj.gov/atr/public/guidelines/0558.pdf. The Guidelines explicitly recognize that antitrust scrutiny of arrangements that "affect the development of goods that do not yet exist" may be warranted. *Id.*

The exact arguments put forward by Defendants in this case were rejected in *Brownlee v. Applied Biosystems Inc.*, No. C 88 20672 RPA, 1989 WL 53864, at *2 (N.D. Cal. Jan. 9, 1989). In *Brownlee*, plaintiffs charged defendants with attempting to monopolize the market for a new scientific instrument, an instrument that defendants had not yet produced. Moving to dismiss, defendants argued that plaintiffs had improperly "defined a market with no products, no sellers and no buyers, and thus, their 'market' does not exist." *Id.* at *2. The court denied motion, holding plaintiffs had properly alleged that there was a market for such instruments defined by a worldwide group of "potential" buyers, and noting that defendants had announced their intent to produce such instruments. *Id.* Here, as in *Brownlee*, the fact that transactions have not yet occurred in the relevant markets does not preclude a finding that they are the proper markets for

---

[12] In any discussion of relevant markets, it is important to remember that market definition is not significant in itself; rather, it is a tool used to evaluate a restraint's potential adverse effects on competition. *See Indiana Fed'n of Dentists*, 476 U.S. at 460-61. "The definition of the relevant market has no independent significance under the Sherman Act. It relates only to the determination of whether a defendant possesses monopoly power." *S. Pac. Communs. Co. v. AT&T Co.*, 740 F.2d 1011, 1020 (D.C. Cir. 1984) (citing *United States v. E. I. duPont De Nemours*, 351 U.S. 377, 394-95 (1956)).

antitrust purposes, especially in light of the several potential entrants who have attempted to compete in those markets but failed due to Defendants' illegal conduct.

The decision in *Consolidated Gas Co. v. City Gas Co.*, 880 F.2d 297 (11th Cir. 1989), *vacated as moot*, 931 F.2d 710 (1991), also demonstrates that a lack of transactions does not preclude a finding of market power. There, plaintiff, a retail supplier of liquid petroleum, decided to convert to natural gas due to the rising costs of liquid petroleum. It sought to obtain gas from defendant. The defendant refused to negotiate a contract, and plaintiff sued, alleging defendant had engaged in unlawful exclusionary conduct. The district court held defendant had unlawfully monopolized the natural gas market in violation of Section 2. On appeal, defendant argued that it could not be found to have monopolized the wholesale market because it had never sold any natural gas for resale. The court rejected this argument, holding that "[t]he rather fortuitous circumstance, however, that [defendant] never actually sold any gas under this agreement does not obscure the fact that it had the power to do so." *Id.* at 300-01. Despite the obvious absence of any transactions in the market, the court affirmed the district court's finding that defendant had monopoly power in the wholesale natural gas market. *Id.* at 301. Similarly, Defendants here have the power and ability to deal with competitors in the markets for purchase and transportation of North Slope natural gas – they have colluded not to do so.

### e) Defendants' authorities do not support their argument.

As with their other arguments, Defendants rely largely on summary judgment or trial decisions. The primary decision they rely upon in which a complaint was dismissed under Rule 12 for failure to allege market definition is easily distinguishable. In *Tanaka v. University of Southern California*, 252 F.3d 1059 (9th Cir. 2001), plaintiff, a student athlete at the University of Southern California ("USC"), sued USC and the Pacific 10 Conference ("Pac-10"), claiming that a Pac-10 rule discouraged student-athletes from transferring from one Pac-10 school to

38

another and thereby violated Section 1 of the Sherman Act.  *Id*. at 1062.  Based on her desire to

remain in Los Angeles, Tanaka alleged a narrow market consisting of student-athletes competing

for positions in women's intercollegiate soccer programs in Los Angeles.  The Ninth Circuit

rejected this market definition, holding that "Tanaka's personal preference to remain in the Los

Angeles area is irrelevant to the question of whether Los Angeles is an area of effective

competition for the services of women's intercollegiate soccer players."  *Id.* at 1063.

Here, unlike *Tanaka*, the alleged markets are not constrained by the Port Authority's

personal preference, but by the geography and geology of the State of Alaska.  The Port

Authority and other competing pipeline companies cannot turn elsewhere for the purchase or

supply of gas necessary for a pipeline to transport North Slope natural gas from the North Slope.

(Compl. ¶¶ 48-49, 100, 105, 156, 159.)  The Port Authority and its competitors have no

reasonably interchangeable substitute – the largest natural gas reserves in the nation are on the

North Slope.  (*Id*. ¶¶ 156, 159.)  Defendants have successfully exercised monopoly power over

the North Slope's abundant natural gas reserves, refused to deal with the Port Authority, and

foreclosed any meaningful competition in the markets for the transportation and purchase of

North Slope natural gas.  (*Id*. ¶¶ 101-05, 158, 161, 171-79.)

The other decisions cited and relied upon by Defendants demonstrate how inappropriate

it is to seek dismissal by challenging the factual allegations supporting market definition.  For

example, the two decisions heavily relied upon by both BP and ExxonMobil – *Fraser v. Major

League Soccer*, 284 F.3d 47 (1st Cir. 2002) and *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d

Cir. 1981) – involved appeals from judgments after long trials.  *SCM* involved a 215-day trial

and 38 days of jury deliberation.  645 F.2d at 1201.  *Fraser* involved a three-month trial in which

the jury found that plaintiff did not prove a relevant market.  284 F.3d at 55.[13]  Surely, no such

lengthy trials would have been necessary had these cases been governed by the simplistic and

incorrect proposition that Defendants propose – *i.e.* that a market must be defined *only* in terms

of existing purchase and sale transactions, (BP Memo. at 18), rather than by a close examination

of market factors governing actual and potential competition.  Similarly, the patent decisions

Defendants rely upon, *SCM* and *Crucible, Inc. v. Stora Kopparbergs Bergslags AB,* 701 F. Supp.

1157 (W.D. Pa. 1988), merely find, in light of the facts and circumstances of those cases, that

certain patented products did not constitute a separate product market at the time of the alleged

anticompetitive acquisitions of the rights to those patents and the alleged anticompetitive activity

was not wrongful at the time it took place.  *SCM*, 645 F.2d at 1209-10; *Crucible*, 710 F. Supp. at

1160-62.  In reaching this conclusion, both courts relied expressly on the federal policy

encouraging protection for and transferability of patents.  *SCM*, 645 F.2d at 1209-10; *Crucible*,

710 F. Supp. at 1160-62.  In the end, Defendants' effort to construct an argument based on

quotes taken from this odd assortment of decisions fails as a matter of law and provides no basis

for its motion to dismiss.

**D.  The Port Authority's Attempted Monopolization Claim is sufficient as a matter of law and is supported by factual allegations.**

ExxonMobil seeks dismissal of the Fourth Claim, contending the Port Authority:  (1) has

pleaded an improper multi-firm "conspiracy to attempt" to monopolize; and (2) has failed to

allege facts sufficient to demonstrate a dangerous probability of achieving monopoly power.

---

[13] Likewise, *Apartment Source of Pa., L.P. v. Philadelphia Newspapers, Inc.*, No. Civ. A. 98-5472, 1999 WL 349938, at *24 (E.D. Pa. May 21, 1999) (cited in BP Memo. at. 19), involved findings after a bench trial.  The court found that defendants' broader product market definition included substitutes that were reasonably interchangeable with plaintiff's service, and on that basis concluded that the market defined by the defendants, rather than the narrower market proposed by the plaintiff, was the relevant product market.  *Id.* at *21-24.

(XOM Memo. at 33-34.)  These arguments mischaracterize the law and the factual allegations in this case.

> 1. **The Port Authority properly alleges that Defendants unlawfully attempted to monopolize in violation of Section 2 of the Sherman Act, not that they "conspired to attempt" to monopolize.**

ExxonMobil states that the Port Authority alleges an impermissible "conspiracy to attempt" to monopolize.  This argument rests on the proposition that an attempt to monopolize claim may not be made against multiple defendants.

The string of decisions cited by ExxonMobil provides little support for this broad proposition.  In those few decisions, courts determined that the specific language of the pleadings improperly charged the respective defendants with "conspiracies to attempt" to monopolize.[14]  In *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993), the Court addressed the issue before it – single firm conduct alleged to violate Section 2.  It did not hold that only single-firm conduct is actionable under Section 2's prohibition on attempts to monopolize.  Here, unlike the decisions cited by ExxonMobil and consistent with *Spectrum Sports*, the Port Authority has specifically alleged an attempt to monopolize and has not made any pleading errors that would warrant dismissal.[15]  (Compl. ¶¶ 201-06.)

---

[14] *See Windy City Circulating Co. v. Charles Levy Circulating Co.*, 550 F. Supp. 960, 967 (N.D. Ill. 1982) (plaintiff alleged in one count that defendants both conspired to monopolize and conspired to attempt to monopolize); *Alabama v. Blue Bird Body Co.*, 71 F.R.D. 606, 609 (M.D. Ala. 1976) (considering motion to amend, court noted that plaintiff improperly titled claim as "conspiracy to attempt to monopolize"), *rev'd on other grounds*, 573 F.2d 309 (5th Cir. 1978); *Invictus Records, Inc. v. American Broad. Co.*, 98 F.R.D. 419, 434 & n.3 (E.D. Mich. 1982) (claims improperly alleged a "conspiracy to attempt to monopolize").

[15] In fact, in *Southern Concrete Co. v. United States Steel Corp.*, 394 F. Supp. 362, 378-80 (N.D. Ga. 1975), the court rejected defendant's motion for summary judgment as to the attempted monopolization claim – a claim involving a concerted attempt to monopolize.  "In [defendant's motion for partial summary judgment] it recognizes that both monopolization and attempted monopolization can be effected by concerted activity."  *Id.* at 378.

Moreover, courts have rejected this argument under similar circumstances. For example, in *In re Visa Check/Mastermoney Antitrust Litigation*, No. 96-CV-5238 (JG), 2003 WL 1712568, at *6 (E.D.N.Y. Apr. 1, 2003), defendant MasterCard argued that plaintiffs had improperly charged a "conspiracy to attempt to monopolize," relying on one of the decisions cited by ExxonMobil. *Id.* The court disagreed, finding that "the evidence of common ownership, a lack of competition, and incidents of concerted activity by the two defendants could permit a jury to conclude that MasterCard, along with Visa, is attempting to monopolize the relevant market." *Id.*

The fact that the Port Authority directs this claim at more than one defendant does not transform a properly pleaded claim into a conspiracy to attempt. *See Aurora Enters., Inc. v. Nat'l Broad. Co., Inc.*, 688 F.2d 689, 695-96 (9th Cir. 1982) (reversing district court's dismissal of plaintiffs' attempted monopolization claim against group of defendants); *Intellective, Inc. v. Mass. Mut. Life Ins. Co.*, 190 F. Supp. 2d 600, 614-15 (S.D.N.Y. 2002) (denying motion to dismiss attempted monopolization claim against five defendant insurance companies working together to monopolize market).

### 2. The Port Authority alleges facts establishing a dangerous probability that Defendants will monopolize North Slope natural gas markets.

In order to state a claim for attempted monopolization, a plaintiff must establish three elements: (1) anticompetitive conduct; (2) a specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power in a relevant market. *See Spectrum Sports*, 506 U.S. at 456; *Confederated Tribes of Siletz Indians of Or. v. Weyerhaeuser Co.*, 411 F.3d 1030, 1041 (9th Cir. 2005). ExxonMobil argues that the Port Authority failed to allege facts demonstrating the

42

third element.  (XOM Memo. at 34.)  This unsupported argument ignores specific allegations contained in the Port Authority's Complaint and should be rejected.[16]

First, the Port Authority alleges Defendants' market power.  It not only alleges that Defendants have a probability of obtaining monopoly power, but alleges that they already possess monopoly power.  (Compl. ¶¶ 158, 161, 165, 170.)  Defendants own over two-thirds of the proved natural gas resources on the North Slope.  (*Id.* ¶¶ 2, 119, 125.)  Defendants have successfully used their market power to exclude competition and prevent others from selling or transporting North Slope gas, to reduce supply, and to maintain artificially high prices in the downstream market.  (*Id.* ¶¶ 171-79.)  These factual allegations are more than adequate to raise a presumption of market power for the purpose of an attempted monopolization claim.  *See Siletz Indians*, 411 F.3d at 1043 (finding 44% market share sufficient); *Hunt-Wesson Foods*, 627 F.2d at 925-26 (finding 65% market share sufficient).  More importantly, the Complaint alleges that a commitment from Defendants would be necessary to construct a pipeline.  (Compl. ¶¶ 16, 48-49.)  Independent producers do not have enough gas to support a pipeline by themselves.  Thus, Defendants have the power to exclude competition, *i.e.*, market power.

The Port Authority also alleges Defendants' individual interests on the North Slope.  Specifically, it alleges that ExxonMobil has a 36.4% interest in the PBU, has a 48.22% interest in the PTU, and is the unit operator of the PTU.  (Compl. ¶¶ 125, 138.)  Contrary to ExxonMobil's argument, even if considered individually, this significant control would suffice to establish a

---

[16] In any event, whether there is a dangerous probability of success is a fact issue and should not be resolved at the pleadings stage.  *See General Electric Co. v. Bucyrus-Erie Co.*, 563 F. Supp. 970, 977 (S.D.N.Y. 1983) ("the requirement that there be a showing of a dangerous probability of monopolization 'is a matter of proof ... not pleading'."); *Welch v. American. Psychoanalytic Ass'n*, No. 85 Civ. 1651 (JFK), 1986 WL 4537, at *11-12 (S.D.N.Y. Apr. 4, 1986) (denying motion to dismiss attempted monopolization claim where plaintiffs alleged that defendants "controlled the market," which is sufficient to demonstrate a dangerous probability of monopolization).

dangerous probability of ExxonMobil monopolizing the North Slope natural gas markets. *See Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1298, 1309 (9th Cir. 1982) (finding 24% market share sufficient for attempted monopolization claim); *Meridian Project Sys., Inc. v. Hardin Const. Co., LLC*, No. Civ.S-04-2728 (FCD), 2005 WL 2615523, at *4-6 (E.D. Cal. Oct. 14, 2005) (denying motion to dismiss because 37% market share sufficient to state claim for attempted monopolization).

Again, the decisions relied upon by ExxonMobil are inapplicable. Its heavy reliance on *Spectrum Sports* is misplaced and would be more appropriate at the summary judgment stage. *See PPG Indus., Inc. v. Pilkington plc*, 825 F. Supp. 1465, 1471 (D. Ariz. 1993) (denying defendant's motion to dismiss attempted monopolization claim and questioning the applicability of *Spectrum Sports* to a motion to dismiss); *Rolite, Inc. v. Wheelabrator Envtl. Sys., Inc.*, 958 F. Supp. 992, 1000-02 (E.D. Pa. 1997) (denying defendant's motion to dismiss attempted monopolization claim; holding that "more specific" facts about defendant's market share are not needed at the pleading stage). Similarly, *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729 (9th Cir. 1987), is inapplicable because, unlike in that case, the Port Authority specifically alleges Defendants' interests in the North Slope, collectively and individually.

### E. The Complaint states a Section 7 claim.

As the Complaint alleges, Defendants have engaged in a long campaign to bottle up natural gas resources on the North Slope. The increase in concentration resulting from the mergers of BP and Amoco, BP and ARCO, and Exxon and Mobil, together with the accretion of a host of smaller leaseholds and gas interests, have substantially reduced competition and facilitated Defendants' anticompetitive scheme. (Compl. ¶¶ 151-53.) These mergers and acquisitions have had an actual anticompetitive effect in that Defendants have managed to secure

such a large portion of the North Slope gas reserves that no pipeline can be built without the commitment from them to sell gas.  (*See id.* ¶ 49.)

Section 7 of the Clayton Act, 15 U.S.C. § 18, is designed to provide redress from this type of conduct.  Defendants challenge the adequacy of Plaintiffs' allegations under Section 7 by making two arguments:  (1) the claims are untimely, because the statute of limitations precludes claims for damages under Section 7 and the doctrine of laches precludes any request for equitable relief; and (2) the Complaint fails to allege the required elements of a Section 7 claim. (XOM Memo. at 26-32; BP Memo. at 24-29.)  Neither argument has merit.

### 1. Resolution of Defendants' arguments that Section 7 claims are untimely is not proper at this stage of the case.

After devoting substantial portions of their memoranda to the contention that the Port Authority has sued too soon – that it is insufficiently prepared to enter the market – Defendants then change tack and argue the opposite position – that the Port Authority has sued too late.

### a) Application of the statute of limitations is premature.

In an effort to deflect review of the anticompetitive effects of the mergers and acquisitions discussed in the Complaint, Defendants invoke the Clayton Act's four-year statute of limitations, with little discussion.  (*See* XOM Memo. at 27-28; BP Memo. at 29.)  BP cites a single decision, *International Telephone & Telegraph v. General Telephone & Electronics Corp.*, 518 F.2d 913 (9th Cir. 1975) ("*ITT*"), while ExxonMobil relies both on *ITT* and a decision from the Eighth Circuit, *Midwestern Machinery Co. v. Northwest Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004).  Each of these authorities reveals that consideration of the statute of limitations is premature in the context of these motions to dismiss.

A motion to dismiss on statute of limitations grounds cannot be granted unless the plaintiffs cannot prove any facts to show that the action is timely.  *Jablon v. Dean Witter & Co.*,

614 F.2d 677, 682 (9th Cir. 1980); *see also Supermail Cargo, Inc. v. United States*, 68 F.3d 1204, 1207 (9th Cir. 1995) ("a complaint cannot be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would establish the timeliness of the claim").  The decisions cited by Defendants demonstrate that a more complete record is necessary before applying the four-year period as a bar to any claims.

In *ITT*, the decision relied upon by both Defendants, the Ninth Circuit reviewed a district court decision after entry of judgment, not on a motion to dismiss.  518 F.2d at 916.  In the words of the district court, the record on which it based its decision was voluminous:  "65 depositions were taken, and designated deposition evidence, together with designated documents totaling several thousand pages, filled over 10 feet of shelf space."  *Int'l Tel. & Telegraph Corp. v. Gen. Tel. & Elects Corp.*, 351 F. Supp. 1153, 1162 n.7 (D. Haw. 1972).  For the Ninth Circuit, however, even this record was insufficient to address statute of limitations arguments, and it directed the trial court to make further findings and to explore whether an exception to the statute could apply.  *ITT*, 518 F.2d at 929.

Similarly, *Midwestern Machinery* indicates that statute of limitations determinations in the merger context require a more complete record.  Initially, on a motion to dismiss, the district court held that for Section 7 liability based on post-acquisition conduct, the holding of stock must be accompanied by anticompetitive use of that stock.  *Midwestern Machinery Co. v. Northwest Airlines, Inc.*, 990 F. Supp. 1128, 1138 (D. Minn. 1998).  Because the court "could not conceive of a post-acquisition use" of stock that had been exchanged for shares in a new company, it granted the motion to dismiss with prejudice.  *Id.*  The Eighth Circuit reversed, finding that it was premature at the pleading stage to address the post-merger use of one firm's assets when two corporate entities are no longer distinct, at the pleading stage.  "[T]his is a

46

matter for discovery, proof, summary judgment or trial and not a matter for decision on a motion to dismiss." *Midwestern Machinery Co. v. Northwest Airlines, Inc.*, 167 F.3d 439, 442 (8th Cir. 1999).  On remand, the district court entered summary judgment, holding that the statute of limitations barred plaintiffs' claims.  *See Midwestern Machinery Co. v. Northwest Airlines, Inc.*, No. Civ.97-1438 DWF/ABJ, 2003 WL 262414, at *4 (D. Minn. Feb. 5, 2003).  In considering the statute of limitations issue, and whether any exceptions might toll the period, the district court contrasted its earlier decision, on a motion to dismiss, with a decision on summary judgment.  "At the time [ruling on the motion to dismiss], there had been no discovery, and the possibility still existed for the plaintiffs to proffer evidence that would support a tolling of the statute or, perhaps, a different date for commencement of the limitations period." *Id.* at *3.  In short, only after the development of a full record was the court able to rule on the statute of limitations issue.

In this case, the Complaint alleges that Defendants used a series of mergers and acquisitions to prevent the marketing of natural gas and that they acquired additional gas leases – given to the original owners with the express purpose of developing those resources – for the purpose of foreclosing any production of gas.  (Compl. ¶¶ 134-53.)  The Port Authority should be given the opportunity to establish how Defendants' use of assets obtained through these mergers and acquisitions support a claim under Section 7.

### b)  Application of the doctrine of laches is premature.

The same analysis applies to ExxonMobil's argument that the doctrine of laches bars any claim for injunctive relief.  For support, ExxonMobil cites *California v. American Stores Co.*, 495 U.S. 271 (1990), and *ITT*.  In *American Stores*, the Supreme Court simply acknowledged the possibility of equitable defenses to private antitrust suits.  The Court expressly stated that the

47

issue of whether any such defense was available at an early stage of the case (there, a grant of a preliminary injunction) was not before it.  495 U.S. at 296.

In *ITT*, the Ninth Circuit held that application of laches requires not only delay, but also prejudice to the defendant.  518 F.2d at 926; *see also Danjaq LLC v. Sony*, 263 F.3d 942, 951 (9th Cir. 2001).  In its memorandum, ExxonMobil makes no mention of any prejudice.  In addition to establishing delay and prejudice, in *ITT* the Ninth Circuit also directed the district court to consider whether any exceptions to the limitations period could apply, or whether the court should exercise its discretion to toll the period.  518 F.2d at 929.  As seen above, the district court in *ITT* was in a position to do so because it had a complete, fully developed record before it.

Any ruling on the use of laches as a bar to equitable relief – as with any ruling on the statute of limitations as a bar to damages claims – is premature in the present motion to dismiss because there is no record on which to determine if these defenses apply, or whether any exception to these defenses can be invoked.

## 2. The Complaint states a Section 7 claim against each Defendant.

Section 7 prohibits a defendant from acquiring assets and holding and using acquired assets if the effect "may be substantially to lessen competition, or tend to create a monopoly." 15 U.S.C. § 18.  The Complaint specifically alleges that Defendants – through a series of mergers and acquisitions – have not only diminished competition in the markets for the transportation and purchase of natural gas from the North Slope, but have eliminated it altogether.  (Compl. ¶¶ 134-53, 207-209.)  Those allegations properly state a violation of Section 7.

To state a claim under Section 7, a plaintiff must allege a relevant market and a reasonable likelihood of substantial lessening of competition in that market.  *See United States.*

*v. E.I. DuPont deNemours & Co.*, 353 U.S. 586, 595 (1957); *California ex rel Lockyer v. Mirant Corp.*, 266 F. Supp. 2d 1046, 1054-55 (N.D. Cal. 2003), *aff'd*, 375 F.3d 831 (9th Cir. 2004). As discussed in section II.C., above, the Complaint properly alleges the relevant markets. For its Section 7 claim, the Port Authority alleges that the relevant markets are the markets for the transportation and purchase of natural gas. (Compl. ¶ 208.) The Complaint provides detailed allegations of the contours of those markets. (*See*, *e.g.*, Compl. ¶¶ 154-61.) *See Mirant Corp.*, 266 F. Supp. 2d at 1055-56 (stating plaintiff need not "'explain the basis for his definition' of the relevant market" because "'a complaint alleging the relevant market need not show on the face of the complaint that the market is the proper one'") (quoting *Walker Process Equip., Inc. v. Food Machinery & Chem. Corp.*, 382 U.S. 172, 177 (1965)).

The Complaint also alleges not only likely anticompetitive effects, but substantial anticompetitive effects that have already occurred. The Port Authority alleges that Defendants concentrated their ownership of natural gas resources and lease interests in the North Slope through a series of acquisitions. (Compl. ¶¶ 24, 134-44, 145-50.) Further, through the holding and use of their ownership and lease interests in natural gas resources, Defendants have prevented the development, marketing, and sale of North Slope natural gas. (*Id.* ¶¶ 119-20, 125-27, 138-144, 151-53.) Ultimately, the Port Authority will have to prove that Defendants' acquisitions, holdings, and use of assets has diminished or threatens to diminish competition. Properly pleading anticompetitive effects for purposes of Federal Rule of Civil Procedure 12(b)(6), however, does not require the detailing of specific evidence Defendants demand. *See, e.g.*, *Twombly v. Bell Atl.*, 425 F.3d at 108-13; *accord FTC v. H.J. Heinz Co.*, 246 F.3d 708, 713 (D.C. Cir. 2001) ("Congress used the words 'may be substantially to lessen competition' to indicate that its concern was with probabilities, not certainties.").

ExxonMobil contends that the Port Authority's claims cannot proceed because there are no allegations that the merged firms previously competed in the relevant market. The Northern District of California rejected a similar argument in *Mirant Corp.* There, the defendant claimed there could be no Section 7 violation because it was the only utility in a non-competitive market prior to deregulation and prior to its contested acquisition (*i.e.*, the merged companies could not have been competitors). *Mirant Corp.*, 266 F. Supp. 2d at 1053. The court agreed that the merged companies were not competitors in the usual sense, but found that commercial realities of the market at issue must be taken into account and that such a determination could not be made on a motion to dismiss. *Id.* at 1054.[17] Equally compelling and persuasive to the court was the fact that plaintiff also alleged anticompetitive effects resulted from the holding and use of the acquired assets. *Id.* at 1055 (citing *United States v. ITT Continental Baking Co.*, 420 U.S. 223 (1975)).[18]

BP argues that its mergers did not increase its ownership of oil and gas resources in the PBU and PTU, but does not dispute that its mergers increased its ownership of gas resources on the *North Slope* or in the market for the sale of gas in North America. In fact, the Complaint does allege that BP's mergers increased BP's interests on the North Slope. (Compl. ¶¶ 139, 146-51.) In any event, BP's arguments miss the point. First, as the Complaint makes clear,

---

[17] The court in *Mirant Corp.* also distinguished the two decisions relied on by ExxonMobil: *Fraser v. Major League Soccer LLC*, 284 F.3d 47 (1st Cir. 2002) and *SCM Corp. v. Xerox Corp.*, 645 F.2d 1195 (2d Cir. 1981). It reasoned that *Fraser* was a narrow holding that did not set forth the parameters of a Section 7 claim, but merely reconciled a possible theory that was consistent with the a jury verdict. The court ruled *SCM* was inapposite because it relied on the exclusivity afforded by a lawful patent grant to determine there was no prior competitive market. *Mirant Corp.*, 266 F. Supp. 2d at 1054.

[18] The other decision relied on by Defendants, *Equifax, Inc. v. FTC*, 618 F.2d 63, 66 (9th Cir. 1980), dealt with the alleged harm caused by a proposed merger itself, and not, as here, with the concentration of market power resulting from a merger and the post-merger anticompetitive effects of holding and using acquired assets.

Defendants' challenged conduct could not have been undertaken unless each Defendant had an illegal assurance from the other that it would cooperate in refusing to deal and limiting output for the anticompetitive purpose, among others, of inflating the price of gas. It is plain that a significantly less concentrated industry would impede such cooperation because it would include more significant independent sources of supply. Second, Plaintiff here is not trying to prevent a merger. Rather, the Port Authority has alleged that through a series of mergers and acquisitions, Defendants concentrated their ownership and interests in natural gas resources and that they have held and used those interests to cartelize natural gas resources and to prevent the development, marketing, and sale of North Slope natural gas.[19]  (Compl. ¶¶ 119-20, 125-27, 138-144, 151-53.) Defendants cannot shoe-horn the Complaint's Section 7 claims into the analysis courts undertake when reviewing pre-merger claims. Section 7 is a remedial statute intended to reach various conduct that causes anticompetitive effects, even after a merger. *See Mirant Corp.*, 266 F. Supp. 2d at 1054; *see also ITT Continental Baking Co.*, 420 U.S. 223, 243 (1975); *Midwestern Machinery*, 167 F.3d at 443; *SCFC ILC, Inc. v. Visa USA, Inc.*, 801 F. Supp. 517, 525 (D. Utah 1992). Where a plaintiff has pleaded the required elements for a Section 7 violation, determinations of the proper relevant market, the extent of market power, and the extent of anticompetitive effects should not be resolved on a motion to dismiss. *Midwestern Machinery*, 167 F.3d at 442; *Mirant Corp.*, 266 F. Supp.2d at 1054-55 (refusing to dismiss Section 7 claim on motion to dismiss); *Gerlinger v. Amazon.com, Inc.*, 311 F. Supp. 2d 838, 855 (N.D. Cal. 2004) (denying judgment on the pleadings on Section 7 claim and requiring a more developed record as to anticompetitive effects).

---

[19] BP's argument that its agreements with ExxonMobil are irrelevant to the Section 7 claim ignores the facts that Plaintiff has alleged that the agreements are part of the Defendants' holding and use of assets that threaten to lessen competition. (*See* Compl. ¶¶ 61-68, 111.)

**III. The Complaint States Claims Under Alaska Law.**

    **A.  The Port Authority's Tortious Interference with Prospective Business Opportunity claim is sufficient under Alaska law.**

        A tortious interference with prospective business opportunity claim has six elements:  (1) an existing prospective business relationship; (2) defendant's knowledge of the relationship and intent to prevent its fruition; (3) failure of the prospective relationship to culminate in pecuniary benefit to the plaintiff; (4) conduct of the defendant interfering with the prospective relationship; (5) damages caused by the defendant; and (6) the absence of privilege or justification.  *See K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 717 (Alaska 2003).  Defendants argue that the Port Authority's allegations are deficient with respect to elements one and six.  (XOM Memo. at 40-42; BP Memo. at 30-32.)[20]  In fact, the Port Authority's allegations are sufficient with respect to both elements.

        **1.  The Port Authority adequately alleges facts showing an existing prospective business relationship with the State of Alaska, Sempra, and others.**

        Restating some of its standing arguments, ExxonMobil argues that the Port Authority has failed to allege facts showing an existing prospective business relationship.  (XOM Memo. at 40-41.)  This argument ignores the Port Authority's specific factual allegations and is unsupported as a matter of law.

        The Complaint describes how Defendants interfered with and frustrated the Port Authority's existing prospective business relationships.  (*See, e.g.*, Compl. ¶¶ 85, 90-91, 101-05.)  With respect to the proposed pipeline, the Port Authority has prospective business relationships with the State of Alaska, gas producers (including both of the defendants and other producers), and gas purchasers.  (*Id.* ¶¶ 85, 217-18, 222.)  The Port Authority also has an existing

---

    [20] Only ExxonMobil argues that the Port Authority fails to allege sufficient facts to satisfy the first element.  BP challenges only the sixth element in its motion.

prospective relationship with Sempra, as Sempra had already contracted with the Port Authority

to assist with constructing and funding the pipeline. (*Id*. ¶¶ 219-20.) Defendants interfered with

and frustrated all of these relationships, causing Sempra to withdraw and otherwise preventing

the Port Authority from moving forward with its proposal. (*Id*. ¶¶ 225-26.) Neither vague nor

speculative, these allegations are sufficient to state a claim against Defendants. *See Odom v.*

*Fairbanks Mem'l Hosp.*, 999 P.2d 123, 132 (Alaska 2000) (reversing dismissal of tortious

interference claim).

ExxonMobil's reliance on *K & K Recycling* is misplaced. Significantly, that decision

involved a motion for summary judgment, not a motion to dismiss, and summary judgment was

granted on the basis of a lack of evidence. *K & K Recycling*, 80 P.3d at 717. The plaintiff in *K*

*& K Recycling* alleged that it had opportunities to market its product, but there was no evidence

that the plaintiff "made **any** commitments to third parties" to bring its product to market. *Id.* at

717 (emphasis added). Here, the Port Authority has adequately alleged a number of

commitments to third parties, including Sempra, all of which have been frustrated by

Defendants' unlawful conduct.

## 2. The Port Authority adequately alleges that Defendants' anticompetitive conduct and intentional interference lack justification or privilege.

Defendants argue that the Port Authority has failed to allege the absence of a privilege,

invoking an "economic interest" privilege. (XOM Memo. at 41-42; BP Memo. at 30-32.)

Again, Defendants argument ignores the allegations and misapplies the law.

The Port Authority's Complaint alleges that Defendants' conduct was without

justification. (Compl. ¶ 226.) It states that Defendants engaged in a "willful and malicious

course of conduct to foreclose the Authority from conducting its business." (*Id.* ¶ 216.) It also

describes how Defendants unlawfully agreed to prevent the Port Authority from constructing a

53

pipeline and to frustrate the Port Authority's prospective business opportunities. (*Id.* ¶¶ 47, 58, 61-64, 67-68, 226-27.) Again, these allegations are more than adequate on a motion to dismiss to establish that Defendants' conduct was unjustified. *See Odom*, 999 P.2d at 132.

Defendants argue that their actions are justified based on their financial interest in a potential pipeline they may build, but they mischaracterize the law.[21] In *RAN Corp. v. Hudesman*, 823 P.2d 646 (Alaska 1991), upon which both Defendants rely, the court held that even "where there is a direct financial interest in a contract, the essential question in determining if interference is justified is whether the person's conduct is motivated by a desire to protect his economic interest, or whether it is motivated by spite, malice, or some other improper objective." *Id.* at 649-50 (quoting *Bendix Corp. v. Adams*, 610 P.2d 24, 31 (Alaska 1980)). That decision did not, as Defendants suggest, carve out an exception to liability merely because a party has a financial interest in a contract. Rather, identifying a financial interest is only the first step. Determining whether the conduct was justified still requires an inquiry into Defendants' motivations, which involves a multi-factored factual determination that is improper on a motion to dismiss. *See id.* at 648 (noting that the sixth element of tortious interference – absence of privilege – requires a multi-factored inquiry); *Bendix*, 610 P.2d at 30 n.10 (listing factors relevant to justification determination). Here, the Complaint alleges that Defendants' conduct was motivated by the desire to eliminate competition and artificially restrict the supply of natural

---

[21] The fundamental reason the law grants an economic or financial interest justification is to protect competition and to ensure that competitors are not chilled from competition by the threat of tort liability. *See RAN Corp.*, 823 P.2d at 648 n.4. This principle has no application here, where the Defendants were motivated not by their financial interest in a potential pipeline they may build, but by the suppression of competition.

gas so that they could maintain supracompetitive profits on other gas interests, (Compl. ¶¶ 63, 68), an objective that is not only improper but illegal.[22]

**B.  The Port Authority properly pleads an Unfair Trade Practices and Consumer Protection Act claim.**

Defendants rely on their earlier arguments that the Port Authority lacks antitrust standing to assert that the Port Authority's Unfair Trade Practices claim should be dismissed.  (BP Memo. 29-30; XOM Memo. 39-40.)  As discussed above, the Port Authority has adequately alleged specific facts demonstrating that it has standing to pursue its antitrust claims.  Therefore, the Port Authority has standing to pursue its Unfair Trade Practices claim.  *See Odom*, 999 P.2d at 132 (reversing dismissal of antitrust plaintiff's Unfair Trade Practice claim).[23]

**C.  The Port Authority adequately alleges BP breached its contractual obligation to negotiate in good faith arising from the Charter for Development of the Alaska North Slope.**

**1.  BP's improper conduct predated any contractual deadline.**

BP's argument that the Port Authority's pleadings fall outside a contractual deadline of December 2003 is incorrect.  The Port Authority alleges a long-standing conspiracy between Defendants not to deal with the Port Authority or other entities, in direct violation of BP's

---

[22] The few decisions cited by Defendants that do not involve summary judgment are inapplicable.  In *Sisters of Providence v. A.A. Pain Clinic, Inc.*, 81 P.3d 989 (Alaska 2003), cited by BP, the court affirmed a jury verdict for plaintiff.  *Nizinski v. Currington*, 517 P.2d 754 (Alaska 1974), involved the judicial proceeding privilege to a charge of libel, an affirmative defense that is distinct from whether conduct that interferes with a party's prospective business opportunities is justified.

[23] ExxonMobil suggests that the claim should be dismissed based on a purported failure to allege an ascertainable loss of money or property.  (XOM Memo. at 39-40 (citing AS 45.50.531(a)).)  This argument ignores the facts alleged in the Complaint.  The Port Authority alleges that Defendants' unlawful and anticompetitive conduct injured its business and property, including through loss of future profits, loss of customers and potential customers, and by the prospective destruction of its business.  (Compl. ¶ 214.)  These alleged losses are further supported by the rest of the allegations contained in the Complaint.  (*Id.* ¶¶ 48-49, 85, 100, 102-04, 220-26.)

contractual duties.  The Port Authority alleges that it "has repeatedly attempted to engage the Defendants in good faith negotiations regarding the purchase of gas from the Defendants' resources on the North Slope."  (Compl. ¶101.)  There is no allegation establishing that these attempts were limited to the detailed offer to Defendants in 2005 described in paragraph 102.

### 2.   The Port Authority is an intended third-party beneficiary of the Charter.

The Alaska Supreme Court has repeatedly held that a court "should not interpret an agreement in a manner which would give meaning to one part of an agreement at the cost of annulling another part."  *Himschoot v. Dushi*, 953 P.2d 507, 510 n.2 (Alaska 1998).  To understand a given contractual provision, the court must therefore look to the whole of the contract for its meaning.  *See, e.g.*, *Earth Movers of Fairbanks, Inc. v. Alaska Dept. of Trans. & Pub. Facilities*, 824 P.2d 715, 717 n.6 (Alaska 1992) (looking to language of contract "as a whole" to understand specific provisions).

For a third-party right in a contract to be recognized, the contract must intend that at least one purpose of the contract is to benefit a third party.  *Stewart-Smith Haidinger, Inc. v. Avi-Truck, Inc.*, 682 P.2d 1108, 1112 (Alaska 1984) (citing *Alaska v. Osborne*, 607 P.2d 369, 371 (Alaska 1980)).  It is clear the parties to the Charter for Development of the Alaska North Slope ("Charter") intended to benefit the Port Authority, as the Charter specifically confers *on the Port Authority* the benefit of BP's obligation to negotiate in good faith: "During this period, BP and ARCO will give fair consideration to all reasonable approaches, projects and plans proposed by the State, joint interest owners and others, *including LNG projects developed or proposed by the newly established port authority*…."  (Charter at I.J.(4) (BP Memo., Ex. 1); Compl. ¶ 230.)  BP is further obligated to "meet and confer with project sponsors on reasonable request," (Charter at I.J.(4)) and to "make reasonable efforts to assist in obtaining [necessary approvals from other field interest owners.]"  (Charter at I.J.(1).)

56

It is axiomatic that specific contract terms are given greater weight than general language. *See Sourdough Dev. Servs., Inc. v. Riley*, 85 P.3d 463, 468 n.7 (Alaska 2004). Because the specific contractual provisions demonstrate that it was the intent of the parties to the Charter to benefit the Port Authority specifically, the general provisions pointed to by BP in its motion to dismiss should either be read to conform to the clear, specific intent of the parties that their contract benefit the Port Authority, or, if this is not possible, to be trumped by these specific provisions. *See Norville v. Carr-Gottstein Foods Co.*, 84 P.3d 996, 1004 (Alaska 2004) ("In contracts, as in statutes, where one section deals with a subject in general terms and another deals with a part of the same subject in a more detailed way, the two should be harmonized if possible; but if there is a conflict, the specific section will control over the general.").

BP relies on two generalized provisions for its argument that the parties to the Charter did not intend to create third party rights: the arbitration provision and the construction provision.

This arbitration provision is limited to disputes between the State, BP, and ARCO – it does not extend to third party beneficiaries of the contract. At the very least, this language is ambiguous, and as such, it should be read in conformity with the specific contractual language creating a third-party right in the Port Authority. Moreover, the issue should be preserved for determination at a later stage of the proceedings. "[W]here there is uncertainty or ambiguity, intent may be ascertained from the language and conduct of the parties, the objects sought to be accomplished and the surrounding circumstances at the time the contract was negotiated." *Pepsi Cola Bottling Co. of Anchorage v. New Hampshire Ins. Co.*, 407 P.2d 1009, 1013 (Alaska 1965) (reversing the trial court's premature grant of summary judgment where appellant sought opportunity to supplement evidence of intent). This issue is one of fact, and is not appropriate for resolution on a motion for summary judgment, let alone a motion to dismiss. *See Smalley v.*

*Juneau Clinic Bldg. Corp.*, 493 P.2d 1296, 1305 (Alaska 1972) ("Since we find the two agreements ambiguous … we hold that … this issue was an inappropriate one for resolution by summary judgment.").

Read in context, the construction provision indicates that the parties sought to limit the ability of other regulatory entities or successors to the merged entity's partial interests to sue under the contract. The provision is not inconsistent with section I.J., in which the contracting parties clearly manifest the intent to benefit the Port Authority. To the extent that the general disclaimer of an intent to confer rights and remedies on "other persons" does conflict with section I.J.(4), it is governed by the more specific language of the latter, as explained above.

**IV. Defendants' Other Arguments Provide No Support For Dismissal Of Plaintiff's Claims.**

Defendants end their briefs with strained, albeit creative, arguments that ignore that the Complaint alleges and seeks relief for serious violations of the antitrust laws. Specifically, ExxonMobil argues that this action is preempted by the Stranded Gas Development Act, (XOM Memo. at 45-49), and BP contends that the Port Authority failed to sue indispensable third parties, even though those third parties are not accused of any wrongdoing, (BP Memo. at 36-37).

**A. The Port Authority is authorized to bring this lawsuit, which is not preempted by the Stranded Gas Development Act.**

**1. This lawsuit is consistent with the Stranded Gas Development Act.**

ExxonMobil challenges the Port Authority's power to bring this lawsuit, claiming that the lawsuit conflicts with the Stranded Gas Development Act ("SGDA"). The Port Authority's

58

lawsuit, however, is entirely consistent with the letter and purpose of the SGDA. ExxonMobil's preemption argument is meritless and should be rejected.[24]

Passed in 1998, the SGDA was intended to "encourage new investment to develop the state's stranded gas resources by authorizing establishment of fiscal terms" that are "tailored to the particular economic conditions of the project and to establish those fiscal terms in advance with as much certainty as the Constitution of the State of Alaska allows …." AS 43.82.010. In other words, the SGDA permits the State administration to negotiate gas and oil tax and royalty concessions as inducements to build a gas pipeline, not to limit or constrain municipal action. *See* AS 43.82.020. Of course, the legislation was deemed necessary because of Defendants' long-running joint refusal to develop or to market North Slope gas. The Port Authority's pipeline project is economically viable without concessions under the SGDA, and there is no requirement that a pipeline sponsor seek such concessions.

ExxonMobil's suggestion that the SGDA limits the Port Authority's ability to enforce the antitrust laws because this action somehow interferes with the operation of the SGDA is inconsistent with both the language and purpose of the SGDA. To the contrary, the only conduct that has interfered with the SGDA has been Defendants' anticompetitive refusals to supply gas and unlawful efforts to restrict competition on the North Slope. The same is true with respect to the other legislative provisions thrown in by ExxonMobil at the end of its brief, none of which preempt this lawsuit.

---

[24] Alaska law requires that municipal powers be liberally construed. *See* A.K. Const. art. X, § 1; AS 29.35.400. The decisions cited by ExxonMobil all recognize this rule, which ExxonMobil ignores in its motion.

*Alaska Gasline Port Authority v. ExxonMobil Corp., et al.,* No. 4:05-cv-00026-RRB

**2.    The Port Authority's lawsuit is not expressly preempted by the Stranded Gas Development Act.**

In Alaska, the standard for demonstrating preemption of a municipal act is very stringent. In order to preempt a municipal ordinance, "[t]he prohibition must be either by express terms or by implication such as where the statute and ordinance are so substantially irreconcilable that one cannot be given its substantive effect if the other is to be accorded the weight of law." *Simpson v. Anchorage*, 635 P.2d 1197, 1200 (Alaska Ct. App. 1981) (citation omitted).  ExxonMobil has failed to show that, when passing the SGDA, the State Legislature intended to selectively preclude municipal entities' ability to enforce federal law.  ExxonMobil relies on the portion of the SGDA that makes the general statement that "if a provision of this chapter conflicts with another provision of state or municipal law, the provision of this chapter governs," for the proposition that the Port Authority's lawsuit is preempted.  (XOM Memo. at 45 (quoting the SGDA).)  As noted above, the SGDA says absolutely nothing about limiting the ability of port authorities or other municipal entities to sue to enforce the federal antitrust laws.

**3.    The Port Authority's lawsuit does not substantially interfere with the Stranded Gas Development Act or any other State act.**

Absent express preemption, ExxonMobil must show that "an ordinance substantially interferes with the effective function of a state statute or regulation or its underlying purpose." *Liberati v. Bristol Bay Borough*, 584 P.2d 1115, 1122 (Alaska 1978).  This standard is so stringent that ExxonMobil has only cited a single decision in which a municipal ordinance was actually preempted.  *See Simpson*, 635 P.2d at 1200 (finding municipal drunk driving ordinance preempted where "the municipality's legislative authority was limited by the express terms of state legislation applicable to all local ordinances regulating the operation of motor vehicles").

The other decisions cited by ExxonMobil all hold that the challenged municipal ordinances were ***not*** preempted despite state regulation.  *See, e.g.*, *Anchorage v. Repasky*, 34

60

P.3d 302, 311-12 (Alaska 2001) (holding municipal charter's grant of line item veto to mayor

was not prohibited by state law); *McCormick v. Dillingham*, 16 P.3d 735, 740 (Alaska 2001)

(holding two local ordinances were valid); *Kotzebue Lions Club v. City of Kotzebue*, 955 P.2d

921, 923 (Alaska 1998) (holding state regulation of charitable gaming did not preempt municipal

taxation of such activity); *Liberati*, 584 P.2d at 1121-22. These decisions demonstrate that

preemption applies only when the State passes a statute that sets one standard, and a municipality

passes an ordinance in *direct conflict* on the same substantive matter that sets a different and

incompatible standard. As noted above, that is simply not the case here – this lawsuit and the

SGDA are entirely compatible.

On a final note, ExxonMobil fails to cite a single decision in which a legislative act has

been held to eliminate a municipal entity's power to bring a federal lawsuit. As one would

expect of an argument about preemption, ExxonMobil relies exclusively on decisions

challenging the power of political subdivisions to *legislate* in the shadow of state-wide

regulation. Those decisions are therefore inapplicable and provide no support for ExxonMobil's

motion.

### B. BP's Rule 12(b)(7) Motion to Dismiss for failure to join indispensable parties is entirely without merit.

In a final effort to avoid review of its anticompetitive behavior, BP argues that this case

should be dismissed under Federal Rules of Civil Procedure 19 and 12(b)(7) for failure to join

indispensable parties. (BP Memo. at 36-37.) In moving to dismiss on this ground, BP does

nothing more than simply invoke Rule 19. It fails to address a single one of the many factors the

Court must consider in analyzing whether Rule 19 applies, let alone furnish any authority or

evidence demonstrating that the action should be dismissed.[25]  BP's argument under Rule 19 is simply an effort to deflect attention from critical issues brought forward by the Complaint – Defendants' anticompetitive refusals to develop and sell North Slope natural gas – and it should be rejected.

First, BP cites no precedent for the remarkable proposition that in an antitrust action alleging conspiracy and other violations of the Sherman and Clayton Acts, third parties who are not accused of wrongdoing should be made parties to the liability phase of the proceedings.

Second, BP fails to address the detailed analysis in which the Court must engage to determine whether Rule 19 mandates dismissal for failure to join indispensable parties.  *See*, *e.g.*, *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558-60 (9th Cir. 1990); *Schnabel v. Lui*, 302 F.3d 1023, 1029-31 (9th Cir. 2002).  This detailed analysis involves a host of factors, the first of which is a determination whether an absent party is "necessary" to the suit, an involved process with at least four elements.  *Makah Indian Tribe*, 910 F.2d at 558.  Then, if the party is necessary and cannot be joined, the court must consider whether the party is "indispensable," so that in "equity and good conscience" the suit should be dismissed.  *Id.*  This too involves a four-part analysis.  *Id.* at 560.  The inquiry detailed above is "a practical one and fact-specific, and is designed to avoid the harsh results of rigid application."  *Id.* at 558.

BP does not address a single one of the many factors that the Court must weigh in ruling on a motion to dismiss for failure to join an indispensable party.  Instead, it merely conjures the specter that other North Slope gas interests may be affected by injunctive relief.  There is,

---

[25] In arguing for dismissal under Rule 12(b)(7), BP cites a single decision for the proposition that Rule 19 is designed to protect the interests of absent parties.  In that case, *United States ex rel. Morongo Band of Mission Indians v. Rose*, 34 F.3d 901, 909 (9th Cir. 1994), the effort to dismiss the action under Rule 12(b)(7) was rejected by both the district court and the Ninth Circuit.

however, no reason to believe that, when the time comes to fashion appropriate equitable relief for Defendants' illegal conduct, this Court will be unable to provide an appropriate mechanism for all interested parties to be heard. By moving the court under Rule 12(b)(7), BP bears the burden to do more than simply invoke Rule 19. *Id.* ("The moving party has the burden of persuasion in arguing for dismissal."); *Biagro Western Sales, Inc. v. Helena Chemical Co.*, 160 F. Supp. 2d 1136, 1141 (E.D. Cal. 2001) ("A motion to dismiss for failure to join an indispensable party requires the moving party to bear the burden in producing evidence in support of the motion."). As its moving papers demonstrate, BP has failed to meet this burden, and the motion must be denied.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should deny the Defendants' Motions to Dismiss in their entirety.

Dated:  March 10, 2006                    Respectfully submitted,

                                           s/John F. Cove, Jr.

                                          David Boies
                                          Robert Silver
                                          John F. Cove, Jr.
                                          Kenneth F. Rossman IV
                                          BOIES, SCHILLER & FLEXNER LLP
                                          1999 Harrison St., Suite 900, Oakland, CA 94612
                                          510.874.1000; 510.874.1460 (fax)
                                          jcove@bsfllp.com

                                          William M. Walker
                                          WALKER & LEVESQUE, LLC

                                          Charles E. Cole
                                          LAW OFFICES OF CHARLES E. COLE

                                          *Counsel for Plaintiff Alaska Gasline Port Authority*

63

## Certificate of Service

I hereby certify that on March 10, 2006, a copy of the foregoing document entitled**,**

**"CONSOLIDATED OPPOSITION OF  ALASKA GASLINE PORT AUTHORITY TO MOTIONS TO DISMISS OF EXXON MOBIL CORPORATION AND EXXON MOBIL ALASKA PRODUCTION, INC. (#33), BP P.L.C. (#44), AND BP EXPLORATION (ALASKA) INC. (#30)**"

was served electronically on each of the following:

David Boies, Kevin Barry, John F. Cove, Jr., Kenneth F. Rossman, IV, Robert Silver, William M. Walker, Charles E. Cole, Jeffrey M. Feldman, Paul B. Hewitt, Bradley S. McKim, Ronald C. Redcay, Matthew T. Heartney, Angel L. Tang, Donald B. Craven, William B. Rozell, Douglas J. Serdahely, C. Fairley Spillman, Matthew P. Whitley, and James P. Tuite,

and via U. S. Mail on each of the following:

**David J. Beck**
BECK REDDEN & SECREST
1221 McKinney Street Ste. 4500
Houston, TX 77010

**L. Nicole White**
BECK REDDEN & SECREST
1221 McKinney Street, Ste. 4500
Houston, TX 77010

**Eric J.R. Nichols**
BECK REDDEN & SECREST
1221 McKinney Street, Ste. 4500
Houston, TX 77010

**J. Andrew Langan**
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601

**David J. Zott**
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601

**Benjamin W. Hulse**
KIRKLAND & ELLIS LLP
200 East Randolph Drive
Chicago, IL  60601

By:  s/John F. Cove, Jr.

BOIES, SCHILLER & FLEXNER LLP
1999 Harrison St., Suite 900, Oakland, CA 94612
510.874.1000; 510.874.1460 (fax)
jcove@bsfllp.com