Donald B. Craven (DC Bar No. 221424)
**AKIN GUMP STRAUSS**
**HAUER & FELD LLP**
1333 New Hampshire Avenue, N.W.
Washington, DC  20036
(202) 887-4000; (202) 887-4288 (fax)
dcraven@akingump.com

David J. Beck (Federal Bar No. 919)
**BECK, REDDEN & SECREST**
1221 McKinney Street, Suite 4500
Houston, TX  77010
(713) 951-3700; (713) 951-3720 (fax)
dbeck@brsfirm.com

William B. Rozell (Alaska Bar No. 7210067)
623 Basin Road
P.O. Box 20730
Juneau, AK  99802
(907) 586-0142; (907) 463-5647 (fax)
bartrozell@aol.com

Douglas J. Serdahely (Alaska Bar No. 7210072)
**PATTON BOGGS LLP**
601 West 5th Avenue, Suite 700
Anchorage, AK  99501
(907) 263-6310; (907) 263-6345 (fax)
dserdahely@pattonboggs.com

*Attorneys for Defendants Exxon Mobil Corporation and*
*ExxonMobil Alaska Production, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| THE ALASKA GASLINE PORT AUTHORITY, <br><br> Plaintiff, <br><br> v. <br><br> EXXONMOBIL CORPORATION, a New Jersey corporation; EXXONMOBIL ALASKA PRODUCTION, INC., a Delaware corporation; BP P.L.C., a United Kingdom corporation; and BP EXPLORATION (ALASKA) INC., a Delaware corporation, <br><br> Defendants. | Case No. 4:05-cv-00026-RRB <br><br> **REPLY MEMORANDUM IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS EXXON MOBIL CORPORATION AND EXXONMOBIL ALASKA PRODUCTION, INC.** |

　
# TABLE OF CONTENTS

**PAGE**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ............................................................................................. 1

ARGUMENT ................................................................................................... 3

I.    THE PORT AUTHORITY IS PROHIBITED FROM PROSECUTING THIS
ACTION ............................................................................................... 3

    A.    This Lawsuit Interferes with the Pervasive Legislative Scheme that
Governs the State's Development and Management of Its Natural Gas
Resources ................................................................................... 3

    B.    Ample Precedent Supports a Determination that this Lawsuit Is Preempted
Because It Conflicts with the Accomplishment of Statutory Goals of
Statewide Importance ...................................................................... 6

II.    THE COURT SHOULD DISMISS THE PORT AUTHORITY'S ANTITRUST
CLAIMS (FIRST, SECOND, AND THIRD CLAIMS FOR RELIEF) UNDER
RULE 12(b)(6) FOR LACK OF ANTITRUST STANDING ............................. 9

    A.    The Courts Frequently Dismiss Antitrust Claims for Lack of Standing ............... 11

    B.    Rule 12(b)(6) Dismissal Is Appropriate Because the Port Authority's
"Ability to Finance Entry" Depends on the Outcome of a Complex, Highly
Uncertain Government Approval Process ............................................... 11

    C.    Dismissal Is Also Proper Because the Port Authority Lacks Commitments
for the $4 Billion-Plus in Non-Guaranteed Front-End Financing that Will
Be Required ................................................................................ 14

    D.    The Port Authority Cannot Rely on a "Futility Exception" to Excuse Its
Failure to Secure Financial Commitments ............................................. 16

III.    THE PORT AUTHORITY FAILS TO REBUT EXXONMOBIL'S
ARGUMENTS THAT THE SECTION 7 CLAIMS (FIFTH CLAIM FOR
RELIEF) ARE TIME-BARRED ................................................................ 18

    A.    The Statute of Limitations Bars the Port Authority's Section 7 Damages
Claim ....................................................................................... 18

    B.    The Doctrine of Laches Bars the Port Authority's Section 7 Equitable
Claim ....................................................................................... 20

    C.    The Court Can Resolve the Timeliness of the Port Authority's Section 7
Claims on a Motion to Dismiss .......................................................... 20

IV.    THE PORT AUTHORITY CANNOT RESCUE ITS ATTEMPTED
MONOPOLIZATION CLAIM (FOURTH CLAIM FOR RELIEF) ..................... 21

V.    THE COMPLAINT'S ALLEGATIONS CANNOT SUSTAIN THE STATE
LAW CLAIMS (SIXTH AND SEVENTH CLAIMS FOR RELIEF) ................... 24

CONCLUSION ............................................................................................... 25

# TABLE OF AUTHORITIES

## CASES

*A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239 (S.D.N.Y. 2004) ................................23

*Alaska v. City of Petersburg*, 538 P.2d 263 (Alaska 1975) ................................................7

*Allstate Ins. Co. v. Mun. of Anchorage*, 599 P.2d 140 (Alaska 1979) ................................8

*Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799 (D.C. Cir. 2001) ................................13

*Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245 (10th Cir. 2003)............12, 17

*Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459
   U.S. 519 (1983)................................................................................11, 22

*Aurora Enter., Inc. v. NBC, Inc.*, 688 F.2d 689 (9th Cir. 1982) ................................22

*Austin v. Blue Cross and Blue Shield of Ala.*, 903 F.2d 1385 (11th Cir. 1990)............................11

*Bendix Corp. v. Adams*, 610 P.2d 24 (Alaska 1980) ................................................24

*Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704 (9th Cir. 2003) ................................9

*Bristol-Myers Squibb Co. v. Copley Pharm., Inc.*, 144 F. Supp. 2d 21 (D. Mass. 2000)............13

*Bubar v. Ampco Foods, Inc.*, 752 F.2d 445 (9th Cir. 1985) ................................9, 15, 16

*Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559 (11th Cir. 1987) ................12

*California ex rel. Lockyer v. Mirant Corp.*, 266 F. Supp. 2d 1046 (N.D. Cal. 2003) ................19

*Chugach Elec. Ass'n, Inc. v. City of Anchorage*, 476 P.2d 115 (Alaska 1970) ................7, 8

*City of Juneau v. Hixson*, 373 P.2d 743 (Alaska 1962) ................................................7

*City of Kenai v. Kenai Peninsula Newspapers, Inc.*, 642 P.2d 1316 (Alaska 1982) ................7

*City of Kodiak v. Jackson*, 584 P.2d 1130 (Alaska 1978) ................................................7

*City of Phil. v. Beretta U.S.A., Corp.*, 126 F. Supp. 2d 882 (E.D. Pa. 2000) ................8

*City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256 (3d Cir. 1998)................12, 13, 14

*Clegg v. Cult Awareness Network*, 18 F.3d 752 (9th Cir. 1994) ................................2

*Cmty. Elec. Serv. of L.A., Inc. v. Nat'l Elec. Contractors Ass'n*, 869 F.2d 1235 (9th Cir. 1989) ......................................................................................................................9

*Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117 (9th Cir. 19 80) ...........................................21

*County of Stanislaus v. Pac. Gas & Elec. Co., No. Civ. 93-5866*, 1995 WL 819150 (E.D. Cal. Dec. 18, 1995) ...................................................................................................11

*DM Research, Inc. v. Coll. of Amer. Pathologists*, 170 F.3d 53 (1st Cir. 1999) ............................2

*DeHusson v. City of Anchorage*, 583 P.2d 791 (Alaska 1978).........................................................7

*In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460 (9th Cir. 1993)...................................................................................................9, 10, 15, 16

*Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538 (9th Cir. 1987).........................................................11

*Fleer Corp. v. Topps Chewing Gum, Inc.*, 415 F. Supp. 176 (E.D. Pa. 1976) ..............................18

*Florida Seed Co. v. Monsanto Co.*, 915 F. Supp. 1167 (M.D. Ala. 1995) ....................................11

*Gas Utils. Co. of Ala., Inc. v. S. Natural Gas Co.*, 996 F.2d 282 (11th Cir. 1993) ................15, 16

*Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335 (S.D. Fla. 2002)....................23

*Int'l Telephone & Telegraph Corp. v. Gen. Tel. & Elec. Corp.*, 518 F.2d 913 (9th Cir. 1975) ....................................................................................................................20

*Jade Aircraft Sales, Inc. v. City of Bridgeport*, No. 83-454, 1990 WL 128573 (D. Conn. July 9, 1990) ...............................................................................................12

*Jefferson v. Alaska*, 527 P.2d 37 (Alaska 1974) .......................................................................7, 8

*Johnson v. City of Fairbanks*, 583 P.2d 181 (Alaska 1978) ...........................................................7

*K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702 (Alaska 2003)........................................24

*Lamp Liquors, Inc. v. Adolph Coors Co.*, 410 F. Supp. 536 (D. Wyo. 1976) ..............................12

*Lennon v. Seaman*, 63 F. Supp. 2d 428 (S.D.N.Y. 1999) ............................................................21

*Libby v. City of Dillingham*, 612 P.2d 33 (Alaska 1980)................................................................7

*MGIC Indem. Corp. v. Weisman*, 803 F.2d 500 (9th Cir. 1986) ....................................................4

*Macauley v. Hildebrand*, 491 P.2d 120 (Alaska 1971) ..............................................6, 7

*Midwestern Mach. Co. v. Northwest Airlines, Inc.*, 392 F.3d 265 (8th Cir. 2004)..................19, 20

*Mun. of Anchorage v. Repasky*, 34 P.3d 302 (Alaska 2001) ............................................8

*Mun. Utils. Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493 (11th Cir. 1991) ...............11

*In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113 (N.D. Cal. 2005)..............................11

*Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir. 1984) ...........................................16

*Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104 (9th Cir. 1999) .....................................9

*RAN Corp. v. Hudesman*, 823 P.2d 646 (Alaska 1991)..................................................25

*Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729 (9th Cir. 1987) ..............................2, 23

*Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857 (7th Cir. 1999) ................................................2

*Simpson v. Mun. of Anchorage*, 635 P.2d 1197 (Alaska Ct. App. 1981) ...................................5, 7

*Solinger v. A & M Records, Inc.*, 586 F.2d 1304 (9th Cir. 1978)...................................................18

*Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'n, Inc.*, 376 F.3d 1065 (11th Cir. 2004) ........................................................................................22, 23

*Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993) ................................................21, 22, 23

*Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*, 405 F. Supp. 2d 1141 (C.D. Cal. 2005)....................................................................................................23

*Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*, 200 F.3d 307 (5th Cir. 2000) ........................................................................................................22

*Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870 (5th Cir. 2002) ............................8

*Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566 (11th Cir. 1991) .........................................18

*Tose v. First Pa. Bank*, 492 F. Supp. 246 (E.D. Pa. 1980) ...............................................18

*Tunley v. Mun. of Anchorage Sch. Dist.*, 631 P.2d 67 (Alaska 1980) .............................................7

*Utah Gas Pipeline Corp. v. El Paso Natural Gas Co.*, 233 F. Supp. 955 (D. Utah 1964)............18

*Walleri v. City of Fairbanks*, 964 P.2d 463 (Alaska 1998) .............................................7

*Wright v. Mun. of Anchorage*, 590 P.2d 425 (Alaska 1979)............................................7

*Xechem, Inc. v. Bristol-Myers Squibb Co.*, 274 F. Supp. 2d 937 (N.D. Ill. 2003).........................13

## STATUTES AND RULES

15 U.S.C. § 720n(b)(1) ................................................................................14

AS 38.05.180 ..............................................................................................5

AS 43.82.600 ..............................................................................................4

Fed. R. Civ. P. 17(b) ..................................................................................8

## CONSTITUTIONAL PROVISIONS

Alaska Const., art. VIII, § 2 ........................................................................6

Alaska Const., art. VIII, § 12 .......................................................................6

## TREATISES

2 Moore's Federal Practice § 12.34 (3d ed.) ...............................................2

P. Areeda and H. Hovenkamp, II Antitrust Law ¶ 320c5 (2d ed. 2000) ........................19

P. Areeda and H. Hovenkamp, V Antitrust Law ¶ 1205b (2d ed. 2003) ........................20

## OTHER AUTHORITIES

*Consolidation in the Oil and Gas Industry: Raising Prices?: Hearing Before the S. Comm. on the Judiciary*, 109th Cong., Federal News Service (2006) ...............................4

Press Release No. 06-20, Alaska Governor F. Murkowski, Governor Announces Agreement on Gas Pipeline (Feb. 21, 2006)........................................................3

Defendants Exxon Mobil Corporation and ExxonMobil Alaska Production, Inc. (collectively "ExxonMobil") respectfully submit this memorandum in reply to Plaintiff's Consolidated Opposition ("Opp.") to the motions to dismiss the Complaint.

## INTRODUCTION

Throughout its opposition, Plaintiff Alaska Gasline Port Authority seeks to restate the issues presented by the motions to dismiss in ways designed to deflect attention from the deficiencies that require dismissal of its Complaint.  For example, the Port Authority begins its opposition with the overblown assertion that defendants' dismissal arguments would "place [their] conduct . . . beyond the reach of the antitrust law."  Opp. 1.  But the question presented here is not whether defendants enjoy antitrust immunity – clearly they do not.  Rather, ExxonMobil's motion to dismiss presents two principal issues:  (1) whether the Port Authority, as a political subdivision of the State, is authorized to seek judicial relief that would interfere with Alaska's ability to develop North Slope gas resources under the process contemplated by the Stranded Gas Development Act; and (2) whether the Port Authority has pleaded sufficient facts to state any claim for relief and, in particular, to satisfy the preparedness requirement of antitrust standing.  As shown in ExxonMobil's opening brief and in the discussion that follows, the Port Authority's Complaint fails on both counts.

The Port Authority seeks to shield the sufficiency of the Complaint from judicial scrutiny by repeatedly emphasizing notions of notice pleading and insisting that its allegations raise issues of fact inappropriate for resolution at this juncture.  The Port Authority apparently believes that, because it has managed to assemble 54 pages of allegations and has invoked multiple antitrust theories, it gets a free pass to proceed to extensive discovery of defendants' files in the hope of finding something to support its conclusory allegations of conspiracy.

The Port Authority confuses quantity with quality. Mere recitation of the elements of various antitrust claims, coupled with facially deficient factual allegations, is not enough to state a claim. Moreover, courts are not bound to accept "'[c]onclusory allegations or legal conclusions masquerading as factual conclusions.'" 2 Moore's Federal Practice § 12.34 (3d ed.) (citation omitted); *see also Clegg v. Cult Awareness Network,* 18 F.3d 752, 754-55 (9th Cir. 1994) (courts do not have to accept legal conclusions that "cannot reasonably be drawn from the facts alleged"); *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987) (same) (affirming Rule 12(b)(6) dismissal).

District courts have broad discretion to grant motions to dismiss, and while a "plaintiff need not include evidentiary detail, [it] must allege a factual predicate concrete enough to warrant further proceedings." 2 Moore's Federal Practice § 12.34 (3d ed.). As noted in *DM Research, Inc. v. Coll. of Amer. Pathologists*, 170 F.3d 53, 56 (1st Cir. 1999), such a "factual predicate" is "the price of entry, even to discovery," which may be "costly and burdensome." *See also Ryan v. Mary Immaculate Queen Ctr.*, 188 F.3d 857, 860 (7th Cir. 1999) (purpose of a motion to dismiss is "to allow the court to determine at the outset of the litigation, before costly discovery is undertaken, whether the plaintiff has any tenable theory or basis of suit, so that if he does not the case can be got rid of immediately without clogging the court's docket and imposing needless expense on the defendant") (citations omitted).

Here, the allegations of the Complaint, when examined with appropriate care, reveal that the Port Authority has failed to satisfy the price of entry. It has not pleaded adequate facts to show that it is authorized, and has antitrust standing, to pursue this action.

**ARGUMENT**

**I.     THE PORT AUTHORITY IS PROHIBITED FROM PROSECUTING THIS
        ACTION**

In its opening brief, ExxonMobil explained that this lawsuit is unauthorized under state law because it runs afoul of the express preemption provision of the Stranded Gas Development Act and impermissibly interferes with the operation of that Act and Alaska's other laws governing natural resource development and management.  Mem. of Law in Supp. of Mot. to Dismiss of Exxon Mobil Corp. and ExxonMobil Alaska Production, Inc. ("XOM Mem.") 42-49. The Port Authority responds that its lawsuit is consistent, and does not interfere, with the state statutory scheme for developing its natural gas resources and that its lawsuit is not prohibited, either explicitly or implicitly, by state law.  Opp. 58-61.  Those contentions are wrong and should be rejected.

> **A.     This Lawsuit Interferes with the Pervasive Legislative Scheme that Governs
>         the State's Development and Management of Its Natural Gas Resources**

The Alaska legislature enacted the Stranded Gas Development Act based on its findings that, among other things, North Slope gas resources are commercially stranded, changes in the state and local tax structure are needed to promote fiscal certainty and remove barriers to development, and determining the best way to commercialize the gas resources is a matter of statewide importance.  XOM Mem. 45-46.  The Act therefore creates a comprehensive and detailed process for negotiating and approving contractual agreements designed to make the development and commercialization of North Slope gas resources a reality.  XOM Mem. 46. That process is now gaining momentum, as evidenced by the recent announcement that "the State of Alaska and the producers have reached agreement on a natural gas pipeline contract."

Press Release No. 06-20, Alaska Governor F. Murkowski, Governor Announces Agreement on Gas Pipeline (Feb. 21, 2006), http://www.gov.state.ak.us/news.php?id=2221.[1]

The Port Authority, however, is not content to let the statutory procedures run their course. Rather, through this lawsuit, the Port Authority seeks relief that would undermine the entire process – namely, an injunction ordering the defendants to sell it North Slope gas.[2] Such a judicial decree would not only scuttle the State's recently announced agreements with the producers, but also subvert negotiations with other potential project sponsors.

The Port Authority dismisses these concerns with the assertion that this lawsuit "is entirely consistent with the letter and purpose of the SGDA." Opp. 59. According to the Port Authority, the language of the Act "permits the State administration to negotiate gas and oil tax and royalty concessions as inducements to build a gas pipeline, not to limit or constrain municipal action." *Id.* In so arguing, however, the Port Authority ignores the language of the statute that expressly preempts conflicting municipal actions. AS 43.82.600. It is difficult to imagine a conflict more fundamental than the one sought by this lawsuit – that is, seeking to

---

[1] The Court may properly take notice of this type of public information and consider it on a motion to dismiss. *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) (noting that on a motion to dismiss, a court "may take judicial notice of matters of public record outside the pleadings") (citations omitted).

[2] The recent testimony of the Port Authority's litigation counsel, David Boies, before the U.S. Senate Committee on the Judiciary has erased any doubt about the relief sought in this case. In response to a question from Chairman Specter, Mr. Boies confirmed that the Port Authority "seek[s] a mandatory injunction that would tell" the defendants "to sell the[ir] gas" to it. *Consolidation in the Oil and Gas Industry: Raising Prices?: Hearing Before the S. Comm. on the Judiciary*, 109th Cong., Federal News Service at 22 (2006). (A copy of the transcript of this public record testimony is attached hereto as Exhibit A.).

have the federal courts, rather than the State's elected officials under a carefully crafted legislative scheme, determine how North Slope gas resources will get to market.[3]

The Port Authority similarly cannot justify this lawsuit based on its supposed consistency with the Act's purpose. Opp. 59. The Port Authority cannot contend seriously that asking this Court to order the sale of North Slope natural gas to the Port Authority, and thereby to preempt the outcome of the legislatively prescribed process, is consistent with the purpose of the Stranded Gas Development Act. Moreover, even if it were assumed for argument's sake that this lawsuit seeks to advance the same general goals as the Stranded Gas Development Act, it does not follow that the Port Authority would be empowered to pursue a course of action that would frustrate the *specific means* that the State has chosen to achieve those goals.[4] *See Simpson v. Mun. of Anchorage*, 635 P.2d 1197, 1207 n.16 (Alaska Ct. App. 1981) (rejecting argument that "any similarity of broad social policies furthered by [a municipal] ordinance and a [state] statute would automatically render the ordinance consistent with the statute").

Here, the Stranded Gas Development Act establishes comprehensive and intricate procedures that are themselves components of the State's uniform laws and regulations for the administration of Alaska's natural gas resources.[5] These laws and regulations constitute a valid – indeed an unimpeachable – exercise of the State's preeminent authority, derived from the

---

[3] The Stranded Gas Development Act establishes special procedures involving the Executive, the public, the Legislature, and the Judiciary directly in the process for negotiating, reviewing, and approving contracts for qualifying stranded gas projects. XOM Mem. 46.

[4] The Port Authority's dubious contention that its "pipeline project is economically viable without concessions under the SGDA" is irrelevant here. Opp. 59. The issue before the Court is whether the Port Authority is empowered to pursue this lawsuit and the relief it seeks, not whether its proposed project is viable without regard to the Act.

[5] The most significant of those laws is AS 38.05.180, which sets forth uniform procedures for administration of the State's oil and gas leaseholds.

mandatory and unqualified language of Article VIII of the Alaska Constitution, to manage its natural resources in the manner of its choosing. This authority may not be subordinated to municipal prerogatives.[6] *See Macauley v. Hildebrand*, 491 P.2d 120, 122 (Alaska 1971) (state law preempted borough's attempt to impose accounting procedures on school district where the "constitutional mandate for pervasive state authority in the field of education" was expressed in mandatory terms and did not assign concurrent responsibility to municipalities).

It is precisely such a subordination of state policy that the Port Authority's lawsuit seeks to achieve. The Authority is attempting to trump the State's procedures and to have this Court substitute its judgment for that of the Legislature, the Executive, and the Alaska administrative agencies charged with implementing the State's natural resources laws and regulations.[7] The Port Authority is prohibited from frustrating the policies of its parent state in this manner.

### B. Ample Precedent Supports a Determination that this Lawsuit Is Preempted Because It Conflicts with the Accomplishment of Statutory Goals of Statewide Importance

The Port Authority presumes that it is entitled to act in any way not expressly or implicitly prohibited by state law. Opp. 60 (citing *Simpson*, 635 P.2d at 1200). Although

---

[6] Alaska Const., art. VIII, § 2 ("The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people."); *id.* § 12 ("The legislature shall provide for the issuance, types and terms of leases for coal, oil, gas, oil shale, . . . and other minerals as may be prescribed by law.").

[7] Two assertions in the Port Authority's brief make clear that it is seeking to have this Court second guess judgments made by the Alaska legislative and executive branches. First, the Port Authority asserts that the defendants' alleged, long-standing conspiracy necessitated enactment of the Stranded Gas Development Act (*see* Opp. 59) even though the statute's extensive legislative history and findings contradict that charge. *See* XOM Mem. 45-46. Second, the Port Authority accuses the Executive of complicity in the alleged conspiracy by giving the defendants "enormous financial concessions . . . as a reward for suppressing output over the course of decades." Opp. 5.

"prohibition" is the standard generally applied in Alaska preemption cases, the Port Authority's argument ignores two crucial refinements to the preemption test, both described in ExxonMobil's opening brief (XOM Mem. 44) and both applicable here.

First, where the Alaska legislature has *expressly provided* that state law preempts conflicting municipal action, the existence of a conflict between the state and municipal schemes necessarily satisfies the "prohibition" standard. *See Simpson*, 635 P.2d at 1200 (municipality could not enact drunk-driving ordinance stricter than state statute, where statute expressly preempted inconsistent municipal action). Second, the Alaska courts have repeatedly required "local enactment[s] to yield if [they] directly or indirectly impede[] implementation of statutes which s[eek] to further a specific *statewide* policy." *Johnson v. City of Fairbanks,* 583 P.2d 181, 185 (Alaska 1978) (emphasis added); *see also DeHusson v. City of Anchorage*, 583 P.2d 791, 793 (Alaska 1978); *Macauley v. Hildebrand*, 491 P.2d 120, 122 (Alaska 1971); *Chugach Elec. Ass'n, Inc. v. City of Anchorage*, 476 P.2d 115, 123 (Alaska 1970) (all finding municipal actions preempted by need for statewide uniformity in area of law). Consistent with these refinements to the general "prohibition" standard, and with its case-by-case approach to preemption challenges, the Alaska Supreme Court has found municipal actions to be preempted by state law on a number of occasions.[8] The Port Authority is simply wrong when it suggests that the "stringency" of the prohibition standard has resulted in a judicial finding of preemption on only one occasion. *See* Opp. 60.

---

[8] *See, e.g.*, *Walleri v. City of Fairbanks*, 964 P.2d 463, 468 (Alaska 1998); *City of Kenai v. Kenai Peninsula Newspapers, Inc.*, 642 P.2d 1316, 1325 (Alaska 1982); *Tunley v. Mun. of Anchorage Sch. Dist.*, 631 P.2d 67, 77 (Alaska 1980); *Libby v. City of Dillingham*, 612 P.2d 33, 42 (Alaska 1980); *Wright v. Mun. of Anchorage*, 590 P.2d 425, 427 (Alaska 1979); *City of Kodiak v. Jackson*, 584 P.2d 1130, 1133 (Alaska 1978); *Alaska v. City of Petersburg*, 538 P.2d 263, 268-69 (Alaska 1975); *Jefferson v. Alaska*, 527 P.2d 37, 43 (Alaska 1974); *City of Juneau v. Hixson*, 373 P.2d 743, 749 (Alaska 1962) (all finding municipal action preempted by state law).

The Port Authority is equally wrong to suggest that preemption analysis does not apply here because the challenged municipal action is the filing of a lawsuit. *See* Opp. 61. The Port Authority, as a creature of state law, lacks authority to take *any* action that frustrates the laws and policies of Alaska. Indeed, the Alaska courts have applied preemption analysis to a wide variety of municipal actions in addition to ordinance-making. *See Mun. of Anchorage v. Repasky*, 34 P.3d 302, 307 (Alaska 2001) (exercise of mayor's general veto power); *Allstate Ins. Co. v. Mun. of Anchorage*, 599 P.2d 140, 143-44 (Alaska 1979) (investigation by Anchorage Equal Rights Commission); *Jefferson v. Alaska*, 527 P.2d 37, 38-39 (Alaska 1974) (city's conveyance of sewer system to borough); *Chugach*, 476 P.2d at 116 (city's refusal to issue permit required by ordinance). While the Alaska courts have not considered the precise issue presented here, other courts have, concluding that state statutes may eliminate a municipality's authority to bring suit in federal court. *See City of Phil. v. Beretta U.S.A., Corp.*, 126 F. Supp. 2d 882, 889-90, 894-95 (E.D. Pa. 2000) (municipality's action in filing lawsuit was preempted by state statutes barring municipal efforts to regulate firearms and to recoup expenditures on law enforcement and health services), *aff'd on other grounds*, 77 F.3d 415 (3d Cir. 2002); *Terrebonne Parish Sch. Bd. v. Mobil Oil Corp.*, 310 F.3d 870, 878-83 (5th Cir. 2002) (dismissing school board's complaint as time-barred; state Constitution did not extend to political subdivisions the privileged treatment accorded the State as a civil plaintiff).[9]

Finally, the Port Authority is wrong to suggest that, because this case arises under federal law, it can be distinguished from the cited authorities. Consistent with Fed. R. Civ. P. 17(b), the

---

[9] The Port Authority mistakenly criticizes ExxonMobil for "fail[ing] to cite a single decision in which a legislative act has been held to eliminate a municipal entity's power to bring a federal lawsuit." Opp. 61. In fact, ExxonMobil cited two examples of such decisions, *Beretta* and *Terrebonne*. *See* XOM Mem. 43 n.28.

Ninth Circuit has held that *state* law determines whether a corporate plaintiff is authorized to bring suit and that the federal interest in adjudicating antitrust disputes must yield where a would-be plaintiff lacks the capacity to sue as a matter of state law. *See Cmty. Elec. Serv. of L.A., Inc. v. Nat'l Elec. Contractors Ass'n*, 869 F.2d 1235, 1239 (9th Cir. 1989) (affirming dismissal of federal antitrust suit where plaintiff's corporate powers had been suspended by the California Franchise Tax Board, and rejecting plaintiff's argument that "federal antitrust law should prevail because of the federal interest involved"), *overruled in part on other grounds by Townsend v. Homan Consulting Corp.*, 914 F.2d 1136 (9th Cir. 1990).[10]

In sum, to avoid upsetting the legislative scheme for developing North Slope gas resources and undoing the enormous effort the State has devoted to negotiating agreements under the Stranded Gas Development Act, this Court should dismiss this action. Contrary to the Port Authority's assertions, ample precedent supports such a result.

## II.    THE COURT SHOULD DISMISS THE PORT AUTHORITY'S ANTITRUST CLAIMS (FIRST, SECOND, AND THIRD CLAIMS FOR RELIEF) UNDER RULE 12(b)(6) FOR LACK OF ANTITRUST STANDING

The Complaint should be dismissed because the Port Authority has failed to plead facts sufficient to show that its ability to enter the market is anything more than "merely a gleam in the eye and a hope in the heart of its promoters." *Bourns, Inc. v. Raychem Corp.*, 331 F.3d 704, 712 (9th Cir. 2003) (not cited by the Port Authority); *accord In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1465 (9th Cir. 1993) (same); *Bubar v. Ampco Foods,*

---

[10] As with its attempt to distinguish the filing of suit from traditional ordinance-making, the Port Authority's federal supremacy argument ignores that the Port Authority, as a creature of state law, lacks the power to take *any* action that frustrates state law or policy. This principle is embodied in the general rule, accepted in the Ninth Circuit, that a municipality lacks standing to prosecute federal claims against its parent state. *See Palomar Pomerado Health Sys. v. Belshe*, 180 F.3d 1104, 1107 (9th Cir. 1999).

*Inc.*, 752 F.2d 445, 450 (9th Cir. 1985).[11]  In its opening brief, ExxonMobil demonstrated the various deficiencies in the Complaint's allegations of preparedness to enter the market, noting its failure to allege that the Port Authority has consummated contracts necessary for entry or has any background and experience in the prospective business.  XOM Mem. 15-17.[12]  ExxonMobil focused in particular on the Complaint's most glaring standing problem – the absence of any showing that the Port Authority has the ability to finance this admittedly massive and complex undertaking.  ExxonMobil argued that the Port Authority's market entry is speculative as a matter of law because it is dependent on *both*:  (1) receipt of $18 billion in federal loan guarantees, which the Complaint fails to allege have even been applied for; *and* (2) receipt of more than $4 billion in *additional* non-guaranteed financing commitments, which the Complaint fails to allege have been secured.  XOM Mem. 12-26.  As a consequence, ExxonMobil asked the Court to dismiss the Port Authority's Complaint.

In an effort to avoid that result, the Port Authority argues that:  (1) the standing issues cannot be resolved on a Rule 12(b)(6) motion (Opp. 15-17); (2) the Complaint's conclusory allegations that federal loan guarantees are "available," and that the project will be "profitable," are sufficient to confer standing despite the lack of any actual financing commitments (Opp. 22-23); and (3) defendants' alleged antitrust violations excuse the Port Authority's failure to secure

---

[11] These three cases all hold that, to have antitrust standing, a would-be market entrant must demonstrate:  (1) background and experience in the prospective business; (2) affirmative action to engage in the proposed business; (3) the ability to finance entry; and (4) consummation of contracts.  *See, e.g.*, *In re Dual Deck*, 11 F.3d at 1465.

[12] In its opposition, the Port Authority acknowledges the critical necessity for expertise in the industry (Opp. 20), but does not assert that it possesses such expertise.  Instead, the Port Authority attempts to overcome this deficiency by citing various preliminary or former relationships it has or had with third parties.  However, it cites no authority for the proposition that the requirement of background and experience can be met in such a manner.

any financing commitments.  Opp. 17-18, 22-23.  None of these assertions, however, can

withstand scrutiny, and the Court should grant Rule 12(b)(6) dismissal for lack of standing.

### A.    The Courts Frequently Dismiss Antitrust Claims for Lack of Standing

Courts frequently dismiss antitrust claims for lack of standing.  In the seminal standing

case of *Associated Gen. Contractors of Cal., Inc. v. California State Council of Carpenters*, 459

U.S. 519, 545 (1983), the Court affirmed Rule 12(b)(6) dismissal of an antitrust complaint,

concluding that the plaintiff's standing allegations were insufficient as a matter of law.

Numerous cases decided after *Associated Gen. Contractors* have held that failure to plead

antitrust standing adequately is a proper basis for Rule 12(b)(6) dismissal.[13]  Other cases have

specifically dismissed claims based on a plaintiff's failure to plead the necessary intent and

preparedness to enter the market.[14]

### B.    Rule 12(b)(6) Dismissal Is Appropriate Because the Port Authority's "Ability to Finance Entry" Depends on the Outcome of a Complex, Highly Uncertain Government Approval Process

To enter the market, the Port Authority will have to raise billions of dollars of capital – a

daunting challenge for an entity consisting of three municipalities of only modest size and means.

The Port Authority acknowledges that its ability to finance up to 80 percent of the $20-billion plus

---

[13] *See, e.g.*, *Eagle v. Star-Kist Foods, Inc.*, 812 F.2d 538, 540 (9th Cir. 1987); *Mun. Utils. Bd. of Albertville v. Alabama Power Co.*, 934 F.2d 1493, 1498 (11th Cir. 1991); *Austin v. Blue Cross and Blue Shield of Ala.*, 903 F.2d 1385, 1389 (11th Cir. 1990).

[14]  *See, e.g.*, *Florida Seed Co. v. Monsanto Co.*, 915 F. Supp. 1167, 1171, 1176 (M.D. Ala. 1995), *aff'd* 105 F.3d 1372 (11th Cir. 1997) (dismissing antitrust claims after holding that whether a plaintiff has standing as a prospective competitor is a question of law properly raised by a motion to dismiss) (citations omitted); *In re Napster, Inc. Copyright Litig.*, 354 F. Supp. 2d 1113, 1124 (N.D. Cal. 2005) (dismissing antitrust claim on standing grounds where plaintiffs' alleged involvement in the market was too speculative); *County of Stanislaus v. Pac. Gas & Elec. Co.*, No. Civ. 93-5866, 1995 WL 819150, at *21 & n.15, 16 (E.D. Cal. Dec. 18, 1995) (dismissing claim on standing grounds where plaintiffs never sought access to defendant's pipeline and had not taken "substantial and demonstrable" steps to enter the market).

cost of entry is critically dependent on its ability to access federal loan guarantees that can be given to only *one* selected project. Compl. ¶¶ 81, 97. The Port Authority has not alleged that it has applied for the guarantees or that it has been selected as "the project" to receive them. In fact, the Complaint fails to note that the Department of Energy has not yet adopted implementing regulations establishing the procedures and standards for assessing a potential project sponsor's qualifications for federal loan guarantee consideration. *See* XOM Mem. 21-22 & n.13.

Where market entry hinges on a complex, highly uncertain government-approval process, Rule 12(b)(6) dismissal for lack of standing is warranted. *See City of Pittsburgh v. West Penn Power Co.*, 147 F.3d 256, 258-60 (3d Cir. 1998) (discussed extensively at XOM Mem. 22-23). In *City of Pittsburgh*, the plaintiff City claimed that a proposed merger unlawfully would eliminate competition between two power producers in a market where one of the producers was not yet a competitor because it had not received public utility commission approval to enter the market. In affirming Rule 12(b)(6) dismissal, the Third Circuit held that, because the producer's receipt of approval was completely speculative, the City lacked standing to sue. *Id.* at 268.[15]

The Port Authority makes a perfunctory attempt to distinguish *City of Pittsburgh*, mischaracterizing it as a case in which the "complaint failed to allege causation as an element of antitrust injury." Opp. 16 & n.2. In fact, the complaint contained "bold averments" on the loss of competition caused by the alleged antitrust violation. *City of Pittsburgh*, 147 F.3d at 267. The court nevertheless concluded that "[w]e cannot assume the existence of a PUC certificate,"

---

[15] *See Lamp Liquors, Inc. v. Adolph Coors Co.*, 410 F. Supp. 536, 541 (D. Wyo. 1976) (dismissing antitrust complaint for lack of standing where plaintiff's market entry was premised on receipt of a Wyoming wholesale liquor license); *see also Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245, 1257-58 (10th Cir. 2003) (no evidence of acquisition of mining permits); *Cable Holdings of Ga., Inc. v. Home Video, Inc.*, 825 F.2d 1559, 1562 (11th Cir. 1987) (FCC approval lacking); *Jade Aircraft Sales, Inc. v. City of Bridgeport*, No. 83-454, 1990 WL 128573, at *2 (D. Conn. July 9, 1990) (plaintiff lacked zoning and FAA approval).

thus making the "injury averred by the City . . . simply too speculative to permit relief under the antitrust laws." *Id.* at 269. Similarly here, because the Court cannot "assume the existence" of the government approvals that are necessary before market entry can occur, the Port Authority's claim is "too speculative to permit relief under the antitrust laws." *Id.*

The Port Authority attempts to rely on *Xechem, Inc. v. Bristol-Myers Squibb Co.*, 274 F. Supp. 2d 937, 944 (N.D. Ill. 2003), *rev'd on other grounds,* 372 F.3d 899 (7th Cir. 2004), where the court held that lack of FDA approval did not justify dismissing a generic drug manufacturer's complaint on standing grounds. Opp. 16. But, as the *Xechem* court recognized, "other federal courts have split in their rulings" on the same issue. 274 F.2d at 943. For example, in *Bristol-Myers Squibb Co. v. Copley Pharm., Inc.*, 144 F. Supp. 2d 21, 24-25 (D. Mass. 2000), the court dismissed under Rule 12(b)(6) a potential generic drug manufacturer's market exclusion, noting that the lack of FDA approval rendered the prospects of market entry too speculative. Based on *City of Pittsburgh*, the court reasoned that dismissal was proper because the generic firm "ha[d] not received" even "the tentative regulatory approval required for market entry." *Id.*

More important, the FDA approval process for generic drugs at issue in *Xechem* and *Bristol-Myers* is completely different from the loan guarantee process under the Alaska Natural Gas Pipeline Act ("ANGPA"). FDA approval for a generic drug involves a simple, streamlined process whereby the generic drug applicant merely "piggybacks" on earlier FDA approvals. *See, e.g.*, *Andrx Pharm., Inc. v. Biovail Corp. Int'l*, 256 F.3d 799, 801-02 (D.C. Cir. 2001) ("Subsequent applicants who wish to manufacture generic versions of the pioneer drug . . . need only complete an Abbreviated New Drug Application . . . that relies on the FDA's previous determination."). By contrast, the ANGPA loan guarantee process will involve no such piggybacking, and the yet-to-be-established regulatory standards undoubtedly will require that an

applicant comply with rigorous criteria before the federal government will even consider guaranteeing loan obligations of up to $18 billion. *See* XOM Mem. 17-21.

Moreover, neither the FDA process for generic drug approval, nor even the approval process in *City of Pittsburgh*, was a "winner-take-all" affair. ANGPA, by contrast, explicitly provides that "[i]n no case shall loan guarantees be issued for more than one qualified project." 15 U.S.C. § 720n(b)(1). The Port Authority fails to address that fact, even though its Complaint specifically acknowledges that "competitors" will vie for the guarantees. Compl. ¶ 81.

Here, as in *City of Pittsburgh*, the standing analysis does not require a burdensome "fact intensive" inquiry, notwithstanding the Port Authority's contrary suggestion. Opp. 15. Rather, the Court can rule as a matter of law that the Port Authority's entire antitrust case, which is dependent on government approvals that have not even been applied for (much less obtained), "is simply too speculative to permit relief under the antitrust laws." *City of Pittsburgh,* 147 F.3d at 269.

### C.     Dismissal Is Also Proper Because the Port Authority Lacks Commitments for the $4 Billion-Plus in Non-Guaranteed Front-End Financing that Will Be Required

Based on the Complaint's allegations and ANGPA's 80% loan guarantee limit, it is indisputable that the Port Authority would need *$4 billion-plus* in additional front-end equity or other non-guaranteed financing. *See* XOM Mem. 21-22 & n.14. The Port Authority's brief never mentions the 80% limit and only vaguely references the need for additional financing. The Port Authority concedes that it has no financing commitments whatsoever, but asserts that, because of the project's anticipated profitability, financing will be forthcoming. Opp. 22-23. As a matter of law, that bald assertion is insufficient to show the "ability to finance entry." Under Ninth Circuit and other precedent, such a showing requires a party to secure *actual* financing commitments.

14

For example, the Ninth Circuit has held that plaintiffs lacked standing where they had failed to secure such actual commitments. *Bubar v. Ampco Foods, Inc.*, 752 F.2d 445 (9th Cir. 1985). The court held that, even though certain "venture capital groups" would provide a majority of the required multimillion dollar financing, the remainder was still in doubt, rendering plaintiffs' market entry too speculative to confer standing to sue:

> Even with the prospective participation of the venture capital groups, another $500,000 to $800,000 would have yet to be raised, either by debt or additional equity financing, *and there were no commitments for such financing*. . . . We agree with the district court that the plaintiffs in this posture did not have standing to bring this private treble damage antitrust action.

*Id.* at 454 (emphasis added). Likewise, the Port Authority lacks standing because it has failed to allege facts showing that it has commitments for the $4 billion-plus in required non-guaranteed financing.

The Ninth Circuit reiterated the need for committed financing in *In re Dual-Deck Video Cassette Recorder Antitrust Litig.*, 11 F.3d 1460, 1465 & n.4 (9th Cir. 1993). The court there held that the plaintiff failed to show the "ability to finance entry," and thus lacked standing, where it had made inquiries about financing but had no binding commitments. The court found that the plaintiff, like the Port Authority, had "no demonstrated ability to raise the money to enter the market" but only had "pie in the sky" plans. *Id.* at 1465-66. Similarly, in *Gas Utils. Co. of Ala., Inc. v. S. Natural Gas Co.*, 996 F.2d 282, 283 (11th Cir. 1993), the court held that standing was lacking despite plaintiff's argument that it had been unlawfully prevented from building a gas pipeline because it had not actually "*secured* financing." *Id.* at 283. The court explained that "'[t]he mere possibility of financing being available in the abstract is not enough.'" *Id.* (quoting *Hayes v. Solomon*, 597 F.2d 958, 975 (5th Cir. 1979)).

### D.     The Port Authority Cannot Rely on a "Futility Exception" to Excuse Its Failure to Secure Financial Commitments

The Port Authority argues it need not allege facts showing financial commitments and other concrete steps toward market entry because defendants have blocked its entry, rendering any further preparedness efforts "futile."  Opp. 17-18.[16]  But, in the face of allegations that market entry has been blocked by an antitrust violation, the Ninth Circuit routinely has required plaintiffs to sufficiently allege all four preparedness criteria and has not hesitated to find lack of standing where, as here, the showing could not be made.

For example, in *Bubar* the Ninth Circuit required plaintiffs to show that they had sufficient financing commitments, even though plaintiffs alleged that defendants sold a business to a competitor and thereby completely blocked plaintiffs' market entry.  752 F.2d at 451-54, 458; *see also In re Dual Deck*, 11 F.3d at 1465 (finding that the plaintiff lacked standing for failure to satisfy financing and other preparedness criteria even though the alleged conspiracy blocked plaintiff from entering the market); *Gas Utils.*, 996 F.2d at 283 (same).[17]

---

[16] In its Complaint (¶ 16) and Opposition (at 3), the Port Authority quotes a statement by the former CEO of ExxonMobil that makes the unremarkable observation that producers of North Slope gas will play a significant role in the commercialization of that resource.  As the authorities discussed above make clear, that fact in no way excuses the Port Authority's failure to allege that it has secured actual financial commitments - contingent or otherwise - from potential lenders of the federally guaranteed portion of the project's costs or from sources of the $4 billion-plus in front-end funding necessary to finance the project.

[17] The Port Authority cites the case of *Ostrofe v. H.S. Crocker Co.*, 740 F.2d 739 (9th Cir. 1984) for the proposition that the Ninth Circuit has "recognized the . . . futility doctrine in antitrust standing decisions."  Opp. 18.  *Ostrofe*, however, is not a preparedness case.  Indeed, the plaintiff in *Ostrofe* previously had worked in the industry and alleged that he was the victim of a group boycott by employers.  740 F.2d at 742.  The Ninth Circuit held that the plaintiff was not required to seek a job and actually be turned down in order to establish injury from a boycott.  *Id.* at 743-44.

The leading case considering, and rejecting, the broad futility exception proposed by the Port Authority is *Ashley Creek Phosphate Co. v. Chevron USA, Inc.*, 315 F.3d 1245 (10th Cir. 2003). There the plaintiff argued that defendants used their ownership of a pipeline to block plaintiff's entry into the phosphate fertilizer market. Like the Port Authority, the plaintiff argued that the alleged antitrust violation relieved it of the obligation to show that it was fully prepared to enter the market. The Tenth Circuit disagreed, squarely holding that the plaintiff's "lack of preparation is not excused by a futility exception to the preparation requirement." *Id.* at 1258. The court explained at some length its rationale, which applies equally to the Port Authority's arguments here:

> Ashley Creek's futility argument boils down to an assertion that a proposed market participant need take no further preparatory steps, even of the most basic and preliminary nature, after an asserted violation of the antitrust laws by the party in control of an essential facility. *Such an approach would eviscerate the standing requirement, rendering it wholly dependent on the merits of the plaintiff's case*. . . . Furthermore, none of the cases cited by Ashley Creek support its assertion that this court should adopt such an expansive reading of the futility doctrine. In the very cases cited by Ashley Creek, the courts applied the four-factor preparedness test and analyzed whether the plaintiff had presented adequate evidence of concrete preparedness.

*Id.* at 1258-59 (emphasis added) (citing *Thompson v. Metro. Multi-List, Inc.*, 934 F.2d 1566, 1572 (11th Cir. 1991) (finding standing when plaintiff was already an established realtor); *Jayco Sys. v. Savin Bus. Mach. Corp.*, 777 F.2d 306, 314 (5th Cir. 1985) (finding standing only for injury to plaintiff's normal business, not to its proposed business expansion); *Hecht v. Pro-Football, Inc.*, 570 F.2d 982, 994 (D.C. Cir. 1977) (noting that plaintiff's preparation must be at "a stage where it is accompanied by certain indicia of ultimate success"); *Gas Utils. Co. of Ala., Inc. v. S. Natural Gas Co.*, 825 F. Supp. 1551, 1573 (N.D. Ala. 1992) (holding that plaintiff could not use

defendant's denial of access to a pipeline to create an inference of antitrust injury to business or property)).

     In accord with *Ashley Creek*, and the Ninth Circuit's decisions in *Bubar* and *Dual-Deck*, the so-called futility exception does not excuse the Port Authority's failure to secure financing commitments or satisfy the other preparedness criteria.[18]

## III.    THE PORT AUTHORITY FAILS TO REBUT EXXONMOBIL'S ARGUMENTS THAT THE SECTION 7 CLAIMS (FIFTH CLAIM FOR RELIEF) ARE TIME-BARRED

### A.    The Statute of Limitations Bars the Port Authority's Section 7 Damages Claim

     The Port Authority does not dispute that the two challenged acquisitions involving ExxonMobil and its predecessors fall outside the four-year limitations period. Presumably, therefore, the Port Authority bases its § 7 claims on the "holding and use" of the assets acquired

---

[18] The two "futility" cases on which the Port Authority primarily relies involved plaintiffs who were far more "prepared" for entry than is alleged here and had no issues of ability to finance entry. Opp. 17-18. In *Thompson*, the plaintiff was already established in the market from which it had allegedly been excluded. 934 F.2d at 1572. Similarly, in *Fleer Corp. v. Topps Chewing Gum, Inc.*, 415 F. Supp. 176, 179, 181 n.2 (E.D. Pa. 1976), the plaintiff was an "actual competitor" with the defendant in several product areas, "ha[d] an ongoing business," and already owned "manufacturing and marketing operations that would be used in" the new business. The Port Authority also cites *Utah Gas Pipeline Corp. v. El Paso Natural Gas Co.*, 233 F. Supp. 955, 965 (D. Utah 1964), for the proposition that the issue of whether plaintiff's failure to prepare to enter the market was caused by plaintiff's own inadequacy or the conspiracy to monopolize "cannot be resolved solely upon the basis of the complaint." That case, however, was decided before the Ninth Circuit, the Tenth Circuit, and other Courts of Appeals established specific legal standards for determining the adequacy of a party's intent and preparedness to enter the market. *See Solinger v. A & M Records, Inc.*, 586 F.2d 1304, 1309-10 (9th Cir. 1978) (the first Ninth Circuit case to adopt the test). Moreover, to the extent that *Utah Gas* recognizes a futility defense, it is inconsistent with the Tenth Circuit's later decision in *Ashley Creek.*

    The only case cited by the Port Authority in which a plaintiff was relieved of the obligation to show financing commitments based on futility is *Tose v. First Pa. Bank*, 492 F. Supp. 246 (E.D. Pa. 1980). Opp. 23. In *Tose*, however, the claimed antitrust violation was a "banking boycott" by several large banks designed to "deny plaintiffs access to the credit market in the Philadelphia area." 492 F. Supp. at 248. No such violation is alleged here.

by ExxonMobil in these transactions.  But liability under a holding and use theory requires that

the acquired assets be used in a way that is *different* from their use before the acquisition.

*Midwestern Mach. Co. v. Northwest Airlines, Inc*., 392 F.3d 265, 272 (8th Cir. 2004) ("[S]ince

holding and using assets acquired in a merger in the same manner as they were used at the time

of the merger is merely an unabated inertial consequence of the merger, only different uses of

assets can justify restarting the statute of limitations.") (internal citations omitted); *see generally*

P. Areeda and H. Hovenkamp, II Antitrust Law ¶ 320c5 (2d ed. 2000).  The Port Authority cites

no contrary authority[19] or facts to support its claim.[20]

The Port Authority cites (Opp. 44) the Complaint's allegations that the challenged

acquisitions "have increased the Defendants' market power and substantially reduced

competition in the relevant markets" and that defendants "have a stronger incentive and ability to

withhold production in concert, in order to maintain high prices."  Compl. ¶¶ 151, 152.  Those

allegations, however, amount to no more than the claim that the acquisitions increased

ExxonMobil's market power – precisely the type of claim that was found legally insufficient to

extend the statute of limitations in *Midwestern Machinery*.  As that court noted, "[a]ll horizontal

mergers lead to increased market share, and, with that, increased market power," but uses of such

---

[19] The Port Authority instead relies heavily on the district court decision in *California ex rel. Lockyer v. Mirant Corp.*, 266 F. Supp. 2d 1046 (N.D. Cal. 2003).  Opp. 49-51.  The *Mirant* court, however, specifically found that, to survive a motion to dismiss, a plaintiff "must allege and prove more than simply that defendants made the acquisitions at issue."  *Mirant*, 266 F. Supp. 2d at 1055.  It further noted that a plaintiff "add[s] nothing" to its § 7 claim by "alleg[ing], in a conclusory fashion, that defendants are more likely to coordinate pricing, production and withholding of electricity with other electricity generators in the relevant market."  *Id*.  This latter type of accusation, provides the basis for the Port Authority's § 7 claim.

[20] Indeed, the Complaint itself alleges that the defendants have used the relevant North Slope gas assets in the same manner for more than 20 years, *i.e.*, refusing to develop and market the resources.  Compl. ¶¶ 16-17, 47.

power "are merely reaffirmations of the original merger." *See* 392 F.3d at 273-74.  To hold

otherwise would allow the holding and use theory to "swallow the time bar." *Id.*  Because the

Complaint fails to allege that use of the assets changed after the acquisitions, the statute of

limitations bars the Port Authority's § 7 claims, thus requiring their dismissal.

**B.      The Doctrine of Laches Bars the Port Authority's Section 7 Equitable Claim**

The Ninth Circuit has held that the four-year statute of limitations for Clayton Act

damages actions should be used as the "guideline" in applying the doctrine of laches to § 7

claims for equitable relief.  *Int'l Telephone & Telegraph Corp. (IT&T) v. Gen. Tel. & Elec.

Corp.*, 518 F.2d 913, 928 (9th Cir. 1975); *see also* P. Areeda and H. Hovenkamp, V Antitrust

Law ¶ 1205b at 299 (2d ed. 2003).  The Port Authority does not dispute that point, but instead

argues that the doctrine of laches is inapplicable because ExxonMobil has failed to show

prejudice.  Opp. 48.  The Ninth Circuit decision on which the Port Authority relies, however,

held that "[t]he *bare fact of delay* creates a rebuttable presumption of prejudice." *IT&T*, 518

F.2d at 926 (emphasis added).  The Port Authority has alleged no facts that rebut this

presumption.  Therefore, as a matter of law, laches should bar the Port Authority's claims for

equitable relief.

**C.      The Court Can Resolve the Timeliness of the Port Authority's Section 7
          Claims on a Motion to Dismiss**

Rather than dispute ExxonMobil's assertion that the relevant acts occurred outside the

four-year limitations period, the Port Authority dedicates most of its § 7 response to the argument

that the Court should not decide the issue on a motion to dismiss.  Opp. 45-48.  The Port

Authority emphasizes that, because the decisions in *IT&T* and *Midwestern Machinery* came only

after lengthy litigation, the Court should refrain from considering on a motion to dismiss whether

the § 7 claims in this case are time-barred.  The Port Authority's argument ignores both the law

and common sense.  In *IT&T* and *Midwestern Machinery*, the courts had to grapple with previously unsettled legal issues.  In this case, however, the governing legal principles are now well-established, and the untimeliness of the claims is plain on the face of the Complaint.

The Port Authority, moreover, ignores ample case law holding that a limitations defense may properly be raised in a motion to dismiss where, as here, the running of the period is clear from the face of the complaint.  *See, e.g.*, *Conerly v. Westinghouse Elec. Corp.*, 623 F.2d 117, 119 (9th Cir. 1980) ("When the running of the statute is apparent from the face of the complaint . . . then the defense may be raised by a motion to dismiss."); *Lennon v. Seaman*, 63 F. Supp. 2d 428, 439 (S.D.N.Y. 1999) ("[W]hen the defense of laches is clear on the face of the complaint, and where it is clear that the plaintiff can prove no set of facts to avoid the insuperable bar, a court may consider the defense on a motion to dismiss.").

The Port Authority has alleged no facts providing a legal or equitable basis for extending the limitations period but nevertheless asserts that it "should be *given* the opportunity to establish how Defendants' use of assets obtained through" the challenged "mergers and acquisitions support a claim under Section 7."  Opp. 47 (emphasis added).  The Port Authority thus asks for a license to engage in a fishing expedition into large and complex transactions approved years ago by antitrust enforcement agencies.  That baseless entreaty falls far short of satisfying the price of entry that would be required to justify such massive discovery.  The Port Authority's untimely § 7 claims therefore should be dismissed.

## IV.    THE PORT AUTHORITY CANNOT RESCUE ITS ATTEMPTED MONOPOLIZATION CLAIM (FOURTH CLAIM FOR RELIEF)

The Port Authority concedes that its attempted monopolization claim is governed by the Supreme Court's decision in *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993).  Opp.

42.[21]  The Supreme Court there held that showing a dangerous probability of monopolization – a crucial element of an attempt case – requires proof that the defendant "would monopolize *a particular market*."  *Spectrum Sports*, 506 U.S. at 459 (emphasis added).  This in turn requires proof of "the defendant's economic power in that market."  *Id.*

Here, the Complaint alleges attempted monopolization of two purported markets – the purchase and the transportation of natural gas from the North Slope.  Compl. ¶ 202.  The Complaint, however, does not allege that ExxonMobil either purchases or transports North Slope gas.  Thus, the Complaint fails to allege that ExxonMobil even participates in the alleged relevant markets, much less has substantial economic power in such markets.  The attempted monopolization claim therefore must be dismissed.  *Spanish Broad. Sys. of Fla., Inc. v. Clear Channel Commc'n, Inc.*, 376 F.3d 1065, 1075 (11th Cir. 2004) (stating that "because [defendant] does not participate in the relevant market, [plaintiff's] attempted monopolization claim against [defendant] was properly dismissed").

To obscure this deficiency in the Complaint, the Port Authority avoids mention of the actual markets alleged in the attempted monopolization claim.  Instead, it vaguely refers to "North Slope natural gas markets."  Opp. 42-44.  But the Court can evaluate the Complaint only as it is written.  *Associated Gen. Contractors of Cal., Inc. v. California State Council of*

---

[21] The Port Authority strenuously argues that it has not alleged a "conspiracy to attempt to monopolize," which it recognizes is not a Sherman Act offense.  Opp. 41.  The Complaint, however, alleges *only* joint conduct (Compl. ¶ 204) and, therefore, does not state a claim for attempted monopolization.  It is the substance of the claim that controls.  In *Stewart Glass & Mirror, Inc. v. U.S. Auto Glass Discount Ctrs., Inc.*, 200 F.3d 307, 315-16 (5th Cir. 2000), the Fifth Circuit rejected an attempted monopolization claim, like the Port Authority's, where "no single appellee engaged in an attempt to monopolize, nor did any one entity succeed in singularly monopolizing, the auto glass repair market."  As a result, the court said that plaintiff's § 2 claim could be brought as a conspiracy claim only, not as an attempt claim.  *Id.* at 316.  In *Aurora Enter., Inc. v. NBC, Inc.*, 688 F.2d 689, 695-96 (9th Cir. 1982), cited by the Port Authority, the court did not directly address the issue resolved in *Stewart Glass*.  Opp. 42.

*Carpenters*, 459 U.S. 519, 526 (1983) (finding that it is "not . . . proper to assume that . . . defendants have violated the antitrust laws in ways that have not been alleged"). Nowhere in the Complaint has the Port Authority alleged ExxonMobil's participation or market share in either market at issue. Thus, the Complaint fails as a matter of law to allege a "dangerous probability" of achieving monopoly power as required by *Spectrum Sports*. 506 U.S. at 459.[22]

As a fallback, the Port Authority asserts that inadequate pleading of the "dangerous probability" element cannot result in Rule 12(b)(6) dismissal. Opp. 43 n.16. That proposition is plainly incorrect. *See Spanish Broad. Sys*., 376 F.3d at 1075; *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 736 (9th Cir. 1987) (granting Rule 12(b)(6) dismissal of attempted monopolization claim where complaint failed to allege monopoly power in appropriate relevant market); *Standfacts Credit Servs., Inc. v. Experian Info. Solutions, Inc.*, 405 F. Supp. 2d 1141, 1151-52 (C.D. Cal. 2005) (granting Rule 12(b)(6) dismissal of attempted monopolization claim for insufficient pleading of "dangerous probability" element); *A.I.B. Express, Inc. v. FedEx Corp.*, 358 F. Supp. 2d 239, 250 (S.D.N.Y. 2004) (granting Rule 12(b)(6) dismissal of attempted monopolization claim where there was no possibility of a "dangerous probability" of monopolization because defendant not alleged to participate in relevant market); *Gen. Cigar Holdings, Inc. v. Altadis, S.A.*, 205 F. Supp. 2d 1335, 1351 (S.D. Fla. 2002) (granting Rule 12(b)(6) dismissal for failure to allege sufficient facts to show "dangerous probability" of successful monopolization). As in these cases, the Court can, and should, dismiss the Port Authority's attempted monopolization claim, which is deficient as a matter of law.

---

[22] The Port Authority relies on allegations of ExxonMobil's percentage ownership interests in the gas in the Prudhoe Bay and Point Thomson Units. Opp. 43. These figures, however, are not even alleged in the Complaint to constitute shares of any relevant market, much less the markets for the purchase and transport of North Slope gas.

## V.    THE COMPLAINT'S ALLEGATIONS CANNOT SUSTAIN THE STATE LAW CLAIMS (SIXTH AND SEVENTH CLAIMS FOR RELIEF)

The Port Authority concedes that its ability to survive dismissal on its state-law unfair competition claim depends on whether it has pleaded adequate facts to show that it has antitrust standing.  Opp. 55.  For the reasons explained in ExxonMobil's opening brief and in this reply, the Port Authority has failed to plead such facts, and its state-law unfair competition claim therefore must be dismissed for lack of standing.

Likely reflecting its recognition that its putative relationships with the State of Alaska and other producers are too speculative to support a cause of action, (*see* XOM Mem. 39-41), the Port Authority attempts to satisfy the first element of its tortious interference claim – that is, the existence of a sufficient existing business opportunity – by emphasizing its alleged contract with Sempra.  *See* Opp. 52-53.  Thus, the Port Authority argues that it "has already contracted with" Sempra (Opp. 53), effectively converting its claim into one for tortious interference with contractual relations – a distinct tort that, under Alaska law, has its own unique proof requirements.  *Compare Bendix Corp. v. Adams*, 610 P.2d 24, 27 (Alaska 1980) (contractual relations) *with K & K Recycling, Inc. v. Alaska Gold Co.*, 80 P.3d 702, 717 (Alaska 2003) (prospective business opportunity).  For purposes of this case, the most important of those requirements is that the evidence must show that the defendant caused a third party to *breach* a contract with the plaintiff.  *See Bendix Corp.*, 610 P.2d at 27.  Here, the Port Authority has conspicuously failed to allege that Sempra breached its contracts with the Port Authority, claiming only that Sempra has "discontinued" or "withdrawn from" the alleged agreements.  *See* Opp. 52-53; Compl. ¶¶ 104, 225.

Whatever was the true nature of Sempra's relationship with the Port Authority, the Complaint's allegations plainly are insufficient to support either a claim for tortious interference

24

with contract or a claim for tortious interference with prospective business opportunity. As explained in ExxonMobil's opening brief (at 39-40), the Port Authority has not alleged facts showing that ExxonMobil had interfered with an *existing* business opportunity given the speculative nature of the Port Authority's ability to fulfill its business plans. Nor has the Port Authority alleged that Sempra *breached* an existing contract.

The Port Authority also misconstrues the nature of ExxonMobil's privileged interest in the subject matter of the litigation, arguing that it involves ExxonMobil's "financial interest in a potential pipeline [it] may build." Opp. 54. ExxonMobil, however, has a direct financial interest in the *gas* that the Port Authority seeks to purchase. XOM Mem. 42. The Complaint acknowledges as much. Compl. ¶ 106. As a leaseholder, ExxonMobil is privileged to interfere with relations affecting its direct financial interest in the subject matter of its lease. *See RAN Corp. v. Hudesman*, 823 P.2d 646, 650 (Alaska 1991).

## CONCLUSION

The Complaint should be dismissed with prejudice.

Dated:  March 28, 2006                Respectfully submitted,

                                      s/Douglas J. Serdahely

                                      Douglas J. Serdahely
                                      PATTON BOGGS LLP
                                      601 West Fifth Avenue, Suite 700
                                      Anchorage, Alaska  99501
                                      Phone:  (907) 263-6310
                                      Fax:  (907) 263-6345
                                      Email:  dserdahely@pattonboggs.com
                                      Alaska Bar No. 7210072

                                      *Attorney for Defendants Exxon Mobil Corporation
                                      and ExxonMobil Alaska Production, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2006, a copy of the foregoing Reply Memorandum in Support of Motion to Dismiss of Defendants Exxon Mobil Corporation and ExxonMobil Alaska Production, Inc., was served electronically on the following:

**Kevin Barry**
kbarry@bsfllp.com
skalas@bsfllp.com

**Kenneth F. Rossman, IV**
krossman@bsfllp.com
sphan@bsfllp.com

**William M. Walker**
bill-wwa@ak.net
shelley-wwa@ak.net
karen-wwa@ak.net

**Ronald C. Redcay**
ronald_redcay@aporter.com

**Angel L. Tang**
angel_tang@aporter.com

**Matthew T. Heartney**
matthew_heartney@aporter.com

**John F. Cove, Jr.**
jcove@bsfllp.com

**Jeffrey M. Feldman**
feldman@frozenlaw.com
carper@frozenlaw.com
anderson@frozenlaw.com

**David Boies**
dboies@bsfllp.com

**Robert Silver**
rsilver@bsfllp.com

**Charles E. Cole**
colelaw@att.net

**Bradley S. McKim**
bradley.mckim@bp.com

By:    s/Nina E. Bingham
          Nina E. Bingham, Legal Secretary
          PATTON BOGGS LLP