PANEL ONE OF A HEARING OF THE SENATE JUDICIARY COMMITTEE

SUBJECT:  CONSOLIDATION IN THE OIL AND GAS INDUSTRY:
RAISING PRICES?

CHAIRED BY:  SENATOR ARLEN SPECTER (R-PA)

WITNESSES:
JOSEPH M. ALIOTO, PARTNER, ALIOTO LAW FIRM, SAN FRANCISCO;
TOM GREENE, SENIOR ASSISTANT ATTORNEY GENERAL FOR THE STATE
OF CALIFORNIA;
SEVERIN BORENSTEIN, E.T. GRETHER PROFESSOR OF BUSINESS
ADMINISTRATION AND PUBLIC POLICY, HAAS SCHOOL OF BUSINESS,
UNIVERSITY OF CALIFORNIA AT BERKELEY;
PEG LAUTENSCHLAGER, ATTORNEY GENERAL FOR THE STATE OF WISCONSIN;
DAVID BOIES, CHAIRMAN, BOIES, SCHILLER AND FLEXNER LLP,
ARMONK, NEW YORK


LOCATION:  226 DIRKSEN SENATE OFFICE BUILDING, WASHINGTON, D.C.

TIME:  10:30 A.M. EST
DATE:  TUESDAY, MARCH 14, 2006

     (C) COPYRIGHT 2006, FEDERAL NEWS SERVICE, INC., 1000 VERMONT AVE.
NW; 5TH FLOOR; WASHINGTON, DC - 20005, USA.  ALL RIGHTS RESERVED.  ANY
REPRODUCTION, REDISTRIBUTION OR RETRANSMISSION IS EXPRESSLY PROHIBITED.

     UNAUTHORIZED REPRODUCTION, REDISTRIBUTION OR RETRANSMISSION CONSTITUTES
A MISAPPROPRIATION UNDER APPLICABLE UNFAIR COMPETITION LAW, AND FEDERAL NEWS
SERVICE, INC. RESERVES THE RIGHT TO PURSUE ALL REMEDIES AVAILABLE TO IT IN
RESPECT TO SUCH MISAPPROPRIATION.

     FEDERAL NEWS SERVICE, INC. IS A PRIVATE FIRM AND IS NOT AFFILIATED WITH
THE FEDERAL GOVERNMENT.  NO COPYRIGHT IS CLAIMED AS TO ANY PART OF THE
ORIGINAL WORK PREPARED BY A UNITED STATES GOVERNMENT OFFICER OR EMPLOYEE AS
PART OF THAT PERSON'S OFFICIAL DUTIES.

     FOR INFORMATION ON SUBSCRIBING TO FNS, PLEASE CALL JACK GRAEME AT 202-
347-1400.

                    THIS IS A RUSH TRANSCRIPT.
          -------------------------------


     SEN. SPECTER:  The Judiciary Committee will now proceed
with our hearing on concentration of the oil and gas industry,
whether it results -- has resulted in the raising of gas prices.

It was reported yesterday that the price of gasoline rose 11 cents over the past two weeks to $2.35 for a gallon nationally.  At the same time, the price of crude oil dropped -- a seven-cent-per-gallon drop.  The Governmental Accounting Office in 2004 concluded that the increased concentration of the oil and gas industries has resulted in higher wholesale gasoline prices.

We have seen a phenomenal rise in the concentration in oil and gas companies -- with oil and gas companies.  In the past decade, there have been some 2,600 mergers.  This year, the FTC approved Chevron's acquisition of Unocal and Valero's of Premcor.  The largest transaction occurred in 1999 when Exxon merged with Mobil.  Other transactions have included British Petroleum's acquisition of Amoco; Marathon's joint venture with Ashland Petroleum; and another joint venture which combined the refining assets of Shell and Texaco.

ExxonMobil recently reported that it had earned over $36 billion in the year 2005, which is the largest corporate profit in U.S. history.  There are a variety of interpretations by the economists whether the mergers result in efficiencies in scale, whether they result in lower prices to the consumers.  But we do know that there have been a wave of mergers and acquisitions, and we do know, at the same time, that gasoline prices have risen and that the largest profits in the history of corporate America were reported by ExxonMobil last year -- as I say, some $36 million billion.

The Judiciary Committee has wrestled with this issue over the years and this is the second of hearings on this particular subject.  Last week, I put into the Congressional Record a proposal for legislation which was designed to bring comments. I did not introduce a bill but only sought comments.

Section one of the legislation would amend the Clayton Act by prohibiting oil and gas companies from diverting, exporting or refusing to sell existing supplies with the specific intention of raising prices or creating a shortage.  Section two amends the Clayton Act by prohibiting the acquisition of an oil or gas company, or the assets of such a company when the acquisition would lessen competition.  That modifies -- would modify Clayton on the language of substantially modifying competition.

The bill was reported inaccurately in a number of the media outlets.

EXHIBIT # _____A_____

Page # ___2___ of ___51___

2

Section three would require the governmental accounting office to evaluate whether divestitures required by the antitrust agencies in oil and gas industry mergers have been effective in restoring competition.

Section four references a joint federal-state task force.

And section five would eliminate the (Judge-May ?) Doctrine, which prevents OPEC members from being sued for violations of U.S. antitrust laws.

Since the proposed suggested legislation circulated, I've had a number of comments from members on the committee. And with some modifications, there are prospects of having a fair number of cosponsors of the legislature.

I have one inquiry:  Why do I have a television screen with an unfamiliar face occurring?  Okay, he's a witness who will be testifying.  Can we black him out until he appears as a witness, please?  (Laughter.)  A little startlingly to see him in my hearing room not knowing why he was there.  (Laughter.)

Excuse us, professor, we'll come back to you.

Senator Leahy will be joining us momentarily.  He and I were just over at the judicial conference, invited by the the chief justice to update the chief justices -- chief judges of the circuits -- of the district courts, and I know he will be along shortly.

In his absence, let me yield to you, Senator Feinstein.

Is the ranking democrat present for an opening statement?

SEN. DIANNE FEINSTEIN (D-CA):  Thank you very much, Mr. Chairman.

Mr. Chairman, I also sit on the Energy Committee and we have had the five big CEOs of the oil companies before us there. And I note that you will be having them here in the second panel this morning, and I appreciate that very much.

I'd also like to welcome two Californians to the panel, Mr. Tom Greene of the California Attorney General's Office, and Mr. Joseph Alioto, distinguished San Francisco attorney, which brings back a lot of memories for me.

EXHIBIT # _____A_____
Page # ___3___ of ___51___

You have pointed out, Mr. Chairman, that in the last decade
we have witnessed a dramatic consolidation of the oil and gas
industry.  And that consolidation has gone largely unchecked by
the federal government.  Highly concentrated oil and gas markets
that exist today really raise very serious questions about the
degree of competition that's actually left in the industry and
the amount -- the huge amount -- of market power that some of
these companies now weld.

    The GAO's testimony from the last hearing provides a
picture of the vast scope of this consolidation -- more than
2,600 mergers since 1991, most of them occurring in the second
half of the 1990s, including those involving large, partially or
fully vertically integrated companies.  You mentioned in 1998
British Petroleum and Amoco to form BP Amoco, later merging with
ARCO; in '99, Exxon, the largest United States oil company,
merging with Mobil, the second largest.  Since 2000, we found
that at least eight more large mergers have occurred.

    In his testimony, Joseph Alioto likens the recent spate of
mergers of U.S. companies to the reconstitution of the Standard
Oil monopoly that was broken up nearly a century ago.  Although
each of these mergers reduce the companies' costs, they were
nevertheless followed by increases in prices for consumers.
These price increases cannot be explained solely by the increase
in the cost of crude oil.

    Last year was the most profitable year ever for American
oil companies.  And Exxon had the single most profitable year of
any company in our nation's history.  How much has the oil
industry been consolidated?  In 1991, the five largest oil
companies controlled 27 percent of the nation's gasoline
stations.  Today, five companies control 61 percent of those
stations.  A decade ago, the five largest oil companies
controlled one-third of the nation's refinery capacity.  Today,
five companies control 50 percent of the refinery capacity.

    In the last decade, the five largest oil companies have
doubled -- doubled -- their control of oil production.  In my
state, the top four refiners own nearly 80 percent of the
market.  Six refiners also own 85 percent of the retail outlets,
selling 90 percent of the gasoline in California.

    Now, even these numbers don't reveal the extent to which
the oil market has been concentrated, as the effect of market
concentration is heightened by the high level of cooperation in

EXHIBIT #_____A_____
Page #___4___ of ___51___

the oil industry and the joint ventures that exist between many of the remaining companies.

For example, as also described in Mr. Alioto's testimony -- you won't have to give it, Joe -- oil in terminals and refineries is exchanged and shared depending on the needs of any particular company. Due in part to this cooperative behavior, no company has built a new refinery in the United States in 30 years. These mergers have had real impacts on Americans.

A study of eight mergers in the '90s by the GAO determined that a majority of the mergers resulted in increases in the wholesale price of gas, with each of these mergers costing between one and seven cents per gallon. Another impact of the mergers is that they provided the oil industry with enough market power to create a zone pricing system, where refiners can target specific areas in the city where independent dealers are located and undersell them. We heard about that in the Energy Committee.

Attorney General Blumenthal testified at the previous hearing that, quote, "If the wholesale supply of gasoline were truly competitive, the major oil companies would not be able to dictate the price of wholesale gasoline based on location," end quote. In order to respond to the problems posed by consolidation, I'd like very much to work with you, Mr. Chairman, to craft legislation to help address these concerns.

I think we have a real problem. I think we must address it. And I thank you for taking the leadership with your suggested legislation in so doing.

SEN. SPECTER: Thank you very much, Senator Feinstein.

I now yield to our distinguished ranking member, Senator Leahy.

SEN. PATRICK LEAHY (D-VT): Thank you, Mr. Chairman. I also commend you for doing this. The chairman and I were over at the Supreme Court earlier this morning. (Some boys ?) and others have spent far more time over there than I have.

But I am concerned. This fuel crisis is draining hard-earned money from our families, our farmers, our factories, our businesses. I actually agreed very much with President Bush when he said in his State of the Union address that we're

addicted to oil in this country.   There are a number of things
we should do.

One is we should find -- we should really find
alternatives, because right now we have foreign policy crises
that are able to go on because we, the American public, are
fueling some of these countries with what we are paying them,
but also we lose our own flexibility.

I think as a first step we ought to enact the NOPEC bill
into law.   For weeks we've been evaluating the security
concerns prompted by a foreign government's ownership of a
company to take over effective control of port facilities in six
of our major ports.   At the same time, in the case of the oil
cartels, government-controlled entities routinely collude to set
prices, and they have also wielded their power to purposely
create major supply -- (inaudible) -- concerns in the United
States.   We ought to be able to react to that.   I hope to join
with the chairman and Senators Kohl and DeWine and others on a
new bill which would include this NOPEC legislation.

Oil companies have to realize they're not just in the
business of making oil; they're in the business of supplying a
reliable energy source to millions of Americans, and are given
numerous benefits and abilities to do that.

It's not being -- it's not being parochial to say that this
energy source is crucial to many in my home state of Vermont.   I
say that because you'd see the same thing in many other parts of
the country.   Vermont's businesses, their families, their
farmers, their hospitals, their colleges, they can't offer
anything without it.   A typical Vermont farmer -- it impacts --
the lousy planning of our oil giants could be catastrophic.

One farmer I've known for years, Howard Horgan (sp), his
dairy operation fuel costs on about 800 acres increased by
$10,000 in one year.   His costs went from just under 50,000
(dollars) to just under 60,000 (dollars) in one year.   The
overall increase in fuel costs for an average Vermont farmer
last year was 43 percent; that's a very significant -- in a
small farming operation, a very significant surcharge.   It may
seem like pennies compared to huge profit sums we're going to be
discussing today, but to me, and to all Vermonters, we know what
the terrible consequences can be -- forcing many farmers to make
unfair choices between running their farms or heating their
home.   These are not choices anyone should be faced with,
certainly not our hard-working farmers.   And in a state where

6

the temperature can drop to 10 degrees below zero, it's forcing
many of our families to determine whether they're going to heat
or eat.

Now it's not just farmers in my home state of Vermont, but
we have the same thing in Wisconsin, in Pennsylvania, in Idaho
and California and others.

How could record gasoline and home heating prices in
comparison to the record profits of the oil companies -- the
answer may not be easy.  But boy, there is an enormous
disconnect when oil companies are making more money in one year
than many countries -- than the net income of many, many
countries.

So Mr. Chairman, I commend you for doing this.  You have a
great panel here.  I would ask to insert for the record a
statement by Senator Feingold and also ask to include in the
record a statement from the St. Albans Cooperative Creamery.

SEN. SPECTER:  Without objection, those statements will be
made a part of the record.

Our customary practice is just to have opening statements
from the chairman and ranking, but I yielded to Senator
Feinstein in Senator Leahy's absence.  We make an exception on
antitrust cases because we have a very active antitrust
subcommittee.  And I want to yield now to the chairman of that
subcommittee who has authored some very impressive legislation.
We've offered some in the past together, and some of it has been
incorporated in the bill -- prospective bill which I introduced
to the Congressional Record last week.

Senator DeWine.

SEN. MIKE DEWINE (R-OH):  Mr. Chairman, I want to thank
you for incorporating our NOPEC legislation in your bill, and I
want to thank you also very much for holding this hearing.

I'm glad, Mr. Chairman, that we have representatives here
today of the oil industry to discuss this very critical question
that my constituents are asking.  The question is, what is
causing the high fuel prices that we are all so sick of paying?
We hear so many people who come and testify in front of Congress
and say there's nothing wrong in the industry.  And yet -- and
they tell us that the market is functioning normally -- yet my
constituents in Ohio feel there is something wrong when they're

paying record prices at the pump while oil companies are making record profits.

One of the causes of the skyrocketing gas prices certainly could be the mergers in the oil industries.  Did the FTC allow too many oil industry mergers?  Are the antitrust laws up to the challenges of dealing with the modern energy market?  Should the antitrust agencies take a more aggressive approach in this market?

These are all very legitimate questions.  I think it's clear that the agencies need to take a very hard look at any future mergers in this industry.  And they should examine their past enforcement actions.

Senator Kohl and I have worked hard in our antitrust subcommittee to encourage FTC monitoring and enforcement.  And I'm pleased that the committee is considering your draft legislation, Mr. Chairman, which includes a provision that Senator Kohl and I have pursued since the year 2000 that Senator Leahy just mentioned.  That provision, of course, contains the language from our NOPEC bill which the Senate passed last year.

Mr. Chairman, the biggest thing that we can do to control gas prices in the future is to lower crude oil prices.  And one of the biggest causes of high crude oil prices is the illegal price fixing of the OPEC cartel.  Our NOPEC language makes it clear that the Antitrust Division of the Justice Department can prosecute OPEC for its illegal activities.  America needs NOPEC as an effective tool to hold down prices.

The chairman's draft legislation also addresses a concern some have expressed that certain oil companies may have acted to manipulate supply and requires a very important study of the legal standards for mergers and also industry data sharing.

Mr. Chairman, I think this information will be very useful as we figure out what we can do to combat high energy costs.  I look forward to discussing this draft legislation today.

Mr. Chairman, just to put this issue into historical context, I think it's interesting to remember that one of the first big antitrust cases ever prosecuted was of course the famous Standard Oil case.  And that case established most of the fundamental principles of antitrust law that continue to this day.

8

One of those principles, to put it in everyday terms, is simply this: It isn't illegal just to be big, and in fact, it's even legal to be a monopoly.  But what is not legal is when a company abuses its size or uses unfair tactics to shut out its competitors or harm competition.

As we examination the impact of mergers in the oil industry today, we should remember that we need to evaluate the conduct of these companies, not just the fact that they have grown in recent years.

It goes without saying, Mr. Chairman, nobody is satisfied with the way this market is behaving, and none of us is happy with the high gas prices that we are paying.  So we do need to keep looking at the conduct of this industry and the role of the antitrust laws, and we need to keep looking very carefully.

Most important we need to find some way, any way, to help our citizens and businesses as we all struggle with increasing energy prices.  We owe it to the American people, and we owe it to our constituents at home.

Thank you, Mr. Chairman.

SEN. SPECTER:  Thank you very much, Senator DeWine.

Would the witnesses please rise?  And may we bring back Professor Borenstein on the monitor.  Professor Borenstein has already got his right hand raised.

(Witnesses are sworn in.)

SEN. SPECTER:  May the record show the witnesses said "I do" in response to the question.

We're going to lead this morning with Mr. David Boies, who is chairman of Boies, Schiller and Flexner, serves as counsel for the plaintiffs in the case alleging that ExxonMobil and British Petroleum have conspired to withhold supplies of Alaskan North Shore natural gas from the market.

This litigation raises the issues which are articulated in Section One of the draft bill which has been circulated, put into the Congressional Record, which would prohibit -- which would amend the Clayton Act by prohibiting oil and gas companies from diverting, exporting, or refusing to sell existing supplies

EXHIBIT # _____A_____
Page # ___9___ of ___51__

with the specific intention of raising prices or creating a
shortage.

Thank you for joining us, Mr. Boies, and we look forward to
your testimony.

MR. BOIES:  Thank you.

SEN. SPECTER:  I might add, in accordance with our rules,
statements will be five minutes in duration.  We ask you to stay
within that time limit to allow maximum time for dialogue,
questions and answers by the members.  And we have, as you see,
a very large representation of the committee here today.

Mr. Boies, the floor is yours.

MR. BOIES:  Thank you, Mr. Chairman.  I appreciate the
opportunity to appear to address the important issues that the
committee has raised.

Let me begin by emphasizing something that I think we all
know but is nevertheless worth talking about in a context of
natural gas.  And my remarks are going to be primarily limited
to natural gas today.

We are paying in the United States record high prices for
natural gas.  What you can see is the tremendous increase just
from 1999 to 2005, where it's virtually $13 per 1,000 cubic feet
for gas.  That is a price that imposes enormous hardships both
on individual consumers and on businesses in this country.  It
causes individual consumers, even middle-class consumers, to
have to choose between heating their homes in the wintertime and
other needed expenses.

Now we know that this is a function of supply and demand. I
want to focus also on what the consequences of this supply and
demand imbalance is to the companies that are the primary
suppliers of natural gas.

And of course, what the chairman has already indicated, and
other people have talked about, are the tremendous increases in
profits for Exxon and British Petroleum in the last few years.
And profits by themselves are not bad.  Profits often are
indications of where there are opportunities to exploit the
market.  But where you have a market that is controlled not by
competitive free-market forces but by the power of one or two or
a few companies, what happens is the free market forces break

10

down.  The role of profits breaks down.  And what happens is that you have private companies in effect taking the consumer surplus that should be available to individuals, that should be available to businesses.

And what you can see is, this is the $36 billion in 2005 that several people have mentioned.  British Petroleum has less, only $22 billion in 2005.  But nevertheless, but what is as important as the absolute size is the trend line, because you see the increase in profits together with the increase in natural gas prices.

Now the reason for this is a supply and demand imbalance, and what I'm trying to -- one of the points I want to address today is the reason for that imbalance.  We all know that there are tremendous gas reserves in Alaska.  But over decades of having control over those natural gas, zero has been transported to the United States.  Although in Prudhoe Bay the majority of oil has been produced, no natural gas has been exported off of the North Slope, either from Prudhoe or Port Thompson or any other source.

Despite the need for natural gas here in the United States, despite the availability of that natural gas in Alaska, none of it has been exploited.  And in the United States we use approximately 22 trillion cubic feet of natural gas a year.  There are 35 trillion cubic feet of proven reserves in Alaska, and probably another 140 to 160 additional trillion cubic feet available.  If you simply transported 4 to 6 billion cubic feet a day to the United States, it would have a tremendous effect on increasing supply, reducing price, and that could go on for 35 or 40 years, just utilizing what we know are the reserves in Alaska.  And those reserves are probably actually much higher than the figures here indicate.

Eight billion cubic feet of gas a day is already extracted.  It comes out of the ground as a consequence of oil production.  But instead of transporting that to the United States, it is reinjected in the ground.  If they simply sold half of that into the United States, 4 billion cubic feet a day, it would have a tremendous effect on natural gas prices and supply.

And there have been many pipeline proposals that have been made over the last 10 years to do just that -- Yukon Pacific, MidAmerican Energy, TransCanada, and Alaska Gas Port Authority, which is my client -- have all made proposals to bring this natural gas to market.

EXHIBIT #_____A_____
Page #___11___ of ___51___

In a competitive market, that's what would have happened. But in fact, every single one of those proposals was refused. And the reason it was refused was because that allows the oil companies to keep control. And here is a statement just last year from the CEO of Exxon about why they are refusing, because they know that by refusing they prevent the development of a pipeline that will bring the gas to the United States.

As he says here, we control it. If we won't commit, nobody will finance it, even with federal loan guarantees which this Congress passed. Nobody is going to finance it. So by controlling it they, in effect, prevent the export of natural gas to the United States.

My time is up, and I'd be pleased to respond to any questions that the panel will have later.

SEN. SPECTER: Thank you very much, Mr. Boies.

We'll now turn to Attorney General Peg Lautenschlager, attorney general of the state of Wisconsin, who along with four other state attorneys general conducted an investigation into natural gas pricing. According to information provided to me, that investigation concluded that volatility and increases in natural gas cannot be entirely explained by changes in supply and demand.

Thank you for joining us, Madame Attorney General, and we look forward to your testimony.

MS. LAUTENSCHLAGER: Thank you, Mr. Chairman.

It's a pleasure to be here today, Mr. Chairman, and I thank you for affording us an opportunity to participate in this panel.

As you indicated -- oh, and let me also say too that in seeing the draft that you are proposing we not only are appreciative that you are considering some changes to this structure about these things, but also that you've included attorneys general from the states as people who may be doing some enforcement, and we appreciate that inclusion.

That being said, for the states of Iowa, Missouri, Illinois, and Wisconsin, all consuming states of natural gas, the issue of natural gas prices, the continued upward increase

EXHIBIT #    A
Page #   12   of   51

of those prices, and the volatility of those prices has been of great concern.

In the wake of Katrina and other events, we accordingly got together, the four states and the attorneys general therefrom, in order to discuss natural gas prices. We brought in a variety of folks; talked to everybody from the industry to suppliers, utilities, and the like.

And among the things we found is that while the tight supply and demand does in many ways deal with this -- the gradual upward increase, it doesn't explain the volatility of the market.

So as a result of that, we started looking to try to determine exactly what does explain that. And among the things we found was this incredible correlation between the frequency of trading in the commodity market and the spikes in price that were going on. And this we found to be disconcerting because as we looked at possibilities regarding things like market manipulation, we found that indeed probably about 80 percent of the trading that goes on in these markets is unreported and not in any way reported in a way in which we can do an analysis.

So as a result of that we became very concerned, because we felt as though something didn't pass what we would call in Wisconsin the so-called smell test, and as a result of that, we would like to explore further but kind of met dead ends as we had no answers to this trading.

What we do know is this: We know that the upward volatility of natural gas prices can't simply be explained by traditional supply and demand, and that's not to diminish the need for alternative fuel sources; it's not to say that demand reductions are not merited or worthy. But what it is to say is that we need to explore further.

Secondly, we found that obviously the financial markets are complex and lack almost completely any kind of transparency.

Thirdly, we found that indeed there is consolidation in natural gas pricing. Right now about 20 percent of the market is controlled by one oil company, BP; the next three largest firms having market shares of about 10 percent, two of which are major oil companies -- collectively control over 50 percent of the market.

13

Given the low elasticities of supply and demand, the reactions to the market to relatively small changes in the supply-demand balance, given the growing consolidation of ownership in the natural gas market by companies that have often -- have arms that engage in extensive trading presents a potential for market manipulation and other kinds of abuses.

Accordingly we believe that kind of the putting all of your eggs in one basket when it comes to just a few energy companies has not served the American people well, particularly those of us in places that are cold, places that do not produce natural gas, and places which are very reliant on that product.

SEN. SPECTER:  Thank you very much, Attorney General.

Our next witness is senior assistant attorney general of the state of California, Mr. Tom Greene, California's chief antitrust attorney.  He conducted several investigations into the energy industry.  He argued a celebrated case in California versus Arc America, and won, upholding state indirect purchaser remedies.

Thank you for joining us, Mr. Greene, and the floor is yours for five minutes.

MR. GREENE:  Thank you, Mr. Chairman and members.

At the outset, let me submit my prepared remarks for the record, and I'd like to summarize briefly my comments.

SEN. SPECTER:  Without objection, your full statement will be made a part of the record.

MR. GREENE:  Thank you, Mr. Chairman.

And let me say as a line prosecutor that I am enormously pleased to see the language in your draft legislation.  Let me turn to the high points, at least from my perspective.

With respect to NOPEC, we are prosecuting a case right now against Powerex arising from the electrical emergencies in California in 2000 and 2001.  Powerex is a wholly owned subsidiary of the government of British Columbia.

They have asserted both of the defenses which your legislation and Mr. DeWine's legislation would address -- that is, active state and sovereign immunity.  I must tell you as a

EXHIBIT #_____A____
Page #___14___ of ___51___

prosecutor that is enormously frustrating to have a company which, from my perspective and the perspective of most Californians, grossly abused our markets, simply say in essence the legal version of Ali Ali Oxen Free based on these two doctrines.

If you could change this, we could have enormous impact in the courtrooms of America, and I think we could make a big difference for the consumers of America as well.

Let me turn to the merger analysis. You have proposed a significant change in the standard under Section 7 to appreciable effects on markets. I can tell you as someone who worked on all of the mergers that you discussed earlier that that standard change would make, again, a significant difference in the real world of antitrust litigation on the ground. These are extremely complex markets. When we dealt with ExxonMobil, for example, the focus was on the notion that these markets are international. At some level, that's absolutely true. But they also have appreciable local effects and we need the tools -- and I think this would provide an important tool -- for us to be able to address those kinds of problems.

Finally, let me turn to the idea of a joint task force. As the former chair of the Multistate Antitrust Task Force of the National Association of Attorneys General, let me share the perspective of the attorney general that this is an enormous recognition of the important role of state attorney generals and state prosecutors.

But I would like to mention something that is slightly orthogonal to the proposal you have here, which is the problem we have under Section 1 of the Sherman Act. As Judge Posner and others have articulated, we are in a bit of a bind. Indeed, there is a fundamental paradox currently in the case law in the basic jurisprudence of antitrust to the effect that the more concentrated an industry -- the economics of this suggest that the more concentrated the industry, the easier it is for the industry to coordinate with relatively little in the way of additional communications.

The petroleum industry is classically a highly concentrated oligopoly. So on the one side, we have the economics of this suggesting that with great concentration comes the ability to communicate in a way which will allow firms to essentially reach a tacit agreement as to pricing and other important aspects of production.

15

EXHIBIT #_____A_____
Page #____15___ of ___51___

On the other side of that, the emerging jurisprudence, at least in some of the most important circuit courts of the United States -- taking from my perspective -- again, I'm mostly a plaintiff in these kinds of cases -- taking a perspective on both Monsanto and Matsushita to the effect that you need very compelling evidence of the existence of an agreement.

The combination of that jurisprudence and that economic reality is increasingly creating what I described I think in my prepared testimony as the dirty secret of antitrust jurisprudence, which is that it's increasingly difficult to prosecute large, concentrated industries in any effective way under Section 1 of the Sherman Act.  I think it would be an enormous contribution to your proposed joint task force's agenda if you took a look at that aspect of Section 1 and increasingly concentrated industries.

With that, Mr. Chairman, and members, thank you for your attention, and I'm certainly available to answer questions.

SEN. SPECTER:  Thank you very much, Mr. Greene.

Our next witness is Mr. Joseph Alioto.  Represented clients in more than 3,500 antitrust cases according to his resume -- it's a phenomenal number -- and gone to trial, I'm advised, in approximately 75 of those.  He represented the plaintiffs in Bray versus Safeway in which he won the largest judgment in the history of antitrust at that time.  Years ago -- I think it was your father, Mayor Alioto, who appeared before this committee. I think people would be interested to know that you are not Mayor Alioto but are his son, if that is correct, because that's a question which has come to several of us in the interim.

MR. ALIOTO:  Yes, sir.

SEN. SPECTER:  And your youthful appearance tells us that you are not the former mayor, but I thought it would be worth just a moment to state that explicitly for the record.

Thank you for coming to Washington to testify, Mr. Alioto, and we look forward to your testimony.

MR. ALIOTO:  Thank you members of the committee.  It's a pleasure and an honor to appear before you on this important issue.  And also, it's wonderful to be able to appear before the

EXHIBIT # _____A_____
Page # __16__ of __51__

former mayor of San Francisco, now senator of California,
Senator Feinstein, who I've known for many, many years.

I tried in my testimony to try to be as factual as I could.
And the facts that I stated are not rumors and they're not
suppositions and they are not economic theories.  These are
facts which I developed from time to time during various cases
and they're important facts and, in many instances, they involve
cases in which the Federal Trade Commission or the Department of
Justice previously allowed these kinds of activities to go
forward, and I think without proper investigation.  And I want
to point out why I think that and what I think could be done.

But first, I've pointed out that in the Shell-Texaco joint
venture situation, this was a situation in which the two
companies combined their refining and marketing.  And
immediately after doing so -- this is in the late 1990s --
immediately after doing so when crude oil was at its lowest
since the Depression, when their own costs were at their lowest
-- that's what they claimed was the purpose of the joint venture
-- and when there was substantial over-capacity, they first
raised the price of Texaco to equal Shell -- which Texaco had
ordinarily been below -- and then they increased their prices by
50 to 70 percent.  And there was absolutely no justification for
it at all.

The second instance that I wanted to show you where they
would act against the economic interest -- and these are the
chief executive officers, by the way, that are making these
decisions.  The second instance I gave to you in my program was
Conoco and Phillips.  And in Conoco and Phillips, the chief
executive officers met some 40 times or more.  One of the
executive officers kept notes, and in those notes, he revealed a
number of different things, one of which was that the chief
executive officer of Phillips wanted to go ahead with the merger
because he was afraid that the oil prices would drop otherwise,
and that he felt that this was a necessary thing to keep that
going.  He also mentioned there that the idea was that the
industry would be reduced to six or seven of the (fully?) major
integrated oil companies in the United States, and that in fact
happened.

He also mentioned -- and I say it because Mr. Boies, my
friend, had mentioned it.  He also mentioned in these notes that
as far as Alaska goes that there was an informal agreement
between Exxon and British Petroleum to operate the area.  And
Phillips itself had been into the area with $7 billion --

EXHIBIT #_____A_____
Page #____17___ of ___51___

couldn't even go in to operate its own business but had to yield
to British Petroleum.

Now, all of these are matters of evidence and they could
have and should have been taken by the government, but the
government never, never cross-examines any of the executives.
At least, that's what I found.  And there were two instances --
which I also wanted to repeat in these areas, too, Mr. Chairman
-- and that it is that it has been an excuse for most of these
mergers that they are supposed to create efficiencies and
they're also supposed to pass costs on to the consumer.  But
that, in fact, doesn't happen and you can find that out if you
question the chief executive officers, which I did.

And I asked them in each of these instances you were given
this -- the idea was it was supposed to be efficient and you
were going to pass these costs on to the public.  Did you do
that?  And the answer was no.  Do you intend to do it?  No, of
course not.  And the efficiencies they are talking about are not
efficiencies of the market, they're efficiencies of cartel.
They agreed to shut down various plants in order to create
capacity instead of modernizing the plants and hiring people.

I also gave you the evidence with regard to their meetings.
They meet at least once a month, all the top executives.  They
exchange everything.  They use each other's facilities.  They
use each other's refineries.  They use each other's tankers.
They swap their different stations.  They swap their refineries.
They have agreements -- all of these were approved by the FTC.
And when we fought them, we were able to show otherwise.

And finally, I just wanted to point out that the law itself
under Section 7, under these mergers -- I pointed out that all
of these are all the old Standard Oil companies -- Exxon-
Standard Oil of New Jersey buying Mobil; Standard Oil of New
York -- British Petroleum buying Soho-Standard Oil of Ohio, and
then as a combine buying Amoco-Standard Oil of Indiana and then
as a combine buying ARCO; Chevron buying Texaco; Chevron and
Texaco having an agreement in Indonesia under Caltex that they
would not import the oil from Indonesia into the United States
during the surplus problem.  All of these issues are basic
facts, but all of them could be enumerated if the government
took a bit of time just to look at them.

And just briefly, I wanted to say this -- I think the
committee should consider the private right of action.  The
farmers and the citizens are not able to bring these lawsuits

EXHIBIT # _____A_____
Page # __18__ of __51__

because of the Illinois -- (inaudible) -- case.  And because of
that -- and there's no real prosecution, except by the
government, and the government simply won't do it.

Thank you.

SEN. SPECTER:  Thank you.  Thank you very much, Mr. Alioto.

We now turn to our final witness on the panel, Professor
Severin Borenstein, who is the Grether professor of Business
Administration of Public Policy at the University of California,
director of the University of California's Energy Institute --
Ph.D. in economics from MIT.

Thank you very much for joining us via satellite, Professor
Borenstein, and we look forward to your testimony.

MR. BORENSTEIN:  Thank you very much.  Can you hear me?

SEN. SPECTER:  We do.

MR. BORENSTEIN:  Okay.  Thank you for inviting me. I'm
sorry I couldn't appear in person.  My teaching schedule,
unfortunately, conflicted with this.

I want to start out by pointing out that as of Friday, the
wholesale price of gasoline was $1.66 a gallon on the New York
Mercantile Exchange.  Of that, $1.43 was the price of crude oil.
So I think that puts in context right away that of that $1.66,
only 23 cents is the refining margin.  When we start talking
about attacking market power in the refining industry, which I
think there are real concerns about, we have to recognize that
that's not going to do anything to change the world price of
oil.

The world price of oil is set in the single world market
for oil, which the oil -- U.S. oil companies really are not able
to control.  They are small players in that market.  For the
same reason that they are not big enough to control the price of
oil or influence it significantly, their claims that we can have
some real affect on the price of oil -- for instance, by open
(ANWR ?) or drilling in more places in the United States -- are
also not plausible.  This is one big bathtub of oil and the
United States is a very, very small player in it.

The high oil prices right now are due to very strong growth
and demand over the last five years and, as many of the panel

19

EXHIBIT # _____A_____
Page # __19__ of __51__

members pointed out, the restriction of supply or the ability of OPEC to restrict supply. It's not just OPEC, I think, actually, because most of the members of OPEC actually are producing all they can.

The real issue here is Saudi Arabia and unfortunately, the NOPEC sort of legislation, I think, would not get at that because Saudi Arabia holds the only real slack capacity right now and they are the ones who are really able to move the price of oil. That high oil price is most of the high price of gasoline right now.

Refining margins -- the difference between the wholesale price of gasoline and the world price of oil -- are higher than they have been up to about five years ago. For the prior years, refining was a very bad business. These refineries made very poor returns. Basically, they built a bunch of refining capacity going into the early 1970s and then found themselves with much too much capacity after the oil shock. As a result, those margins were very low. They made very poor returns.

That continued into the '90s when demand growth finally caught up, and now, instead of running at capacity utilizations of 75 percent, they're up to the 95 percent level. That means this is a very tight refining market. At the same time, as many have pointed out, concentration in the refining industry rose. The problem that we run into when we get into the situation of tight refining markets and concentrated markets is there are two types of scarcity that can occur. Natural scarcity -- because we actually really are short of refining capacity -- and when there really is natural scarcity, prices should rise to reflect that. If we don't let them rise, we're going to get gas lines and shortages.

The other possibility is artificial scarcity. That is scarcity created by players who find it in their interests to restrict output so the prices will go up. Unfortunately, when you get into a tight market and some of the players are of significant size, both of those outcomes are possible. And unfortunately in the oil industry, it's very difficult to tell them apart.

A few years ago, I testified before the Senate Governmental Affairs Committee during the California electricity crisis and argued that we could see quite clearly the exercise of market power in that business. The reason I could argue there that I thought we could -- (off mike) -- more power was there's a

20

fairly straightforward conduction process. You put natural gas into an electric generating plant and electricity comes out, and we have a good idea of what the costs are. Unfortunately, the refining business is much more complex and second-guessing the refineries or their incentives to produce a little more is quite difficult.

As a result, I think it is extremely difficult to do empirical studies after the fact that actually show that the refiners are exercising market power. And with due respect to the General Accounting Office, I actually don't believe that this study does show that. I think it does show a correlation, but it falls well short of showing a causal effect of the mergers.

That said, I think now in a situation where the industry is sufficiently concentrated that we are in real danger of these firms having incentives to raise prices -- (off mike). As a result, what I think that what we need is a change in the enforcement of the antitrust law, at the very least.

In the past, essentially what has happened in practice -- (off mike) -- is oil refining companies have said look -- (off mike) -- economy from this. You should let us merge. The FTC economists don't understand -- (off mike). It's very difficult to diagnose whether those economies are real or the companies are making them up. But in fact, these companies don't have a clear idea of how big those -- (off mike) -- are. So what we'll do is we'll look for a potential for an increase in market power. We don't talk -- (off mike) -- the merger go through. That's what they have done over the last decade.

I think we are now at the point where the potential for market power and increases from additional mergers are quite serious and we need a real shift in the burden of proof. Unless the refiners can show very clear definitive economies, not hand-waving that says of course things get (deeper?) when we get bigger -- (off mike) -- economies, these -- (off mike) -- mergers should not be allowed.

That said, I still think that there is large evidence that the current market is -- (off mike) significant market power. I think if you look at the margins they are higher. They're probably about 10 cents -- 8 to 10 cents higher than they have been up to five years ago. Some of that is certainly natural scarcity. A few cents of it might actually be market power. But when you start looking at the context -- (off mike) -- gas

prices, that's not where the big money is.  The big money is in
the extremely high price of crude oil that's being caused by the
world market and that is a result of -- (off mike) -- demand and
Saudi Arabia, in particular, being able to restrict supply and
keep the supply -- (off mike).

SEN. SPECTER:  Thank you very much, Mr. Borenstein.

We'll now go to five-minute rounds by the members of the
committee, beginning with you, Mr. Boies.

If the ExxonMobil and British Petroleum were to change
their practice, do you have any idea as to what the impact would
be on natural gas prices in the United States?

MR. BOIES:  I think you can certainly say that the natural
gas prices would go down.  I think you can say they would go
down substantially.  I think it's typical --

SEN. SPECTER:  Can you be any more specific than that?

MR. BOIES:  Well, what I can say is that a single gas
pipeline, such as my client has proposed, would bring 7 to 10
percent new capacity in.  If you look at historically, that
would -- if you looked at the price chart that we saw, that
would bring the price down maybe as much as 20, 25 percent from
the high that it is now.

SEN> SPECTER:  We have very limited time.  If you could
supplement your answer by quantifying that and giving us the
basis for your conclusion.

MR. BOIES:  Absolutely.

SEN. SPECTER:  On your litigation, do you seek a mandatory
injunction that would tell them to sell the gas or to cooperate
with somebody who builds a pipeline?

MR. BOIES:  We do.  We do, Mr. Chairman.

SEN. SPECTER:  Mr. Greene, you've testified that more
concentration brings a tacit agreement, I believe were your
words.  You can't prosecute a tacit agreement, or can you?  You
have to be able to prove it.  Could you expand on your basis for
concluding there is an agreement?  That would be a conspiracy in
restraint of trade.  When you say tacit, you are putting it
outside the ambit of a lawyer's proof, are you?

MR. GREENE:  I think I'm trying to articulate to the committee that highly concentrated industries oftentimes find their way to mutual accommodations, which is classic of oligopoly behavior and is widely understood.

SEN. SPECTER:  You say, mutual accommodations?

MR. GREENE:  They can frequently find their way to reducing output, increasing prices simply because they understand each other's business.

SEN. SPECTER:  How does that happen when it's outside of the purview of the tough prosecutor to be able to prove?

MR. GREENE:  Well, what has happened recently is that those agreements are facilitated by, in essence, the sharing of certain kinds of information.  And I've suggested some of the ways that that's done in my prepared testimony.  But because of the way the law is working currently -- at least in many of the circuits in the United States -- that is insufficient to establish the notion of an agreement or a combination within the purview of --

SEN. SPECTER:  Mr. Greene, because of the limitations of time, let me ask you to supplement your answer and be as specific as you can on that point.

MR. GREENE:  I'd be pleased to.

SEN. SPECTER:  Madame Attorney General, you say that the volatility and increase in natural gas prices could not be entirely explained by changes in supply and demand.  Are you suggesting that concentration of ownership could explain the volatility and increase in natural gas prices?

ATTY GEN. LAUTENSCHLAGER:  Among the things we've looked at, Mr. Chairman, are indeed that.  We've also looked at the trading activity that's done on the commodity market, as best we can, given its opaqueness.  If you were to look at our written testimony -- you can see from exhibit EF-1, which is on -- or EF-7, excuse me, which is on page six of that testimony -- a graph which shows the price at the wellhead of natural gas and then you can see the various spikes in that.  And if you compare that with the changes in trading activity, you can see a pretty direct correlation.

SEN. SPECTER:  Can I interrupt you, again?  Would you supplement that with specifics?

MS. LAUTENSCHLAGER:  Absolutely.

SEN. SPECTER:  Mr. Alioto, when you testify about all of these concessions you've gotten from these CEOs, and I'd like to follow up with you and get the specifics -- get the specific cases and the specific language and the notes of testimony and the transcripts.

But the question I have for you, when you confronted the regulatory authorities and you chastised them for not doing cross-examination or the kind of skilled incisive lawyer's work, what did they say?

MR. ALIOTO:  Well, what they do, Senator, is that the law has always been clear in mergers.  And we've had some very good decisions by the Supreme Court in the '60s and the '70s.  That is still the law.  But what they now use is something called merger guidelines that is written by, apparently, attorneys in the Department of Justice and in the Federal Trade Commission, and they are very, very lenient.  And they certainly are not in accord with what the Supreme Court's decisions were.

So when we go into court, we have two things we have a problem with:  we have to -- we're trying to use the law of the Supreme Court, but the government comes in against us -- along with the oil companies or others, in antimerger cases -- and they're using their guidelines and using their authority, which is very effective with judges, especially in injunction cases when you're trying to break up mergers.

Thank you, Mr. Alioto -- Alito -- Alioto.  My red light went on --

MR. ALIOTO:  Not quite Alito, Senator.

SEN. SPECTER:  I didn't --

MR. ALIOTO:  He can't spell.  (Laughter.)

SEN. SPECTER:  Thank you very much, Mr. Alioto.

MR. ALIOTO:  (Laughs.)

24

SEN. SPECTER:  We're going to follow up with you on the specifics.  I'm not going to ask any further questions because my red light is on.  But I would ask Mr. Greene for an amplification of why he thinks amending Section 7 before appreciable lessening would help you more than substantial lessening.

Senator Leahy.

SEN. LEAHY:  Thank you.

And Mr. Alioto, as the only Italian-American on this panel, I'll make sure I get it right.  Later in this week I'll be the Irishman on this -- (laughter).

MR. ALIOTO:  We're all Irish, Senator.

SEN. LEAHY:  Well, except for -- no, not the only Irishman -- except my mother would point out she came from Italy.

Mr. Alioto, in your testimony -- and this is sort of a follow-up on what Chairman Specter was saying -- you mentioned that Congress does not need to pass new legislation to address the problems associated with the heavy consolidation of the energy industry, but we ought to enforce what's on the books.  More specifically, you talked -- if I'm correct -- of Section 7 of the Clayton Act.

But the Justice Department is unwilling to enforce the laws that are already on the books.  What does Congress do to obtain stricter enforcement?  I'm concerned about what you said about the -- very concerned about what you said about the guidelines that the Department of Justice set down.  What do you do if they're not going to enforce the laws?

MR. ALIOTO:  I think that it is extremely important that the private right of action be reinforced by the Congress, that it be made clear that the private parties can bring actions under the antimerger statute.  As I think that you know, Senator, farmers and citizens -- many people are concerned about the farmers -- they have basically no standing.  They're not allowed to come in and file under the antitrust laws, and they're even given problems in the antimerger statutes.

SEN. LEAHY:  And am I correct that you feel that the Justice Department does not enforce Section 7 of the Clayton Act?

EXHIBIT # _____A_____
Page # __25__ of __51__

MR. ALIOTO:  There's no question about it, yes.  And I told both of them that and I just think it's terrible.  I think they've abdicated their responsibility to the people with regard to the antitrust laws.

SEN. LEAHY:  Thank you.

And Dr. Borenstein, I -- can you hear me okay?  Of course, now we've got to turn you back on here.  All right.

Your written testimony states, let me read it, "that oil industry claims that their profits are comparable to other industries are not credible."  You also note that a major cause of high prices is that some producers are able to exercise market power.  Most notably, Saudi Arabia was able to move oil prices significantly with its output decisions.

Senator Specter and Senator DeWine and Senator Kohl and I are going to introduce legislation called NOPEC that would allow, as you know, the Justice Department to take action against foreign entities whose government's manipulate prices. If Saudi Arabia was deterred by (exercising ?) its market (profit ?) by limiting output, what effect would that have on the American consumers at the pump?

MR. BORENSTEIN:  Well, I think right now the effect would actually be fairly small.  Even Saudi Arabia has very little slack capacity.  If they increased output by a couple of million barrels a day, which is about  -- one million is probably about as much as they could do once they get on the market.  Right now that could lower prices at the pump somewhere -- off the top of my head, I would guess about 10 cents a gallon.

SEN. LEAHY:  Well, let me --

MR. Borenstein:  (Off mike) -- be a fairly small piece, because the world's supply and demand situation -- (off mike).

SEN. LEAHY:  And it's growing.

MR. BORENSTEIN:  And it's growing.  This situation is likely to get worse with real scarcity, regardless of any attempts to manipulate prices.

SEN. LEAHY:  Well, let me ask you another thing:  For several years, the largest oil companies have received some

26